**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 69 C 2145 |
| v. | ) | |
| | ) | |
| THE DEMOCRATIC ORGANIZATION | ) | Honorable Judge Wayne R. Andersen |
| of COOK COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNOR PAT QUINN'S RESPONSE TO
PLAINTIFFS' MOTION FOR ENTRY OF SUPPLEMENTAL RELIEF**

NOW COMES Pat Quinn, in his official capacity as Governor of the State of Illinois, by and through his attorney, Lisa Madigan, Attorney General of Illinois, and in Response to Plaintiffs' Motion for Entry of Supplemental Relief states as follows:

**INTRODUCTION**

In 1972, Plaintiffs and former Governor Richard B. Ogilvie entered into a consent decree that barred patronage practices in the conditions of employment for current government workers. For the next 37 years, Plaintiffs pursued no further relief against the State.  Now, based on media reports of patronage hiring practices by former Governor Rod Blagojevich, Plaintiffs seek wide-ranging and extraordinary relief against Governor Quinn, including injunctive relief, damages, and the appointment of a special master to manage core areas of State sovereign responsibility. Plaintiffs, however, never secured a judgment against any Governor of Illinois with respect to hiring practices, and it is clear that they lack standing to seek injunctive relief on this issue now. Further, to the extent Plaintiffs seek enforcement of the 1972 Consent Decree for alleged non-

compliance by former Governor Blagojevich, their Motion is untimely, and they cannot justify the exceptional remedies requested.  For these reasons, Plaintiffs' Motion must be denied.

## PROCEDURAL HISTORY

*The original lawsuit.*  In 1969, Plaintiffs Michael Shakman and Paul Lurie sued various Democratic officeholders in the City of Chicago and Cook County, alleging that these officials maintained a patronage system that violated their rights under the First and Fourteenth Amendments.  The case was dismissed for lack of standing.  *Shakman v. Democratic Org. of Cook County*, 310 F. Supp. 1398 (N.D. Ill. 1969).  A divided court of appeals reversed and reinstated the lawsuit, with one panel member dissenting on the ground that the case presented issues not subject to "judicially discoverable and manageable standards."  *Shakman v. Democratic Org. of Cook County*, 435 F.2d 267, 272 (7th Cir. 1970) (citation omitted).

*The 1972 Consent Decree.*  The parties continued to litigate the case following its remand to the district court, and in October 1971, tendered to the court a proposed consent judgment.  In a cover letter to the agreed order, the parties asked the court not to enter the judgment at that time, but to condition entry of the order upon Plaintiffs "obtain[ing] comparable relief with respect to the Governor's patronage in the Northern District of Illinois."  (Pls.' Mot., Ex. A at 5.)  To that end, Plaintiffs filed a two-count amendment to the original complaint (Counts VII & VIII), naming as defendants a variety of Republican officials, including Illinois Governor Richard B. Ogilvie in his personal and official capacities.[1]  (*See generally* Second Am. Compl., Docket No. 376.)  Governor Ogilvie, among numerous other defendants, agreed to be bound by the terms of the proposed consent judgment, which was entered by the court in May 1972 ("1972 Consent Decree").

---

[1] References to officeholders of the Governor of Illinois are made by name where appropriate, or, when referring generally to the office itself, to the "Governor of Illinois" or the "Office of the Governor."

The 1972 Consent Decree prohibited its signatories from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor."  (*See* Pls.' Ex. A, ¶E(1).)  The decree explicitly reserved jurisdiction to the court for further litigation of three specific questions:

> What governmental positions "by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions be exempt from inquiry under this Judgment";

> Whether "political sponsorship or other political considerations [can] be taken into account in hiring employees" and "[i]f so, to what extent"; and

> "What remedies and implementing procedures ought to be granted and established by the court in connection with the resolution of the questions raised in the foregoing [two issues]?"

(Pls.' Ex. A, ¶H(1)(a),(b) & (c).)  The decree also reserved jurisdiction for the following purpose:

> To enable the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the enforcement of compliance with the provisions contained herein, and for the punishment of the violation of any of such provisions.

(Pls.' Ex. A, ¶H(2).)

*Litigation over hiring practices.*  Following entry of the 1972 Consent Decree, Plaintiffs and several "consenting" defendants attempted "to resolve without trial the factual issues relevant to their remaining dispute over hiring practices."  *See Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315, 1324 (N.D. Ill. 1979).  In 1977, eight of these "consenting" defendants submitted agreed responses to a series of requests to admit,[2] in which they detailed patronage hiring practices used to help elect candidates for office supported by the Democratic

---

[2] These defendants were: The Democratic County Central Committee of Cook County; the City of Chicago; George W. Dunne, individually and as President of the Board of Commissioners of Cook County; the Clerk of the Circuit Court of Cook County; the Assessor of Cook County; the Clerk of Cook County; the Treasurer of Cook County; and the Forest Preserve District of Cook County.

party. *Id.* at 1324-25. In addition, two defendants that had not joined the 1972 Consent Decree, the Cook County Sheriff and the Chicago Park District ("non-consenting defendants"), also entered into factual stipulations on "all issues remaining in the case." *Id.* at 1324. By contrast, then-Governor James R. Thompson neither participated in these negotiations, nor entered into any such stipulations with Plaintiffs.

Plaintiffs then moved for partial summary judgment on their patronage hiring claims against the eight "consenting" and two "non-consenting" defendants. *See id.* at 1325. Plaintiffs sought only a determination of liability against these defendants, suggesting that "the question of appropriate relief . . . be left for 'subsequent resolution.'" *Id.* The court ultimately granted Plaintiffs' motion for partial summary judgment "as to these defendants [against whom judgment was sought]," finding that the hiring practices described in defendants' admissions violated Plaintiffs' constitutional rights. *Id.* at 1355. The court did not enter a final order at that time and instead allowed the parties to design an appropriate remedy. *Id.* Negotiations continued until April 1983, when the court entered a final judgment enjoining the several defendants from "conditioning, basing or knowingly prejudicing or affecting the hiring of any person as a Governmental Employee (other than for Exempt Positions), upon or because of any political reason or factor" ("1983 Consent Decree"). *See Shakman v. Democratic Org. of Cook County*, 569 F. Supp. 177, 179 (N.D. Ill. 1983). Governor Thompson was not a party to the 1983 Consent Decree or otherwise enjoined from any of the conduct covered by that decree.

Five defendants appealed this judgment.[3] The court of appeals reversed, concluding that Plaintiffs lacked standing to pursue a claim for patronage hiring practices. *See Shakman v. Dunne*, 829 F.2 1387, 1399 (7th Cir. 1987) (conventionally, "*Shakman II*"). The court deemed

---

[3] The five appellants were: The Democratic County Central Committee of Cook County; George W. Dunne, individually and as President of the Board of Commissioners of Cook County; the Assessor of Cook County; the Clerk of Cook County; and the Forest Preserve District of Cook County.

the causal connection between defendants' conduct and Plaintiffs' asserted injury to be "particularly attenuated," and held that Plaintiffs did not suffer an injury "'fairly traceable' to the actions of the defendants" as required by Article III. *Id.* at 1397. Therefore, the court dismissed "[t]hose aspects of the complaint which challenge the patronage hiring practice of the defendants." *Id.* at 1399.

> ***Further proceedings against certain defendants.***  Following this decision, additional defendants entered into consent decrees extending the terms of the 1972 Consent Decree (or, in some cases, a similar decree) to cover illegal patronage hiring.  In turn, several of these "extended" consent decrees were later subject to Supplemental Relief Orders, which, in part, reaffirmed those classes of individuals eligible for relief, reappointed special masters to manage implementation of the parties' decrees, ordered the development of hiring plans, set forth standards for enforcement, and created mechanisms for individuals to secure relief.  (*See, e.g.,* Supplemental Relief Order for Cook County, Docket No. 587; Supplemental Relief Order for the Sheriff of Cook County, Docket No. 957; Supplemental Relief Order for the Forest Preserve District of Cook County, Docket No. 1010.)  No other consent decree or other order was ever agreed to by or entered against any Governor of Illinois.

> ***Plaintiffs' Motion for Supplemental Relief.***  Invoking the 1972 Consent Decree, Plaintiffs now move this Court for supplemental relief against the current Governor of Illinois, Pat Quinn, based on media reports of patronage hiring practices by former Governor Rod Blagojevich.  Plaintiffs acknowledge that the 1972 Consent Decree did not adjudicate any rights between themselves and Governor Quinn with respect to political considerations in hiring practices (Pls.' Mot. ¶2), but assert nonetheless that the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), "resolved one of the issues on which the Court

had retained jurisdiction by finding that patronage practices in connection with most hiring decisions are unlawful." (Pls.' Mot. ¶4.) To demonstrate the need for supplemental relief, Plaintiffs submit two Chicago Sun-Times articles reporting the existence of "clout lists" maintained by former Governor Rod Blagojevich. (Pls.' Mot. ¶8 & ¶10, Exs. D & E.) They do not make any direct allegations of patronage against Governor Quinn. (Pls.' Mot. ¶9.)

In their prayer for relief, Plaintiffs ask this Court to grant them "supplemental relief with respect to the 1972 Order similar to the supplemental relief orders entered by this Court in the last several years." (Pls.' Mot. ¶11.) Specifically, Plaintiffs request:

A.      Additional injunctive relief prohibiting the basing or conditioning of hiring for non-exempt employment positions under the jurisdiction of the Governor upon political sponsorship, support or other impermissible political conditions or factors;

B.      The appointment of a special master, monitor or compliance administrator ("Special Master") to investigate and recommend appropriate reforms in the employment practices for non-exempt jobs under the jurisdiction of the Governor within the Northern District of Illinois;

C.      Appropriate remedial measures with respect to prior violations of the Court's 1972 Order, including a damage remedy for persons harmed by prior illegal patronage employment practices;

D.      Development, with input from the Special Master, of a hiring plan for non-exempt positions; and

E.      Development, with input from the Special Master, of a list of employment positions that are properly exempt from the rules against political sponsorship or conditioning employment upon political factors or considerations.

(Pls.' Mot. ¶11A-E.) Plaintiffs' requests for relief may be grouped generally into two categories: those seeking relief for alleged illegal hiring practices by former Governor Blagojevich (Pls.' Mot. ¶11A & D), and those seeing relief for former Governor Blagojevich's alleged non-compliance with the 1972 Consent Decree (Pls.' Mot. ¶11B, C & E).

## **ARGUMENT**

Plaintiffs' Motion for Entry of Supplemental Relief should be denied in its entirety. First, the liability of any Governor to Plaintiffs with respect to patronage hiring was never adjudicated, either by consent or otherwise; thus there is no basis to grant "supplemental" relief. Further, it is clear in light of *Shakman II* and other decisions of the Supreme Court and the court of appeals that Plaintiffs do not have standing to pursue a judgment against Governor Quinn now. Finally, Plaintiffs are not also entitled to relief for former Governor Blagojevich's alleged non-compliance with the 1972 Consent Decree. Plaintiffs' requests for relief are untimely; and even assuming they are timely, Plaintiffs' proposed remedies are either unwarranted or unavailable. Therefore, for all of these reasons, Plaintiffs' Motion for Entry of Supplemental Relief should be denied.

## I.    **Plaintiffs have no right to injunctive relief for alleged patronage hiring practices.**

Plaintiffs seek for the first time in 37 years injunctive relief against the Office of the Governor, including an extraordinary request for the appointment of a special master to oversee all State government hiring under the jurisdiction of Governor Quinn in the Northern District of Illinois. (Pls.' Mot. ¶11.) But before Plaintiffs may seek such remedies, they must first show some entitlement. Two avenues are suggested by Plaintiffs' Motion: (1) enforcement of the existing 1972 Consent Decree; and (2) a traditional prayer for equitable relief. Neither approach is viable.

### A.    **There is no judgment that Plaintiffs may enforce with respect to hiring.**

Plaintiffs have never secured a judgment against any Governor with respect to hiring practices. The 1972 Consent Decree governs only current government employees, as opposed to outside candidates for employment (Pls.' Mot., Ex. A). *See United States v. Armour & Co.*, 402

U.S. 673, 681 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.").  Further, the decree explicitly reserved the question of whether "political sponsorship or other political considerations [can] be taken into account in hiring employees," and, unlike the orders entered into with the City and several County defendants, Plaintiffs never sought—much less secured—a judgment against any Governor of Illinois on this issue.  Without an existing consent decree or judgment, there is simply no term to enforce.  *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 863 (7th Cir. 2005) ("[E]ntry and continued enforcement of a consent decree regulating the operation of a governmental body depend on the existence of a substantial claim under federal law.") (quoting *Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993) (en banc)).  In addition, because no previous Governor was a signatory to any of the other *Shakman* decrees, Governor Quinn is not bound by any of their terms.  *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *see also Taylor v. Sturgell*, 128 S. Ct. 2161, 2166-67 (2008) ("[O]ne is not bound by a judgment . . . in which he is not designated as a party or to which he has not been made a party.").

Plaintiffs essentially concede this point by explicitly basing their claim for relief solely on a decision in a separate case, *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).  As Plaintiffs allege:

> Governor Rod Blagojevich . . . maintained and operated an illegal patronage employment system that violated the 1972 Order with respect to person[s] who were already government employees, *and violated the principles established in the* Rutan *case with respect to hiring persons for positions under the jurisdiction of the Governor*.

(Pls.' Mot. ¶5; emphasis added.)  It is true that *Rutan* answered the question of whether patronage hiring violates the First Amendment, and there is no question that the State is bound

by this decision.  *See Rutan*, 497 U.S. 62.  But *Rutan* did not, as Plaintiffs assert, "resolve[] one

of the issues on which the Court had retained jurisdiction" because it did not adjudicate any

claim between the parties to the *Shakman* litigation.  (Pls.' Mot. ¶4).  *Rutan* clarified the law

upon which Plaintiffs' claims rest; it is not a judgment in their favor on the merits of their suit.

In fact, Plaintiffs attempt to disguise their unsupported request for injunctive relief by

equating it to the "supplemental relief orders entered by this Court in the last several years with

respect to the City of Chicago, Cook County and other governmental offices."  (Pls.' Mot. ¶11.)

Each of these supplemental relief orders, however, was based on a separate consent decree that

previously adjudicated the rights of the parties to the order with respect to patronage hiring.  (*See*

Supplemental Relief Order for Cook County, Docket No. 587; City of Chicago's Agreed

Settlement Order and Accord, Docket No. 601; Supplemental Relief Order for the Sheriff of

Cook County, Docket No. 957; Supplemental Relief Order for the Forest Preserve District of

Cook County, Docket No. 1010.)  Thus, these orders cannot serve as precedent for the

extraordinary relief Plaintiffs now seek.

In sum, Plaintiffs are not seeking to enforce an existing judgment between themselves

and the Governor in their plea for injunctive relief with respect to patronage hiring.  Instead, they

attempt to avoid ever litigating this issue by bootstrapping their claim to the terms of the 1972

Consent Decree via the Court's decision in *Rutan*.  There is no judgment in this case that binds

the parties on the issue of patronage hiring.  Consequently, this Court may not grant Plaintiffs'

request for relief as an action to enforce already-existing rights.

**B.      Plaintiffs cannot establish a right to injunctive relief with respect to hiring.**

Plaintiffs have failed to demonstrate a pre-existing right to relief under the 1972 Consent

Decree.  Plaintiffs also cannot establish a new right to injunctive relief through a more traditional

invocation of this Court's equitable authority.  "According to well-established principles of equity," to obtain injunctive relief, Plaintiffs must first show they have suffered an irreparable injury; that legal remedies are inadequate; that the balance of hardships favors a remedy in equity; and that the public interest would not be disserved by such relief.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  But the fundamental problem with invoking this Court's equity jurisdiction at this point is the same problem that has plagued Plaintiffs since *Shakman II*: a lack of standing to pursue patronage hiring claims.

### 1.  *Shakman II* resolved the issue of standing against Plaintiffs.

Over 20 years ago, the court of appeals unequivocally held that Plaintiffs lacked standing to pursue a claim against the defendants with respect to patronage hiring practices.  *See Shakman v. Dunne*, 829 F.2 1387 (7th Cir. 1987).  The court described the "heart of the plaintiffs' case" as "the[] contention that the hiring practices of the defendants violate the speech and associational rights of candidates and voters."  *Id.* at 1395.  The court found that the injury claimed by Plaintiffs—inequality in the treatment of speech as a result of patronage acts by incumbent officials—was based on "countless individual decisions" that are in turn based on "countless individual political assessments that those who are in power will stay in power."  *Id.* at 1397.  As a result, the court deemed the causal connection between defendants' conduct and Plaintiffs' asserted injury to be "particularly attenuated," and held that Plaintiffs did not suffer an injury "'fairly traceable' to the actions of the defendants" as required by Article III.  *Id.*  The court dismissed for lack of standing "[t]hose aspects of the complaint which challenge the patronage hiring practice of the defendants."  *Id.* at 1399.  After *Shakman II*, Plaintiffs have no standing to seek relief against Governor Quinn.

Even if the dismissal of Plaintiffs' complaint is deemed operative only as to those specific defendants on appeal in *Shakman II*, collateral estoppel would prevent Plaintiffs from litigating this issue now against Governor Quinn.  "The doctrine of issue preclusion [collateral estoppel] applies when: (1) the issue that one party seeks to preclude is identical to an issue involved in the prior action; (2) the issue must have been actually litigated in the prior action; (3) the determination of the issue must have been essential to the final judgment in the prior action; and (4) the party precluded from relitigating the issue must have been represented in the prior action."  *Shakman v. Democratic Org. of Cook County*, No. 03-4819, 2004 WL 407015, *7 (N.D. Ill. Jan. 28, 2004).  This test is easily met with respect to Plaintiffs' hiring claim: there is an identity of issues between Plaintiffs and each of the defendants with respect to patronage hiring; the standing issue with respect to hiring was litigated in *Shakman II* and was subject to a final judgment (both in the district court and in the court of appeals); the court of appeals "ruled directly on the issue, thus making its determination 'essential,'" *see id.* at *8; and Plaintiffs were represented fully in the previous action.  Thus, even if Plaintiffs' hiring claim remains in the case following *Shakman II*, it is clear that collateral estoppel would prevent Plaintiffs from securing a judgment against Governor Quinn—and therefore injunctive relief—with respect to this issue.

> **2.  Even if *Shakman II* is not preclusive, Plaintiffs still do not have standing to seek injunctive relief with respect to hiring practices.**

Regardless of the preclusive effect of *Shakman II*, Plaintiffs do not have standing to pursue relief against Governor Quinn for patronage hiring.  To meet the "irreducible constitutional minimum" requirements of standing, Plaintiffs must show that they personally have suffered an actual (or imminent) injury, that there is a causal connection between the injury and the complained of conduct, and that it is likely that the injury will be redressed by a

favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs cannot meet this test.

First, the significant concerns with causation discussed in *Shakman II* are just as relevant today as they were 20 years ago.  As the court of appeals noted then, Plaintiffs have not shown "with the certainty required by the case-and-controversy requirement[] that the injury they assert is 'fairly traceable' to the actions of the defendants that form the basis of their complaint."  *See Shakman II*, 829 F.2d at 1397.  Plaintiffs have not amended their pleading against the Office of the Governor in the years between that decision and their current request for relief; thus, there is no basis for this Court to conclude that Plaintiffs can now establish this element of standing.[4]

In addition, Plaintiffs cannot establish either of the remaining elements of the standing triumvirate—injury and redressability—with respect to their claim of patronage hiring practices:

*Injury.*  The Complaint against the Office of the Governor is now nearly 40 years old. There is no allegation Plaintiffs have suffered *any* injury between 1969 (the date of the original complaint upon which the 1972 amendments were based) and December 22, 2009 (when the instant motion was filed).   There is no basis to conclude that Plaintiffs are suffering a "continuing, present" harm that is "sufficiently real and immediate" to justify the extraordinary injunctive relief they now seek.  *See O'Shea v. Littleton*, 414 U.S. 488, 494-96 (1974).  As the Supreme Court has made clear, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (quoting *O'Shea*, 414 U.S. at 495-96); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs.,*

---

[4] None of the amendments to the pleadings involved then-Governors.  An amendment in 1991 joined Independent Voters of Illinois as a plaintiff against the Cook County defendants.  (*See* Count IX, Second Amended Complaint, Docket No. 376.)  A second amendment in 2006 added several individual plaintiffs against the City of Chicago.  (*See* Count X, Second Amended Complaint, Docket No. 376.)

*Inc.*, 528 U.S. 167, 187 (2000) ("*Steel Co.* established that citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit.").

Neither does Plaintiffs' Motion contain any basis to conclude that they are suffering any present injury. The sole reference to any "current" conduct is:

> Governor Blagojevich's misdeeds were not limited to his administration, but grew out of a pervasive disregard of applicable court orders and law by personnel administrators and others operating under the jurisdiction of the Governor. Upon information and belief, many of the individual[s] who operated the illegal Blagojevich patronage system continue to hold positions of responsibility for employment decisions in state government today.

(Pls.' Mot. ¶5.) These charges of ongoing patronage practices are purely speculative. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44 (1976) ("[U]nadorned speculation will not suffice to invoke the federal judicial power."). Without more specific allegations demonstrating that Plaintiffs are personally suffering a "continuing, present" injury, there can be no finding that Plaintiffs have standing to seek injunctive relief against Governor Quinn. *See O'Shea*, 414 U.S. at 498 ("[U]ncertainty about whether the alleged injury will be likely to occur" renders allegations "too insubstantial to warrant federal adjudication.").

**Redressability.** Further, Plaintiffs cannot meet the redressability requirement of standing. Plaintiffs seek: an injunction prohibiting patronage hiring; a special master to manage reform; development of a hiring plan; and damages for persons harmed by prior illegal patronage employment practices. (Pls.' Mot. ¶11.) None of this relief, however, addresses Plaintiffs' alleged personal injuries; indeed, the request for damages is particularly illustrative because the money is meant to compensate actual or would-be government employees, not the Illinois voters whom Plaintiffs represent. *See Steel Co.*, 523 U.S. at 106 ("In requesting [damages], therefore, respondent seeks not remediation of its own injury . . . but vindication of the rule of law . . . . This does not suffice.") (citations and internal quotation marks omitted). As the Supreme Court

has admonished, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *See id.* at 107.

In fact, in a directly analogous opinion, the Seventh Circuit rejected allegations similar to those made by Plaintiffs as insufficient to satisfy the redressability requirement.  In *Plotkin v. Ryan*, 239 F.3d 882, 883 (7th Cir. 2001), voters sued then-Secretary of State George Ryan for patronage employment practices in connection with his gubernatorial campaign.  Like these Plaintiffs, the plaintiffs in *Plotkin* made "no allegations that the [patronage practices were] continuing under [the new] administration." *See id.* at 885.  Instead, they alleged only that:

> [T]here exists in the Secretary of State's office a deep-seated culture and policy or custom of intertwining and requiring coerced partisan political work together with the official duties of the office," and as a result, "[t]here is a substantial likelihood that without remedial steps being taken that such or similar unlawful conduct will continue.

*Id.*  The court deemed these allegations "purely speculative" and insufficient to demonstrate an injury the court could redress with a favorable decision.  *Id.* ("[E]ach element [of standing] . . . must be supported by more than unadorned speculation.").  The court found that the plaintiffs' requested remedies—injunctive and declaratory relief, including fines and damages—did nothing to assuage their alleged injuries as voters.  *Id.*  In this case, the allegations and requested relief in Plaintiffs' Motion are nearly indistinguishable from *Plotkin*.  There is simply insufficient support to find a redressable injury that would justify Plaintiffs' request for relief.

Standing clearly has been a critical issue throughout the 40-year history of this litigation.  *See, e.g., Shakman*, 435 F.2d 267; *Shakman II*, 829 F.2d 1387.  Recently, the issue has once again been a subject of dispute.  *See Shakman v. City of Chicago*, 426 F.3d 925 (7th Cir. 2005) (motion to vacate 1983 Consent Decree); *O'Sullivan*, 396 F.3d at 853-59 (discussing motion to dismiss complaints alleging violations of 1983 Consent Decree); Cook County's Mot. to Vacate

1994 Consent Decree, Docket No. 513.  There is a critical difference, however, between the procedural posture of Governor Quinn and that of defendants who have tried unsuccessfully to raise lack of standing as a basis for relief.  Unlike the City of Chicago or Cook County, Plaintiffs have never obtained, through litigation or by consent, a judgment against a Governor of Illinois that can now serve as the basis for subject matter jurisdiction with respect to hiring practices. *See O'Sullivan*, 396 F.3d at 857-59; *Shakman v. Democratic Org. of Cook County*, No. 69-2145, 2004 WL 691782 (N.D. Ill. March 30, 2004).  Thus, the reasons for rejecting standing arguments brought by other parties do not apply here.[5]

There is no basis to grant Plaintiffs' requests for an injunction and the appointment of a special master to oversee the State's employment practices.  Plaintiffs do not have a judgment—by consent or otherwise—to enforce, and they may not now secure injunctive relief against Governor Quinn given their lack of standing to do so.  Therefore, this portion of Plaintiffs' Motion must be denied.

## II.    Plaintiffs are not entitled to relief under the 1972 Consent Decree.

Plaintiffs also request supplemental relief for alleged non-compliance with the parties' existing consent decree.  Specifically, Plaintiffs request: (1) "appointment of a special master to investigate and recommend reforms in the employment practices for non-exempt jobs under the jurisdiction of the Governor within the Northern District of Illinois;" (2) "[a]ppropriate remedial measures with respect to prior violations of the Court's 1972 Order, including a damage remedy for persons harmed by prior illegal patronage employment practices"; and (3) "[d]evelopment, with input from the Special Master, of a list of employment positions that are properly exempt

---

[5] Certainly there are individuals who possess standing to sue the State for allegedly impermissible political considerations in employment.  *See, e.g., Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009); *Allen v. Martin*, 460 F.3d 939 (7th Cir. 2006); *Riley v. Blagojevich*, 425 F.3d 357 (7th Cir. 2005); *Kiddy-Brown v. Blagojevich*, 408 F.3d 346 (7th Cir. 2005).  Plaintiffs are just not among them.

from the rules against political sponsorship." (Pls.' Mot. ¶11A, B & C.) Plaintiffs fail to demonstrate that their requests for relief are timely and that their proposed relief is appropriate.

**A.      Plaintiffs' requests for relief are not timely.**

Twenty-five years ago, the court of appeals set a limitations period for parties seeking relief for alleged violations of the 1972 Consent Decree. In *Smith v. City of Chicago*, 769 F.2d 408, 413 (7th Cir. 1985), the court of appeals analogized the rights conveyed by the decree to Title VII of the Civil Rights Act of 1964, and held that the 180-day period of limitations established by Title VII applies to actions alleging violations of the decree. Although the lack of specific factual details in Plaintiffs' Motion makes it difficult to ascertain a precise time-frame for any alleged wrongdoing, at the very least it is clear Plaintiffs are too late in pressing any claim for non-compliance that might have occurred under former Governor Blagojevich. Governor Blagojevich was removed from office on January 29, 2009, and thus Plaintiffs should have filed a claim, at the very latest, by July 29, 2009, for any violation of the 1972 Consent Decree that might have occurred under his administration.

Although there are equitable exceptions to this limitations period, Plaintiffs certainly knew there might have been non-compliance with the decree before June 2009, six months before bringing their Motion. For a number of years, public reports—including those on which Plaintiffs now rely—have suggested that the Blagojevich administration was involved in conduct that possibly violated the 1972 Consent Decree. Governor Blagojevich's "clout lists" were disclosed as long ago as 2006, *see, e.g.,* Chris Fusco & Dave McKinney, *Governor's office kept clout list*, Chicago Sun-Times, May 17, 2006, *available at* 2006 WLNR 8461023, and it was widely reported at that time that federal authorities were investigating Governor Blagojevich's role in questionable patronage practices, *see, e.g.,* Rick Pearson & John Chase, *Feds hot on state*

*jobs trail*, Chicago Tribune, July 1, 2006, *available at* 2006 WLNR 11395943.  Plaintiffs have

known about Governor Blagojevich's practices for years; in fact, they attach to their recent

discovery requests an August 11, 2006, Associated Press article describing a "special

applications" database of 2,103 names used to make employment decisions by agencies within

the Blagojevich administration.  (*See* Pls.' Req. for Docs. to Def. Patrick Quinn, Ex. E.)  Indeed,

Governor Blagojevich was impeached and removed from office in January 2009.  There is no

doubt Plaintiffs have long been on notice of Governor Blagojevich's possible non-compliance

with the 1972 Consent Decree.  Thus, their request for relief is untimely and is barred.

### B.      Plaintiffs' requested relief is not appropriate.

Further, even if Plaintiffs' request for relief is timely, the remedies they seek are without

basis.  Although the "power of a district court to formulate an equitable remedy for an

adjudicated violation of law is broad," its "equitable discretion is not unlimited."  *People Who*

*Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 533 (7th Cir. 1997).  "[W]hen

the decree is addressed to a branch of government rather than to private persons, it must be

formulated with sensitivity to the separation of powers and the dignity of the states as quasi-

sovereigns."  *Id.*  In "reform[ing] important public institutions . . . the court must be sensitive not

only to the concerns of comity but also to the practical limitations of the federal judiciary as an

administrative body."  *Id.*  In addition, when fashioning equitable relief, remedies that "prohibit

specified conduct are generally preferable to those that impose affirmative duties."  *Id.* at 534.

Moreover, any "equitable remediation must be guided by norms of proportionality.  That is, the

remedy must be tailored to the violation, rather than the violation's being a pretext for the

remedy."  *Id.* (citations omitted).  It is clear that Plaintiffs' requested relief for non-compliance

with the 1972 Consent Decree must be denied.

**1.   Plaintiffs have not shown a need for a special master.**

Plaintiffs ask this Court to appoint a special master to "investigate and recommend reforms in the employment practices for non-exempt jobs under the jurisdiction of the Governor within the Northern District of Illinois." (Pls.' Mot. ¶11.)  "[A]ppointment of a master must be the exception and not the rule."  Advisory Committee's Notes on 2003 Amendments to Fed. R. Civ. P. 53.  As a leading federal treatise cautions: "If there is an overarching principle regarding the utilization of masters in contemporary federal practice it is restraint."  *See* Charles Alan Wright & Arthur R. Miller, *et al.*, 9C Federal Practice & Procedure § 2605 (3d ed. 2009 Supp.). Indeed, there are "limited circumstances" in which a court may appoint a special master, only two of which are even arguably relevant here: (1) by consent of the parties; and (2) to address "posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  *See* Fed. R. Civ. P. 53(a)(1)(A) & (C).

Neither circumstance is present here.  The parties have not consented to the appointment of a special master, nor have Plaintiffs argued, much less demonstrated, that any remaining issues between the parties with respect to the 1972 Consent Decree cannot be effectively addressed by a judge of this court.  *See id.*  More importantly, Plaintiffs have not demonstrated such extensive and on-going non-compliance with the 1972 Consent Decree that would compel such intrusive oversight of state government.  *See People Who Care*, 111 F.3d at 534 ("Violations of law must be dealt with firmly, but not used to launch the federal courts on ambitious schemes of social engineering.").

The Supreme Court has repeatedly urged caution in crafting remedies in the area of government reform:

> [T]he public interest and considerations based on the allocation of powers within our
> federal system require that the district court defer to local government administrators,

> who have the primary responsibility for elucidating, assessing, and solving the
> problems of institutional reform.

*Rufo*, 502 U.S. at 392 (citations and internal quotation marks omitted); *see also Frew v. Hawkins*,

540 U.S. 431, 442 (2004) (state officials should be given "latitude and substantial discretion" in

modification of consent decree).  This concern is particularly relevant in this case, as Plaintiffs

seek to bind future Governors based on the alleged misconduct of one former Governor.

Indeed, appointing a special master to manage Governor Quinn's employment practices

would deprive State officials of their responsibility.  *See Horne v. Flores*, 129 S. Ct. 2579, 2594

(2009) ("States and localities depend upon successor officials, both appointed and elected, to

bring new insights and solutions to problems.").  Governor Quinn has already taken concrete and

meaningful steps to abolish any prohibited use of patronage considerations in State

employment—and he did so *before* Plaintiffs filed their Motion.  For example, in August 2009

Governor Quinn signed legislation directing the Office of the Inspector General to investigate

allegations of prohibited employment practices.  *See* 5 ILCS 430/20-20(9) (adding power to

"review hiring and employment files of each State agency within the Executive Inspector

General's jurisdiction to ensure compliance with *Rutan v. Republican Party of Illinois*, 497 U.S.

62 (1990), and with all applicable employment laws.").  Further, in early December 2009,

Governor Quinn issued an administrative order to all State agencies to clarify and improve

guidelines for compliance with *Rutan*.  *See* Admin. Order No. 2, "Directive to State Agencies,

Updating Guidelines for Compliance with the *Rutan* Decision" (Dec. 10, 2009), *available at*

http://www.illinois.gov/publicincludes/statehome/gov/documents/AO-2009-2.pdf.       Wresting

responsibility from an elected official—before he has had a chance to remedy his predecessor's

past alleged abuses—by appointing a costly special master would be an unwarranted intrusion

into a State executive's core authority.  *See Horne*, 129 S. Ct. at 2594 (cautioning courts not to

"improperly deprive officials of their designated legislative and executive powers"); *People Who Care*, 111 F.3d at 540 ("[W]e are mindful of the criticisms that have been made of the use of special masters in institutional reform litigation—a use that involves endowing a private individual with powers over state government.").

### 2.   Plaintiffs' request for damages is barred by the Eleventh Amendment.

Plaintiffs also request "[a]ppropriate remedial measures with respect to prior violations of the Court's 1972 Order, including a damage remedy for persons harmed by prior illegal patronage employment practices."  (Pls.' Mot. ¶11D.)  Such retrospective relief, however, is not available in suits, such as this one, seeking injunctive relief against state officials under *Ex parte Young*, 209 U.S. 123 (1908).[6]

In *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court rejected a federal injunction directing Illinois officials to reimburse public aid recipients for wrongfully withheld benefits.  The court of appeals had upheld the injunction, reasoning that "the [Eleventh] Amendment did not bar the award of retroactive payments of [benefits] found to have been wrongfully withheld" because "the grant of such a monetary award [is] in the nature of equitable restitution."  *Id.* at 663-64.  On review, the Supreme Court reaffirmed the well-established rule that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."  *Id.* at 663.  The Court distinguished the kind of prospective relief authorized by *Ex parte Young* and the retroactive relief granted by the district court, and concluded it was the retroactive nature of the remedy, and not necessarily its ancillary fiscal impact, that rendered the relief constitutionally impermissible.  *Id.* at 667-68.

---

[6] The signatories to the 1972 Consent Decree bound their successors in office only in their "official" capacities.  *See Hernandez v. O'Malley*, 98 F.3d 293, 294-95 (7th Cir. 1996); *Plotkin v. Ryan*, No. 99-53, 1999 WL 965718, *7 (N.D. Ill. Sept. 29, 1999).  As a result, Plaintiffs' suit necessarily falls within the *Ex parte Young* exception to Eleventh Amendment immunity.

The Court also observed that a retroactive award of monetary benefits could not be properly characterized as "equitable restitution," reasoning that "it is in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.* at 668.  Therefore, the Court held "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, and may not include a retroactive award which requires the payment of funds from the state treasury." *Id.* at 677 (citations omitted).

The distinction between permissible prospective and impermissible retrospective relief still stands.  *See Frew*, 540 U.S. at 437 ("Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity."); *Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005) ("*Ex Parte Young* does not reach, however, claims for retroactive damages to be paid from a state treasury, which the Eleventh Amendment generally continues to preclude."); Charles Alan Wright & Arthur R. Miller, *et al.*, 13 Federal Practice & Procedure § 3524.3 (3d ed. 2009 Supp.) ("Under *Edelman*, which remains regnant, then, the focus is on prospective relief (which is allowed) and retrospective relief (which is not).").

Further, the 1972 Consent Decree did not abrogate Governor Quinn's Eleventh Amendment immunity barring retrospective relief.  "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [the court] will find waiver only where stated by the most express language." *Edelman*, 415 U.S. at 673 (quotation marks omitted); *see also Frew*, 540 U.S. at 438-39 ("In light of the State's assertion of its Eleventh Amendment immunity, the state officials lacked the authority to agree to remedies [in the consent decree] beyond the scope of *Ex parte Young* absent a waiver."); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-76 (1999).  Nothing in the 1972 Consent Decree addressed then-Governor Ogilvie's immunity, much less waived it in "the most express"

terms as to any subsequent Governor.  (*See* Pls.' Ex. A.)  If anything, the 1972 Consent Decree waived Plaintiffs' right to seek such relief: "Plaintiffs' claims for money damages, compensatory and exemplary, against the defendants named in paragraph C above are hereby dismissed." (Pls.' Ex. A, ¶G.)  Governor Quinn's assertion of constitutional immunity to bar the award of retrospective relief is valid, and Plaintiffs' request must be denied.

### 3.   Plaintiffs' request for a list of exempt positions is unnecessary.

Finally, this Court should deny Plaintiffs' request to appoint a special master to develop a list of employment positions that are properly exempt from the rules against political sponsorship or conditioning employment upon political factors or considerations.   (Pls.' Mot. ¶11.) Presumably, Plaintiffs request this relief in order to identify those positions not subject to the strictures of *Rutan*—which, in addition to hiring, encompasses transfer, promotion, and other employment actions—so as to more easily identify incidents of allegedly impermissible political sponsorship.  *See Rutan*, 497 U.S. at 79 ("We hold that the rule of *Elrod* and *Branti* extends to promotion, transfer, recall, and hiring decision based on party affiliation and support.").  But the agencies under the jurisdiction of Governor Quinn already explicitly designate all of their positions as either "*Rutan* exempt" or "non-exempt" in each job description generated and maintained by the agencies' personnel division, the Department of Central Management Services.  Such designations were mandated by administrative orders issued by Governors Thompson and Edgar in 1990 and 1991.  *See* Admin. Order No. 1, "Directive to State Agencies Regarding Personnel Practices" (July 17, 1990); Admin. Order No. 2, "Directive to State Agencies, Guidelines for Interviewing Job Candidates" (Oct. 1, 1990); Admin. Order No. 1, "Personnel Policies Directives" (Jan. 31, 1991) (all attached hereto as Group Exhibit 1).  And these position descriptions have been relied on as authoritative with respect to political exemptions by courts in this circuit.  *See Riley v. Blagojevich*, 425 F.3d 357, 365 (7th Cir. 2005).

22

Plaintiffs' request for the development of an "exempt employment list" is therefore unnecessary and should be rejected. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he moving party must satisfy the court that [injunctive] relief is needed."); *Wernsing v. Thompson*, 423 F.3d 732, 744-45 (7th Cir. 2005) (same).

## CONCLUSION

Plaintiffs have not carried their burden of showing either a right to or need for the extraordinary relief they seek against Governor Quinn.  Plaintiffs never secured a judgment against any Governor of Illinois with respect to hiring practices, and they lack standing to seek injunctive relief on this issue now.  Further, Plaintiffs have not made a timely request for relief for Governor Blagojevich's alleged non-compliance with the 1972 Consent Decree.  Nor have they justified the exceptional and highly intrusive remedies they now seek against Governor Quinn, against whom there are no allegations of wrongdoing and who has made and continues to make significant efforts to correct any misdeeds of his predecessor.  Plaintiffs' Motion for Entry of Supplemental Relief should be denied.

WHEREFORE, for the foregoing reasons, Defendant Pat Quinn respectfully requests that this Court deny Plaintiffs' Motion for Entry of Supplemental Relief in its entirety.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

PAT QUINN, in his official capacity
as the Governor of the State of Illinois

By:      /s/ Brent D. Stratton
BRENT D. STRATTON
DEBORAH J. ALLEN
DAVID M. FRIEBUS
Office of the Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-2560