UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL L. SHAKMAN, *et al.*,      )
                                   )
            Plaintiff,             )      Case No. 69 C 2145
                                   )
v.                                 )      Magistrate Judge Sidney I. Schenkier
                                   )
DEMOCRATIC ORGANIZATION OF         )
COOK COUNTY, *et al.*,             )
                                   )
            Defendants.            )

## MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court upon the motion of the post-Supplemental Relief Order Complaint Administrator, Mark Vogel, to compel the testimony of Doris Gershon ("Motion to Compel") (doc. # 3036). For the reasons set forth below, the Court grants the Motion to Compel.

I.

In 1972, Defendant Cook County (the "County") entered into a consent decree, which prohibited the County from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *Shakman v. Democratic Org. of Cook County,* 481 F. Supp. 1315, 1358 (N.D. Ill. 1979), *vacated sub nom., Shakman v. Dunne,* 829 F.2d 1387 (7th Cir. 1987). In 1994, the County entered into a subsequent consent decree that incorporated the 1972 consent decree's prohibitions and extended those prohibitions to include the County's hiring practices (*see* doc. # 587 at 5). On February 2, 2007, the Honorable Wayne R. Andersen entered a Supplemental Relief Order ("SRO"), which included a procedure for administering

---

[1] On July 28, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 1752, 1753, 1754, 1756).

complaints of unlawful political discrimination in Cook County employment in violation of the

consent decrees or the SRO (*Id.*). Similar consent decrees and a supplemental relief order were

entered regarding the Cook County Forest Preserve District (the "Forest Preserve") (*see* doc. # 1010:

January 14, 2009, Supplemental Relief Order ("FPD-SRO")), as well as to various other

governmental entities which are defendants in the *Shakman* litigation. We focus here on the orders

pertaining to the County and the Forest Preserve.

The consent decrees and the supplemental relief orders created a network of individuals and

entities assigned various responsibilities for ensuring that the County and the Forest Preserve meet

their obligations to eschew unlawful political discrimination in employment practices. We do not

attempt a comprehensive catalog of this network; we highlight only those individuals and entities

relevant to the present dispute.

The SRO governing the County established a "Shakman Compliance Administrator," now

known as the Cook County Compliance Administrator ("CCA"), charged with ensuring future

compliance with the County's consent decrees (doc. # 531). Among other things, the CCA was

empowered to review the County's hiring practices, assist in establishing training programs on non-

political hiring, adjudicate claims based on *pre*-SRO violations, and assist in proposing a new hiring

plan (*Id.*). The FPD-SRO created a similar position – the District Compliance Administrator for the

Forest Preserve District ("DCA") with similar authority (doc. # 1010).

The SROs governing the County and the Forest Preserve also created a procedure whereby

individuals could lodge complaints alleging political discrimination that they claim occurred after

entry of the SROs. The SROs specified that the County Inspector General's Office ("IGO"), or

another individual selected by the Court, would administer the complaint procedure (doc. # 587 at

2

22-31).[2] If the plaintiffs objected to the individual serving as the Inspector General discharging that function under the SRO, they could suggest that another individual or entity be appointed to administer the complaint procedures (doc. # 587 at 22 n.1). The plaintiffs did object, and in 2009, Judge Andersen appointed Mark Vogel as post-SRO Complaint Administrator ("CA") for the County and the Forest Preserve (docs. ## 1024, 1025).[3] The Court charged the CA with investigating and reporting complaints of unlawful political discrimination in County employment (doc. # 587 at 11-16; doc. # 1025). To accomplish this task, the Court empowered the CA to issue subpoenas and "to take testimony to the same extent as a lawyer for a party in discovery proceedings in civil litigation" (doc. # 1025 at 3).

## II.

We now turn to the dispute that is the subject of the present motion. Doris Gershon worked for more than 25 years in the Human Resources Department for Cook County ("HR") (doc. # 3116: Response To Post-SRO Complaint Administrator's Motion to Compel Testimony of Doris Gershon ("Resp. Br.") at 8). Most recently, she served as Deputy Chief of HR. In carrying out their *Shakman* decree and SRO duties, in 2009 and 2010, various officials interviewed Ms. Gershon about areas within her knowledge and expertise: hiring practices and procedures of Cook County. On March 5, July 15, August 19, and August 24 of 2009, the CCA and her staff interviewed Ms. Gershon, and

---

[2] The SRO identifies the Inspector General's Office as one of the entities that can be responsible for administering the complaint procedure (doc. # 587 at 22). After the entry of the SRO, a subsequent Cook County ordinance established the Office of the Independent Inspector General ("OIIG"). For purposes of this order, the IGO and the OIIG will be considered the same (*see* doc. # 1025 at 2 n.1).

[3] On February 22, 2012, this Court entered an order transitioning the functions to the OIIG (doc. # 2663). The order provided that Mr. Vogel, as CA, would continue to handle post-SRO complaints filed prior to February 22, 2012, and that the OIIG would handle complaints filed after that date. The February 22, 2012, order also set a termination date of November 30, 2012, for Mr. Vogel's investigations of post-SRO complaints against the County, but provided for the extension of that deadline as needed to allow Mr. Vogel to complete his investigations. That date has been extended to February 28, 2013 (doc. # 3140).

she answered questions regarding her HR duties, including "hiring and the hiring process (including screening, eligibility lists, job descriptions, requests to hire, and testing); onboarding; reclassifications; layoffs; recalls; desk audits; salary increases; and evaluation of a hiring process" (doc. # 3036: Post-SRO Complaint Administrator's Motion to Compel Testimony of Doris Gershon ("CA's Br.") at 14).

On May 18, 2010, the CA's Office interviewed Ms. Gershon, and she answered questions regarding "the job application system, Taleo, and department interaction with HR regarding hiring, union positions, requests to hire and promotions" (*Id.* at 14-15). On September 14, 2010, the OIIG interviewed Ms. Gershon. At that meeting, she was represented by the State's Attorney's Office, and she answered questions regarding "improper manipulation of the *Shakman* Exempt List" and "other employment matters such as her duties, maintenance of personnel files, and the creation of job positions" (*Id.* at 14). On October 20, 2010, the DCA interviewed Ms. Gershon regarding "the hiring processes of the FPD" (*Id.*). She was again represented by the State's Attorney's Office and answered questions regarding "hiring, posting of job positions, accepting applications, screening, eligibility lists, interviews, hiring decisions, documentation, policies and procedures, recalls, staff and specific position postings" (*Id.*).

In addition, Ms. Gershon, in her capacity as Deputy Director of HR, was called to testify at two Cook County Employee Appeals Board hearings during 2010. At those hearings, Ms. Gershon answered questions under oath regarding "the *Shakman* Exempt List and the employment and termination of two allegedly *Shakman* exempt employees" (CA's Br. at 15).

Mr. Vogel, in his role as CA, subpoenaed Ms. Gershon, who is no longer employed by Cook County, for a deposition on March 6, 2012 (CA's Br. at 2).[4] The CA sought to gather information about County employment practices, policies, and facts relevant to complaint investigations he was conducting (*Id.*). At the March 6, 2012 deposition, Ms. Gershon's attorney, Raymond Pijon, advised attorneys from the CA's office that Ms. Gershon had received a grant of immunity on February 5, 2007, for her grand jury testimony regarding hiring practices in Cook County, and that she intended to exercise her Fifth Amendment privilege against self-incrimination and refuse to answer any related questions (*Id.*, Ex. 1 at 8). The deposition proceeded, and Ms. Gershon declined to answer nearly every question, asserting the Fifth Amendment (*Id.*) Consequently, the CA elected to continue the deposition on a later date.

In April, May, and June 2012, the CA and an attorney from the CA's office communicated with Mr. Pijon and informed him that Ms. Gershon had already voluntarily disclosed information that related to "most, if not all, of the same lines of questioning" that the CA wished to pursue at her deposition (CA's Br. at 3 & Ex. 2). Ms. Gershon's deposition was then resumed on June 13, 2012 (*Id.*, Ex. 3). Again, Ms. Gershon asserted her Fifth Amendment privilege to nearly all questions, and when asked to identify what fear she had of prosecution, her attorney refused to allow her to answer (*Id.*, Ex. 3 at 4).

Consequently, on October 9, 2012, the CA filed the present Motion to Compel, arguing that Ms. Gershon's invocation of her Fifth Amendment privilege lacks merit because: 1) she did not establish that answering any of the CA's questions would tend to incriminate her or forge a link in

---

[4] The parties do not specify when Ms. Gershon left her position with Cook County, but the CA's brief refers to her as the "County's former Deputy Chief of Human Resources" (CA's Br. at 2). And in the June 13, 2012, deposition, Ms. Gershon stated that she had been "out of the County for a year and a half" (CA's Br., Ex. 3 at 8).

the chain of evidence under any theory of criminal liability; 2) her blanket assertion of privilege is frivolous and in some cases, in bad faith; and 3) even if she had a valid Fifth Amendment claim, she waived her privilege as to areas of questioning that she had already answered during previous interviews. The CA's motion included transcripts from both depositions (CA's Br. at Ex's. 1, 3). In addition, the CA included a summary showing how previous interview statements that Ms. Gershon had given were responsive to the same or similar questions as those posed in the depositions (*Id.*, Ex. 4).

## III.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege may be "asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal proceeding or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972). The privilege extends to answers that would themselves implicate the witness in a crime as well as those that would furnish a link in the chain of evidence needed to prosecute the witness for a crime. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Courts must liberally construe the privilege against compulsory self-incrimination in favor of the right it was intended to secure. *Id.*

That said, the protection afforded by the Fifth Amendment is limited to instances in which the witness has reasonable cause to apprehend danger from a direct answer. *Hoffman*, 341 U.S. at 486. The Fifth Amendment does not provide *carte blanche* to refuse to answer all questions. *Id.*; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002). The witness is not excused from answering a question "merely because he declares that in so doing he would

incriminate himself—his say-so does not of itself establish the hazard of incrimination." *Hoffman*, 341 U.S. at 486.

Rather, "[t]o be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d at 663–64 (emphasis in original). The witness must have some objectively reasonable basis to perceive some real danger of prosecution. This perception must not be imaginary or fanciful. *United States v. Apfelbaum*, 445 U.S. 115, 128 (1980).

Once the witness asserts the privilege, "it is for the court to say whether [his] silence is justified, . . . and to require [him] to answer if it clearly appears to the court that he is mistaken." *Hoffman*, 341 U.S. at 486. The trial judge is in the best position to consider whether a responsive answer to the question could be harmful to the witness under the particular factual circumstances. *Ryan v. Comm'r of Internal Revenue,* 568 F.2d 531, 539 (7th Cir. 1977). In assessing the claim, the Court must be guided "as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *Hoffman*, 341 U.S. at 487. "If the court concludes, based on the circumstances of the case, that disclosure of the testimony would not lead to a conviction that violates the Self-Incrimination Clause, then the court may force the witness to speak." *United States v. Gecas,* 120 F.3d 1419, 1429 (11th Cir. 1997); *In re High Fructose Litig.*, 293 F. Supp. 2d 854, 859 (C.D. Ill. 2003) (quoting *Gecas*, 120 F.3d 1429), *certification granted*, 303 F. Supp. 2d 971 (C.D. Ill. 2004), *certified question answered*, 361 F.3d 439 (7th Cir. 2004).

The party attempting to invoke the privilege bears the burden of establishing its foundation. *See, e.g., United States v. Melchor Moreno,* 536 F.2d 1042, 1049 (5th Cir. 1976); *F.T.C. v. First*

*Universal Lending, LLC*, No. 09-82322-CIV, 2011 WL 666149, at *3 (S.D. Fla. Feb. 12, 2011); *G.D. Searle & Co. v. Interstate Drug Exchange, Inc.*, 117 F.R.D. 495, 500 (E.D.N.Y. 1987). Furthermore, the party must assert the privilege in response to specific questions, and may not simply refuse to answer any and all questions. Courts have consistently rejected blanket claims of privilege. *See, e.g., In re Grand Jury Subpoena*, 739 F.2d 1354, 1359 (8th Cir. 1984) (witness may not claim privilege as blanket defense);*United States v. Malnik*, 489 F.2d 682, 685-86 (5th Cir. 1974) (collecting cases); *Medical Assurance Co. v. Weinberger*, No. 4:06–CV–117 JD, 2012 WL 4050305, at *6 (N.D. Ind. Sept. 12, 2012); *First Universal Lending*, 2011 WL 666149, at *5 (blanket refusal to answer all questions, even benign ones, militates against finding that witness believed she would be subject to criminal prosecution); *Core-Mark Int'l, Inc. v. Sparacio,* No. 91-C-7232, 1994 WL 53763, at *5 (N.D. Ill. Feb. 18, 1994).

Even where a witness is actively under criminal indictment or investigation, a judge cannot presume that any response to all possible questions would tend to be incriminating. *Core-Mark*, 1994 WL 53763, at * 5. "The person claiming the privilege must establish the possibility of self-incrimination with respect to *each question* and assist the court in its job of weighing the validity of the privilege claim by explaining, to the extent possible, why an answer might tend to be incriminating." *Id.* (emphasis in original); *see also Davis v. Fendler*, 650 F.2d 1154, 1160 (9th Cir. 1981) ("[a] proper assertion of a Fifth Amendment privilege requires, at a minimum, a good faith effort to provide the trial judge with sufficient information from which he can make an intelligent evaluation of the claim").

With these principles in mind, we consider Ms. Gershon's assertion of a Fifth Amendment privilege.

8

### A.

Despite the general disapproval of blanket Fifth Amendment assertions, Ms. Gershon invoked the privilege in response to nearly all of the deposition questions, except her name and questions about her husband's business. Though the CA proceeded to ask specific questions, Ms. Gershon refused to answer, asserting the privilege over 750 times (CA's Br. at Exs. 1, 3). The subject matter of the questions covered the details of certain employment policies and procedures, whether she knew certain individuals, what occurred during particular employment decisions, and whether she recognized specific documents, among other things. Ms. Gershon steadfastly refused to answer, asserting the Fifth Amendment. Ms. Gershon's responses amounted to a blanket assertion of her Fifth Amendment privilege. Ms. Gershon's blunderbuss approach has left the Court guessing at which questions might elicit answers that could be incriminating. This is not a proper assertion of the privilege.

In addition, when we consider some of the questions Ms. Gershon declined to answer, we are hard-pressed to discern how answers would subject Ms. Gershon to criminal liability. Ms. Gershon has not helped the Court understand how an answer to any particular question could incriminate her. For example, Ms. Gershon was questioned about the hiring policies and procedures of the County:

> Q.    Could you briefly describe the screening process in Cook County? (CA's Br., Ex. 1 at 13).

> Q.    Can you please tell me a little about the posting process and how postings are created? (*Id.*, Ex. 3 at 3, p. 46).

> Q.    Can you please explain the process of a salary change? (*Id.*, Ex. 3 at 7, p. 61).

Q.   What procedure did the HR department utilize from 2008 through 2010 when hiring an exempt employee?  (*Id.*, Ex. 3 at 13, p. 87).

Q.   What is the hiring procedure for motor vehicle drivers in the Highway Department?  (*Id.*, Ex. 3 at 17, p. 101).

Q.   What would be the process to change or alter the minimum qualifications on a job posting?  (*Id.*, Ex. 3 at 23, p. 127).

We fail to see how answers to these questions could subject Ms. Gershon to prosecution.[5]  These types of questions elicit responses regarding the policies and procedures of Cook County and do not appear on their face to delve into activity by Ms. Gershon that could expose her to criminal liability. *See, e.g., Carter–Wallace, Inc. v. Hartz Mountain Indus., Inc.*, 553 F. Supp. 45, 50 (S.D.N.Y. 1982) ("many of the questions that the executives refused to answer were wholly innocuous inquiries into such subjects as the basic duties and responsibilities of the two executives and whether certain individuals were employed by [the corporation].  Because the answers to such questions 'could not possibly' provide an incriminating link in the chain of evidence, [the individuals claiming the privilege] are ordered to respond to the questions...."); *see also, e.g., Donovan v. Spadea*, 757 F.2d 74, 78 (3d Cir. 1985) ("Spadea asserts that the *Hoffman* standard is met here because the Secretary's investigation might uncover evidence of criminal violations of LMRDA.  However, the contempt judgment here was based on his refusal to answer six particular questions concerning the length of

_____

[5] The CA further contends that by virtue of Ms. Gershon's former position within the County's Human Resources Department, she is a member of a "control group" and consequently does not possess a Fifth Amendment privilege with respect to the policies and procedures of the County, relying on *United States v. White*, 322 U.S. 694, 699-701 (1944), and *Bellis v. United States*, 417 U.S. 85, 87, 89-90 (1974).  Those cases hold that current officers or employees may not rely on the Fifth Amendment to decline to produce documents of a collective entity. *See White*, 322 U.S. at 699-704 ("assistant supervisor" of a union may not assert Fifth Amendment privilege to refuse to produce union documents); *Bellis*, 417 U.S. at 89-90, 100-101 (former partner in small firm may not decline on Fifth Amendment grounds to produce partnership documents).  Neither case analyzes the Fifth Amendment privilege with regard to the testimony of a former employee or supervisor.  Given our ruling, we need not analyze whether they offer some analogous authority for the scope (if any) of the Fifth Amendment protections for former employees when testifying about the policies and procedures of their former employers.

his tenure as a union officer, the territorial jurisdiction of the District Council, and the like. We agree with the district court that these questions are facially innocuous and do not appear likely to elicit incriminatory responses.").

In addition, we find that answers to the CA's questions about Ms. Gershon's former title, and whether she knew certain people, could not possibly incriminate her. Examples of these types of questions include:

Q.   Is it correct that you were the Deputy Chief of the Bureau of Human Resources? (CA's Br., Ex. 1 at 13).

Q.   Do you know Betty Torres? (*Id.*, Ex. 3 at 8, p. 66).

Q.   How long have you known Joanne Tripani? (*Id.*, Ex. 3 at 15, p. 96).

Q.   How long did you work with Annette McCauley? (*Id.*, Ex. 3 at 27, p. 141).

An answer to any of these questions could not form the basis for a criminal prosecution. *See Harris v. City of Chicago*, 266 F.3d 750, 754 & n.4 (7th Cir. 2001) (noting general questions that could not incriminate the witness: "'What did your duties entail as a patrolman?' and 'Who was your partner?'"); *In re Grand Jury Subpoena*, 739 F.2d at 1359 (no Fifth Amendment privilege for answers to questions whether witness knew certain individuals).

Ms. Gershon also asserted her Fifth Amendment privilege in response to questions asking her if she recognized various County documents, including a job posting, a requisition form, a response to a union grievance, and memoranda (Motion to Compel at 11, citing various exhibit pages). "There can be nothing incriminating about authenticating an innocuous document." *Butcher v. Bailey*, 753 F.2d 465, 470 (6th Cir. 1985).

Ms. Gershon's blanket assertion of the privilege undermines her claim that she has an objectively reasonable fear of prosecution. Indeed, her broad-based refusal to answer even the most

11

anodyne questions and her argumentative comments suggest simply that she no longer felt like answering questions, and militates against a finding that Ms. Gershon truly believed answering questions would expose her to criminal liability. *First Universal Lending*, 2011 WL 666149, at *5. What's more, in several responses, Ms. Gershon displayed her contempt for the deposition process:

A.   I take the Fifth. I'm going to take all Fifths. I mean, I don't want to go through this (CA's Br., Ex. 3 at 6, p. 59).

A.   I take the Fifth. I'm going to do this all the time. I mean, I'm not going to go through this again (*Id.*, Ex. 3 at 7, pp. 62-63).

A.   I take the Fifth. This is so stupid (*Id.*, Ex. 3 at 12, p. 81).

A.   I take the Fifth. This is crazy (*Id.*, Ex. 3 at 22, p. 123).

A.   I take the Fifth. This is stupid (*Id.*, Ex. 3 at 23, p.126).

A.   I take the Fifth. This is making me crazy (*Id.*, Ex. 3 at 27, p. 141).

These responses demonstrate more of an overriding disdain for the deposition, rather than a well-founded fear of self-incrimination.

**B.**

Ms. Gershon offers several reasons to support the proposition that she has an objectively reasonable fear that answering questions in the deposition may subject her to criminal prosecution (doc. # 3116: Resp. Br. at 7-11). *First*, she contends that because the CA is working closely with the OIIG and the Cook County State's Attorney's Office, she can reasonably assume that "both civil and criminal investigations are in play" (*Id.* at 7). *Second*, Ms. Gershon argues that investigation of Cook County hiring practices has "long been associated with the possibility of criminal prosecutions," citing a September 2006 newspaper report of the FBI seizing documents from the Cook County Human Resources Department (*Id.* 7-8 & Ex. B). *Third*, Ms. Gershon contends that

on January 24, 2007, she received a subpoena for grand jury testimony regarding hiring practices, and on February 5, 2007, Chief Judge James F. Holderman issued an order granting Ms. Gershon immunity for her testimony in response to the subpoena (*Id.* at 8). She claims that this grant of immunity, under 18 U.S.C. § 6002, also reasonably causes her to believe that answering deposition questions may subject her to some potential criminal liability (*Id.* at 10). *Fourth*, Ms. Gershon asserts that the CA has specifically targeted her in an investigation of "improper manipulation of the Shakman Exempt list," and she has reasonably concluded that her conduct in keeping the list is being investigated for potential criminal liability (*Id.* at 9). We find each of these arguments unconvincing.

## 1.

Ms. Gershon first contends that because the CA works closely with the OIIG and the State's Attorney's Office, she could conclude that both civil and criminal investigations are in play (Resp. Br. at 7-8). Ms. Gershon's argument begs the question of whether an answer to any specific question could incriminate her. If so, she would be entitled to assert her Fifth Amendment privilege even if the CA did not work closely with the OIIG and the State's Attorney; on the other hand, an answer to a CA's question that would not be incriminating is entitled to no Fifth Amendment protection even if the CA shared that answer with prosecutorial authorities. A witness must offer some credible reason why a response would pose a real danger of incrimination and not just a "'remote and speculative possibility.'" *Wachovia Securities, LLC v. Neuhauser*, No. 04 C 3082, 2011 WL 1465653, at * 2 (N.D. Ill. April 18, 2011) (quoting *Martin-Trigona v. Gouletas*, 634 F.2d 354, 360 (7th Cir. 1980)). We are not persuaded that the general interaction between the CA, OIIG, and the State's Attorney's Office suggests any real danger of prosecution for Ms. Gershon in answering any particular question.

13

Moreover, as the CA correctly responds, in its appearances in *Shakman* proceedings, the State's Attorney's Office is often adversarial to the CA, representing the employees the CA interviews. *See* 55 Ill. Comp. Stat. 5/3-9005(a)(4) (2011) ("(a) The duty of each State's attorney shall be: . . . (4) To defend all actions and proceedings brought against his county, or against any county or state officer, in his official capacity with his county."). Indeed, the State's Attorney's Office represented Ms. Gershon in her September 14, 2010, interview with the OIIG. Moreover, the fact that the OIIG and the CA work together on occasion is merely a function of the overlapping and similar duties assigned to the offices. That the OIIG ordinance requires the OIIG to notify law enforcement authorities when it determines or suspects criminal conduct has occurred does nothing to justify Ms. Gershon's assertion of the privilege. Nor did it deter her from answering questions freely when she was questioned by the OIIG, represented by her counsel – from the State's Attorney's Office.

### 2.

We also do not find persuasive Ms. Gershon's highly general assertion that "it was common knowledge that the FBI was engaged in an ongoing investigation into Cook County hiring practices" to bolster her claim that her fear of prosecution is reasonable (Resp. Br. at 8). The newspaper article reporting the FBI raid and the grand jury investigation both focused on activities that occurred in 2006 and early 2007, so the statutes of limitations for activities from those investigations have likely run.[6] Ms. Gershon does not identify any current or pending criminal investigation to justify her invocation of the privilege. And, despite years of investigations by the CA, Ms. Gershon does not

---

[6] See generally the general limitations statute for Illinois, 720 Ill. Comp. Stat. 5/3-5(b), and the federal general limitations statute, 18 U.S.C. § 3282.

14

cite a single criminal prosecution, state or federal, that has arisen from information gathered by the CA in *Shakman* proceedings.

### 3.

Ms. Gershon does not suggest that she is currently (or indeed has ever been) the subject of a criminal investigation. But, even if a witness is under criminal investigation, that fact alone does not establish that her response to any particular question would be incriminating. *Core-Mark*, 1994 WL 53763, at * 5. While Ms. Gershon emphasizes that she received a grant of use immunity and testified before a grand jury in 2007, she only asks the Court to infer that she could have had some potential criminal liability, otherwise Judge Holderman would not have granted her immunity. Ms. Gershon cannot establish a reasonable fear of incrimination in 2013 based on a grant of immunity in 2007 – and certainly not when we have no idea of the basis for a grant of immunity six years ago, or what connection (if any) it has to particular questions that Ms. Gershon now refuses to answer.

Moreover, during 2009 and 2010, Ms. Gershon willingly responded to questions regarding hiring practices in seven interviews and two hearings and never once claimed a Fifth Amendment privilege to decline to answer. If her fear of prosecution actually arose from her grand jury appearance in 2007, the 2006 FBI seizure of documents, or the alleged "common knowledge" of an ongoing FBI investigation, one would think that she would have asserted the privilege during 2009 and 2010. But she did not. We find that her prior conduct undermines Ms. Gershon's claim that she now has a reasonable fear of prosecution that she evidently lacked in 2009 and 2010.

### 4.

Finally, Ms. Gershon suggests that because the OIIG drafted a memorandum on September 14, 2010, regarding "Improper Manipulation of the Shakman Exempt List," which

includes a list of her duties regarding keeping the list, she has an objectively reasonable fear of criminal prosecution. But on that same date, Ms. Gershon was interviewed by the OIIG about the *Shakman* Exempt List, and though she was represented by counsel, she did not assert her Fifth Amendment privilege. In addition, on October 20, 2010, Ms. Gershon, again represented by a member of the State's Attorney's Office, was interviewed by the DCA about the hiring processes of the FPD. Again, she answered questions freely and did not assert a Fifth Amendment privilege. We see no basis for Ms. Gershon's claim that a memorandum from 2010, which did not cause her to assert a Fifth Amendment privilege at that time, gave her a reasonable basis to do so in 2012.

## IV.

The CA also contends that Ms. Gershon waived any right she may have had to assert the Fifth Amendment privilege because prior to her depositions, she voluntarily answered questions covering the same or similar subjects – her County employment, the County's hiring, firing and employment practices, specific postings and processes, the *Shakman* exempt list and *Shakman* exempt positions, the health system, the creation of new positions, and details regarding certain individuals – during interviews or proceedings with the OIIG, the CCA, the DCA, Employee Appeal Board, and the CA. Ms. Gershon responds that her voluntary disclosures were not part of the same proceeding, and thus she did not waive her right to assert the privilege in this proceeding. Although we grant the motion to compel because (as explained above) we find that Ms. Gershon did not have a reasonable fear of incrimination, in the interest of completeness, we address the waiver issue.

A witness may waive her Fifth Amendment privilege by testifying: once a witness reveals an incriminating fact, she may not then invoke the privilege to avoid revealing the details. *Rogers v. United States*, 340 U.S. 367, 373 (1951). A person who waives the privilege in one proceeding,

16

however, does not thereby waive it in another proceeding. *See, e.g., Slutzker v. Johnson*, 393 F3d 373, 389 (3d Cir. 2004); *United States v. Gary*, 74 F.3d 304, 312 (1st Cir. 1996); *Chagolla v. City of Chicago*, 529 F. Supp. 2d 941, 947 (N.D. Ill. 2008). For example, voluntary testimony before a grand jury does not waive the privilege against self-incrimination at trial. *See, e.g., United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979).

The CA specified the following interviews or proceedings in which Ms. Gershon voluntarily answered questions regarding those areas of interest to the CA: 1) the September 14, 2010 OIIG interview regarding improper manipulation of the *Shakman* Exempt List; 2) the March 5, July 15, August 19, August 24, 2009 interviews with the CCA and staff regarding Ms. Gershon's human resources duties and employment actions; 3) responses to CCA inquiries regarding "similar processes" of the Cook County Health and Hospital System and to the hiring process relative to a specific posting process; 4) the October 20, 2010 interview with the DCA regarding the hiring processes of the FPD; 5) the May 18, 2010 CA interview regarding the job application system; and 6) two Employee Appeals Board hearings at which Ms. Gershon testified regarding the *Shakman* exempt list and the employment and termination of two allegedly *Shakman* exempt employees. The CA asserts that "each of Gershon's statements, as well as her deposition, took place in the context of the single, ongoing Shakman investigation of Cook County's hiring, firing, and employment practices, as well as more specific issues relating to these topics, all pursuant to the Shakman Consent Decrees and SRO" (CA's Reply Br. at 4). Ms. Gershon claims that her previous statements were made in investigations "outside of this proceeding" (Resp. Br. at 6).

We find that, except for the two Employee Appeals Board hearings, all of the prior interviews were part of this same proceeding. The Employee Appeals Board hearings are not a part of the procedures established by the *Shakman* SROs; nor is that Board an entity designated in the *Shakman* consent decrees or SROs to investigate or handle complaints. The Employee Appeals Board, which was created by Cook County ordinance, hears appeals by Cook County employees in cases of discharge, demotion, or suspension. *See* Cook County, Ill. – Code of Ordinances, Part I, Ch. 44, Art. II, Sec. 44-50. Though the hearings may have concerned similar subject matter as that in some *Shakman* investigations, we conclude that the Employee Appeals Board proceedings are distinct enough to be deemed separate from the *Shakman* proceeding. Consequently, testifying before the Board would not have waived any valid Fifth Amendment privilege Ms. Gershon might have asserted in this proceeding.

On the other hand, the CA, OIIG, DCA, and CCA all interviewed Ms. Gershon within the context of carrying out their responsibilities under the *Shakman* consent decrees and the SRO. Ms. Gershon freely responded to questions regarding the hiring, firing, and employment practices of Cook County propounded to her in the context of the ongoing investigation under the auspices of this civil case. Were we to find that Ms. Gershon had a sound basis for asserting her Fifth Amendment privilege as to some of the questions asked in the deposition, we would nevertheless find that she has waived that privilege with respect to her answers to questions on the same subjects in the prior interviews with the CA, OIIG, DCA, and CCA.

## CONCLUSION

For the reasons set forth above, we grant the CA's Motion to Compel Doris Gershon's testimony.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: January 29, 2013

19