IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. SHAKMAN and<br>PAUL M. LURIE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, *et al.*,<br><br>Defendants. | Case No. 69 C 2145<br><br>Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER

Pursuant to an order dated April 29, 2011, this Court confirmed the authority of the *Shakman* Accord Monitor, Noelle Brennan ("Monitor"), to investigate certain persons whose names had arisen in connection with the criminal investigation involving Messrs. Sorich and Sanchez, to determine whether any of those persons had engaged in unlawful political discrimination, and if so, to recommend appropriate remedial action by the City (doc. # 2203 ("4/29/11 Order")). The Monitor (with the assistance of the Inspector General of the City of Chicago, Joseph Ferguson ("IG")), has completed those investigations. As a result of those investigations, the Monitor or the IG found that 13 employees at the City had engaged in unlawful political discrimination at some point prior to 2005, and recommended a range of disciplinary responses.[1] The City has responded to those recommendations, and in each instance imposed discipline "consistent with the recommended disciplinary ranges" (doc. # 3657: City of Chicago's response to plaintiffs' motion ("City's Resp.") at 11). The persons in question (ten of whom remain employees of the City) have served (or shortly will serve) the discipline that has been imposed.

---

[1] Twelve reports were prepared by the Monitor and one was prepared by the IG (Pls.' Mot. at 1-2).

On January 10, 2014, plaintiffs, Michael L. Shakman and Paul M. Lurie, *et al.* ("plaintiffs") filed a motion to make public the 13 reports which found that City employees had engaged in unlawful political discrimination prior to 2005 and recommended discipline, and with which the City agreed by imposing discipline (the "Sustained Reports") (doc. # 3636: Plaintiffs' motion ("Pls.' Mot.")). Plaintiffs request that the Sustained Reports and the City's response to each be disclosed with redactions only of witnesses' names and other identifying information about the witnesses (doc. # 3635: Plaintiffs' memorandum in support of their motion ("Pls.' Mem.") at 1).

In addition, plaintiffs ask the Court to have the Monitor "prepare and publicly file a summary of her investigations that lists the total number of individuals she and the Inspector General investigated pursuant to the Court's order of April 29, 2011" (Pls.' Mot. at 1). Plaintiffs request that the Monitor's summary specify the "number of reports in which she respectively did and did not recommend discipline[,] summarize the City's response to the 13 Sustained Reports, and provide such other information as the Monitor believes useful to an understanding of the investigative process and the results of the investigations" (*Id.* at 2). Plaintiffs suggest that the Court should afford the City an opportunity to review this summary in advance in order to prepare and simultaneously file any comments regarding the summary (*Id.*).

The City agrees that a summary of the Monitor's investigations should be made public, but argues that the Sustained Reports should be edited and redacted as necessary to keep private the names and identities of the persons who were found to have engaged in prohibited conduct (City's Resp. at 3-4). In her separate filing, the Monitor does not address the proposal by the plaintiffs that she prepare a summary of the overall results of the investigations. She supports public filing of the Sustained Reports with the names of the subject employees redacted, but

without mentioning any further editing (doc. # 3665: Recommendation Regarding Availability of Completed Monitor Discipline Reports ("Monitor's Rec.") at 2). In addition, the Monitor further recommends public filing, with similar redactions, of three additional reports regarding her investigations of the Chicago Department of Transportation ("CDOT") (*Id.* at 2 and Ex. 1).

So, it appears that no one objects to the proposal that the Monitor summarize the overall results of the investigations. We will grant that request. We do not address here the form that summary will take; the Court will separately address that question with the Monitor and the parties.

Moreover, the Monitor and the parties all agree that the Sustained Reports should be released to the public with the remaining dispute focusing on whether to disclose the identities of the City employees involved. For the reasons stated below, we conclude that the Sustained Reports should be published, with redactions of the names and titles of witnesses as well as the names and titles of the City employees who were disciplined.

I.

We briefly summarize the background that precedes the current motion. In 2005, when federal criminal indictments filed against former City officials exposed widespread unlawful hiring practices, the plaintiffs sought the appointment of a special master to oversee City compliance with the Court's orders (doc. # 310: Application to Hold City of Chicago and its Mayor in Civil Contempt for Violations of Court Orders). Consequently, in August 2005, the Court appointed Noelle Brennan as the *Shakman* Monitor, charged with studying the City's employment practices, policies, and procedures for nonpolitical hiring, promotion, transfer, discipline, and discharge (doc. # 316: Order Appointing Court Monitor and Counsel ("8/2/05 Order") at 2; doc. # 3484: July 31, 2013 Report Regarding Monitor's Recommendations for

Discipline for City Employees Engaged in Hiring Fraud ("7/31/13 Report") at 2-3). On May 31, 2007, plaintiffs and the City of Chicago entered into an Agreed Settlement and Accord, for which this Court has continuing oversight until such time that we find that the City has achieved substantial compliance and terminate the Accord (doc. # 642).

Ms. Brennan first asked the City to investigate and report on current City employees who had been implicated during the Sorich and Sanchez trials as having participated in hiring fraud, but years passed and – for a variety of reasons that need not be recounted here – no investigations took place. Finally, in 2011, Ms. Brennan sought authority to conduct the investigations herself, and on April 29, 2011, this Court confirmed her authority to investigate "whether and to what extent the City has addressed and remedied the employment practices brought to light as a result of the *Sorich* case" (4/29/11 Order at 1-2, citing *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008)).

The April 29, 2011 Order set out the following procedures governing any Monitor's office recommendations to the City resulting from the investigations:

> [A]ny such recommendations shall include a detailed statement of the basis for the Monitor's conclusions, a summary of the information relied upon, and specific recommendations for corrective action to be instituted by the City. Such report shall be sent to the Mayor's Office, the Law Department, applicable department heads, plaintiffs' counsel and the Inspector General.

(4/29/11 Order at 3). The order required the City to respond in writing to the Monitor's report, detailing whether it agreed with or disputed the recommendations and whether and to what extent it would implement those recommendations (*Id.* at 4). Further, this Court addressed the issue of confidentiality of the investigations:

> The Monitor shall determine whether and to what extent all or any part of the record of individual investigations shall be treated as confidential, and shall inform the City and the plaintiffs' counsel of the Monitor's decision in writing. Either the City or plaintiffs may seek review by the Court of the Monitor's

4

designation of material as confidential, or failure so to designate. The material shall be maintained in confidence until the Court rules on any such motion, which shall be brought by the party seeking to alter the Monitor's determination. The burden of establishing confidentiality shall be borne by whoever seeks confidential treatment, and shall be decided by applicable law.

(*Id.*).

In 2012, when the Monitor had completed an initial set of reports, this Court deferred the question of the degree to which it would make reports publicly available until all reports were completed and the City had responded to all of them (doc. # 2923: Transcript of Proceedings from May 22, 2012 Hearing ("5/22/12 Tr.") at 7). Now that the Monitor has completed the investigations and the City has responded, the plaintiffs have moved to make public 13 Sustained Reports, including the name and current job position with the City of each of the 13 individuals who are the subjects of the Sustained Reports, with only the names and identifying information of witnesses redacted (Pls.' Mot. at 1; Pls.' Mem. at 3). The City and the Monitor agree that the Sustained Reports should be made public and that some effort should be made to protect the privacy of witnesses. Unlike plaintiffs, the City and the Monitor further agree that some effort should be made to protect the identities of the disciplined employees. However, they appear to disagree on the proper scope of these efforts. The Monitor proposes only name redactions (Monitor's Rec. at 2), while the City takes a broader view and argues that the efforts should entail "select edits and redactions necessary to protect the names and identities of the individual employees" (City's Resp. at 3-4).[2]

---

[2] The City represents that the Monitor and the IG do not object to disclosing the Sustained Reports with "limited redactions and edits necessary to prevent the disclosure of employees' identities" (City's Resp. at 3-4). In addition, the City represents that the Monitor and the IG do not object to the approach illustrated by the sample redlined report prepared in conjunction with the Monitor and supplied to the Court for review (*Id.*). The Monitor's Recommendation, however, though filed after the City's Response, refers only to redactions of names, and makes no mention of the redlined report approach. Thus, we conclude that the Monitor takes no position on the editing approach advanced by the City.

## II.

The issue before us presents the tension between the public's interest in the parties' efforts to eradicate patronage in the City's employment practices and the privacy interests of individuals in decisions affecting their employment, including disciplinary actions taken against them. The Court has not found any statute or case law that controls the decision in this case; nor have the parties offered any case or statute that squarely resolves the question (doc. # 3662: Plaintiffs' Reply Memorandum in Support of Motion to Release Thirteen of Monitor's Sorich-Sanchez Reports ("Pls.' Reply") at 2). Indeed, plaintiffs candidly acknowledge that "the parties agree that none of these cases is controlling and the Court has some discretion regarding the issue" (Pls.' Reply at 4). Consequently, in resolving this issue, we apply a balancing test, weighing the competing interests and attempting to calibrate a solution respectful of both sets of legitimate concerns.[3]

### A.

Weighing heavily in favor of disclosure is the serious public interest in sunshine – bringing the City's employment practices into the light of day to better root out and deter the illegal patronage practices that had once burgeoned behind closed doors. The Supreme Court has emphasized the seriousness of the interest in eliminating patronage in public employment.

---

[3] Both the City and the plaintiffs rely on *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984) to support their arguments (City's Resp. at 8-9; Pls.' Reply at 1, 8-9). In *Stern*, a federal Freedom of Information Act ("FOIA") case, the court was interpreting two exemptions to FOIA in determining whether to disclose the identities of three FBI employees who had been investigated in connection with a possible cover-up of illegal FBI surveillance activities. *Id.* at 86. We find *Stern* helpful to the extent that it recognized that disciplined employees retain some interests in privacy that must be balanced against the public's right to disclosure. *Id.* at 91. But our decision on striking the balance between the public and private interests at stake here is not governed by FOIA, Illinois FOIA, or any municipal ordinances (*see also* 5/22/12 Tr. at 4-5: "I am familiar with the various Illinois statutes that provide protection for certain disciplinary information about public employees as well as personnel records, but I don't think that those laws apply to the question of what I may choose to make public about investigations that are conducted by a Monitor that has been appointed by this Court with respect to investigations conducted under the authority of this Court and investigations conducted to obtain information that this Court already has said may bear on the issue of the Court's consideration of substantial compliance").

*See, e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 79 (1990) (extending *Elrod* to promotion, transfer, recall, and hiring decisions based on party affiliation and support); *Branti v. Finkel*, 445 U.S. 507, 519 (1980) ("continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments"). The fact that the *Shakman* case has lumbered on since 1969 demonstrates the difficulty of resolving this problem, and underscores the magnitude of the public interest in disclosure of the Monitor's recommendations and the City's responses. The parties all acknowledge the legitimate public interest at stake here.

The countervailing interests are the privacy concerns of the 13 current and former City employees whom the Monitor found to have engaged in prohibited conduct. These persons are not parties to this lawsuit, and were not the subject of any criminal prosecutions stemming from the Sorich and Sanchez investigations and prosecutions. But, the Monitor found that these 13 individuals engaged in conduct that violated *Shakman* decrees prior to 2005.[4]

In general, employees have a recognized interest in keeping their personal information from personnel files out of the public domain. *See Porter v. Casino Queen, Inc.*, No. 09–24–WDS, 2009 WL 4823925, at *1 (S.D. Ill. Dec. 10, 2009) ("While there is a legitimate general privacy interest in one's personnel files, that interest is not absolute, and does not inevitably trump other legitimate, competing interests"). In the ordinary workplace setting, an employee has a privacy interest in her employment records, and disciplinary actions generally are not public. This applies not only to private employees but also to public employees, who retain a privacy interest in their personnel files. That interest finds some degree of protection in a variety

---

[4] The *Sorich* case had exposed violations of the 1972 and 1983 Consent Decrees in this case (4/29/11 Order at 2).

of ordinances and laws. *See, e.g., Dep't of the Air Force v. Rose*, 425 U.S. 352, 380-81 (1976) (in the FOIA context, balanced cadets' privacy interests in their disciplinary records against the government's interest in making public an understanding of its operations, and released case summaries of disciplinary actions with redactions of cadets' names and other identifying information); *Beck v. Dep't of Justice*, 997 F.2d 1489, 1494 (D.C. Cir. 1993) (FOIA case: "There can be no dispute that there is 'something' on the private-interest side of the equation. A government employee has at least some privacy interest in his own employment records, an interest that extends to 'not having it known whether those records contain or do not contain' information on wrongdoing, whether that information is favorable or not"); Chicago Municipal Code § 2-56-110 (IG's investigatory files and reports are confidential and summaries of sustained reports may issue publicly without disclosure of subjects' names); 105 ILCS 5/34-13.1(e) (Illinois School Code: Inspector General's summary reports "shall not contain any confidential or identifying information concerning the subjects of the reports and investigations").

Plaintiffs argue that public employees who engage in misconduct automatically forfeit their privacy interest and have no right to shield their disciplinary records from public disclosure (Pls.' Mem. at 12-14; Pls.' Reply at 8-9). We disagree. In a hearing before this Court on May 22, 2012, where the parties first addressed public availability of the Monitor's reports of investigations of CDOT employees who engaged in hiring sequences between 2002 and 2005, this Court recognized the employees' legitimate interest in confidentiality (5/22/12 Tr. at 3-4) ("I recognize that subjects of this investigation do have a legitimate privacy interest"). And we stand by that position today. We do not accept plaintiffs' contention that disciplined public employees forfeit all privacy rights in their personnel records.

That said, we find that the privacy interests at stake here are not absolute and that there are instances where these interests can be trumped by more compelling, competing rights. The parties have well expressed their views, held in good faith, as to why the identities of the 13 employees should or should not be disclosed. After considering the arguments they have presented, we find that the legitimate public interest in the Sustained Reports does not warrant disclosure of the employees' names or titles.

**B.**

We begin with the recognition that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). As Judge Posner explained in considering motions to seal settlement agreements:

> The reason for this right of public access to the judicial record is to enable interested members of the public, including lawyers, journalists, and government officials, to know who's using the courts, to understand judicial decisions, and to monitor the judiciary's performance of its duties.

*Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013) (chambers opinion) (citations omitted); *see also GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014) ("Secrecy in judicial proceedings is disfavored, as it makes it difficult for the public (including the bar) to understand why a case was brought (and fought) and what exactly was at stake in it and was the outcome proper. The interest in allowing public access to the judicial record is thus a social interest rather than a concern solely of the litigants") (citations omitted). This presumption of public access, however, applies "only to the materials that formed the basis of the parties' dispute and the district court's resolution." *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002).

As we work toward the goal of ending judicial oversight, the Monitor's Sustained Reports and the City's response to them will play a role in determining whether the City has

achieved substantial compliance. The Honorable Wayne R. Andersen, who previously presided over the Accord, observed that an issue of central importance in this case is: "Has the City of Chicago adopted procedures, rules and structures that provide reasonable assurance that the City's long history of illegal patronage employment practice has stopped and will not be repeated as soon as the Court is no longer watching?" *Shakman v. City of Chicago*, No. 69 C 2145, 2009 WL 2848863, at *3 (N.D. Ill. Sept. 1, 2009). Judge Andersen made that observation -- with which we fully agree -- in rejecting a motion by anonymous City employees to have some IG's reports (which did not reveal employee names) filed under seal. He found the reports critical to answering that central question he posed, and found that the reports did not violate the employees' privacy interests because they had not revealed the employees' names. *Id.* at 2. Although the Sustained Reports and the City's responses are relevant to answering Judge Andersen's question, we find that the names of any disciplined employees, past or present, are not relevant to this Court's analysis of whether the City has achieved substantial compliance. We thus conclude that the identities of the disciplined employees are not subject to the presumption of public access that attaches to judicial documents or materials that will affect the disposition of this case.

In reaching that conclusion, we note the importance of historical information gathered by the Monitor regarding the *Sorich* era, and the City's efforts to discipline employees who engaged in unlawful political discrimination during that troubled period. However, we expect that what will be of paramount importance is where the City stands in its here-and-now efforts to stay on the straight and narrow.[5] The public's interest in the historical record will be amply served by

---

[5] In a November 1, 2013 report, the IG stated that his office had discovered that City employees had miscoded disciplinary suspensions, which concealed the true nature of the disciplinary action taken (11/1/13 Report at 1-2, Ex. B). The plaintiffs contend that this shows a continuing desire by City employees to cover up misdeeds and thus, the identities of the employees here should be disclosed. While we agree that this reveals evidence that

disclosing both the Monitor's Sustained Reports (with all but the identities of the witnesses and the disciplined employees), and her summary of the investigations as a whole. Making public the Sustained Reports, with these minimal redactions, will suffice to satisfy the purpose of disclosure – allowing the public to comprehend the basis for the judicial determination. We are not persuaded that revealing the identities of these disciplined employees, whose conduct is now nearly a decade in the rear-view mirror and who, by all accounts, have properly performed their duties since that time, will enhance the public value of the Sustained Reports.

### C.

Plaintiffs also contend that the deterrent effect of identifying the disciplined employees overrides their individual privacy interests, because public disclosure "sends an important message that will encourage future compliance" (Pls.' Mem. at 6). In contrast, the City argues that revealing the names of these individuals will hinder future investigations by chilling employees' willingness to come forward and cooperate (City's Resp. at 6-7). Both of these arguments, however, prove too much and too little. While some employees may be deterred from engaging in prohibited conduct when they learn that they might face public disclosure of their activities, others might be deterred from cooperating with investigations for fear of subjecting themselves or their colleagues to public censure. With no way of knowing which of these two outcomes will more frequently occur, we consider these contending arguments to be a wash.

---

continued vigilance will always be necessary, we disagree that this situation warrants disclosing the names of the employees. Moreover, meeting the test of substantial compliance does not require perfection. The test recognizes that there may be (and likely always will be) missteps in any human venture. Thus, while it is important to know if missteps occur, it is no less important to know how the City responds. Here, once the miscoding was discovered, the issue was referred to the IG for investigation, "with the City's full support and cooperation" with an eye toward disciplining any intentional miscoding in order to deter similar future conduct (City's Resp. at 12).

In addition, while we appreciate the salutary effect of the City's willingness to reach back and punish conduct from nearly a decade ago, we believe that a swift and appropriate response to any alleged present-day unlawful political discrimination will produce greater deterrent effect than any imposition of discipline for long-past conduct. The deterrent effect of punishing pre-2005 conduct will be suitably served by making the Sustained Reports public without identifying the employees involved.

**D.**

We also consider that disclosure of the names of the employees involved in the Sustained Reports, coming so many years after the fact, would constitute a *de facto* penalty beyond whatever disciplinary action the City has already imposed. Although we accept plaintiffs' denial that they have any interest in embarrassing the disciplined employees (Pls.' Mem. at 5), the naming of names nonetheless would amount to a public shaming of these individuals, which we find is not justified by any hypothetical additional deterrent effect. Moreover, it singles these 13 individuals out for conduct that occurred *before 2005*, while the identities of City employees who may have been disciplined for more recent conduct are shielded by a municipal ordinance that bars disclosure of their names.[6] We do not find that the subjects of the Sustained Reports deserve harsher treatment simply because their discipline (while imposed by the City) resulted from a judicially-authorized investigation into historical *Shakman* violations.[7]

---

[6] Chapter 2-56-110 of the Municipal Code provides that when the IG issues sustained findings reports, the public summary should not disclose the name of the investigated individual.

[7] We are likewise not persuaded that disclosure of the identities of the persons at issue in the Sustained Reports is warranted by the fact that the Monitor - who conducted most of the investigations - is paid by the City for her work. The IG, who prepared a number of reports, also is paid by the City. And, in any event, whether the names of the individuals are made public should not turn on the budgetary line item out of which payment for the investigation occurs. Indeed, we suspect that plaintiffs would advocate for disclosure of the names even had all of the investigations been conducted by the IG or the Corporation Counsel and not by the Monitor.

When we authorized the Monitor to proceed with these investigations, our intention was to gather historical information about what happened during that period and why -- in order to prevent future noncompliance, to determine whether City employees engaging in unlawful political discrimination had escaped discipline, and to gauge the City's response to help determine whether it was moving toward substantial compliance (5/22/12 Tr. at 6: "Documenting what occurred during that period is of value, as I had previously expressed, certainly to learn what occurred during that period, what errors were made to guide us so that we can avoid that in the future. But it presents a different matter with respect to a public need to know at this time than do allegations of present misconduct and present violations of a court order"). Thus, when the Court set this task for the Monitor, the purpose was not punitive, and when we make use of the reports in determining substantial compliance, the purpose will still not be punitive. Our goal at that time will be to review the City's conduct in creating, implementing, and enforcing rules and procedures that forbid political patronage in its employment practices. We will be focusing on the forest, not the trees. Redacting the names and titles will prevent the Sustained Reports from taking on a punitive aspect that this Court never intended, while allowing public access to the same information that this Court will consider in assessing the City's degree of compliance.

**E.**

The Monitor also recommends the public filing of three additional reports she prepared regarding her investigation of CDOT and the City's response to those reports (Monitor's Rec. at 2). These three reports, however, were created in the context of a first attempt at these investigations. We found the process used in this maiden voyage of the investigations to be unhelpful and polarizing, and consequently we decline to rely on those reports or to add them to

the public record. The Monitor produced the Sustained Reports (as well as the many other reports that did not recommend discipline) based on a process that was created in response to the defects identified by the CDOT experience (7/31/13 Report at 10). Indeed, the Monitor has commented that the subsequent process has proved to be a productive one: "The parties' use of the collaborative process proved to be far more effective and successful than the process that was used during the CDOT investigations" (*Id.* at 12). The Monitor has summarized the initial CDOT investigative process and results in various reports she has publicly filed (*see* doc. # 2875 (6/27/12); 7/31/13 Report). We do not consider it useful to make public the back-and-forth between the Monitor and the City in that initial effort that gave way to the "more cooperative and less contentious" (7/31/13 Report at 10) process that was used for all other reports – including the 13 Sustained Reports.

### III.

One last item requires clarification. The City originally had taken the position that in order to protect the employees' identities, summaries of the Monitor's Sustained Reports should be prepared and issued. The City's brief refers to "select edits and redactions to protect the names and identities of the individual employees" (City's Resp. at 3). Plaintiffs argue that the sample summary that was prepared shows that the process would result in reconstituted reports that are too general to be useful (Pls.' Mem. at 15-16).

We agree with plaintiffs' assessment. We conclude that the Sustained Reports should retain as much of its original content as possible so that there is sufficient detail for the public to assess whether the City has made good faith efforts to address the instances of noncompliance that were found. The Sustained Reports must provide enough detail to understand the conduct involved and assess the adequacy of the City's response.

In the May 2012 hearing, we explained that we would ultimately agree to authorize the publication of some of the information in the future. With that in mind, we advised the Monitor to draft her reports to avoid interspersing identifying details throughout so that it would be easier to protect the identities without having to re-write the reports:

> I would ask the Monitor, when preparing future reports, to be cognizant of that so that he may think of ways to do that in a way that the relevant information can be made public without directly or indirectly identifying particular individuals who are subject of the investigation. . .

(5/22/12 Tr. at 8). The Monitor prepared the Sustained Reports after the May 22, 2012 hearing, with our guidance in mind.

Moreover, although the City now seeks additional editorial revisions to remove identifying details, in the past, the City accepted name redactions as sufficient (doc. # 1279: Response of City of Chicago Inspector General's Office to "Movant's Motion to Have Documents Filed Under Seal" at 2 & Ex. 1 (Corporation Counsel did not object to public filing of June 26, 2009 IG's investigative report that did not reveal names of individuals for whom discipline was recommended but only generically described them)). While we are not saying the City is now estopped from seeking more extensive identity protection, we use its prior position merely to show that simple redactions adequately addressed past privacy concerns. In ruling on a motion filed by "anonymous employees of the City of Chicago" to have documents filed under seal and removed from the public record, Judge Andersen concluded that the IG's report had not violated any of the privacy interests of those employees specifically mentioned because, other than referring to "a few of the higher-ranking officials by their job titles," the report did "not mention their names." *Shakman*, 2009 WL 2848863, at *2. No one has argued to the Court in this motion that the anonymous movants were subsequently outed by the IG's report.

15

That said, we cannot foreclose the possibility that redacting names and titles will not perfectly protect an individual's identity. At the same time, someone with motivation and a detective's eye may be able to ferret out the identity even with the reconstituted reports advocated by the City. At bottom, we will not take measures to protect the privacy interests of the individuals that dilute the reports so much that the public will not receive the information that it should. To the extent that information remains that might make it possible to discern an individual's identity even after the redaction of names and titles, that is because the public interest in that information outweighs the individuals' interest in having us do more to protect their privacy. Thus, the Sustained Reports should issue with redactions only of the names and titles of the disciplined employees, as well as those of witnesses. We decline to go to the lengths of requiring indeterminate edits in order to obscure all potentially identifying details. *Cf. Dep't of the Air Force*, 425 U.S. at 381 ("To be sure, redaction cannot eliminate all risks of identifiability, as any human approximation risks some degree of imperfection, and the consequences of exposure of identity can admittedly be severe. But redaction is a familiar technique in other contexts and exemptions to disclosure under [FOIA] were intended to be practical workable concepts") (citations omitted).

## **CONCLUSION**

The City has made great strides in recent years to demonstrate its determination and desire to move into a new era of City government and to prevent a return to the days of rampant patronage in its employment practices. Entering the Sustained Reports into the public record with minimal redactions to protect the identities of witnesses and disciplined employees will document one aspect of the City's continuing effort to show the Court and the public that it has put that era firmly into the past.

For the reasons set forth above, we therefore grant plaintiffs' motion to make the Sustained Reports part of the public record, but we deny their request to do so without redaction of the names and titles of the individual subjects of those reports. We also grant the unopposed request by plaintiffs that the names and identifying information of witnesses be redacted.

Finally, we grant plaintiffs' request to have the Monitor generate a summary of her investigations, listing the number of individuals investigated and identifying the number of reports in which she did or did not recommend discipline, as well as the City's response to the Sustained Reports. We will address separately the specifics of that report and the process to be used in preparing it.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED: February 21, 2014**