IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL L. SHAKMAN, et al., )
                                  )
             Plaintiffs, )
                                  )      No. 69 CV 02145
vs. )
                                  )      Magistrate Judge Schenkier
DEMOCRATIC ORGANIZATION OF )
COOK COUNTY, et al., )
                                  )
             Defendants. )

## MEMORANDUM OPINION AND ORDER

Intervenor John R. Jackson seeks to vacate an arbitration award (the "Award") denying his political discrimination claim against the Forest Preserve District of Cook County (the "District") pursuant to the Illinois Uniform Arbitration Act, 710 ILCS § 5/1 *et seq.* Mr. Jackson filed a timely "Motion to Vacate Arbitration Award" (doc. # 3549) and a "Memorandum in Support of Motion to Vacate Arbitration Award" ("Jack. Mem.") (doc. # 3550), arguing that the Award should be vacated because the Arbitrator exceeded his authority and made gross errors of law and fact that are apparent on the face of the Award. For its part, the District asks this Court to deny Mr. Jackson's motion and to confirm the Award (doc. # 3606). The motion has been fully briefed. After careful review of the parties' submissions, we deny Mr. Jackson's motion and confirm the Award.

### I.

We begin with a brief overview of the *Shakman* Decree and then provide a summary of both Mr. Jackson's *Shakman* claim and the Award.

### A.

Under the *Shakman* Decree, the City of Chicago[1] is barred (except for certain positions not at issue here) from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315, 1323, 1358 (N.D. Ill. 1979), *vacated sub nom., Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied,* 484 U.S. 1065 (1988). To sustain a *Shakman* claim, a plaintiff must show, by clear and convincing evidence, that employment decision-makers were aware of the affected employees' political affiliations (or lack thereof) and made their employment decisions based on those political considerations. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Everett v. Cook County*, 704 F. Supp. 2d 794, 804 (N.D. Ill. 2010) (citing *Shakman v. Democratic Org. of Cook County*, No. 69-2145, 2009 WL 855633, at *2 (N.D. Ill. Mar. 30, 2009)); *see also Maxwell v. County of Cook*, No. 10 CV 00320, 2011 WL 4639530, at *6 n.6 (N.D. Ill. Mar 17, 2011) (Schenkier, J.). Once a plaintiff makes this showing, the burden shifts to the defendant to show that it would have made the same employment decision notwithstanding the political reason or factor. *Shanahan*, 82 F.3d at 780.

As part of the *Shakman* proceedings, on March 5, 2009, the district court approved a Supplemental Relief Order. *See* Supplemental Relief Order for the Forest Preserve District of Cook County ("SRO"), in *Michael Shakman et al. v. Democratic Org. of Cook County et al.,* Case No. 69 C 2145 (doc. # 1049). In addition to describing the political patronage activities that are prohibited, the SRO provides review and enforcement procedures for alleged violations

---

[1]The City of Chicago includes within its governance the Forest Preserve District of Cook County, which manages over 69,000 acres of public land. fpdcc.com (last visited May 22, 2014).

occurring after the entry of the SRO (*see Id.,* Section V). These procedures allow complainants the option of filing a complaint with the *Shakman* Special Complaint Administrator, electing to go to arbitration, or filing a complaint in federal court (*Id.*). An individual who elects to go to arbitration under the SRO is barred from filing a complaint in federal court (*Id.*). In this case, after failing to receive a promotion, Mr. Jackson filed a complaint with the office of the Cook County *Shakman* Complaint Administrator, Mark Vogel, on August 4, 2010 (Dist. Mem. at 1). Mr. Vogel sustained Mr. Jackson's complaint, whereupon Mr. Jackson elected to proceed with binding arbitration (*Id.* at 2).

**B.**

Mr. Jackson began working for the District in 1994 as a woodsman within the Resource Management Department (Jack. Mem., Exh. 2 at 48). By 2010, Mr. Jackson had risen up to the position of Resource Technician (*Id.*). The Resource Management Department is responsible for forestry-related tasks, including fire suppression, prescribed burns, mowing, and tending to the trees and various plants within the District's parks (*Id.* at 56, 101). Meanwhile, the District's Maintenance Department is responsible for maintaining the appearance of the parks, including garbage removal, sign and fence repair, portal cleaning, picnic table upkeep, mowing, and snowplowing (Jack. Mem., Exh. 3 at 2).

In June 2010, the District posted a Notice of Job Opportunity ("Posting") announcing the opening of an Assistant Maintenance Divisional Superintendent ("AMDS") position within the Maintenance Department (Jack. Mem., Exh. 10). The Posting contained a "Job Summary" paragraph; a "Knowledge, Skills, Abilities and Other Characteristics" paragraph; and a "Minimum Qualifications" paragraph that called for three minimum qualifications: (1) a high

school diploma or G.E.D. certificate; (2) four years of professional experience working in a Maintenance Operations Division; and (3) a valid commercial driver's license (*Id.*).

Mr. Jackson decided to apply for this position, and he accordingly submitted an Employment Application Form on May 7, 2010 (Jack. Mem., Exh. 8). On July 9, 2010, Mr. Jackson was called for an interview before a three-person panel composed of Darrell Howell, Kathleen Weger, and Jose Virella, all of whom are or were District Regional Superintendents (Dist. Mem. at 3). Also present during the interview was Carmen Sanchez, a *Shakman* compliance officer (Jack. Mem., Exh. 2 at 72-73). The panel asked Mr. Jackson approximately eight questions regarding his application and delved into his supervisory experience and machinery expertise (*Id.* at 73-74). Ultimately, two of the 14 interviewees were awarded the AMDS jobs, but Mr. Jackman was not one of them—he was ranked third of all the interviewees and lost out on the position to a Maintenance Department employee named Colleen Sinodinos and to another employee named Joseph LaFata.[2]

On July 27, 2010, Mr. Jackson filed a complaint with the *Shakman* Complaint Administrator, Mark Vogel, alleging that he "as well as others were passed up do [sic] to favoritism and possible politics" (Dist. Mem., Exh. 2). Mr. Jackson contended that Ms. Sinodinos was unqualified for the promotion because she had much less time on the job and far less experience operating various work-related machines (*Id.*). Mr. Jackson further asserted that Ms. Sinodinos had a close working relationship with two out of the three people on the interview panel—Kathy Weger, who was Ms. Sinodinos's supervisor prior to her promotion; and Darrell Howell, who was Ms. Sinodinos's husband's supervisor—and that they "most likely coached

---

[2]Mr. LaFata had 30 years of experience working for the Cook County Highway Department (Jack. Mem., Exh. 3 at 5). Mr. Jackson does not claim that Mr. LaFata's promotion to the AMDS position was the product of unlawful political considerations.

4

[her] with the questions and answers" (*Id.*). Moreover, Mr. Jackson stated that "from what [he] understand[s]," Ms. Sinodinos belongs to the 19th Ward of Cook County (*Id.*).

Mr. Vogel conducted an investigation that involved a review of the June 9, 2010 interview material, including the application forms and individual scoring sheets, as well as interviews (with the help of his staff) of all involved persons: Mr. Jackson, Colleen Sinodinos, Joseph LaFata, Kathy Weger, Darrell Howell, Jose Virella, Michael Martin (a former District Superintendent and, at the relevant time, Kathy Weger's supervisor), and four unnamed co-workers (Jack. Mem., Exh. 3). Mr. Vogel completed a Final Investigation Report (the "Vogel Report") in which he concluded that Ms. Sinodinos's advancement had been the product of improper political influences (*Id.* at 1-18). Specifically, Mr. Vogel found that "[m]any of the individuals that discussed Sinodinos' application pre-interview, as well as other interview panel members, were aligned with Sinodinos' political affiliations" (*Id.* at 16). He concluded that Mr. Martin had talked with Kathy Weger about Ms. Sinodinos prior to her interview, and that Michael Martin "was Colleen Sinodinos' most influential clout, due to their shared political organization—Cook County's 19th Ward" (*Id.* at 2 n.1, 6). He further concluded that Ms. Sinodinos was less qualified for the AMDS position than Mr. Jackson, a belief shared by the *Shakman* compliance monitor who attended the interview (Ms. Sanchez), and who reported that "Jackson interviewed better than Sinodinos" (*Id.* at 9).

As a result of Mr. Vogel's conclusions, memorialized in the Vogel Report, Mr. Jackson filed the paperwork necessary to commence an arbitration proceeding against the District, and a four-day hearing was held before Arbitrator James Cox between November 13, 2012 and March 27, 2013 (Jack. Mem., Exh. 1 at 1). Mr. Jackson was represented by counsel throughout the proceedings. In his post-hearing brief, Mr. Jackson maintained that high-level, politically-

5

connected employees of the District, particularly Michael Martin, violated *Shakman* by discussing Ms. Sinodinos's candidacy prior to her interview and by "put[ting] politics into play" as Mr. Martin "was very outspoken about using political clout to obtain a promotion" within the District (Jack. Mem., Exh. 4 at 26-27). The District, in its closing arguments, maintained that Ms. Sinodinos's political activity was separate and apart from her work and that any evidence presented to the contrary derived from hearsay and conclusory statements regarding Michael Martin (Jack. Mem., Exh. 5 at 17-18). The District further asserted that Ms. Sinodinos's experience within the private sector and the Maintenance Department equipped her to be a contender for the position, whereas Mr. Jackson's work history was exclusively within the Resource Department—a department with different duties and qualifications from those sought (*Id.* at 22-23).

On June 20, 2013, the Arbitrator issued a 32-page Award in which he concluded that "[t]he Sinodinos selection had been based on <u>fair and valid selection criteria established by the District without regard to any political considerations</u>," and he accordingly denied Mr. Jackson's complaint (Jack. Mem., Exh. 1 at 32) (emphasis in original). The Arbitrator determined that Ms. Sinodinos "was not shown to be politically active in the 19th Ward beyond engaging in a walk for charity . . . and buying fund raising tickets in 2008" (*Id.* at 4). Similarly, the Arbitrator did not find any evidence showing that Mr. Martin was involved with Ms. Sinodinos in any 19th Ward activities (*Id.*). While the evidence established that Mr. Martin had a conversation with Ms. Weger prior to the July 9 interviews in which he told Ms. Weger that Ms. Sinodinos was a "great" worker, the Arbitrator was unconvinced that Mr. Martin "would seek to exercise political influence in support of an employee who did not have any political relationship with him besides

6

belonging to the 19th Ward" and whom the evidence established was not politically active (*Id.* at 31).

The Arbitrator observed that while nepotism was a possible consideration at play during the interview process, the only question properly before him was whether Ms. Sinodinos's selection had been politically influenced by Mr. Martin—not whether some other form of favoritism was implicated (*Id.* at 8).[3] In addition, while he found no evidence of a *Shakman* violation by Mr. Martin, the Arbitrator discussed evidence that he found showed that Mr. Jackson had engaged in a *Shakman* violation of his own shortly before his interview—an improper contact with a member of the interview panel (Ms. Weger) (*Id.* at 12-20). The Arbitrator noted that this evidence of Mr. Jackson's improper conduct did not come to light until well after Mr. Vogel had completed his report, and that it also raised serious questions about Mr. Jackson's credibility and his entitlement to a promotion (*Id.* at 12-13).[4]

Finally, even when taking the evidence in the light most favorable to Mr. Jackson by construing Mr. Martin's comment about Ms. Sinodinos being a "great" worker as an attempt to

---

[3] At the time of the interviews, Ms. Sinodinos worked directly for interview panelist Kathleen Weger, and Ms. Sinodinos's husband worked for one of the other three selecting panel members. The Arbitrator noted that Mr. Jackson never raised the issue of the fairness of having the panel staffed with Maintenance Department members, nor did he challenge the appropriateness of the threshold qualifications (Jack. Mem., Exh. 1 at 7, 21).

[4] The parties do not dispute that Mr. Jackson visited with Ms. Weger at her office on July 1, 2010—about one week prior to his interview. However, the parties do dispute how and why the meeting materialized. Mr. Jackson contends that he and co-worker Curtis Alexander arrived at the Palos Division office, where Ms. Weger works, to fill up their truck with gas; that Ms. Weger initiated contact; and that she asked them if they knew anyone who was applying for the AMDS position (Jack. Mem., Exh. 2 at 76; Exh. 1 at 13). Mr. Jackson claims he replied by telling Ms. Weger that he was applying for the position, to which Ms. Weger responded that she was on the interview panel (*Id.*). Ms. Weger, meanwhile, presents a very different story. Ms. Weger contends that she received a phone call from Mr. Jackson's supervisor, John Pellegrino, informing her that Mr. Jackson wanted to stop by her office that day (Jack. Mem., Exh. 5 at 4). Ms. Weger claims that she was worried about the propriety of this, and that when Mr. Jackson arrived at her office, she refused to speak with him about the interview process and promptly left her office (*Id.*). District records from the time period in question fail to indicate that Mr. Jackson gassed up his truck in Palos or that he logged out of his own assigned work area (located some 15 miles away) (Dist. Mem. at 6). District phone records confirm that Mr. Pellegrino made a phone call to Ms. Weger on July 1st (*Id.*; *see also* Jack. Mem., Exh. 1 at 12-20). It is undisputed that neither Ms. Weger nor Mr. Jackson immediately reported the incident: it did not come to light until well after the interview and selection process had concluded and after Mr. Vogel had completed his Final Report.

politically influence her promotion, the Arbitrator nevertheless found that all three members of the interview panel reasonably found Ms. Sinodinos to be more qualified. The Arbitrator found Ms. Sinodinos to be more qualified than Mr. Jackson on account of her having the required four years of maintenance experience along with other skills sought in connection with the position, such as clerical skills (*Id.* at 31).

## II.

The SRO provides that arbitration decisions will be reviewed solely and exclusively by this Court, and only according to the procedures and standards set forth in the Illinois Arbitration Act, 710 ILCS 5/1 *et seq.* (SRO, Section V.B.6). The Arbitration Act delineates a specific, narrow set of circumstances under which a court may disturb an arbitration award. The Arbitration Act provides that a court "shall vacate an award" where:

> (1) The award was procured by corruption, fraud or other undue means;
>
> (2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party;
>
> (3) The arbitrators exceeded their powers;
>
> (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of Section 5, as to prejudice substantially the rights of a party; or
>
> (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by the circuit court is not ground for vacating or refusing to confirm the award.

710 ILCS 5/12(a)(1)-(5).

Thus, judicial review of an arbitration award is extremely limited. *Clanton v. Ray*, 979 N.E.2d 371, 376 (Ill.App.Ct. 2011); *Laatz v. Intergovernmental Risk Mgmt. Agency*, 784 N.E.2d

877, 879 (Ill.App.Ct. 2003). "The purpose of arbitration is to achieve a final disposition of differences between parties in an easier, more expeditious and less expensive manner than by litigation." *Shultz v. Atlantic Mut. Ins. Co.*, 853 N.E.2d 94, 101 (Ill.App.Ct. 2006) (citing *Pillott v. Allstate Ins. Co.*, 363 N.E.2d 460, 463 (Ill.App.Ct. 1977)). Accordingly, we will construe arbitration awards so as to uphold their validity "wherever possible." *Salsitz v. Kreiss*, 761 N.E.2d 724, 731 (Ill. 2001). "Because the parties to an arbitration did not bargain for a judicial determination, a reviewing court cannot set aside an arbitration award because of errors in judgment or mistakes of law or fact," unless they are gross errors apparent on the face of the award. *See Int'l Ass'n of Firefighters, Local No. 37 v. City of Springfield*, 883 N.E.2d 590, 592 (Ill.Ct.App. 2008); *Hawrelak v. Marine Bank, Springfield*, 735 N.E.2d 1066, 1069 (Ill.App.Ct. 2000). A party challenging an arbitration award bears the burden of demonstrating why the award should be vacated or modified, and a court will grant every reasonable inference in favor of the award's finality and validity. *Laatz*, 784 N.E.2d at 879.

### III.

Mr. Jackson challenges the arbitration decision on grounds that: (1) gross errors of law are apparent on the face of the Award; (2) gross errors of fact are apparent on the face of the Award; (3) the Arbitrator improperly failed to admit into evidence the entire Vogel Report; and (4) the Arbitrator improperly failed to order the production of Ms. Weger's disciplinary records (Jack. Mem. at 4-15). We address each of these arguments in turn.

### A.

Mr. Jackson first argues that the Arbitrator made gross errors of law that are evident on the face of the Award. Specifically, Mr. Jackson maintains that he met his burden of proof of showing that political motivations were at the heart of Ms. Sinodinos's selection, and that he did

so by providing the following evidence: (1) the Vogel Report, which opined that the interview process "was more likely than not tainted from the start;" (2) reports concerning campaign contributions from the Sinodinos family, Michael Martin, and three members of the interview panel; (3) testimony that Kathleen Weger spoke with Michael Martin, former Assistant Maintenance Supervisor Frank Mole, and Jose Virella regarding Ms. Sinodinos prior to the July 9 interview; (4) testimony of investigators from Mark Vogel's office establishing that Mr. Martin, prior to the interview, spoke with Ms. Weger about Ms. Sinodinos and about how they were both 19th Ward members; and (5) evidence establishing Mr. Jackson's and Ms. Sinodinos's individual qualifications (Jack. Mem. at 5-6). Mr. Jackson maintains that, despite this showing, the Arbitrator improperly allowed the District to shift the analysis of Jackson's *Shakman* claim away from what is required under the law by presenting evidence pertaining to Mr. Jackson's communication with Ms. Weger (*Id.* at 6). Mr. Jackson argues that the Arbitrator improperly focused upon this evidence, used it to opine negatively about his credibility, and then allowed the District to suggest that Mr. Jackson did not deserve a promotion because of "unclean hands" (*Id.* at 6-7).

The Arbitrator found Mr. Jackson's evidence "insufficient to establish that the Sinodinos selection had been affected by the alleged exercise of political influence by Michael Martin" (Jack. Mem., Exh. 1 at 31). The Arbitrator also found that even if Mr. Martin's comment regarding Ms. Sinodinos were politically motivated, Ms. Sinodinos nevertheless was selected over Mr. Jackson because she was the superior candidate (Id. at 31). The Arbitrator explained:

> [T]he evidence established that the Sinodinos selection had been based on <u>fair and valid selection criteria established by the District without regard to any political consideration</u>. As the evidence discussed at length shows, Sinodinos had clearly been <u>more qualified for the promotion</u> than John Jackson who did not even meet <u>the minimum eligibility qualifications</u>. The Panel's selection was consistent with the comparative Maintenance experience of Jackson and Sinodinos and, most

10

> critically, had been made consistent with the qualifications mandated by the District's Posting. It is clear, irrespective of Martin's compliment of Sinodinos's work, that <u>Jackson was not entitled to the Assistant Division Superintendent job in the Maintenance Department because he lacked prescribed Maintenance experience</u>.

(Id. at 32 (emphasis in original)).

We see no sound basis upon which to disturb this ruling. For an arbitration award to be vacated based on mistake, the moving party must show, by clear and convincing evidence, that there is a gross mistake of law or fact that is apparent on the face of the award. *LRN Holding, Inc., v. Robert Bosch Tool Corp.*, No. 3-12-0595, 2013 WL 4511333, at *5 (Ill.Ct.App. 2013). This means that "a reviewing court must be able to conclude, from the award's face, that the arbitrator was so mistaken as to the law that, if apprised of the mistake, he would have ruled differently." *Sloan Elec. v. Prof'l Realty & Dev. Corp.*, 819 N.E.2d 37, 44 (Ill.Ct.App. 2004).

Our review of the face of the Award reveals that the Arbitrator fully understood and properly applied the burden-shifting analysis required when considering an alleged *Shakman* violation. The Arbitrator set forth this standard in his Award, and even proceeded to the second prong of the analysis (whether the criteria used in selecting Ms. Sinodinos was fair and valid) despite finding that Mr. Jackson had failed to establish the first prong (whether political factors were integral to employment decisions) (Jack. Mem., Exh. 1 at 31). The Arbitrator considered the testimony of many witnesses, including Mr. Jackson; District employees John Pellegrino, Curtis Alexander, Timothy Paluch, and Colleen Sinodinos; District Superintendent Joseph Pellegrino; Division Superintendent Kathy Weger; former Regional Superintendent Jose Virella; and Maintenance Supervisor Len Dufkis. The Arbitrator reviewed at length the testimony regarding the duties of the Maintenance and Resource Management Departments. He reviewed evidence pertaining to the Posting and the application forms submitted by both Mr. Jackson and

11

Ms. Sinodinos. He considered the testimony surrounding Mr. Jackson's visit to Ms. Weger. He considered whether, political motivations aside, Ms. Sinodinos was chosen pursuant to "fair and valid" criteria. We find no indication that the Arbitrator so misunderstood the applicable law in this case that, apprised of any alleged mistake, he would have acted differently. *TruServ Corp. v. Ernst & Young, LLP,* 876 N.E.2d 77, 84 (Ill.App.Ct. 2007); *see also First Health Group Corp. v. Ruddick,* 911 N.E.2d 1201, 1215 (Ill.App.Ct. 2009) (in upholding arbitrator's award, the court noted that the arbitrator heard live testimony, assessed the credibility of witnesses and considered exhibits and evidence).

Mr. Jackson takes particular issue with the Arbitrator's attention to the facts surrounding his July 1st visit to Ms. Weger's office, which the Arbitrator viewed as a "furtive contact [that] had been made with an objective of adversely affecting the fairness of the selection process" (Jack. Mem., Exh. 1 at 15-16, 32), but which Mr. Jackson viewed as "irrelevant evidence which had no bearing on the true issue in the case" (Jack Mem. at 6). Mr. Jackson disagrees with the Arbitrator's lengthy description of the circumstances surrounding this visit (eight pages out of 32) and contends that the Arbitrator "even went so far as to suggest that because the incident could have invalidated Jackson's promotion, it was a factor to consider in deciding his claim" (*Id.* at 7).

The Arbitrator committed no gross error of law by plumbing the depths of this interaction in an effort to understand all that occurred among the persons involved in the interview process. While it is true, as Mr. Jackson points out, that the Arbitrator devoted about eight pages to the circumstances surrounding Mr. Jackson's visit to Ms. Weger's office, the Award is 32 pages long and provides a detailed account of all the witnesses and evidence presented at the hearing. Devoting eight pages to the topic of Mr. Jackson's visit to Ms. Weger's office, while lengthy, is

hardly an indicator of error on the Arbitrator's part. The Arbitrator did not predicate his findings on Mr. Jackson's *Shakman* violation or on a theory of "unclean" hands; rather, notwithstanding this episode, the Arbitrator found that Ms. Sinodinos possessed the requisite maintenance experience required of the Posting while Mr. Jackson did not. The Arbitrator acted well within his purview in making these assessments.[5]

Perhaps Ms. Sinodinos had the upper hand during the interview process because: (a) one of the panelists was her supervisor; (b) another panelist was her husband's supervisor; and (c) the panelists all had involvement with the Maintenance Department and thus may have placed a premium on Maintenance Department skills and experience. However, none of these factors involve the use of unlawful political considerations barred by *Shakman*. And, our task is simply to determine whether the Arbitrator grossly erred in the application of law—meaning an error so evident on the face of the award that the Arbitrator, if apprised of this error, would change his opinion. This is simply not the case here, and thus we will not interfere with the Arbitrator's conclusions.

## B.

Next, Mr. Jackson asserts that the Arbitrator's Award contains gross factual errors apparent on the face of the Award. All of these alleged errors involve instances in which the Arbitrator either misconstrued the qualifications required of the AMDS position or contradicted

---

[5] While the Arbitrator did not base his Award on Mr. Jackson's contact with Ms. Weger, the Arbitrator did express "serious questions about . . . [Mr. Jackson's] entitlement to the promotion after making such an improper pre interview contact" (Jack. Mem., Exh. 1 at 12-13). This raises the possibility that Mr. Jackson might have been disqualified from the interview process—prior to his own interview—had Ms. Weger immediately informed her supervisors of Mr. Jackson's visit. But the District did not raise this point to argue that the District met the second prong of the *Shakman* burden-shifting analysis, and the Arbitrator did not rule on this basis; accordingly, we need not further address this point.

himself by stating at various times within the Award that Mr. Jackson was less qualified than Ms. Sinodinos, only to state elsewhere within the Award that Mr. Jackson was more qualified than Ms. Sinodinos. Mr. Jackson contends that a review of the specific qualifications set forth in the Posting reveals how the Arbitrator grossly misconstrued the requirements and contradicted himself.

The Posting lists three minimum qualifications: (1) a high school diploma or G.E.D. Certificate; (2) four years of professional working experience in a Maintenance Operations Division; and (3) a valid commercial (Class B) driver's license (Jack. Mem., Exh. 10).[6] The Posting also contains a "Job Summary" that outlines the scope of the job, and a "Knowledge, Skills, Abilities and Other Characteristics" section that describes abilities necessary to the position, such as the ability to work well with others and to maintain employee moral (*Id.*). Mr. Jackson states that the Arbitrator, in assessing the minimum requirements for the job, incorrectly failed to consider "two other extremely important qualifications that were required for the job"—those being: (1) the requirement that candidates must possess knowledge of [District] personnel policies and procedures, including disciplinary and grievance procedures; and (2) the requirement that candidates have the ability to train all personnel in methods of fire-fighting and fire suppression (Jack. Mem. at 9). Mr. Jackson argues that he possesses much greater experience than Ms. Sinodinos in fighting and suppressing fires (*Id.* at 9-10).

From an examination of the Posting, it is clear that there are only three minimum requirements for the job. The attributes listed in the "Job Summary" section or the "Knowledge,

---

[6]As an exhibit to the motion, Mr. Jackson submitted the actual Notice of Job Opportunity (Jack. Mem., Exh. 10). The Arbitrator inserted additional language to the second requirement, so that it reads: "(2) four years of professional working experience in a Maintenance Operations Division; **or an equivalent combination of education, training and professional work applicable to the area of assignment**" (Jack. Mem., Exh. 1 at 22) (emphasis added). The minimum qualifications section of the Posting makes no mention of the "equivalent combination" language set forth above. We are unable to discern the source of this additional language; however, the Arbitrator adopts it and the District does not object to it. Thus, for purposes of this Memorandum Opinion and Order, we will assume its accuracy.

Skills, Abilities And Other Characteristics" sections, while certainly advantageous skills, are not minimum job qualifications (Jack. Mem., Exh. 1 at 24 n.8). Accordingly, there is no merit to Mr. Jackson's contention that the Arbitrator failed to take "other extremely important qualifications" into account. The Arbitrator found that while Mr. Jackson met two of the minimum qualifications (education and commercial driver's license), he did not meet the third: "four years of professional working experience in a Maintenance Operations Division or an equivalent combination of education, training and professional work applicable to the assignment" (*Id.* at 22). Moreover, as to that particular qualification, the Arbitrator found that Mr. Jackson "did not come close" to matching Ms. Sinodinos's experience level (*Id.*). Whereas Ms. Sinodinos had more than five years outside experience working maintenance for another company, and two and a half years of experience working for the Maintenance Department, Mr. Jackson had no "professional working experience in Maintenance having never working in such a Department or performed such duties either with the [District] or while in the Navy before his hire" (*Id.*). Critically, the Arbitrator noted that "whether he could have succeeded in Maintenance is irrelevant here. As part of the Panel's comparison of qualifications, the relative importance of professional working experience in Maintenance—the area of assignment—may not be ignored" (*Id.*).

The remainder of Mr. Jackson's argument pertains to his claim that the Arbitrator vacillated between minimizing his qualifications as compared to Ms. Sinodinos's qualifications, and, at other times, highlighting the strength of his application. Mr. Jackson suggests, for instance, that since the Arbitrator acknowledged that the overall scoring between Mr. Jackson and Ms. Sinodinos was "close," he could not also conclude that Ms. Sinodinos was the superior candidate.

In our view, Mr. Jackson has culled through an extensive, 32-page Award to find isolated instances in which he claims he has "caught" the Arbitrator making contradictory statements. We see no need to address each of these individual instances. The Arbitration Award, on its face, is consistent in the finding that Ms. Sinodinos was the more qualified candidate (and that the panel thus properly could reach that conclusion). We find no sound basis upon which to elevate these alleged inconsistencies to the level of "gross factual error."

We may not set aside an arbitration award for errors of law or fact if, after a full and fair hearing, the arbitrator ruled upon the submitted issues and the ensuing decision contains his honest decision. *Rauh v. Rockford Prods. Corp.*, 574 N.E.2d 636, 644 (Ill. 1991); *Duemer v. Edward T. Joyce and Assoc., P.C.*, 995 N.E.2d 321, 330 (Ill.Ct.App. 2013). There is no question that the Arbitrator conducted a full and fair hearing in this case. The hearing took place over the course of four days, testimony was taken from many witnesses, the Arbitrator ruled upon the submitted issues, and then he memorialized his findings in a comprehensive, detailed award. It is not the job of this Court to subject the Arbitrator to a level of scrutiny akin to appellate review. *See Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1129 (7th Cir. 1997). We decline Mr. Jackson's invitation that we do so here.

C.

Mr. Jackson's next argument asserts that the Arbitrator exceeded his authority when he limited the admissibility of the Vogel Report. By way of background, prior to the hearing, Mr. Jackson filed a motion asking that the Vogel Report be admitted as substantive evidence during the hearing, relying principally on *Everett v. Cook,* 704 F. Supp. 2d at 803 n.3, for the contention that *Shakman* claim investigation summaries are admissible under the public records or reports exception to Federal Rule of Evidence 803. The Arbitrator distinguished *Everett* from the facts

of this case, however, and concluded that the Vogel Report was "clearly admissible under FRE 803 but only as to its recitation of activities, matters observed and conclusions" (Jack. Mem., Exh. 13). The Arbitrator did not admit the substance of interviews conducted by Mr. Vogel and/or his staff of various co-workers and employees because they contained "vagaries," including information based on innuendo, second-hand knowledge, rumors, and alleged "common knowledge" (*Id.* at 2). Mr. Jackson asserts that the Arbitrator misconstrued the differences between *Everett* and the instant case and thus committed gross legal error apparent on the face of the Award. Mr. Jackson contends that "[a]n arbitration is supposed to grant more latitude with respect to admission of evidence than the court system" (Jack. Mem. at 13).

An arbitrator is obligated to provide the parties with a fundamentally fair hearing. *See Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Cent. Region v. Union Pacific R.R. Co.*, 522 F.3d 746, 751 (7th Cir. 2008); *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1992). A fundamentally fair hearing is "one that meets the minimal requirements of fairness—adequate notice, a hearing on the evidence and an impartial decision by the arbitrator." *Int'l Bhd. Elec. Workers v. CSX Transp., Inc.*, 446 F.3d 714, 720 (7th Cir.2006). But in conducting the hearing, the arbitrator enjoys wide latitude. *Generica*, 125 F.3d at 1130. "Arbitration proceedings are not constrained by formal rules or procedure or evidence; the arbitrator's role is to resolve disputes, based on his consideration of all relevant evidence, once the parties to the dispute have had a full opportunity to present their cases." *Id.* (quoting *Hoteles Condado Beach v. Union De Tronquistas*, 763 F.2d 34, 40 (1st Cir. 1985)). An "arbitrator is not bound to hear all of the evidence tendered by the parties. . . . [H]e must give each of the parties to the dispute an adequate opportunity to present its evidence and

arguments." *Id*. Only when the exclusion of relevant evidence actually deprives a party of a fair hearing is it appropriate to vacate an arbitral award. *Id*.

The Arbitrator's decision to exclude portions of the Vogel Report from evidence did not deprive Mr. Jackson of a full and fair hearing; nor did it constitute gross legal error. The Vogel Report was not binding upon the Arbitrator, just as it would not have been binding upon this Court had Mr. Jackson elected to proceed in federal court. Mr. Jackson may disagree with the Arbitrator's treatment of this non-binding report, but the Arbitrator had full discretion to exclude portions that he found to be of little probative value. The Arbitrator noted significant differences between the SRO Reports in *Everett* and those in the Vogel Report. The *Everett* reports, he found, did not contain statements of third parties but were "essentially retroactive summaries of Claim Investigations and do not contain the hearsay statements by interviewees we find in the Vogel Report" (Jack. Mem., Exh. 13). By contrast, the Arbitrator concluded that the Vogel Report contained statements of third parties *as recounted by the interviewer*—not independent third party statements—and that the summaries often failed to provide concrete examples of what was meant by such terms as "political favors," "good reputation," or "mediocre" or "atrocious" work (*Id*.). Accordingly, the Arbitrator decided that evidence of this nature needed to be provided first-hand by the interviewees themselves. This way, both parties would "receive fair treatment and a reasoned Award may be made" (*Id*.).

The Court can discern no grounds for disturbing this evidentiary ruling as the Arbitrator acted well within his bounds. "Arbitrators are not bound by the rules of evidence." *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 591 (7th Cir. 2001) (quoting *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 203-04 n.4 (1956)). Further, Mr. Jackson elected to proceed with arbitration rather than pursue his claim in the judicial arena. He opted for a "quicker, less

18

structured way of resolving disputes," and so he must now abide by the consequences of making that choice, including the fact that he lost "the right to seek redress from the courts for all but the most exceptional errors at arbitration." *Dean v. Sullivan*, 118 F.3d 1170, 1173 (7th Cir. 1997). Despite Mr. Jackson's protestations about the Arbitrator's alleged misapplication of *Everett*, we find no gross error on the face of the Award nor any other evidence of exceptional error suggesting that the Arbitrator exceeded his authority.

### D.

Finally, Mr. Jackson maintains that the Arbitrator exceeded his authority by failing to order the production of Kathy Weger's disciplinary records. This argument, once again, takes issue with the propriety of an evidentiary ruling. For the same reasons stated above, we conclude that the Arbitrator did not err in refusing to order these records. Following an *in camera* inspection, the Arbitrator concluded that Ms. Weger's disciplinary records were of little probative value because they did not shed any light on whether the District unlawfully discriminated against Mr. Jackson. He did, however, allow Mr. Jackson to question Ms. Weger during the hearing about her disciplinary record. The Arbitrator had full discretion to make this evidentiary ruling. It is not for this Court to stand in judgment of every ruling the Arbitrator made. To hold otherwise would be tantamount to giving Mr. Jackson the proverbial second bite at the apple. *See Slaney*, 244 F.3d at 591 (noting that "[o]ur judicial system is not meant to provide a second bite at the apple for those who have sought adjudication of their disputes in other forums and are not content with the resolution they have received"). Mr. Jackson has failed to demonstrate any prejudice he suffered from this ruling; nor has he shown how this ruling rises to the level of gross legal error on the face of the award or how it deprived him of a full and fair hearing.

## CONCLUSION

For the reasons set forth above, the Court denies Mr. Jackson's Motion to Vacate the Arbitration Award (doc. # 3549). We therefore confirm the arbitration award dated June 20, 2013 denying Mr. Jackson's claim. This case is terminated.

ENTER:

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: June 2, 2014**