UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN and PAUL M. LURIE *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 69 C 2145 |
| v. | ) ) | |
| THE DEMOCRATIC ORGANIZATION OF COOK COUNTY *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

## *AMICUS CURIAE* SUBMISSION BY THE OFFICE OF EXECUTIVE INSPECTOR GENERAL FOR THE AGENCIES OF THE ILLINOIS GOVERNOR

The Office of Executive Inspector General for the Agencies of the Illinois Governor (the "OEIG") respectfully submits this statement as *amicus curiae* in the above-captioned matter. With the Court's permission, the OEIG is appearing as *amicus curiae* not in support of any party's position, but to provide information to assist the Court in resolving the matters before it. More specifically, this statement includes information regarding the OEIG's jurisdiction, duties and responsibilities, as well as the OEIG's investigation of matters related to issues now before this Court. As an independent agency whose statutory duties include monitoring State hiring practices, the OEIG is in a unique position to provide background information, facts and data that may not be found in the parties' submissions, and may assist the Court in determining what remedies, if any, should be undertaken in this matter.

Below we discuss: (1) the basis for the OEIG appearing as *amicus curiae*; (2) the history of the Ethics Act and the OEIG; (3) the Supreme Court's decision in *Rutan v. Republican Party of Illinois* and the State of Illinois' actions to comply with that decision; (4) the OEIG's

investigation regarding employment practices at the Illinois Department of Transportation ("IDOT"); and (5) activities the OEIG has undertaken with regard to State hiring and employment.

## I.    BASIS FOR THE OFFICE OF EXECUTIVE INSPECTOR GENERAL TO APPEAR AS *AMICUS CURIAE*

The OEIG is in a position to assist the Court because the Plaintiffs' allegations and the relief sought in this Court implicate the investigative mandate and the investigative activities of the OEIG.  First, the Plaintiffs' allegations implicate the OEIG's duty under the Ethics Act to "review hiring and employment files of each State agency within [its] jurisdiction to ensure compliance with Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), and with all applicable employment laws."  5 ILCS 430/20-20(9).  The Plaintiffs allege that the Governor has "applied prohibited political considerations to reassign numerous State employees from exempt to non-exempt positions[,]"  (Plfs' Amended Mot. for Supp. Relief (Dkt. No. 3744), hereafter "Plfs' Amended Mot.," at 1), in violation of *Rutan v. Republican Party of Illinois,* 497 U.S. 62 (1990), and in violation of a 1972 consent judgment that was entered in this case.

Second, the Plaintiffs' allegations and request for relief also implicate a specific investigation that the OEIG has recently completed involving IDOT's misuse of a "Staff Assistant" position to circumvent administrative orders designed to ensure compliance with *Rutan.*  Specifically, the Plaintiffs allege that IDOT created a scheme whereby it "created or re-designated numerous 'staff assistant' or 'executive secretary,' positions, which it designated as *Rutan*-exempt even though the jobs performed by those placed in the positions did not actually require the sort of policy making tasks that would qualify the position as exempt."  (Plfs' Amended Mot. (Dkt. No. 3744) at ¶ 16.)  According to the Plaintiffs, the "*faux*-exempt positions

were filled with employees based on political consideration rather than qualifications." (*Id.*)

As relief, the Plaintiffs seek, among other things, the appointment of a Special Master to: (1) "investigate and recommend appropriate reforms in the employment practices for non-exempt jobs under the jurisdiction of the Governor within the Northern District of Illinois"; (2) provide input regarding the development "of a hiring, promotion, reassignment and employment plan for non-exempt positions"; and (3) provide input regarding the development "of a list of employment positions that are properly exempt from the rules against political sponsorship or conditioning employment upon political factors or considerations." (Plfs' Amended Mot. (Dkt. No. 3744) at 10.)[1] Plaintiffs' allegations and request for relief clearly implicate laws for which the OEIG is charged with ensuring compliance and relate to OEIG investigative activities.

Specifically, on August 22, 2014, the Executive Ethics Commission (EEC) published the OEIG's Final Report for Case No. 11-01567, *In re Schneider, Hannig, Hughes, Woods, Jr.* ("Report").[2] Based on the confidentiality provisions of the Ethics Act, 5 ILCS 430/20-90 and 20-95, it is the OEIG's policy not to publicly disclose or discuss its pending investigations unless and until its final reports are published by the EEC. Accordingly, although the OEIG's investigation regarding hiring practices at IDOT commenced in 2011[3] and was completed and

---

[1] In their Reply to Governor Quinn's Response, Plaintiffs clarified that they are asking the Court to "appoint a monitor with the initially limited assignment of working with IDOT and the Governor's Office … to determine why the admitted conduct occurred, whether it would be too costly (as Secretary Schneider claimed) to open the positions to others, and what needs to be done systemically to prevent future violations." (Plfs' Reply [Docket No. 3869] at 3.)

[2] A copy of the Report as published by the EEC is attached to this Statement as an Appendix. Pursuant to the Ethics Act, 5 ILCS 430/20-52(b),the EEC has redacted certain information.

[3] The Plaintiffs' motion implies that the OEIG's IDOT investigation began in early 2012. (Plfs' Amended Mot. (Dkt. No. 3744) at ¶14.) In fact, the OEIG's investigation began in April 2011 based on complaints received by the OEIG, and then in September 2011, the OEIG self-initiated a wider and more expansive investigation into the "Staff Assistant" position.

provided to the Office of the Governor on June 12, 2014, the OEIG was constrained from publicly disclosing its investigative activities, its findings or its recommendations until August 22, 2014, when the EEC publicly released the Report. Nevertheless, witnesses or news reporters may become aware of OEIG investigations (as they did in this matter) while the investigations are pending, and the Ethics Act does not expressly prohibit those persons or entities from disclosing what they learn about OEIG's investigative activities.[4] Indeed, in support of their motion, Plaintiffs cite to information in a news article published on August 14, 2013. (Plfs' Amended Mot. (Dkt. No. 3744) at ¶ 14.)

The Plaintiffs' claim in this matter, and in particular their request for appointment of a Special Master, implicates the OEIG's jurisdiction and duty under the Ethics Act to ensure compliance with *Rutan* and all other applicable employment laws. The Respondent's defense is, in part, based expressly on the Governor's signing into legislation the expansion of the OEIG's "jurisdiction to cover *Rutan* hiring and directing the OEIG to investigate allegations of prohibited employment practices." (Gov. Quinn's Resp. (Dkt. No. 3809) at 16.) Accordingly, both the claims and the defenses in this matter implicate statutory mandates and executive orders that are administered by the OEIG. Moreover, the Office of the Governor's statements regarding action(s) it has taken reflect OEIG recommendations made in its Report.[5]

---

[4]    The Better Government Association (BGA) became aware that the OEIG was investigating IDOT and, on multiple occasions, sought to obtain confidential information relating to its investigation. OEIG staff, however, declined to disclose any information. Thereafter, the BGA printed a news article relating to IDOT's staff assistant position in which they identified their "findings," the first of which was that the "state's executive inspector general is investigating hiring irregularities, and has interviewed a number of former state-government employees." (www.bettergov.org/clout_hiring_persists_under_quinn/)

[5]    At the time counsel for the OEIG appeared before the Court on July 29, 2014 seeking leave to appear as *amicus curiae* in this matter, the confidentiality constraints discussed above prevented the OEIG from stating that it had completed its investigation on June 12, 2014, and had received a response

**II.     HISTORY OF THE STATE OFFICIALS AND EMPLOYEES ETHICS ACT AND THE OFFICES OF EXECUTIVE INSPECTORS GENERAL**

In 2003, the State Officials and Employees Ethics Act (Ethics Act) was enacted. 5 ILCS 430/1-101 *et seq*. Among other things, the Ethics Act created five independent Executive Inspectors General ("EIGs"), as well as a Legislative Inspector General, and the Illinois Executive Ethics Commission. The OEIG is one of the five independent EIGs.[6] The jurisdiction of each EIG was to "investigate allegations of fraud, waste, abuse, mismanagement, misconduct, nonfeasance, misfeasance, malfeasance, or violations of [the Ethics Act] or violations of other related laws and rules." 5 ILCS 430/20-10(c). As initially enacted, the Ethics Act provided that the EIGs could only investigate allegations or complaints they received, and that they were required to keep their investigations confidential. In other words, the EIGs could not self-initiate investigations in the absence of a complaint, and could not publicly disclose the results of its investigations, even if there were findings of wrongdoing.

In 2009, the Legislature amended the Ethics Act to change how EIGs operate in three key respects. *First,* the Ethics Act now allowed EIGs to self-initiate investigations; the amendment removed language from Section 20-20 of the Act that prohibited EIGs from initiating investigations upon their own prerogative. *Id.* § 430/20-20.

*Second*, the Ethics Act, as amended, included a process by which the EEC was required to publicly release certain EIG final reports and had the discretion to release other EIG final

---

from the Office of the Governor on July 3, 2014, in which the Office of the Governor agreed to implement all OEIG recommendations, including its recommendation that the staff assistant position be abolished.

[6]     The other four EIGs are for the Illinois Attorney General, Secretary of State, Comptroller, and Treasurer.

reports.  5 ILCS 430/20-52(a).  Specifically, the Ethics Act now provides that in instances where there are EIG findings of wrongdoing and the affected agency terminates the alleged wrongdoer(s) or imposes a suspension of at least three days, the EEC is required to publish the EIG's final report.  *Id.*  In all other instances, the EEC has the sole discretion to determine whether to publish an EIG final report.  *Id.*

*Third,* the Ethics Act, as amended, required EIGs to "*review* hiring and employment files of each State agency within the Executive Inspector General's jurisdiction to ensure compliance with Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), and with all applicable employment laws."  5 ILCS 430/20-20(9) (emphasis added).

## III.  THE *RUTAN* DECISION AND STEPS THE STATE OF ILLINOIS UNDERTOOK TO COMPLY WITH *RUTAN*

In 1990, in *Rutan v. the Republican Party of Illinois*, 497 U.S. 62 (1990), the United States Supreme Court held that "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so."  *Id.* at 78.  The government can show such a vital interest by showing that "party affiliation is an appropriate requirement for the effective performance of the pubic office involved."  *Id.* at 71 n.5.

The State of Illinois undertook steps to comply with the *Rutan* decision. Specifically, three Illinois Governors executed successive versions of an Administrative Order aimed at making certain the State of Illinois had a process in place by which it would comply with the *Rutan* decision.  The general mandate of the Administrative Orders was not merely that hiring would be non-political, but that:  "All hiring and other personnel decisions shall be based on the

6

merit and qualification of the candidates." (Administrative Order No. 1 (1990).) In summary, the process established by the various Administrative Orders is as follows:

*First*, if a State agency wants to create a new position, the position description is provided to the Illinois Department of Central Management Services (CMS), which makes an independent determination as to whether the position is to be *Rutan*-covered (meaning that hiring must be based solely on merit) or *Rutan*-exempt (meaning that political affiliation may be considered). CMS's determination is based largely on the duties of the position. The essential criterion for determining *Rutan*-exempt status is whether the duties of the position are such that political affiliation or political loyalty is a valid requirement for the position. Among the various specific factors that CMS considers is whether the position involves policymaking, spokesperson responsibilities, or the handling of confidential information. If the position is determined to be *Rutan*-exempt, the State agency may fill the position without regard to the procedures required to fill *Rutan*-covered positions.

*Second,* if the position is determined to be *Rutan*-covered, the Administrative Orders require State agencies to follow a specified hiring procedure to ensure that openings for the positions will be publicly posted, that there is open competition for the position, and that the position is filled based on politically neutral, merit-based criteria.

## IV. OEIG INVESTIGATION INVOLVING EMPLOYMENT PRACTICES AT IDOT

On August 22, 2014, the EEC published the OEIG's Final Report (Report) for Case No. 11-01567, *see* Appendix, which was the culmination of a three year-plus OEIG investigation, the majority of which was self-initiated, regarding hiring improprieties at IDOT. Under the Ethics Act, the EEC was not required to publish OEIG's Final Report relating to IDOT hiring because

no employee was suspended for at least three days or terminated.[7] *See* 5 ILCS 430/20-52(a).  The EEC published the Report under its discretion to do so as granted by the Act.  *See id.*

The Report concludes, under a "reasonable cause" standard, that IDOT used a putatively *Rutan*-exempt "Staff Assistant" position to improperly hire personnel in circumvention of the merit-based process required for hiring personnel into non-exempt (or *Rutan*-covered) positions. The OEIG investigation found that after CMS was provided with IDOT's Staff Assistant position description, CMS then concluded, based on the position description, that Staff Assistants would be *Rutan*-exempt positions.  CMS's determination thus allowed IDOT to fill the Staff Assistant position based on political affiliation or other non-merit based considerations.  However, the OEIG found that IDOT generally hired and assigned persons into Staff Assistant positions to perform duties either exclusively, or almost exclusively, outside the duties set forth in the Staff Assistant position description.  In other words, most persons hired as Staff Assistants were not assigned the actual duties and responsibilities of the Staff Assistant position, but rather were assigned other duties, all or most of which would not support *Rutan*-exempt status.

Specifically, the OEIG investigation resulted in the following findings. *First*, *Rutan*-exempt Staff Assistants were hired to perform the duties of *Rutan*-covered positions. For example, in May 2010, a Staff Assistant was hired in IDOT's Division of Highways to perform the duties of a *Rutan*-covered Reproduction Services Supervisor position, which involved: (i) overseeing the functions of the Copy Center; (ii) performing print jobs; and (iii) directing Copy Center staff on the completion of copy jobs.  (Report at 47-48.)  In addition, in November 2007,

---

[7]    None of the persons against whom the OEIG made findings was suspended for at least three days or terminated.  The individuals either resigned, had already left IDOT, or their employment status (contract) with the Office of the Governor had expired.

a Staff Assistant was hired in IDOT's Division of Highways to perform the duties of a *Rutan*-covered Support Services Technician position, which involved assisting with: (i) the operation of the motor pool; (ii) maintaining the district supply stockroom; (iii) providing District duplication services; and (iv) performing an annual inventory of all District equipment. (Report at 48-50.)

*Second, Rutan*-exempt Staff Assistants were transferred into *Rutan*-covered positions without going through the *Rutan* hiring process. For example, in April 2006, a Staff Assistant in IDOT's Division of Highways was transferred into the *Rutan*-covered Resource Analyst position, without interviewing for the position. (Report at 70.) In addition, in November 2004, a Staff Assistant who worked in the Bureau of Personnel Management was transferred into the *Rutan*-covered Employment Support Assistant position, without interviewing for the position. (Report at 67-68.)

*Third*, *Rutan*-exempt Staff Assistants reported to *Rutan*-covered supervisors. For example, a Staff Assistant was hired in June 2010 into the Division of Highways and reported to a supervisor in the *Rutan*-covered title Roadside Development Architect. The duties the Staff Assistant performed under the *Rutan*-covered supervisor included: (i) marking trees for removal, (ii) reviewing ComEd tree trimming work, and (iii) reviewing applications to trim trees for advertising signs. (Report at 64-66.)

*Fourth*, *Rutan*-exempt Staff Assistants were evaluated for the performance of duties or in titles that were unrelated to the Staff Assistant position description. For example, a Staff Assistant who was hired in August 2008, in IDOT's Division of Aeronautics, was evaluated in the title Property Maintenance Specialist, which is a position title that does not exist at IDOT. His performance evaluations stated that his duties were: (i) performing property inspections of

9

State-owned properties; (ii) reviewing bills from contractors for work done on State-owned property; (iii) interfacing with subcontractors on mowing, security, and building maintenance; and (iv) serving as a contact person for Rental Tenants. (Report at 51-53.) The OEIG further found that while holding the Staff Assistant position, employees were evaluated in titles such as: Administrative Developer; Pump Station Technician; Computer Support Technician; Compliance Representative; Payroll Administrative Specialist; and Financial Specialist. (Report at 57-58.)

*Fifth*, *Rutan*-exempt Staff Assistants were subsequently hired into *Rutan*-covered positions because of the experience they gained while performing *Rutan*-covered duties as Staff Assistants. For example, a Staff Assistant who was hired in January 2011, in the Office of Finance and Administration, performed the duties of a *Rutan*-covered Procurement Assistant position, as established by interviews with his supervisor and a review of his personnel file. In June 2012, the Staff Assistant was hired into the *Rutan*-covered Senior IT Procurement Analyst position after going through the *Rutan* hiring process because of the procurement experience he gained while holding the *Rutan*-exempt Staff Assistant position. (Report at 59-60.)

In general, the OEIG found evidence that some of the Staff Assistants were hired based on political affiliation, but also found that some Staff Assistants were hired based on familial relationships, expedience, or some other non-political factor. While such non-political, but nevertheless preferential, hires might not have violated the First Amendment under the *Rutan* decision, they violated the Administrative Orders promulgated by the Governor's Office for the purpose of ensuring compliance with *Rutan*.

10

Although the Administrative Orders were designed to ensure compliance with *Rutan*, they have the added effect of prohibiting hiring into *Rutan*-covered positions based on anything other than merit, thus assuring that public employment is available to all applicants on an equal basis, and assuring that public positions will be filled by persons who are qualified to execute the requirements of the position. Violations of the Administrative Orders are no less harmful to the public interest simply because they may have been based on nepotism, cronyism or expedience rather than political affiliation.

## V. OTHER ACTIVITIES THE OFFICE OF EXECUTIVE INSPECTOR GENERAL HAS UNDERTAKEN REGARDING STATE HIRING AND EMPLOYMENT

As noted above, in 2009, the Legislature amended the Ethics Act to provide that the Executive Inspector General shall have the duty to:

> review hiring and employment files of each State agency within the Executive Inspector General's jurisdiction to ensure compliance with Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), and with all applicable employment laws.

5 ILCS 430/20-20(9).

Since 2009, the OEIG has reviewed numerous State hiring and employment related activities. That review has included the review of employment files of agencies within its jurisdiction. The OEIG's file review has occurred in connection with investigations of alleged hiring improprieties, and the investigative review has been extensive. The OEIG has undertaken numerous investigations involving hiring issues and found a variety of instances of hiring-related improprieties. Some investigations involved violations of agency policies, some were violations of the Administrative Orders intended to enforce *Rutan*, and some involved political hiring. Below are examples, in addition to the IDOT/Staff Assistant investigation discussed above, which are publicly available:

11

- *In re Godinez and Buscher,* involving violations of agency employment policy
- *In re Miller,* involving violation of a *Rutan* related administrative order
- *In re Sarmiento, et al.,* involving violation of a *Rutan* related administrative order
- *In re Devlin, et al.,* involving violation of the Personnel Code and *Rutan* related administrative order
- *In re Phelps, et al.,* involving hiring improprieties

In addition, the OEIG has conducted numerous other investigations relating to hiring irregularities, but because the OEIG concluded that the allegations were unfounded or the investigative reports were otherwise not made public, the OEIG is unable to provide this Court with more specific information regarding those investigations. 5 ILCS 430/20-95.

With regard to investigations in general, below is a chart reflecting OEIG investigations completed, the number of investigations resulting in "founded" reports (reports containing findings of wrongdoing), and the number of final reports the EEC published, from 2009 to 2014:

|  | Investigations Completed | Investigations Completed/Founded Report Issued | Reports Published |
|---|---|---|---|
| FY09 | 182 | 91 | 0 |
| FY10 | 172 | 69 | 7 |
| FY11 | 303 | 98 | 22 |
| FY12 | 135 | 38 | 30 |
| FY13 | 126 | 30 | 22 |
| FY14 | 91 | 24 | 19 |
| **Totals** | *1009* | *350* | *100* |

Under the Ethics Act's confidentiality provisions, until the OEIG completes an investigation with a finding wrongdoing and either (1) the investigation results in the suspension of an employee for at least three days or the termination of the employee, or (2) the EEC exercises its discretion to release the report, the general public necessarily has limited knowledge of the OEIG's activities, including: the scope of the investigation, the OEIG's findings and

recommendations and the steps, if any, that have been taken to correct the problems. As a result, the public is only informed of OEIG activities when there is a finding of wrongdoing *and* the OEIG's final report is made public, as occurred with regard to the OEIG's IDOT Report, which it completed on June 12, 2014, but was not publicly disclosed by the EEC until August 22, 2014.

The OEIG will continue to perform its duties and responsibilities as it relates to the oversight of the State's hiring and employment practices within the confines of State law, and will continue to take whatever steps are necessary (and seek whatever additional resources are necessary) to continue to perform its duties on behalf of Illinois citizens.

The OEIG is available to address or respond to any other inquiries the Court deems appropriate.

Dated:  September 15, 2014
Chicago, Illinois

Respectfully submitted,

LISA MADIGAN
ILLINOIS ATTORNEY GENERAL,
On behalf of the Office of the Executive
Inspector General for the Agencies of
the Governor, by


 */s Francis Neil MacDonald*
Assistant Attorney General

Francis Neil MacDonald
Special Litigation Bureau
Office of the Illinois Attorney General
100 W. Randolph Street, 11th Floor
Chicago, Illinois 60601
(312) 814-5194 (o)
(312) 814-4452 (f)
 fmacdonald@atg.state.il.us