**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **MICHAEL L. SHAKMAN and** | ) | |
| **PAUL M. LURIE,** *et al.,* | ) | **Case No. 69 C 2145** |
| Plaintiffs, | ) | |
|  | ) | |
| **v.** | ) | |
|  | ) | |
| **DEMOCRATIC ORGANIZATION OF** | ) | **Sidney I. Schenkier** |
| **COOK COUNTY,** *et al.,* | ) | **United States Magistrate Judge** |
| Defendants. | ) | |

## FIFTH REPORT OF THE SPECIAL MASTER

On November 18, 2014, the Court directed the Special Master, along with her staff and appointed legal counsel, to: (i) investigate the scope and reason for any violation of the 1972 Decree regarding the Illinois Department of Transportation ("IDOT"); (ii) recommend measures that may be necessary or appropriate to prevent any recurrence; (iii) assess the implementation of those efforts to ensure that they are effective; (iv) address whether positions in IDOT labeled as *Rutan*-exempt were properly exempt under applicable legal principles; and, (v) make recommendations for how to remedy any violations of the 1972 Decree. (*See* Order Appointing a Special Master for IDOT, Dkt. 4020 ¶ 3).

The Plaintiffs sought the appointment of a Special Master, in part, because of their concern that the Office of the Executive Inspector General ("OEIG") did not fully investigate the role of the Governor's Office in the misuse of the Staff Assistant position at IDOT. (Plaintiffs' Sur-Reply, Doc. 3949 at 5-8). The OEIG Report, published on August 22, 2014, stated: "[OEIG was] unable to conclude that the Office of the Governor was aware of IDOT's misuse of the Staff Assistant position or who was aware that IDOT was circumventing the *Rutan* hiring process." (2014 OEIG Report at 232). As stated in the Special Master's First Report ("First Report"), our investigation revealed additional evidence of the Governor's Office's involvement that warranted further investigation. (First Report at 15). This Report includes the findings of that investigation.

## I. BRIEF HISTORY OF POLITICAL MANIPULATION, *RUTAN* VIOLATIONS & RECOMMENDATIONS FOR REFORM

To place the present investigation into context, it is helpful to understand the history of reported unlawful patronage practices in the State of Illinois. Over the past decade, various reports have identified illegal hiring practices in the State of Illinois. Namely, two reports issued by the OEIG in 2004, publicly available information about hiring/employment violations during former Governor Blagojevich's term, information revealed during an investigation by the U.S. Attorney's Office, the identification of various clout lists maintained by the Blagojevich Administration, and evidence regarding awarding appointments to Boards and Commissions in exchange for campaign donations, have identified patronage as an ongoing problem in the State of Illinois. Indeed, Governor Quinn established the Illinois Reform Commission in 2009 to help identify needed reforms following the arrest and impeachment of Governor Blagojevich. The Reform Commission made a series of recommendations regarding hiring and employment practices necessary to eliminate manipulation of state hiring in the future. Those reforms were never fully implemented.

### A. 2004 OEIG Report No. 1

In September 2004, the OEIG issued a Final Report (attached as Exhibit 1) regarding "multiple complaints alleging hiring improprieties" at the Illinois Department of Employment Security ("IDES").[1] "Specifically, complainants alleged intentional failures to follow the mandates of Rutan … and bypassing recognized State hiring protocol." The OEIG concluded that the allegations were founded. (*See* Ex. 1 at 1).

The OEIG found that "the HR Department of IDES, in conjunction with individuals in the Governor's Office of Intergovernmental Affairs ('GOIA'), manipulated titles, credentials, positions, position location, or other criteria to fit candidates sponsored by GOIA into positions at IDES without following State law or normal State hiring protocol." Additionally, IDES created positions, titles, and responsibilities to accommodate sponsored candidates. Per IDES Director Brenda Russell, "the procedure was that Joe Cini (Director of GOIA), or someone else at GOIA, would call her to say that they had someone for a job at IDES and they would fax over a resume. The director arranged an interview and GOIA called back to check on how the interview went."[2] (Ex. 1 at 1-2).

The candidates sent by GOIA were frequently unqualified, and testimony from Director Russell revealed that certain candidates could not be refused by the agency. Former IDES HR Director Walker testified that Director Cini from GOIA told him that: (1) "GOIA needed to place

---

[1] This Report became publicly available during the impeachment of Governor Blagojevich.

[2] Notably, one of the persons from GOIA who sent resumes to IDES of favored candidates was now current State of Illinois Representative Michael J. Zalewski. (Ex. 1 at 9).

2

people in positions for which they have no experience, and they 'can be dealt with later'"; and (2) "the Governor's Office determines the hiring process, not the agency (in this case, IDES)." (Ex. 1 at 9. *See also, Id.* at 2 (outlining the forced hiring of a candidate for HR Director, despite her lack of relevant qualifications or experience)).

The OEIG concluded: "There can be little dispute that the Governor's Office improperly exercised a great deal, if not all, control over the hiring at IDES." The OEIG noted that: (a) the Governor's Office sent an unqualified candidate who was hired as a *Rutan*-exempt employee because of her connections; (b) qualified candidates who did not come through GOIA were denied employment; (c) the politically connected candidates hired did not perform the duties described in their written position descriptions; and, (d) candidates were placed into *Rutan*-exempt positions temporarily with the intention that they would later be hired into permanent positions. (*See* Ex. 1 at 2, 4, 7-9, 17-18, 20).

Additionally, the OEIG Report noted that employees who did not cooperate in the scheme would face retaliation, as was the case with the new IDES HR Director Walker. When Walker questioned, or refused to hire candidates sent by the Governor's Office, then-Governor's Office official Zalewski arranged to have Walker fired. The OEIG found that "Walker's efforts at effective management were obstructed and criticized … and ultimately led to his dismissal." (*See* Ex. 1 at 2, 9-11).

### B. 2004 OEIG Report No. 2

Another OEIG Report, also issued in September of 2004, addressed political manipulation of hiring within the Department of Corrections ("DOC").[3] That Report found that two employees were hired illegally into DOC positions that were mandated to be filled by Veterans through a *Rutan*-covered process. The two employees, former State Representative James Phelan and Manuel Acevedo, brother of State Representative Edward Acevedo, were hired as parole supervisors.

In the case of Representative Phelan, the hiring authority received calls directly from Illinois House Speaker Mike Madigan urging the agency to hire Phelan. In his interview, Phelan presented the interviewer with a business card reflecting Phelan's connection to Congressman Lipinski. Notably, Phelan had recently been fired from the City of Chicago's Department of Streets and Sanitation for poor work performance. In the case of Acevedo, he was hired as an "intern" although he performed the duties of the job he applied for—parole officer. The hiring as an "intern" allowed DOC to bypass the *Rutan* hiring requirements.

---

[3] This Report is not publicly available and therefore we rely on newspaper articles that described the nature of the violations.

### C. 2009 Illinois Reform Commission Report

In April 2009, after a lengthy investigation, the Illinois Reform Commission recommended changes to *Rutan*-exempt hiring in its "100-Day Report." To address State patronage abuses, the Reform Commission recommended changes to "more clearly expose ongoing patronage practices while protecting against similar future corruption." (*See* Reform Commission Report at 78).

In addition to recommending an "independent monitor" "to identify patronage abuses and opportunities for reform," the Reform Commission made the following recommendations: (1) legislation or regulations requiring agencies to cooperate with the monitor and prohibiting retaliation against employees who report violations; (2) a public and regularly updated list of *Rutan*-exempt positions (as well as *Rutan*-covered and Personnel Code positions); (3) legislation to protect against wide-scale patronage; (4) prohibitions against accepting campaign contributions from State employees; and (5) reconciliation of *Rutan* with the Personnel Code, so that *Rutan*-exempt positions are exempt from Code protection." (*See* Reform Commission Report at 78-79). Thus, as early as 2009, the State was aware that affording code protection to *Rutan*-exempt positions violated *Rutan* principals. Despite these recommendations, none of those reforms was implemented during Governor Quinn's term. More recently, Governor Rauner has complied with recommendation number (2) and is in the process of complying with recommendation number (5).

These reports (among others) provided notice to State officials that patronage was a problem in the State of Illinois. The Staff Assistant abuse at IDOT occurred after these reports and recommendations were issued. This report focuses on the scope of and reasons for the Staff Assistant abuse at IDOT so that meaningful reforms can be undertaken.[4] Future reforms will only be successful if they address the full scope of past violations.

## II. SUMMARY OF INVESTIGATION FINDINGS

Similar to what was described in the 2004 OEIG Reports, the Special Master's investigation revealed that individuals in Governor Quinn's Office manipulated the hiring process to place low level and often unqualified candidates sponsored by the Governor's Office and/or other elected officials into *Rutan*-exempt positions at various state agencies. Personnel transactions were frequently initiated at the request of the Governor's Office, rather than by a State agency. The Governor's Office passed resumes of politically connected candidates and persistently followed-up with the agency to check on the status of the personnel requests. At times, the Governor's Office specifically instructed an agency to create a personnel request, to find a position for a candidate, or to approve a pending personnel request. In some instances, once a hire received final approval from the Governor's Deputy Chief of Staff and Chief of Staff for a "sponsored"

---

[4] This report focuses on the investigation findings and does not address recommended reforms. Based on those findings, the Special Master will work with the parties to develop and implement meaningful and comprehensive reforms.

4

candidate, the Governor's Office would report back to the sponsor that their recommended candidate was hired.

Our investigation concluded that the Governor's Office played a key role in the Staff Assistant abuse at IDOT. Most notably, the pressure exerted by the Governor's Office to onboard low-level politically connected candidates was the driving force behind the escalating number of Staff Assistants hired at IDOT. The Governor's Office pushed the politically connected candidates through the *Rutan*-exempt approval process with little to no regard for actual hiring need or whether the candidate was qualified to fulfill the stated duties of the job. Many of the sponsored candidates lacked qualifications to perform the duties described in the applicable position description, and performed *Rutan*-covered duties instead. Qualified candidates who did not come through the Governor's Office were sometimes denied employment, despite the requesting department's request to hire them.

Our investigation revealed that certain individuals in Governor Quinn's Office manipulated the *Rutan*-exempt process in a number of ways, including:

- Sending politically connected candidates to IDOT and other agencies for interview and placement, without an agency request, or a clear agency need;

- Persistently following up on candidates and pressuring IDOT to hire the Governor's Office's preferred candidates;

- Pressuring IDOT to hire politically connected candidates who were unqualified to perform the Staff Assistant duties;

- Misusing the *Rutan*-exempt hiring process to place politically connected candidates into positions the Governor's Office knew or should have known were not truly *Rutan*-exempt;

- Misusing the emergency and temporary employee classifications to circumvent hiring protocols and to quickly onboard politically connected candidates;

- Pressuring agencies to hire politically connected individuals who were unqualified to perform the duties stated in the *Rutan*-exempt job description or who would not be performing the duties listed in the job description;

- Having knowledge that some candidates hired through the *Rutan*-exempt process were performing *Rutan*-covered duties; and

- Continuing to allow hiring of *Rutan*-exempt employees into Personnel-Code covered and/or union covered positions despite knowing job protections offered through the Personnel Code and/or collective bargaining agreements were inconsistent with *Rutan*-exempt status.

Moreover, the Special Master's investigation also revealed that a limited number of Elected Officials or their staff members manipulated the *Rutan*-exempt process in a number of ways, including:

- Pressuring the Governor's Office, IDOT and other state agencies to hire their sponsored candidates;

- Sending unqualified politically-connected candidates for hire into *Rutan*-exempt positions at IDOT and in other state agencies to influence hiring decisions; and,

- Using their public offices to influence state agencies to hire their family members, friends, and/or campaign workers.

## III. SCOPE OF INVESTIGATION

### A. Temporal Scope of Investigation

The investigation focused on violations of the 1972 Decree between **2009 and 2014**, with certain exceptions, as specifically noted. The investigation was limited to this time period because: (1) *Rutan* violations during the Blagojevich Administration are already well-documented; (2) the majority of improperly hired Staff Assistants were hired during this time period; and (3) the information available during this investigation related to events occurring primarily during this time period.

### B. Witnesses Interviewed

The Special Master's office interviewed ten former or current Governor's Office or IDOT employees on the record as part of the investigation into the Governor's Office's involvement in the misuse of the Staff Assistant position.[5]

| Interview Date | Name | Position(s)[6] |
|---|---|---|
| July 23, 2015 | Matt Hughes | IDOT: Bureau Chief of Personnel Management (2009-2010)<br>IDOT: Director of Finance & Administration (2010-2013) |
| August 27, 2015 | Ann Schneider | IDOT: Director of Finance & Administration (2005-2010)<br>IDOT: Chief Operating Officer (2010-2011)<br>IDOT: Secretary (2011-2014) |

---

[5] Summaries of the on the record interviews are attached as Exhibit 2.

[6] The chart does not include every State employment position each person has held. Rather, only those positions relevant to the investigation are listed.

| November 5, 2015 | Michelle Woods | IDOT: Staff Assistant / Assistant to Matt Hughes (2008-2010) |
|---|---|---|
| November 6, 2015 | Mike Woods | IDOT: Bureau Chief of Personnel Management (2011-2013) IDOT: Deputy Director of Finance & Administration (2013-2014) |
| December 2, 2015 | Julie Phelps | IDOT: Staff Assistant/Assistant to Matt Hughes (2010-2013) |
| July 8, 2016 | Mark Harris | Governor's Office: Deputy Chief of Staff (2010-2012) |
| August 11, 2016 | Ryan Croke | Governor's Office: Deputy Chief of Staff (2009-2013) Governor's Office: Chief of Staff (2013-2015) |
| September 9, 2016 | Sean O'Shea | Governor's Office: Deputy Chief of Staff (2011-2014) |
| November 23, 2016 | Jack Lavin | Governor's Office: Chief Operating Officer (2009-2010); Governor's Office: Chief of Staff (2010-2013) |
| February 10, 2016 February 13, 2016 | Lindsay Hansen Anderson[7] | Governor's Office: Legislative Counsel / Director (2009-2012); Governor's Office: Senior Advisor (2012-2013) |

In addition, the Special Master's staff conducted several informal interviews of former or current State of Illinois employees. All of the individuals interviewed were asked to provide information regarding their personal knowledge of facts relevant to the investigation. The goal was not to duplicate the OEIG's investigation into the Staff Assistant position. Rather, the goal was to obtain additional information from witnesses the OEIG did not interview or seek additional information from those individuals the OEIG previously interviewed.

### C. Documents Reviewed

The Special Master's office reviewed tens of thousands of documents over the course of the investigation, including the following categories of documents: (1) emails of various State employees; (2) investigative documents and data underlying the 2014 OEIG Report regarding the Staff Assistant position and other material from the OEIG; (3) personnel records; (4) interview

---

[7] Lindsay Hansen Anderson's interview was not transcribed and took place over two telephone calls.

transcripts; (5) resumes; (6) spreadsheets; and, (7) public records.[8]

Regarding the review of emails of various State employees, the Special Master's office had access to the following individuals' emails for each of their respective tenures in the positions listed below (listed in alphabetical order). The Special Master and her staff reviewed a subset of each individual's emails using targeted keyword searches.[9]

| Name | Position(s) |
|------|-------------|
| Lindsay Hansen Anderson | Governor's Office: Legislative Counsel / Director (2009-2012); Governor's Office: Senior Advisor (2012-2013) |
| Justin Cajindos | Governor's Office: Deputy Chief of Staff (2014) |
| Ryan Croke | Governor's Office: Deputy Chief of Staff (2009-2013); Governor's Office: Chief of Staff (2013-2015) |
| Jill Eades | IDOT: Staff Assistant (2003-2014) |
| Gary Hannig | IDOT: Secretary (2009-2011); Governor's Office: Senior Legislative Liaison (2012-2014) |
| Mark Harris | Governor's Office: Deputy Chief of Staff (2010-2012) |
| Matt Hughes | IDOT: Bureau Chief of Personnel Management (2009-2010); IDOT: Director of Finance & Administration (2010-2013) |
| Jack Lavin | Governor's Office: Chief Operating Officer (2009-2010); Governor's Office: Chief of Staff (2010-2013) |
| Joey Mak | Governor's Office: Executive Assistant to Jack Lavin (2009-2011) |
| Simone McNeil | Governor's Office: Chief of Operations (2009-2013); CMS: Director (2013-2014) |
| Sean O'Shea | Governor's Office: Deputy Chief of Staff (2011-2014) |
| Julie Phelps | IDOT: Staff Assistant/ Assistant to Matt Hughes (2010-2013) |

---

[8] The Special Master's office prepared a Chronology of key documents discovered during the investigation, a copy of which is attached hereto as Exhibit 3. The Chronology contains over 500 entries and describes more than 1000 separate emails. A limited number of those emails are discussed herein, and the Chronology is referred to throughout the Report.

[9] The Special Master's investigation focused on IDOT and the Staff Assistant positions. However, during the keyword searches, information was discovered relating to other positions and/or agencies. That information is discussed, as relevant, throughout this report.

| Ann Schneider | IDOT: Director of Finance & Administration (2005-2010)<br>IDOT: Chief Operating Officer (2010-2011)<br>IDOT: Secretary (2011-2014) |
|---|---|
| Tony Small | IDOT: Deputy Director of Finance & Administration (2010-2013);<br>IDOT: Director of Finance & Administration (2013-2015) |
| Michelle Woods | IDOT: Staff Assistant/ Assistant to Matt Hughes (2008-2010) |
| Mike Woods | IDOT: Bureau Chief of Personnel Management (2011-2013);<br>IDOT: Deputy Director of Finance & Administration (2013-2014) |

We did not review all emails that may be relevant to potential *Rutan* violations. A comprehensive review of all emails would have been prohibitively time-consuming and expensive. Rather, as noted above, we conducted various key word searches.

## IV.    PURPOSE OF *RUTAN* AND HOW THE SYSTEM IS SUPPOSED TO WORK

### A.  Purpose of *Rutan* Designation and Standard

The 1972 *Shakman* Consent Decree[10] enjoins the Governor, among others, from "conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." ("1972 Decree.") To investigate the scope of any violation of the 1972 Decree, it is first necessary to understand the legal principles embodied in the *Shakman* Decrees and the Supreme Court's *Rutan* and other anti-patronage decisions. The Supreme Court's decisions restricting patronage practices are grounded in Constitutional rights guaranteed to all persons and apply to most government employment actions. "Political belief and association constitute the core of those activities protected by the First Amendment," the Supreme Court has explained. *Elrod v. Burns*, 427 U.S. 347, 355 (1976). Patronage, the Court explained, "can result in the entrenchment of one or a few parties to the exclusion of others" and "is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government." *Id.* at 370-371. Thus, in most instances, state employment actions cannot be based on political affiliation.

The Supreme Court, however, has recognized that under some circumstances political affiliation can be taken into account in making employment decisions. The standard announced by the Supreme Court is "whether the hiring authority can demonstrate that <u>party affiliation is an</u>

---

[10] Because IDOT's internal documents and policies refer to both the prohibitions in the 1972 Decree and the *Rutan* decision as simply "*Rutan*," we do so as well throughout this report.

appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 519 (1980).

Thus, the theory underlying the *Rutan* designation, as a narrowly tailored restriction on the First Amendment rights of government employees and applicants, is to give the Governor discretion to ensure his/her senior-most advisors or spokespersons are politically compatible with the policies of the Administration. The purpose of *Rutan*, and its progeny, however, was <u>not</u> to create a system whereby the Administration doles out jobs as political favors.

As explained more fully below, individuals in the Governor's Office appeared to fill low level (and other) *Rutan*-exempt positions at IDOT and other State agencies as "political favors." Purported *Rutan*-exempt positions were filled without regard to whether there was an operational need, whether the candidate was qualified for the position, or whether the candidate would perform the stated duties of the position. This was not, in our opinion, the purpose or intent of the creation of *Rutan*-exempt doctrine.

### B.  How the System Was Supposed to Work

The 2014 OEIG Report described how the State's *Rutan*-exempt hiring process is supposed to work at IDOT. The first step is the creation of an Internal Personnel Request ("IPR") to be authorized and executed by the Agency Director making the personnel request. This step ensures <u>there is a legitimate need to hire</u>. The IPR also requires signatures from the Director of Finance and Administration and the Bureau Chief of Personnel Management. (*See* 2014 OEIG Report at 15). After the IPR is approved, the agency's personnel office creates an electronic Personnel Action Request ("ePAR") for the requested position.[11] The ePAR requires multiple levels of approval in the following order: (1) the Agency head (*e.g.* Secretary); (2) Governor's Office of Management and Budget ("GOMB"); (3) Deputy Chief of Staff ("DCOS"); and (4) Chief of Staff ("COS").[12] For *Rutan*-exempt positions, specific candidate information is entered into the ePAR system after GOMB approval. At the final step, the Deputy Chief of Staff and Chief of Staff are required to review and approve the specific "transaction, candidate and salary." (*See* attached as Exhibit 4, ePAR Process Flowcharts). According to IDOT documents, the average time to onboard a new permanent full time employee at IDOT (through the ePAR process) was approximately seven months.

Flowcharts produced by the State regarding the ePAR Process (dated 1/30/2007 and 7/1/2012) also make clear that the hiring <u>agency</u> is supposed to initiate the hiring process. (*See* Ex. 4). Moreover, the various levels of approval required for a *Rutan*-exempt hire were supposed to

---

[11] On July 15, 2016, the Rauner Administration issued an executive order that eliminated the ePAR system.

[12] For Personnel Code Covered positions, approval from CMS is also required.

create checks and balances to eliminate manipulation of the process. As explained more fully below, in many instances, the Governor's Office initiated the hiring process, sent politically connected candidates to agencies, and was involved in all levels of approval.

## V.    GOVERNOR'S OFFICE MANIPULATED *RUTAN*-EXEMPT PROCESS

A review of the documents and emails indicate that personnel transactions were frequently initiated at the request of the Governor's Office. Personnel transactions were supposed to be initiated by the request of an agency director based on a legitimate hiring need and then move their way through various levels of independent approval. In reality, personnel transactions were frequently driven by the request of an elected official or other politically-connected person to hire a candidate, with the Governor's Office directing the personnel transaction through all levels of purported approval.

As part of its investigation, the OEIG reviewed over 150 IPRs (the request for hire that is supposed to initiate hiring process) that resulted in the hires of Staff Assistants and 144 of those IPRs lacked a signature from the requesting Agency Director. (*See* 2014 OEIG Report at 16). This finding is consistent with our review of the documents. The Governor's Office passed resumes of politically connected candidates and persistently followed-up with the agency to check on the status of the personnel requests. At times, the Governor's Office specifically instructed an agency to initiate a personnel transaction or find a position for a candidate. In many instances, the hiring paperwork would be created with a specific candidate in mind without a request to hire from the Agency Director. The Governor's Office sometimes directed the Secretary and/or GOMB to approve hires pending at their level of approval, making each independent level of approval illusory. Once a hire received final approval from the Deputy Chief of Staff and Chief of Staff for a "sponsored" candidate, the Governor's Office would report back to the sponsor that their recommended candidate was hired.

### A.  Governor's Office Created Resume Databases and Tracked Placements

The investigation revealed the Governor's Office used various methods to store, file, and prioritize resumes, including various resume databases. The Governor's Office would often send large batches of resumes to agencies, including IDOT, and include suggestions to "prioritize" or "flag" certain candidates. (*See* Chronology at 8/8/12, 8/22/12, 9/14/12, 1/30/13). Documents reflect that there were early efforts to track resumes provided to Governor Quinn's Office. For example, in August 2009, Simone McNeil in the Governor's Office sent a chart, "Resumes – Double Exempt," to Brendan Dailey at Central Management Services ("CMS"). The chart, which contained approximately three hundred individuals' names, included information about each candidate's background, political connections, if any, and which agencies could potentially hire them into a *Rutan*-exempt position. Although there is nothing inherently improper about tracking resumes, some of the individuals listed in the chart were clearly not qualified for *Rutan*-exempt

positions. For instance, the entry for one candidate name reads, "Summer Intern. No Resume, came through [Governor's Office of Constituent Affairs]."[13]

By late 2011, Ryan Croke created a resume database that could be shared and accessed by others. An early list of the resumes contained in the database included many candidates that would likely be qualified for *Rutan*-exempt positions. However, some candidates did not appear qualified for *Rutan*-exempt positions. For example, the backgrounds of certain candidates were described as "intern," "recycling coordinator," "production assistant," "laborer," "office staff," "stationary fireman maintenance," "data processing operator," "election judge," "office coordinator," "Abercrombie and Finch worker," "waiter/valet," "mail clerk," "electrical foreman," and "maintenance painter," among other things. When resumes were received by the Governor's Office, they would be placed in one of various databases and if they were hired by an agency, that would be reflected in the database. (*See* Chronology at 11/17/11).

Additionally, Croke also created a "SharePoint database" which was used to share resumes with select Personnel Liaisons in various agencies. A February 1, 2013, email reflects that Croke provided access to the resume database on SharePoint to Personnel Liaisons in IDOT, CMS, DNR and the Historic Preservation Agency.[14] By the time of our investigation, the SharePoint database had been deleted, and was no longer accessible.

### B. Governor's Office, Not Agency, Initiated and Directed Hiring Process

Documents revealed that the Governor's Office instructed agencies, including IDOT, to interview and/or place candidates without a request to hire or a particular vacancy to fill. This process extended to IDOT Staff Assistants, other positions in IDOT, and to other agencies. At times, officials in CMS, in conjunction with the Governor's Office, also engaged in initiating the hire process and forwarding resumes for hire.

#### 1. Governor's Office Sent Hundreds of Resumes to IDOT and Other Agencies Without an Agency Request to Hire

IDOT officials testified that receipt of a resume from the Governor's Office came with the expectation that the agency would find a place for the individual. (*See* Ex. 2 (containing testimony

---

[13] In May of 2011, Jack Lavin sent a memorandum to all agency Directors, Secretaries, Chiefs of Staff and Chief Operating Officers requesting bi-monthly reports of *Rutan*-exempt and double-exempt vacancies at each agency. The reports provided the Governor's Office information about all vacant exempt positions throughout state government. The existence of a vacancy, however, did not necessarily mean the agency had an operational need to hire. (*See* Chronology at 12/8/11) (discussing that the agency did not have the need to fill all vacancies).

[14] May 2013 emails show resumes were reviewed before being uploaded. In one email, Deputy Chief of Staff, Justin Cajindos discussed "going through the giant stack of resumes on [his] desk right now" and sent Sutton and Croke "resumes to upload." (*See* Chronology at 3/23/13).

summaries of Hughes, Schneider, and Woods)). Also during OEIG's investigation of the Staff Assistant position, Michael Stout (who was IDOT's Director of Traffic Safety at the time) explained that he contacted both the Governor's Office and Senator Durbin's office to help his daughter get a job at IDOT. He explained that this was the way *Rutan*-exempt positions were handled; first, make a request to the relevant agency and then make a similar request to the Governor's Office. In other words, personnel transactions were not initiated by the request of an agency based on a hiring need.

Documents reviewed during our investigation corroborated that testimony. There were numerous instances of the Governor's Office sending candidates to IDOT, without a request to hire. These examples included correspondence regarding future Staff Assistants **[Staff Asst. 38]**, **[Staff Asst. 17]**, **[Staff Asst. 5]**, **[Staff Asst. 49]**, **[Staff Asst. 3]**, and **[Staff Asst. 39]**.[15] These candidates' resumes came with specific instructions from the Governor's Office, including: IDOT should "call and speak with these individuals"; "consider [him] for an opportunity in D1"; call him "this week"; "look into some potential opportunities"; schedule an interview; and, questioning, "did one of you meet with [her] yet?" (*See* Chronology at 12/14/10 (**[Staff Asst. 38]**); 1/26/11 (**[Staff Asst. 17]**); 1/29/11 (**[Staff Asst. 5]**); 2/10/11 (**[Staff Asst. 39]**); 9/9/11 (**[Staff Asst. 49]**); 10/7/11 (**[Staff Asst. 3]**)).

The Governor's Office also initiated placement of candidates into non-Staff Assistant positions. For example, an August 2011 email from the Governor's Office to IDOT read, "[H]ere is [Candidate's] resume again. Do you know if he has been interviewed? Please set up if not."[16] On October 31, 2012, the Governor's Office sent IDOT the resume of the daughter of Chicago Alderman Ariel Reboyras, asking, "[D]id I send to you to interview? If not please have someone set it up." On November 21, 2012, the Governor's Office again asked, "[C]an someone interview her?" On December 3, 2012, the Governor's Office sent her resume to another agency stating: "[H]ere is the resume of the candidate. After you interview, please give me a call." Other examples include: a September 2013 internal IDOT email stating, "[T]he Governor's Office asked that we interview this candidate for potential opportunities at IDOT," for a candidate with a background as a facility manager; and, a February 2012 email where the Governor's Office requested IDOT interview a specific candidate, noting, "He is the son of Sen. Martinez's assistant." (*See* Chronology at 8/15/11; 10/31/12; 8/13/13; 2/3/12).

The Governor's Office and CMS also sent candidates to other agencies with instructions to place candidates or schedule interviews. For example, in March of 2013, the Governor's Office

---

[15] Other Governor's Office documents reflect that **[Staff Asst. 49]** and **[Staff Asst. 5]** were sponsored by Illinois State Representative Elizabeth Hernandez.

[16] Internal emails reflect that IDOT had reservations about hiring the candidate based on an earlier interview. (*See* Chronology at 7/15/11) (discussing Candidate's 7/21/11 interview). ITAP shows that the candidate was hired by IDOT in 2013 as a permanent full time employee.

forwarded a resume to the Department of Insurance instructing the department to interview a specific candidate and noting that "the sooner this could happen, the better." On October 2, 2013, Acting CMS Director Simone McNeil (formerly of the Governor's Office) sent two candidates, both of whom had been employed by Chicago Alderman Richard Mell, to the Governor's Office with the instruction—"send to appropriate directors for placement in double exempt positions." (*See* Chronology at 3/7/13, 10/2/13).

The Governor's Office also prioritized certain candidates' resumes for placement into vacant jobs. For instance, on May 15, 2013, Lou Bertuca, a senior Governor's Office official emailed Croke with the subject "FW: Alderman Ariel Reboyras" and attached a candidate's resume. Bertuca told Croke to "[m]ove [the candidate] into top 10," and Croke responded, "Got it – he should be easy to place." Bertuca replied, "Keep me updated." (*See* Chronology at 5/15/13).

## 2. Governor's Office Would Persistently Follow Up on Candidates

If the agency did not act quickly or schedule the interview, the Governor's Office would aggressively follow up. A few examples illustrate the process. On November 15, 2011, an internal IDOT email stated: "O'Shea [from Governor's Office] called last night. He would like us to keep him updated step by step regarding the interview process, etc. for **[Staff Asst. 37]** and **[Staff Asst. 41]**."[17] On October 21, 2011, internal IDOT emails stated: "[Governor's Office] called, please enter **[Candidate 28]** candidate info into the Deputy Director position we discussed in DTS-Chicago. Ann [Schneider, IDOT Secretary,] this epar is at your approval level."[18] After referring Staff Assistant candidate **[Staff Asst. 5]** to IDOT and hearing that he had not been contacted, the Governor's Office sent an email stating, "[[**Staff Asst. 5**]] has not been called—[W]hat is going on?!" An email dated February 6, 2011, regarding **[Staff Asst. 43]** (Staff Assistant) and another candidate, noted that the Governor's Office "said we need to have both epars to OMB no later than Monday …I guarantee [Governor's Office] will be calling on this." A June 30, 2010 internal IDOT email regarding **[Staff Asst. 13]** stated, "Govs office called about **[Staff Asst. 13]** have Frank [Mautino] call if u can."[19] (grammatical errors in original). (*See* Chronology at 11/15/11 (**[Staff Asst. 37]** and **[Staff Asst. 41]**), 10/21/12 (**[Candidate 28]**), 2/16/11 (**[Staff Asst. 5]**), 2/6/11 (**[Staff Asst. 43]**), 6/30/10 (**[Staff Asst. 13]**)).

---

[17] According to an AP reporter, **[Staff Asst. 37]** was a democratic donor; **[Staff Asst. 41]** was a former Assistant County Clerk and donor to Dorothy Brown and the 13th Ward Democrats. (*See* Chronology at 5/7/14).

[18] As set forth above, candidate information was not supposed to be entered into the ePAR system until after the Secretary (Ann Schneider) and GOMB approved the ePAR.

[19] "**[Staff Asst. 13]**" refers to **[Staff Asst. 13]**, who was sponsored by State Representative Frank Mautino. **[Staff Asst. 13]** was initially hired as a 60-Day Emergency Hire and then became a full time TMII on August 2, 2010.

The Governor's Office also followed up on non-Staff Assistant candidates. In February of 2012, the Governor's Office sent an email to IDOT regarding United State Senator Durbin's Chief of Staff, Bill Houlilan's wife, stating: "How are we doing? When does she start?" On September 27, 2011, IDOT internal emails regarding **[Candidate 17]** stated, "need you to approve. This is for Mark Harris. The Gov's office would like to put this person in a TM II in the Office of the Secretary."[20] (*See* Chronology at 9/27/11. *See also*, Chronology at 7/1/12 (internal IDOT email instructing Secretary to approve two ePARS, "per Sean's request"); 7/20/12 (internal IDOT email regarding a TM I candidate, noting, "Per Sean O'Shea we need to get him on before the end of the month.")).

The hire process for **[Candidate 6]** illustrates the Governor's Office's role in pushing candidates at IDOT. (*See* infra at IX.A.23). On August 26, 2010, the Governor's Office sent IDOT a copy of **[Candidate 6]**'s cover letter, resume, and CMS Application. The cover letter states that **[Candidate 6]** is "applying for the position of ___." No position is stated. On the same day, internal Governor's Office emails with Subject Line "**[Candidate 6]** and **[Staff Asst. 47]**" (Staff Assistant) state, "Just writing to check on their IDOT epar status." The Governor's Office emailed IDOT again on September 7, 2010 asking IDOT to call "ASAP, please. Re: **[Candidate 6]**." **[Candidate 6]** was hired at IDOT 13 days later, on September 20, 2010, as a 60-Day Emergency Hire TM II Safety Issues Analyst. (*See* Chronology at 8/26/10, 9/7/10, 10/1/10). The duties of that position are described as follows:

> This position is responsible for assisting the Director of the Division of Traffic Safety in the promotion of highway safety measures and programs in Illinois through the development of a highway safety advocate network. The incumbent is also accountable for the preparation of division positions on legislative issues, developing responses to legislation inquiries and conducting special studies/projects to support highway safety activities.

**[Candidate 6]** resume contained no experience, training, or education in traffic safety. Prior to being hired at IDOT, **[Candidate 6]** worked in the Governor's Office for two years. In that capacity he performed duties, such as: submitting work repair orders, resolving billing issues, auditing travel vouchers, and working with excel spread sheets, among other duties. (*See* Chronology at 8/26/10).

When positions for particular candidates were not found quickly enough, the Governor's Office expressed frustration with the agencies. In May 2013, John D'Alessandro (DCOS in Governor's Office) emailed Israel Salazar (Assistant Director of CMS) and Croke about finding a position for candidate **[Candidate 31]**. Salazar told D'Alessandro "We don't have a lot of open

---

[20] TM II positions, which many Staff Assistants were hired into, have been described as "entry level" positions.

double exempts, but I'll see if I can nail something down." D'Alessandro continued to press Salazar on the status of his request, and Salazar informed D'Alessandro:

> I've spoken with him and he's given me his updated resume. Do we know where we want to put him? I can't meet with him in person, he's based in Chicago. . . So barring another phone call (which would do no good without info on a potential position), I'm not sure what else to do at this point. His resume has some management skills listed. . . Also some classes in communications. . . Pretty general background. Thoughts?

(*See* Chronology at 5/29/13).

D'Alessandro forwarded Salazar's email to Croke complaining that "We cannot spend this much time on things like this. Outrageous." Croke responded: "Agreed—called Israel—we found a spot and they will start an epar." **[Candidate 31]**, whose background was in the food service industry, was hired into the *Rutan*-exempt position of Senior Public Service Administrator in CMS in 2013. (*See* Chronology at 5/31/13, 6/7/13; *see also, infra* **[Candidate 31]**, at IX.A.32).

### 3. Agencies Were Pressured to Accept Governor's Office Candidates

During their interviews with the Special Master's Office, Ryan Croke (Deputy Chief of Staff; Chief of Staff), Mark Harris (Deputy Chief of Staff), Sean O'Shea (Deputy Chief of Staff), and Jack Lavin (Chief Operating Officer; Chief of Staff) all testified that the Governor's Office sent candidates to agencies for *Rutan*-exempt positions merely for consideration and the agencies had the discretion to reject candidates and did reject candidates. Croke, Harris, and Lavin all stated that they never applied pressure or forced a specific candidate on an agency. (*See* Ex. 2).

Considering the documents and evidence discussed herein, those explanations are not credible. There are numerous examples of the Governor's Office sending candidates and directing the agency to conduct an interview; following up with agencies to check the status of the candidates; and expressing frustration when agencies did not quickly set up interviews. Additionally, there are numerous examples where the Governor's Office instructed the agency to start an ePAR for a particular candidate, without an agency request to hire, or to approve a pending ePAR.

Moreover, senior IDOT employees Ann Schneider, Matt Hughes, and Mike Woods all testified that it was difficult to refuse candidates sent by the Governor's Office.[21] (*See* Ex. 2). According to those officials, when the Governor's Office's candidate was deemed unqualified and/or not a good fit, IDOT was asked to keep looking until they found a slot or the candidate was

---

[21] Hughes's testimony during the Special Master's investigation sometimes differed from his testimony during the OEIG investigation. Based on the totality of the evidence, however, we credit (some of) Hughes' testimony given during our investigation.

hired into the position over IDOT's objection. Hughes testified he had conversations with O'Shea, specifically, about the Governor's Office sending them entry level candidates (who could not perform higher level jobs without a transportation or engineering background) for *Rutan*-exempt positions. Because many of the Governor's Office candidates were not suited for higher level positions, but the Governor's Office wanted IDOT to find a position, IDOT used the Staff Assistant position to accommodate the lesser experienced and sometimes wholly unqualified candidates. (*See* Ex. 2).

Likewise, on December 22, 2014, as part of a subsequent OEIG investigation, a Director level employee at IDOT reported that the Governor's Office directed *Rutan*-exempt hiring in his department until approximately 2012 or 2013.[22] He explained that the Governor's Office would notify IDOT's Secretary about a candidate and the Director then would be contacted by IDOT's personnel department. He said some of the Governor's Office candidates were qualified; however, many had no skills and were unqualified for the jobs into which they were hired. He was asked to interview the candidates, but the interviews were a "charade" because the candidates had already been promised jobs. The witness stated that candidates who were sent by the Governor's Office were referred to as "Gifts from the Governor." He identified four such candidates, including **[Candidate 16]**, **[Candidate 42]**, **[Candidate 43]**, and **[Candidate 41]**. He said **[Candidate 16]** was Chief of Staff to State Representative Luis Arroyo and he was told to find a spot for him; and **[Candidate 42]** was sent by Speaker Madigan's office and he was told to find him a job even though he lacked basic computer skills. **[Candidate 41]** is married to State Representative Mary Flowers.[23]

In one particularly revealing email exchange, Secretary Schneider sent Sean O'Shea the resume of a candidate she sought to hire for a Contract Compliance Officer. Secretary Schneider wrote:

> I know this is outside of the way we typically go for double exempt spots, but this is such an important area that we don't have strong leadership on . . . and he could hit the ground running. I am just asking for your consideration.

(*See* Chronology at 3/4/13). The candidate was not hired.

---

[22] This same Director was interviewed during OEIG's Staff Assistant investigation, and he identified **[Staff Asst. 26]** as a Staff Assistant hired at IDOT because of his relationship with Congressman Dan Lipinski. The Director said he was contacted by either Hannig or Harris to find **[Staff Asst. 26]** a job. *See infra* at IX.A.19.

[23] Simone McNeil sent Hughes **[Candidate 41]** resume on May 10, 2010. (See Chronology 5/10/10). On May 25, 2010, Lavin emailed Malcolm Weems (GOMB), Jerome Stermer (COS) and Simone McNeil (DCOS) and directed them to approve **[Candidate 41]** ePAR. (Chronology 5/25/10). It was approved the next day.

In another example, in March of 2013, a senior IDOT manager identified and sought to hire a candidate for the Section Chief Transit Capital position. When the Governor's Office was informed, Sean O'Shea vetoed the candidate and told IDOT-- "No, the person I sent you,"- **[Candidate 29]**.[24] IDOT had already interviewed **[Candidate 29]**, after which the hiring manager reported: "We have some serious concerns about his skills" and again suggested an alternate candidate. Ultimately, IDOT's preferred candidate was not hired, but **[Candidate 29]** was hired (albeit in a different position) as a TM III at IDOT. (*See* Chronology at 3/18/13, 3/25/13).

Considering the totality of the evidence, the testimony of the Governor's Office officials interviewed during our investigation cannot be credited with respect to their claims that: they sent candidates to agencies merely for consideration; the agencies had significant discretion to reject candidates; and, they did not pressure agencies to place candidates.

## C. Governor's Office Tracked and Reported Back on Politically Connected Candidates

A limited number of "to do lists" created by Legislative Affairs official Lindsay Hansen Anderson were discovered in email searches. These documents demonstrate that the Governor's Office was tracking, following up on, and reporting back to legislators regarding politically sponsored candidates.

During her interview, Hansen Anderson stated that she sometimes received candidate referrals from elected officials. She acknowledged that she would pass the candidates to agencies and check on the status. She referred to her role as a "messenger" tasked with sharing information between elected officials and the agencies. Hansen Anderson also received requests from legislators asking for updates on candidates. When questioned about her "to do" lists, she asserted that a candidate's name next to an elected official's name did not necessarily mean the candidate was sponsored by that official. However, she did not have any specific recollection of any of the listed names or other information on the "to do" lists. As described herein, our investigation suggests the candidates on her "to do" lists were in fact sponsored by the corresponding elected official.

### 1. December 17, 2010 To Do List

A document created by Hansen Anderson, labeled a "to do" list, dated December 17, 2010, contained a list of calls to make. The list appeared to include the names of candidates who had been recommended for employment with the State of Illinois and the name of the Legislator that made the recommendation.

---

[24] **[Candidate 29]** is the Founder of Chicago political group Citizens for a Better Westside. **[Candidate 29]** was implicated in the City of Chicago illegal hiring scheme revealed in the *United States v. Sorich* criminal trial.

This list included the following information:

Rep. Careen Gordon (2 resumes)
Rep. Hernandez (**[Staff Asst. 5]** resume)
Rep Mautino (**[Candidate 46]** 52918)[25]
Senator Crotty (**[Candidate 40]**) … (Crotty expects answers Monday)
Senator Lightford - **[Staff Asst. 36]** workforce diversity—recommend for Deputy Director[26]
Senator Munoz — **[Candidate 36]**, **[Candidate 38]** 52414, **[Candidate 1]**

(*See* Chronology at 12/17/10) (emphasis added).

The same "to do" list included a section titled "Senior staff" and appeared to idenntify specific Governor's Office staff responsible for each request. For example, Simone McNeil was assigned to usher requests on behalf of **[Candidate 38]** and **[Candidate 1]**; Mark Harris was assigned to usher requests on behalf of **[Staff Asst. 43]**, **[Staff Asst. 46]** and **[Staff Asst. 36]**; and Jack Lavin was responsible for **[Candidate 40]**. Thereafter, **[Staff Asst. 5]** was appointed into a *Rutan*-exempt Staff Assistant on 4/25/11; **[Staff Asst. 46]** was appointed into a *Rutan*-exempt Staff Assistant on 1/5/11; **[Staff Asst. 36]** was promoted to a higher *Rutan*-exempt Staff Assistant position on 5/16/11; and, **[Staff Asst. 43]** was appointed into a *Rutan*-exempt Staff Assistant position on 5/16/11. **[Candidate 38]** (whose background was as a video game sales associate) was appointed into a *Rutan*-exempt secretary position at the Department of Commerce and Economic Opportunity ("DCEO") in early 2011. **[Candidate 1]'s** (Senator Munoz's aunt) resume was circulated noting that she was likely qualified for something "clerical." **[Candidate 40]** was a *Rutan*-covered plumber at DOC seeking a transfer to a different facility. After more than a dozen emails exchanged regarding whether **[Candidate 40]** could be transferred or detailed to a different facility <u>without</u> a *Rutan* required posting, the Governor's Office arranged for a temporary detail, directed the position be posted, and then transferred him to his requested facility. (*See* Chronology at 12/17/10, 10/21/10).

## 2. September 1, 2011 and October 7, 2011 To Do Lists

Hansen Anderson's September 1, 2011 "to do" list contained a list of "legislator requests," identifying candidates for employment and their sponsors, including:

Forby—**[Staff Asst. 6]**;
Hernandez—**[Staff Asst. 49]** (interviewed w IDOT, THA), **[Staff Asst. 5]**.
Lightford—**[Candidate 39]**—Private Secretary DES?
Martinez—**[Candidate 39]**

---

[25] This number refers to **[Staff Asst. 46]'s** pending ePAR.

[26] Senator Lightford was married to **[Staff Asst. 36]**.

(*See* Chronology at 9/1/11, 10/14/11).

Hansen Anderson's October 7, 2011 "to do" list again identified **[Staff Asst. 6]**, **[Staff Asst. 49]** and **[Staff Asst. 5]** next to their legislative sponsor. The document also identified senior Governor's Office staff responsible for each request. Mark Harris was assigned to usher requests on behalf of **[Staff Asst. 49]**, **[Staff Asst. 56]** and **[Staff Asst. 5]** and Jack Lavin was responsible for **[Candidate 37]**. Thereafter, **[Staff Asst. 6]** was appointed as a *Rutan*-exempt Staff Assistant on 9/6/2011; **[Staff Asst. 49]** was appointed as a *Rutan*-exempt Staff Assistant on 1/18/2012; **[Staff Asst. 5]** was promoted from a *Rutan*-exempt Staff Assistant to a *Rutan*-exempt Policy Advisor to the IDOT Secretary on 11/1/2011 (where he recruited Highway Maintainers; maintained databases; and recruited at college job fairs); **[Candidate 39]** (who had been an "intern" in the Illinois Department of Employment Services ("IDES")) was appointed into a *Rutan*-exempt Private Secretary position at IDES in 2011; **[Staff Asst. 56]** (who had completed two 60-Day Emergency Hires as a *Rutan*-exempt Staff Assistant assisting in monitoring traffic for $11.50 an hour in the summer of 2010) was appointed as a *Rutan*-exempt Staff Assistant in the summer of 2011 (his official job title was "Extra Help")[27]; **[Candidate 37]** was appointed as a *Rutan*-exempt Administrative Assistant in the Department of Public Health ("DPH") in 2011.

### 3. Governor's Office Followed Up With Legislators to Report Hires

A number of documents confirmed that the Governor's Office reported back to legislators the status of candidates they had sponsored. A June 24, 2011, email from Lavin's assistant (Joey Mak) to Hansen Anderson stated:

> The following were approved last night. <u>Jack wanted you to be aware so the appropriate legislator could be notified:</u>
>
> **[Candidate 32]** at DJJ (A.J. Wilhelm)
> **[Staff Asst. 48]** at IDOT (Mayfield, Lightford, Lilly)
> **[Staff Asst. 45]** at IDOT (Will Davis)

Hansen Anderson replied: "I have reached out to all of them (although I haven't been able to get through to Mayfield)." (*See* Chronology at 6/24/11) (emphasis added).

Two of these individuals did not appear to be either qualified for *Rutan*-exempt job duties or hired to perform exempt duties. For example, **[Staff Asst. 48]**, whose application reflected only temporary summer job experience, was first hired into a 60-Day Emergency Hire Staff Assistant position in January of 2011 where she was approved to "assist in the overall development and coordination of policy and directives regarding the Office of Communications" in IDOT. In March of 2011, she was hired into another 60-Day Emergency Hire position, this time as a Project

---

[27] After his 2011 appointment expired, his supervisor noted, "His talents did not match the needs of [Traffic Safety Control] except for remedial spread sheet data sorting."

Manager to "assist in the overall development and coordination of policy and directives regarding programs for the Office of Finance and Administration." In May of 2011, she was again hired into a 60-Day Emergency Hire Staff Assistant position, this time to "assist in the overall development and coordination of policy and directives" for the Office of Business and Workforce Diversity. In May 2011, Illinois State Representative Rita Mayfield emailed IDOT requesting that it hire **[Staff Asst. 48]** into a permanent position when her temporary term expired on May 20, 2011. Although Representative Mayfield explained that **[Staff Asst. 48]** was then in an "intern" position (which should have alerted all involved that her position was not appropriately designated *Rutan*-exempt), **[Staff Asst. 48]'s** temporary appointment was renewed for a third term on May 20, 2011, and she was then appointed as a permanent *Rutan*-exempt Staff Assistant at IDOT in late June of 2011. (*See* Chronology at 5/3/11).

Similarly, **[Staff Asst. 45],** whose previous work experience involved administrative duties,[28] was hired into a 60-Day Emergency Hire Staff Assistant position in March of 2011 to "assist in the overall development and coordination of policy and directives." On May 24, 2011, Governors' Office emails reflect that Illinois State Representative Will Davis had requested help getting **[Staff Asst. 45]'s** application for permanent employment "through the pipeline." On June 24, 2011, **[Staff Asst. 45]** was appointed as a permanent *Rutan*-exempt Staff Assistant and the Governor's Office directed that her political contacts, who included Representative Davis and former Illinois Treasurer Alexi Giannoulias, be notified that her permanent hire had been approved. (*See* Chronology at 5/24/11, 6/24/11).

Likewise, on July 21, 2011, Lavin's assistant emailed Harris with a list of 10 approved hires at IDOT and stated: "Jack [Lavin] said you (or Lindsay) should inform the appropriate legislators/sponsors first thing in the morning if they were pushing an epar. He said you knew who was pushing what." (*See* Chronology at 7/21/11) (emphasis added).

Other emails also demonstrate that the Governor's Office would report back to legislators regarding their sponsored candidates. For example, after **[Staff Assistant 49]** was approved as a Staff Assistant hire on December 23, 2011, Harris emailed O'Shea and asked him to "have Lindsay call [R]ep Hernandez re: **[Staff Assistant 49]**." Similarly, on July 29, 2011, Mak informed Harris, after **[Staff Assistant 9]'s** hire was approved, "I left messages for Bill Houlihan (Senator Durbin's COS) and Jeff Torricelli, both of whom have called me about it."[29] On March 1, 2011, Joey Mak informed Lindsay Hansen Anderson that "Jack approved **[Candidate 38]'s** ePAR. She is a

---

[28] **[Staff Asst. 45]** did have administrative assistant work experience. That experience, however, did not relate to assisting in the "overall development and coordination of policy and directives" in IDOT's Bureau of Personnel Management.

[29] Torricelli was a Senior Advisor to the Director on Policy and Economic Development at the Illinois Department of Commerce & Economic Development and is currently a lobbyist.

[Senator] Munoz person. He asked if you could call him and let him know it's done." (*See* Chronology at 12/23/11, 7/29/11, 3/1/11).

## VI.  GOVERNOR'S OFFICE AND ELECTED OFFICIALS DIRECTED HIRING OF IDOT STAFF ASSISTANTS

Documents reveal that the Governor's Office regularly sent politically connected candidates for hire to IDOT without a request for hire. Other elected officials and politicians sent their own candidates to the Governor's Office (for it to facilitate the hire) or directly to the agency. As discussed more fully below, some politically sponsored candidates pushed by the Governor's Office did not appear qualified to perform the policy-level duties described in the Staff Assistant position description. That description reads, in part:

> This position is accountable for assisting in the overall development and coordination of policy and directives regarding [the relevant District/Office/Bureau/Division] programs. This position monitors conformance to existing policies and conducts reviews or studies issues that are of special interest. S/He provides policy interpretation and analysis of policies. In addition, this position provides assistance to the local agencies, elected officials, and the general public.

(*See* Ex. 5).

### A.  IDOT Staff Assistants Were Connected to the Governor's Office

Many Staff Assistants hired during the Quinn Administration had a political connection to the Governor's Office, were sent to IDOT by the Governor's Office, had been employed by the Governor's Office and/or had their hires facilitated by the Governor's Office. From the beginning of 2009 until the final Staff Assistant was hired in 2013, IDOT hired 154 individuals[30] into temporary and permanent full time Staff Assistant positions. Of the 154 individuals hired between 2009 and 2013, our investigation revealed that **at least 53 IDOT Staff Assistants were sponsored by or connected to the Governor's Office.**[31]

---

[30] This figure does not include anyone hired prior to 2009 as a temporary or emergency Staff Assistant and was then subsequently renewed for additional consecutive temporary terms after 2009. This figure does include people who separated from IDOT and then returned sometime between 2009 and 2013.

[31] This is the minimum number of Staff Assistants connected to the Governor's Office. We only designated individuals as having a "connection" to the Governor's Office if we could confirm that connection through documents available. We suspect that the number is actually higher.

In alphabetical order, those candidates are:

**Peter Agoranos; Heidi Angeles; Marquis Ball; Ivan Barajas; Gloria Budd; Maria Cartagena; Hugo Chavez; John Chernis; Tina Cordova; Kayla Crowther; Leigh Dunston; Michael Finch; Gene Ferguson; Brittanie Franklin; Jeffrey Gallichio; Moriah Gelder; Marshall Grant; William Grant; Rebecca Hawkinson; Teresa Helfers; Jerry Hurckes; Aisha (Price) Jordan; Matthew Kisling; Leslie (Krebs) Stoddard; Ezequiel Lopez; Kelly Macias; Joshua McClusky; Demetrius McKennie; Eric McKennie; Joseph McNicholas; Richard Metzger; Dustin Morrison; William Nambo; Wilfredo Nieves; Eugene Oliver; Lana Peterson; Michael Piacenti; Cori Pickett; Henry Pukala; Lakeshia Purchase; Anita Robinson; Shelly Runyard; Bradley (Cole) Schaive; Monica Schulter; James Shales; Todd Shea; Delia (Ramirez) Smires; Geoffrey Springer; Gretchen Tucka; Kathleen Vehovic; James Viverito; Joshua Walton; and, Michele Zippay.**

Many of these candidates lacked the experience or qualifications for appointment to *Rutan*-exempt positions as described in the position description, while others were never requested by the Agency or the Department.

### B.  IDOT Staff Assistants Were Connected to Legislators

Additionally, many Staff Assistants had connections to or were sponsored by legislators, elected officials, and politicians. Our investigation uncovered **at least 70 IDOT Staff Assistants sponsored by or connected to elected officials**. Fifty-six of those politically-connected individuals were hired between 2009 and 2013, while 14 were hired prior to 2009 (and have their year of hire noted).

In alphabetical order, those candidates are:

**Cathy Lynn Allison** (Legislative Liaison for State Rep. Jay Hoffman) [hired in 2003]; **Jean Althoff** (U.S. Rep. David Phelps) [hired in 2004]; **Marquis Ball** (State Rep. John O'Sullivan; former State Rep. J. Joyce; former State Sen. K. Joyce; Michael Joyce); **David Ballard** (General Assembly Scholarship Recipient and Intern for State Rep. Mike Boland); **Ivan Barajas** (State Rep. Lisa Hernandez); **Doris Bartolotti** (employed by Senator Gary Forby; related to Mayor Gary Bartolotti); **Gloria Budd** (Legislative Secretary for State House of Representatives); **Laura Calderon** (Legislative Research and Budge Analyst at House Republican Staff; Legislative Intern; worked for State Rep. Tom Cross; References include State Reps. Tom Cross and Jay Hoffman) [hired in 2006]; **Teresa Caliper** (U.S. Rep. David Phelps; U.S. Rep. Glenn Poshard; U.S. Senator Paul Simon) [hired in 2004]; **Maria Cartagena** (State Rep. Luis Arroyo); **Hugo Chavez** (Office of the Speaker, Michael Madigan; City of Chicago Alderman Marty Quinn); **John Chernis** (U.S. Sen. Richard Durbin's Office); **Leonard Childs** (State Sen. James Clayborne); **Kendrick

Coleman (State Sen. James Clayborne); **Aaron Connor** (State Sen. James Clayborne) [hired in 2008]; **Daniel Creedon** (Staffer at Illinois House Democrats); **Kayla Crowther** (State Rep. Frank Mautino); **Creola Davis** (State Sen. James Clayborne); **Leigh Dunston** (State Sen. Kimberly Lightford); **Jill Eades** (Speaker of the House and State Rep. Michael Madigan) [hired in 2003]; **Michael Finch** (State Sen. Ira Silverstein); **Paul "Mike" Forby** (brother of Senator Gary Forby); **Mark Freund** (Speaker of the House and State Rep. Michael Madigan); **Tonya Genovese** (State Rep. Jay Hoffman) [hired in 2005]; **John Gianulis** (father was Rock Island Co. Democratic Central Committee Chairman) [hired in 2005]; **Alice Gilbert** (Monroe County Democratic Precinct Committeeman); **Marshall Grant** (State Sen. Ken Duncan); **Amy Grivetti-Pikul** (State Sen. Patrick Welch; State Rep. Frank Mautino) [hired in 2003]; **Denise Hamilton** (U.S. Sen. Richard Durbin) [hired in 2004]; **Rebecca Hawkinson** (Secretary of State's Office); **Jarod Hitchings** (State Senators Vince Demuzio and Deanna Demuzio; Former State Rep. Gary Hannig; Montgomery County Democratic Party Chair, Steve White; and, Montgomery County Board Chairman, Mike Plunkett); **Lindsey (Horn) Faulkner** (worked for City of Chicago Mayor Daley and Illinois State House of Representatives) [hired in 2005]; **Jerry Hurckes** (U.S. Congressmen Dan Lipinski, William Lipinski, Glenn Poshard; City of Chicago Alderman Zalewski; State Rep. Robert Molaro); **Derek Jones** (U.S. Rep. Phil Hare; U.S. Rep. Lane Evans); **Walter Karcz** (U.S. Congressman D. Lipinski) [hired in 2008]; **Leslie (Stoddard) Krebs** (Steve White, Democratic County Chairperson; worked on Quinn campaign); **Mark Large** (John Mazzotti, VP of IL Democratic Chairman's Association); **Erik Lowder** (Speaker of the House and State Rep. Michael Madigan); **Joshua McClusky** (Field Coordinator for Quinn; campaign director for various mayoral and city council campaigns); **Demetrius McKennie** (State Sen. Kimberly Lightford); **Eric McKennie** (State Sen. Kimberly Lightford); **Catherine Mikolay** (State Rep. Jay Hoffman; Alan Pirtle, Monroe County Democratic Party Chairman); **Dustin Morrison** (Admin Assistant for Illinois House of Representatives; Field Organizer for Illinois Senate Democratic Victory Fund; Field Coordinator for Governor Quinn); **William Nambo** (Speaker of the House and State Rep. Michael Madigan); **Donna Niemerg** (former State Rep. Bill Grunloh); **Wilfredo Nieves** (Speaker of the House and State Rep. Michael Madigan); **Lana Peterson** (State Rep. Will Davis; State Treasurer Alexi Giannoulis; State Rep. Patrick Verschoore); **Julie Phelps** (State Sen. Ira Silverstein; State Reps. Pat Verschoore and Sarah Feigenholz; former State Rep. Bill Grunloh); **Cori Pickett** (U.S. Senator Richard Durbin's Office; Governor Quinn campaign); **Lakeshia Purchase** (State Sen. Kimberly Lightford; State Reps. Rita Mayfield and Camille Lilly); **Robert Rice** (former State Rep. Bill Grunloh) [hired in 2007]; **Anita Robinson** (State Sen. Cullerton; State Senate Chief of Staff, Sergeant-at-arms); **Alan Ross** (Speaker of the House and State Rep. Michael Madigan; City of Chicago Alderman Frank Olivo); **Janice (Gower) Rush**[32] (U.S. Rep. David Phelps; various ties to Illinois political campaigns); **Christopher Schmidt** (U.S. Rep. Phil

---

[32] Ms. (Gower) Rush worked at IDOT from 1999-2004, when she separated from the agency. She was rehired by IDOT in 2011. She was only counted once. She worked for Congressman Phelps while he was a State Representative and a U.S. Representative.

Hare); **Monica Schulter** (City of Chicago Alderman Gene Schulter); **James Shales** (candidate for Kane County Board); **Todd Shea** (grandfather is Todd Renfrow, former Chairman of Sangamon County Democratic Central Committee); **Delia (Ramirez) Smires** (State Rep. Lisa Hernandez); **Doris Stone** (Served as Shiloh Township Precinct Captain) [hired in 2003]; **Daniel Sullivan** (Senate Page); **Gretchen Tucka** (U.S. Senator Richard Durbin; State Rep. Jay Hoffman); **Kathleen Vehovic** (father is Todd Renfrow, former Chairman of Sangamon County Democratic Central Committee); **James Viverito** (uncle is State Sen. Louis Viverito); **Roberta Vojas** (State Reps. Jay Hoffman and Toi Hutchinson; State Senate President John Cullerton); **Andrew Waeyaert** (U.S. Rep. Phil Hare; U.S. Rep. Lane Evans); **Laura White** (husband is Steve White, Montgomery County Democratic Central Committee Chairman); **Laura (Campo Manka) Wilson** (Legislative Assistant at Illinois House of Representatives); **William "Bill" Winberg** (father-in-law is Todd Renfrow, former Chairman of Sangamon County Democratic Central Committee); and, **Michele Zippay** (State Sen. Deanna Demuzio; State Rep. Jay Hoffman; also, worked as Macoupin County Clerk and Recorder; Illinois State Senate Assistant Minute Clerk).

### C. Specific Examples of Questionable Staff Assistant Hires

Below is a sample of *Rutan*-exempt Staff Assistant candidates where the Governor's Office and/or elected officials were actively involved in directing the hire. Specifically, the below examples show that the Governor's Office (or elected officials) sent the candidates' resumes, instructed IDOT to interview and/or place the candidates (without a particular hiring need), and closely monitored and, in some cases, pushed to accelerate the approval process to ensure the candidates were hired.[33] None of the specific Staff Assistants discussed below performed the *Rutan*-exempt duties stated in the Staff Assistant position description. Additionally, many of the candidates described below lacked the experience or qualifications to perform the duties listed in the Staff Assistant Job Description.

Notably, when approving the Staff Assistant hires, the Governor's Office had the candidate's resume (or application), salary history, and the Staff Assistant Job Description available.

#### 1. [Staff Asst. 3]

[Staff Asst. 3] was connected to Governor Quinn's Office through [Staff Asst. 3]'s legal guardian Michael Joyce, who was appointed to the Illinois Labor Relations Board in 2011. Michael Joyce is the son of former Illinois State Representative Jeremiah Joyce and brother of former Illinois State Representative Kevin Joyce. In early October 2011, the Governor's Office emailed [Staff Asst. 3]'s resume to IDOT and asked that he be interviewed. Less than a month later, by October 28, 2011, a TM II Staff Assistant ePAR for [Staff Asst. 3] was at GOMB for approval. The Governor's Office emailed Emily Monk at GOMB asking if she approved [Staff Asst. 3]'s

---

[33] Most of these Staff Assistants are discussed in more detail in section IX of this Report.

ePAR. By November 2, 2011 the Governor's Office Chief of Staff had approved **[Staff Asst. 3]'s** hire. **[Staff Asst. 3]** began work as a TM II Staff Assistant at IDOT's Department of Public & Intermodal Transportation ("DPIT") on November 28, 2011. Emails reveal that Joe Shacter, Director of DPIT, expressed surprise at **[Staff Asst. 3]'s** arrival at the Thompson Center that day and had no paperwork regarding his hire; Shacter did not initiate the hiring request and had to figure out where to put **[Staff Asst. 3]** after the fact. **[Staff Asst. 3]'s** background was as a short term administrative assistant for Illinois State Representative O'Sullivan, a seasonal tennis instructor, and high school football coach. (*See* Chronology at 10/7/11, 10/28/11, 11/2/11, 11/28/11). Per his employee evaluations as a TM II Staff Assistant, **[Staff Asst. 3]'s** duties included: answering phones, directing visitors, reviewing and processing payments, maintaining time sheets, and preparing spreadsheets for approval.

### 2. [Staff Asst. 5]

**[Staff Asst. 5]** was sponsored by Illinois State Representative Lisa Hernandez, who contacted the Governor's Office about a job on his behalf. In December 3, 2010, Representative Hernandez sent **[Staff Asst. 5]'s** resume to the Governor's Office and the Governor's Office called Representative Hernandez to discuss **[Staff Asst. 5]**. In January 2011, the Governor's Office sent an email to IDOT Personnel with the subject "FW: Resume" and no content; **[Staff Asst. 5]'s** resume was attached. IDOT personnel employees testified that such an email meant the Governor's Office wanted IDOT to interview and place the candidate. During the first three weeks of February 2011, the Governor's Office followed up at least two times regarding **[Staff Asst. 5]'s** hire. **[Staff Asst. 5]** started as a 60-Day Emergency Hire *Rutan*-exempt TM II Staff Assistant at IDOT on February 22, 2011. With the Governor's Office pushing IDOT to renew his appointments, he served four 60-Day Emergency Hire terms as a TM II Staff Assistant before being hired permanently into a different *Rutan*-exempt position at IDOT. As discussed further in section IX, the Governor's Office was involved in obtaining approval for his permanent hire at each step of the ePAR approval process. **[Staff Asst. 5]'s** background was as a bank manager. (*See* Chronology at 12/1/10, 12/17/10, 1/28/11, 2/4/11, 2/16/11, 4/20/11). Per his employee evaluations as a temporary TM II Staff Assistant, **[Staff Asst. 5]'s** duties included: supervising contractors, documenting contracts, inspecting roads, preparing work orders, and sketching out roads for contractors to paint.

### 3. [Staff Asst. 6]

**[Staff Asst. 6]** was sponsored by Illinois State Senator Gary Forby, who contacted the Governor's Office about a job on her behalf. In August 2011, the Governor's Office discussed a pending ePAR, referred to as a "Forby request," and identified **[Staff Asst. 6]** as the request. **[Staff Asst. 6]** appeared on a Lavin List (discussed below at VII.A.1) with a current salary of $6,000 and a requested salary of $45,720 for a *Rutan*-exempt TM II Staff Assistant position. Within the month, the Governor's Office approved **[Staff Asst. 6]'s** hire. Documents suggest the Governor's Office

reached out to Senator Forby to inform him of **[Staff Asst. 6]'s** hire. **[Staff Asst. 6]** started at IDOT as a TM II Staff Assistant on September 6, 2011. **[Staff Asst. 6]'s** background was as a part time "Office Staff" for Senator Forby where she was paid $6,000 per year. Prior to that she worked in grocery store delis and as a greeter. (*See* Chronology at 4/29/10, 8/16/11, 8/26/11; *see also*, *supra* at IX.A.4, discussion regarding Senator Forby sponsoring **[Staff Asst. 6]**). Per her employee evaluations as a temporary TM II Staff Assistant, **[Staff Asst. 6]** duties included: handling daily mail, answering phones, assisting supervisors with administrative services, and handling sign in/sign out sheets.

### 4. [Staff Asst. 8]

**[Staff Asst. 8]** was sponsored by Illinois House Speaker Michael Madigan's office. Emails reflect that Madigan's office contacted IDOT directly about a position for **[Staff Asst. 8]**. In September 2009, Madigan's office called IDOT Personnel regarding **[Staff Asst. 8]'s** start date. IDOT Personnel told Madigan's office that **[Staff Asst. 8]** should arrive at the Thompson Center the following Tuesday. **[Staff Asst. 8]** began work as a *Rutan*-exempt TM III Staff Assistant four days later, on September 8, 2009. Subsequently, the Governor's Office pushed through an unusually high raise for **[Staff Asst. 8]**. In May 2011, **[Staff Asst. 8]** received an irregularly high pay raise at the direction of the Governor's Office, when his position was "reallocated" from TM III to TM V. **[Staff Asst. 8]** was allowed to resign in May of 2014, after he was arrested for physically assaulting Illinois State Representative Acevedo three months earlier. **[Staff Asst. 8]'s** background was at the Metropolitan Water Reclamation District and as a bricklayer. (*See* Chronology at 9/4/09, 5/10/11, 5/11/11, 2/26/14). Per his employee evaluations as a TM III and TM V Staff Assistant, **[Staff Asst. 8]**'s duties included: creating forms and reporting on activities, monitoring DBE complaints, and maintaining relationships with DBE constituents and OBWD staff.

### 5. [Staff Asst. 9]

Several politically connected people contacted the Governor's Office on **[Staff Asst. 9]'s** behalf, and the Governor's Office helped him secure a *Rutan*-exempt Staff Assistant position at IDOT. In June 2011, Governor's Office employees discussed an ePAR for **[Staff Asst. 9]** via email and stated, "Gene Callahan, former aide to Senator Paul Simon" called about **[Staff Asst. 9]'s** ePAR and getting it "through the pipeline." In July 2011, Lavin's assistant stated, "Jack considers it a priority." After **[Staff Asst. 9]'s** hire was approved at the end of July, Lavin's assistant stated, "I left messages for Bill Houlihan[34] and Jeff Torricelli,[35] both of whom have called me about it." **[Staff Asst. 9]** started at IDOT as a *Rutan*-exempt TM III Staff Assistant on August 16, 2011. His new salary was a 2000% increase over his previous job. **[Staff Asst. 9]'s** background was as an

---

[34] Houlihan was Senator Durbin's Chief of Staff.

[35] Torricelli was a Senior Advisor to the Director on Policy and Economic Development at the Illinois Department of Commerce & Economic Development and is currently a lobbyist.

owner of a concrete company and in various state agencies. Although **[Staff Asst. 9]'s** application included several years of work at other State agencies prior to opening the concrete company, the application may be inaccurate. According to his resume, he was an "Administrative Law Judge and Internal Affairs Coordinator" in the Department of Agriculture from 1994 through 1997. **[Staff Asst. 9]**, however, does not possess a law degree and was never registered with the ARDC. (*See* Chronology at 6/23/11, 7/19/11, 7/29/11). Per his employee evaluations as a TM III Staff Assistant, **[Staff Asst. 9]'s** duties included: conducting preliminary investigations, updating and developing databases, assisting with annual ethics in the workplace seminars, and performing inspections for weight checks and traffic control.

### 6. [Staff Asst. 12]

The Governor's Office secured a *Rutan*-exempt Staff Assistant position for **[Staff Asst. 12]**. **[Staff Asst. 12]'s** husband, ▮▮▮▮▮, was the Deputy Fiscal Director for the Governor's Office. Emails showed that Ryan Croke emailed **[Staff Asst. 12]'s** resume to various agencies in early 2011. **[Staff Asst. 12]** was hired by IDOT as a Summer Tech in 2011, even though these positions generally serve as internships and training opportunities for college students. Following the Tech Trainee assignment, **[Staff Asst. 12]** was hired as a TM I Staff Assistant. Simone McNeil emailed Lavin's assistant Mak with four ePARs, including **[Staff Asst. 12]**, saying she wanted to get these done. **[Staff Asst. 12]'s** ePAR was labeled: "**[Staff Asst. 12]**—▮▮▮▮ wife." **[Staff Asst. 12]'s** background (prior to the IDOT summer employment) was working for an insurance company. (*See* Chronology at 1/27/11, 3/2/11, 3/30/11, 5/13/11, 8/16/11). Per her employee evaluations as a TM I Staff Assistant, **[Staff Asst. 12]'s** duties included: coordinating carpools, assisting with air transportation billing, coordinating equipment for events, documenting financial services processes, assisting with State Fair activities, and handling information technology responsibilities.

### 7. [Staff Asst. 13]

**[Staff Asst. 13]** was sponsored by Illinois State Representative Frank Mautino, and the Governor's Office helped her obtain a *Rutan*-exempt Staff Assistant position at IDOT. June and July 2010 emails revealed discussions between the Governor's Office and Representative Mautino about **[Staff Asst. 13]**. After **[Staff Asst. 13]** was appointed to *Rutan*-covered temporary positions at IDOT from January to July 2010, she was hired as a *Rutan*-exempt TM II Staff Assistant on August 2, 2010. She subsequently moved into a *Rutan*-covered position, for which she was the sole candidate interviewed. **[Staff Asst. 13]'s** background was as an administrative assistant at a bank for four months and as a server at restaurants during college. (*See* Chronology at 6/30/10, 7/22/10, 5/13/11). As a TM II Staff Assistant, **[Staff Asst. 13]'s** duties included: working as an administrative assistant, completing financial reports, making spreadsheets, assembling personnel documents, and responding to constituent services requests.

### 8.   [Staff Asst. 17]

The Governor's Office sponsored **[Staff Asst. 17]**. Prior to securing a *Rutan*-exempt TM II Staff Assistant position at IDOT, **[Staff Asst. 17]** worked in the Governor's Office of Constituent Affairs ("GOCA") performing clerical duties. In March of 2010, Croke emailed Jerry Stermer about the GOCA employees and their interests in other agencies. **[Staff Asst. 17]'s** interests included: DCEO, IDES, CMS, or ICCB. Stermer asked Croke to: "Please work with these folks one by one to spur the process. Thanks." The Governor's Office circulated **[Staff Asst. 17]'s** resume at several state agencies before securing *Rutan*-exempt employment for **[Staff Asst. 17]** at IDOT. Croke emailed **[Staff Asst. 17]'s** resume to Hughes in September of 2010, saying: "Thank you for your help. I will send info on the other 2 individuals we discussed asap." **[Staff Asst. 17]'s** background was in several administrative positions. Shortly after being hired at IDOT, it was discovered he lied on his application and did not disclose three prior DUI convictions. After a report was sent to the Governor's Office recommending termination, the recommendation was changed to a suspension. (*See* Chronology at 3/23/10, 3/25/10, 9/9/10). Per his employee evaluations as a TM II Staff Assistant, **[Staff Asst. 17]'s** duties included: processing DBE annual paperwork, requesting additional information from firms by email or phone, preparing checklists for DBE certification applications.

### 9.   [Staff Asst. 19]

The Governor's Office sponsored **[Staff Asst. 19]** and assisted **[Staff Asst. 19]** in finding a *Rutan*-exempt position at IDOT. In March of 2010, Jeffrey Crabtree (Special Assistant on Labor Affairs in the Governor's Office) called Bill Grunloh (IDOT Chief of Staff) about an ePAR for **[Staff Asst. 19]**. In early April, Mak emailed Lavin and Crabtree an update on the status of **[Staff Asst. 19]'s** pending ePAR and Crabtree responded, saying: "Let me know what else I need to do." **[Staff Asst. 19]** was hired as a TM III Staff Assistant on April 27, 2010. **[Staff Asst. 19]'s** background was as a Motor Truck Driver for the City of Chicago. (*See* Chronology at 3/18/10, 4/5/10). Per his employee evaluations as a TM III Staff Assistant, **[Staff Asst. 19]'s** duties included: coordinating tools for inventories and logs, answering phones, completing mail runs, and handling housekeeping duties.

### 10.  [Staff Asst. 22]

**[Staff Asst. 22]** was sponsored by the Governor's Office, who helped him secure a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 22]** was a summer intern at the Governor's Office of Constituent Affairs ("GOCA") and listed Ryan Croke as a reference on his IDOT application. Croke emailed Hughes a resume for **[Staff Asst. 22]** in the summer of 2011. In December of 2011, internal IDOT emails reveal that **[Staff Asst. 22]'s** name was substituted for an existing candidate on an ePAR. Shortly thereafter, **[Staff Asst. 22]** was hired as a TM II Staff

Assistant on January 16, 2012. **[Staff Asst. 22]'s** background was with a medical transport service company and in banking. (*See* Chronology at 6/20/11, 12/7/11). Per his employee evaluations as a TM II Staff Assistant, **[Staff Asst. 22]'s** duties included: preparing and editing various reports, briefing papers for the Chief Operating Officer, updating statistical data for employee counts, and attending, scribing, or facilitating meetings. Notably, **[Staff Asst. 22]** performances were marked as unsatisfactory; issues with his "technical abilities, attendance, team spirit, work quality, and timeliness" were highlighted.

### 11. [Staff Asst. 25]

In May of 2011, the Governor's Office was pushing the permanent full time hire of **[Staff Asst. 25]**, who had worked as a Highway Maintainer and an entry level tech at IDOT in 2009 and 2010. When asked if the hire "was important," the Governor's Office responded that "to a legislator it is." **[Staff Asst. 25]** was hired as a 60-Day Emergency Staff Assistant on March 1, 2011, to "assist in overall development and coordination of policy and directives," and to "provide assistance to the local agencies, elected officials and the general public." **[Staff Asst. 25]** was hired as a permanent TM II Staff Assistant in June of 2011. **[Staff Asst. 25]'s** background was as a temporary Highway Maintainer, a city driver, and body shop worker. (*See* Chronology 5/10/11). Per his employee evaluations from the relevant timeframe, **[Staff Asst. 25]'s** duties included: appraising, reporting, inspecting, and maintaining equipment and completing field reviews.

### 12. [Staff Asst. 35]

The Governor's Office assisted **[Staff Asst. 35]** with securing various *Rutan*-exempt positions at IDOT. **[Staff Asst. 35]** was the step-daughter of Illinois State Senator Lightford and daughter of IDOT employee, **[Staff Asst. 36]**. Internal IDOT emails show that "IDOT [was] asked to put **[Staff Asst. 35]** on as an emergency hire," which they did on October 1, 2012, when she was hired as a TM II Staff Assistant. **[Staff Asst. 35]** remained in consecutive temporary emergency appointments in various titles until a permanent full time position was secured in July of 2013. When Hughes emailed former IDOT Chief Counsel Michael Forti, saying: "Seans [sic] calling about **[Staff Asst. 35]**. We need to make that offer," Forti confirmed that Sean O'Shea, Deputy Chief of Staff, called him about the offer as well. Despite evidence that IDOT did not want to hire **[Staff Asst. 35]**, the emails reviewed show that the Governor's Office pushed her hire. She started a permanent full time position in a TM III Region I Asset Recovery position on July 30, 2013. **[Staff Asst. 35]'s** background was as a package handler, a customer service representative, and a toy store merchandiser. (*See* Chronology at 9/25/12, 7/12/13; *see also*, *infra* additional discussion of push to hire **[Staff Asst. 35]**). Per her employee evaluations from the relevant timeframe, **[Staff Asst. 35]'s** duties included: processing invoices, contacting vendors and IDOT yards for information, copying and filing documents, and completing projects for the Special Services Manager.

### 13. [Staff Asst. 37]

The Governor's Office pushed IDOT to extend an employment offer to **[Staff Asst. 37]**. A November 15, 2011, email from Mike Woods to Marva Boyd (IDOT COS) said: "O'Shea called last night. He would like us to keep him updated step by step regarding the interview process, etc. for **[Staff Asst. 37]** and **[Staff Asst. 41]**." A series of emails on December 6, 2011, show that O'Shea pushed to have **[Staff Asst. 37]'s** ePAR approved quickly at the GOMB level and insisted IDOT update a Lavin List from the same day with ePARs for **[Staff Asst. 37]** (as well as **[Staff Asst. 41]** and **[Staff Asst. 49]**). **[Staff Asst. 37]** was hired as a permanent full time TM II *Rutan*-exempt Staff Assistant at IDOT on January 2, 2012. **[Staff Asst. 37]'s** background was working with the Orland Township where he coordinated job fairs, managed vehicle maintenance, and assisted with a food pantry. (*See* Chronology at 11/15/11, 12/6/11). Per his employee evaluations from the relevant timeframe, **[Staff Asst. 37]'s** duties included: picking up, sorting, and delivering mail, assisting with the inventory and distribution of supplies, and delivering and picking up Motor Pool vehicles from the maintenance garage.

### 14. [Staff Asst. 38]

**[Staff Asst. 38]** was sponsored by the Governor's Office. Mark Harris emailed **[Staff Asst. 38]'s** resume to IDOT personnel in December of 2010. Three weeks later, on January 3, 2011, Harris asked whether **[Staff Asst. 38]** had been interviewed. The next day, Harris followed up again regarding IDOT scheduling an interview with **[Staff Asst. 38]**. IDOT hired **[Staff Asst. 38]** as a 60-Day Emergency Hire TM III Staff Assistant on January 24, 2011. **[Staff Asst. 38]'s** position was renewed at TM II and TM III levels for almost two years, even after internal IDOT emails expressed concerns about his lack of qualifications for the job. **[Staff Asst. 38]'s** background was as an Administrative Assistant 5 for the Cook County Department of Highways where he was a permit inspector and maintenance supervisor. (*See* Chronology at 12/14/10, 1/3/11, 2/25/11, 9/19/12). Per his TM II and TM III Staff Assistant employee evaluations, **[Staff Asst. 38]'s** duties included: organizing, archiving, and disposing of Motor Fuel Tax documents and assisting with other administrative tasks as needed. On an IDOT application, **[Staff Asst. 38]** listed his own Staff Assistant duties as: testing and weighing materials, cleaning equipment, and archiving and organizing files. In September of 2012, Jerry Stermer (GOMB) emailed O'Shea, stating that **[Staff Asst. 38]** "is being or has been dismissed" and "[o]bviously the ask will be to save his job." **[Staff Asst. 38]** was not dismissed by IDOT; rather, on January 16, 2013, **[Staff Asst. 38]** was hired into a TM III Region I Asset Recovery Analyst position in the Chief Counsel's Office.

### 15. [Staff Asst. 46]

Illinois State Representative Frank Mautino sponsored **[Staff Asst. 46]**, and the Governor's Office helped **[Staff Asst. 46]** secure a *Rutan*-exempt Staff Assistant position at IDOT. The Governor's Office communicated with Representative Mautino about **[Staff Asst. 46]'s** ePAR for a Staff Assistant position in December 2010. Hansen Anderson pushed for the ePAR to be approved quickly and referred to it as "time sensitive." **[Staff Asst. 46]'s** ePAR was for a Staff Assistant position in IDOT District 1; however, the District 1 Administrative Manager did not have **[Staff Asst. 46]'s** resume prior to his hire and did not know where to place **[Staff Asst. 46]**. **[Staff Asst. 46]** started as a *Rutan*-exempt TM III Staff Assistant at IDOT on January 5, 2011. **[Staff Asst. 46]'s** background was working for a trucking company as an operations manager, a line leader, a route driver, and warehouse supervisor. (*See* Chronology at 12/17/10, 12/28/10, 1/3/11). Per his TM III Staff Assistant evaluations, **[Staff Asst. 46]'s** duties included: monitoring service contracts and expenditures for equipment repairs, compiling budget reports and records, maintaining inventory records, entering data, processing purchases, and tracking vehicle mileage.

### 16. [Staff Asst. 47]

IDOT Director of Traffic Safety, Michael Stout, sought assistance from both the Governor's Office and Secretary Hannig in getting his daughter **[Staff Asst. 47]** transferred from the Governor's Office to IDOT. When he was unsuccessful, he contacted Senator Durbin's Chief of Staff to assist with the requested transfer and a raise. On June 14, 2010, Senator Durbin's Chief of Staff Pat Souders sent Stout an email stating "Talked to Gov's office. They're on it." On June 24, 2010, Stout sent another email that stated "Sorry for being a pest, any word from the Gov's office on **[Staff Asst. 47]**? No movement here." That same day, Souders replied:

> I was with the Gov's folks today in DC. They said they're working on it. … They get it and are working on it.

On August 17, 2010, Stout sent an email to Souders that stated in part:

> An update on our daughter **[Staff Asst. 47]**, she still hasn't been transferred to IDOT. When you last talked to the Gov's staff, they told you they were waiting for a replacement. That never happened and now they say they can't move her because her raise is too large. [Her salary in the Governor's Office was $26,000 per year.]

Then, on September 15, 2010, Souders sent an email stating, "Heard **[Staff Asst. 47]** is starting at IDOT tomorrow. All good?" (*See* Chronology at 6/11/10, 6/24/10, 8/17/10).

During his OEIG interview, Stout admitted seeking the assistance of the Governor's Office, Secretary Hannig and Souders in getting his daughter transferred to IDOT. Stout told the OEIG investigators in part:

[That] his request of Hannig was permissible because **[Staff Asst. 47]** worked on Quinn's campaign and, therefore, deserved an IDOT job. … In addition to requesting that Hannig find **[Staff Asst. 47]** an IDOT position, Stout requested assistance with finding **[Staff Asst. 47]** IDOT employment from Governor's Office employees Ryan Croke and David (last name unknown). Stout said he worked with Croke and David on Governor Quinn's campaign.

(*See* Chronology at 4/4/14).

On September 16, 2010, **[Staff Asst. 47]** was hired as a Staff Assistant at IDOT. Per her TM II Staff Assistant evaluations, **[Staff Asst. 47]'s** duties included: entering data, assisting with personnel transactions and manual updates, coordinating the battery recycling program, booking conference rooms, filing documents, answering phones, and ordering office supplies.

### 17. [Staff Asst. 52]

The Governor's Office secured **[Staff Asst. 52]**, the daughter of City of Chicago Alderman Gene Schulter, a *Rutan*-exempt Staff Assistant position at IDOT. Between June and September 2010, the Governor's Office sent **[Staff Asst. 52]'s** resume to IDOT (and other agencies) and followed up to ensure a position was found for her. When IDOT did not interview **[Staff Asst. 52]** quickly enough, the Governor's Office sent her resume to IDOT again and asked that they find a position for her. **[Staff Asst. 52]** started at IDOT on October 4, 2010, as a *Rutan*-exempt TM II Staff Assistant on a 60-Day Emergency Hire, and her appointment was renewed for a second term in December 2010, after which she obtained a permanent TM II position in January 2011. She later transferred into a TM IV Assistant to the Secretary position in 2012. **[Staff Asst. 52]'s** background was working for her father, Alderman Gene Schulter, as a Community Outreach Coordinator while she pursued a Master's Degree. Her initial application completed for IDOT in September of 2010, reflected that her salary working for Alderman Schulter was $1322 per month; an application completed three months later asserted that her salary was $3000 per month (for the same job/timeframe). (*See* Chronology at 7/14/10, 7/23/10, 7/27/10, 12/8/10). Per her employee evaluations as a temporary TM II Staff Assistant, **[Staff Asst. 52]'s** duties included: opening and distributing mail, writing letters, answering phones, scheduling meetings, and assisting Regional Engineers with writing letters.

### 18. [Staff Asst. 59]

**[Staff Asst. 59]** was sponsored by Illinois State Senator Louis Viverito, and both former IDOT Secretary Gary Hannig and IDOT Personnel Chief Hughes helped **[Staff Asst. 59]** secure IDOT employment. **[Staff Asst. 59]** was brought on as TM II Staff Assistant in June of 2010, through the 60-Day Emergency Hire process. Emails also revealed that the Governor's Office expedited **[Staff Asst. 59]'s** permanent full time hire. On September 2, 2010, Hansen Anderson

and Harris emailed about an ePAR number for **[Staff Asst. 59]**, which Hansen Anderson then forwarded to GOMB. The ePAR was approved by GOMB on the same day and **[Staff Asst. 59]** was hired as a permanent full time Staff Assistant on September 16, 2010. **[Staff Asst. 59]'s** background was as a bricklayer supervisor and arborist. (*See* Chronology at 4/26/10, 9/2/10). Per his employee evaluations as a TM II Staff Assistant, **[Staff Asst. 59]'s** duties included: reviewing permit applications, removing trees along roads, performing roadside maintenance, and conducting chainsaw maintenance and safety trainings.

### D. Politically Connected Staff Assistants Hired As "Emergency," or "Temporary" Employees to Perform Alleged "Exempt" Duties.

Our investigation revealed an abuse of the "Temporary" and "Emergency" hire processes to onboard Staff Assistants. In some instances, temporary summer employees were appointed to Staff Assistant positions through the *Rutan*-exempt process to perform covered work. In other instances, the 60-Day Emergency Hire process was used to quickly onboard politically connected candidates as Staff Assistants (and other positions). In some instances, the Governor's Office and Legislators were involved in either the initial placement or extended appointment of temporary *Rutan*-exempt Staff Assistants at IDOT.

### 1. Temporary Summer Employees Hired as Staff Assistants

Temporary hourly employment is, by its very nature, unlikely to include *Rutan*-exempt duties like policymaking, being a spokesperson, or handling sensitive confidential information. The following chart contains examples of temporary summer employees appointed to *Rutan*-exempt Staff Assistant positions. These *Rutan*-exempt employees were paid low hourly rates and were often politically connected or related to a State employee. Documents show that most of these employees performed duties that were typically *Rutan*-covered, and usually performed by employees hired through IDOT's Technical Trainee and Engineering Trainee summer intern programs. Many of these Staff Assistants also actually participated in the Technical Trainee position at one point or were hired into other low level positions on 60-Day Emergency Hires. Our investigation detected a general trend wherein people were placed in consecutive temporary positions. Many of these employees switched back and forth between entry-level *Rutan*-covered positions and *Rutan*-exempt positions.

| EMPLOYEE NAME | EMPLOYMENT DATES | POSITION | SALARY | NOTES |
|---|---|---|---|---|
| **[Staff Asst. 2]** | 6/1/11; 6/21/12 | TM II Staff Assistant | $12.00/hr | Listed senior IDOT official as reference; was a college student; worked two summers as exempt Staff Assistant. |

| [Staff Asst. 4] | 6/1/10 | TM II Staff Assistant | $10.65/hr | Selected by Rep. Mike Boland for the General Assembly Scholarship; interned for Illinois House of Reps.; interned for Rep. Boland; was college student. |
|---|---|---|---|---|
| [Staff Asst. 7] | 6/30/11 | TM II Staff Assistant | $11.10/hr | Father is an engineer at CMS; worked three summers during college as a temporary worker, including as exempt Staff Assistant. |
| [Staff Asst. 11] | 9/1/10 | TM II Staff Assistant | $10.65/hr | Worked as a clerk at Secretary of State; related to Staff Assistant John Gianulis; related to Rock Island County Democratic Committeeman Gianulis. |
| [Staff Asst. 15] | 6/9/10 | TM II Staff Assistant | $10.65/hr | Hired as a Staff Assistant straight out of high school; son of Christian County Board Member Mike Drea. |
| [Staff Asst. 18] | 6/1/11 | TM II Staff Assistant | $12.00/hr | Worked at Speaker Madigan and Alderman Olivo Service Offices as intern; listed Alderman Marty Quinn's brother as reference; was college student. |
| [Staff Asst. 20] | 6/14/10 | TM II Staff Assistant | $14.95/hr | Daughter of Senior Advisor to Governor Quinn; was college student; applied for *Rutan*-covered summer position. |
| [Staff Asst. 23] | 6/22/11 | TM II Staff Assistant | $12.00/hr | Selected as Illinois State Scholar (2010); was college student. |
| [Staff Asst. 24] | 6/1/10 | TM II Staff Assistant | $11.50/hr | At time of hire in IDOT, was a current college student. |
| [Staff Asst. 27] | 6/7/10 | TM II Staff Assistant | $10.65/hr | Has three uncles who worked at IDOT. |
| [Staff Asst. 30] | 6/1/10 | TM II Staff Assistant | $10.65/hr | No work experience at all listed on job application; was college student |
| [Staff Asst. 31] | 6/1/10; 8/2/10 | TM II Staff Assistant | $11.50/hr | Initial hire at IDOT as a *Rutan*-covered Bridge Tender in 2009 on 60-Day Emergency Hire; previous |

| | | | | experience doing maintenance for Chicago's Metropolitan Water Reclamation District; listed one IDOT employee as a reference and had an uncle employed by IDOT. |
|---|---|---|---|---|
| **[Staff Asst. 32]** | 6/3/10 | TM II Staff Assistant | $10.65/hr | Worked at DCEO and Cline Center for Democracy. Interned at Generation Obama and did voter registration. |
| **[Staff Asst. 33]** | 6/7/10 | TM II Staff Assistant | $10.65/hr | No work experience at all listed on job application. |
| **[Staff Asst. 34]** | 7/6/11 | TM II Staff Assistant | $11.10/hr | Was a part of the CO-OP Program at IDOT in high school. Worked at Springfield Urban League and CWLP Building and Zoning Department. |
| **[Staff Asst. 40]** | 6/7/10 | TM II Staff Assistant | $10.65/hr | Worked at Illinois Association of Minorities in Government. |
| **[Staff Asst. 42]** | 6/1/10 | TM II Staff Assistant | $14.95/hr | Was summer intern at the Secretary of State's Office. |
| **[Staff Asst. 44]** | 6/16/10 | TM II Staff Assistant | $11.50/hr | Worked at Chicago Park District; records contain the handwritten note "MJM." |
| **[Staff Asst. 48]** | 1/18/11; 5/20/11 | TM II Staff Assistant | $11.10/hr | Hire was facilitated by Governor's Office; listed Senator Kimberly Lightford as a reference; recommended by Representatives Mayfield, Lightford, and Lilly. |
| **[Staff Asst. 50]** | 12/1/10 | TM II Staff Assistant | $10.65/hr | Employed in various positions between 2005 and 2015 and held several successive Technical Trainee positions. Related to IDOT employee. |
| **[Staff Asst. 51]** | 6/1/11; 8/1/11 | TM II Staff Assistant | $12.00/hr | Listed Speaker Madigan, Chicago Alderman Olivo, and Kevin Quinn (brother of Chicago Alderman Marty Quinn) as references. |

| [Staff Asst. 53] | 7/14/10 | TM II Staff Assistant | $10.65/hr | Related to numerous IDOT employees; father ▮▮▮▮▮ is a union leader who supported Governor Quinn. |
|---|---|---|---|---|
| [Staff Asst. 55] | 6/7/10 | TM II Staff Assistant | $10.65/hr | Worked for Illinois Senate as Senate Page; Michael Baysinger (Marion School Board member) as reference. |
| [Staff Asst. 56] | 7/23/10; 9/22/10 | TM II Staff Assistant | $11.50/hr | Listed on Governor's Office documents to assist placing; internal emails show he was intended to be placed in "Summer Program." |
| [Staff Asst. 61] | 10/24/11 | TM II Staff Assistant | $11.10/hr | Listed former Springfield Alderman and IDOT employee Frank McNeil as reference. Worked at City of Springfield (landscaping and maintenance). |
| [Staff Asst. 62] | 6/1/11 | TM II Staff Assistant | $11.10/hr | Listed former Springfield Alderman and IDOT employee Frank McNeil as reference. Email contact was "JoshuaForQuinn." Worked at City of Springfield (landscaping – summer youth program). |

## 2. Staff Assistants Hired Through 60-Day Emergency Hire Process

In addition, our investigation revealed an abuse of the 60-Day Emergency Hire Process to quickly onboard politically connected candidates. The Governor's Office and other Elected Officials (or their staffs) sometimes directed IDOT to find openings or renew appointments. Many of these examples are discussed throughout this report, including: [Staff Asst. 5] at Sec. IX.A.3; [Staff Asst. 35] at Sec. IX.A.21; [Staff Asst. 36] at Sec. IX.A.22; [Staff Asst. 38] at Sec. IX.A.24; [Staff Asst. 52] at Sec. IX.A.31; [Staff Asst. 59] at Sec. IX.A.34. As is discussed below, evidence suggests that the Governor's Office knew, or should have known, that some of these temporary *Rutan*-exempt appointments were improper.

## VII. GOVERNOR'S OFFICE KNEW OR SHOULD HAVE KNOWN OF STAFF ASSISTANT HIRING MISUSE

As noted above, the 2014 OEIG Report was "unable to conclude that the Office of the Governor was aware of IDOT's misuse of the Staff Assistant position" or "aware that IDOT was circumventing the *Rutan* hiring process." Our investigation reached a different conclusion. During our investigation, Ryan Croke (DCOS, COS), Mark Harris (DCOS), and Sean O'Shea (DCOS) testified that they relied upon the agency to verify Staff Assistant qualifications. Further, they and Jack Lavin (COS) denied knowledge that unqualified candidates were hired as Staff Assistants and any knowledge that Staff Assistants were performing *Rutan*-covered duties. (*See* Ex. 2). As set forth below, our investigation found that senior staff in the Governor's Office either knew, or should have known, that the *Rutan*-exempt hiring process was being manipulated.

As explained above, the Governor's Office received, reviewed, forwarded, and tracked resumes of Staff Assistant candidates; most of those candidates had a political connection; and, many of the politically connected or sponsored candidates hired as Staff Assistants lacked any policy or other relevant experience. Moreover, the Governor's Deputy Chiefs of Staff and Chiefs of Staff played an active role in hiring Staff Assistants (and other exempt employees). Those individuals methodically tracked proposed Staff Assistant hires. Either the Deputy Chief of Staff, the Chief of Staff, or both were aware of the candidates' backgrounds; previous work experience; and previous salaries. They were also aware of the duties contained in the Staff Assistant job descriptions. They had regular meetings to discuss which candidates to approve; they directed GOMB and IDOT to approve certain Staff Assistant hires (despite the multilevel approval system that was supposed to occur); they instructed IDOT to hire certain Staff Assistants; and there was frequent, sometimes urgent, email communication from the Governor's Office to IDOT regarding numerous Staff Assistants. Finally, the sheer increase in number of Staff Assistant hires should have alerted the Governor's Office to the manipulation. The idea that IDOT needed, in 2010 alone, seventy-three new assistant policymakers is simply not credible on its face.

### A. The Governor's Office's Intimate Involvement in Staff Assistant Hiring Process Gave Them Notice of Abuses

As explained in more detail below, the Governor's Office maintained internal documents, "Lavin Lists," to track all proposed Staff Assistants, they had a systematic tracking and approval process for the hires, and many of the Staff Assistants were not qualified to perform the duties contained in the Staff Assistant job description.

#### 1. Internal Documents Titled "Lavin Lists" Show Large Number of Staff Assistants with Nearly Identical Duties

Beginning around October 2009, at Jack Lavin's request, IDOT personnel created a document referred to as the "Lavin List," which detailed *Rutan*-exempt proposed hires (ePARS)

pending at the Deputy Chief of Staff and Chief of Staff approval level. Lavin Lists were generally updated and circulated multiple times per month. The Lavin Lists set forth the candidate name, years of IDOT service, current position, current salary, requested position, requested salary, and a summary of the duties to be performed in the requested position. (Relevant examples of the Lavin Lists are attached as Ex. 5). The OEIG Report did not discuss the Lavin Lists.

The information reflected on the Lavin Lists should have alerted the Governor's Office to the misuse of the Staff Assistant position. Many of the Lavin Lists contained multiple requested Staff Assistants with nearly identical job duties. For example, the August 12, 2011, Lavin List contained 11 "New Hires," **nine** of which were Staff Assistants. All nine requested Staff Assistants had the same nearly identical job duties.

> This position is accountable for assisting in the overall development and coordination of policy and directives regarding bureau programs for the District. This position monitors conformance to existing policies and conducts reviews or studies issues that are of special interest. S/He provides policy interpretation and analysis of policies. In addition, this position provides assistance to the local agencies, elected officials, and the general public.[36]

(*See* Chronology at 8/12/11; Ex. 5).

Many of these candidates were politically connected and received huge pay increases over their then-current low-level positions (*See e.g.,* **[Staff Asst. 6]** salary increase from $6,000 to $45,720; **[Staff Asst. 12]** salary increase from $21,732 to $40,140; and, **[Staff Asst. 60]** salary increase from $26,004 to $45,720). Several other requested Staff Assistants were listed on the Lavin Lists as current temporary IDOT employees making $11.00/hour ($21,732/year) and their requested salaries were double their current salaries. Other requested Staff Assistants were listed as current "emergency" employees in "Administrative Support" roles (*See e.g.,* Lavin List 12/28/09: **[Staff Asst. 14]**; **[Staff Asst. 29]**; **[Staff Asst. 54]**). Several other politically connected Staff Assistants appeared on the Lavin Lists with low level current positions and/or low level current salaries (*See e.g.,* **[Staff Asst. 9]** (private sector making $2,466); **[Staff Asst. 62]**

---

[36] The duties for "Project Manager" also mirror the duties for Staff Assistants. Indeed, during the OEIG's investigation of the Staff Assistant position, OEIG discovered other *Rutan*-exempt positions in low-level technical classifications were described on the Lavin Lists in a similar way to the Staff Assistant position. OEIG identified several other positions at IDOT (including the Project Manager, Safety Issues Analyst, Special Assistant to the Director of Traffic Safety and Advisor to the Bureau Chief) where the employees were not performing the duties described in their job descriptions and/or were performing *Rutan*-covered duties. Ultimately, the OEIG referred that investigation on May 27, 2016 to the Governor's Office for its further review.

(temporary Snowbird)). The low level current positions and/or salaries suggest they were not qualified to perform the high-level development and coordination of policy duties listed on the Lavin Lists. (*See* Chronology at 8/12/11; Ex. 5).

## 2. The Governor's Office Approval Process Should Have Revealed Unqualified Candidates

The *Rutan*-exempt process required the Deputy Chief of Staff and Chief of Staff to review candidate qualifications before approving a Staff Assistant hire. Indeed, Jack Lavin testified that he met in person with the Deputy Chief of Staff(s) assigned to IDOT or Simone McNeil to review the potential *Rutan*-exempt hires listed on the Lavin List. He testified he considered the following factors when deciding whether to approve a hire: (1) the agency's need to hire the person; (2) whether the agency "made a case" for hiring the candidate; (3) whether the candidate is qualified for a policy-making and/or management position and the specific job at issue; and, (4) whether the person is committed to the Governor's policies and the agency director's policies. Lavin testified he evaluated these factors <u>primarily based</u> on what the agency and Deputy Chief(s) of Staff told him. Lavin expected that his Deputy Chiefs of Staff would discuss candidates on the IDOT "Lavin Lists" and answer questions regarding who the person was, what their qualifications were, what work they would be doing, whether the agency needed the position filled, what the candidate's background looked like, and whether the salary was appropriate for the work being done and the candidates' backgrounds. (*See* Ex. 2, Lavin Summary at 3).

Although Lavin, Croke, O'Shea and Harris all deny knowledge of the Staff Assistants' qualifications, those denials are not credible. First, the Governor's Office sent IDOT many of the resumes. Second, the Governor's Office had frequent phone calls, meetings, and email communications to discuss the candidates. Croke testified he regularly participated in meetings with agency directors and other Governor's Office staff members regarding personnel matters as both DCOS and COS. (*See* Ex. 2, Croke Summary at 2). Likewise, Harris testified he had frequent discussions with the COS about pending *Rutan*-exempt hires, wherein they reviewed the candidates' backgrounds and the source of a candidate (*i.e.*, whether someone recommended the candidate). (*See* Ex. 2, Harris Summary at 2).[37] Similarly, O'Shea testified that he participated in regular conference calls with IDOT to discuss proposed hires pending DCOS and COS approval, and discussed, among other things, salary information and whether someone recommended the candidate. He discussed candidates with Lavin, including the source of the candidates if known. If neither knew who recommended a specific candidate, they might delay approving the hire. (*See* Ex. 2, O'Shea Summary at 2-3). Third, final approval required both DCOS and COS approval of the candidate. In other words, the Governor's Office selected, discussed, and approved candidates.

---

[37] However, Harris denied specifically reviewing candidate qualifications for the position.

Given this evidence, it is simply not credible to believe that the Governor's Office lacked knowledge that some Staff Assistants were unqualified.

### 3. Examples of Specific Candidates the Governor's Office Knew were Unqualified

A comparison of specific candidates' resumes to the stated job duties for which they were hired reveals that senior staff in the Governor's Office knew some candidates they were pushing for jobs at IDOT were unqualified to fulfill the duties stated on the Lavin Lists. For example, the Governor's Office sent IDOT **[Staff Asst. 12]'s** resume, which listed prior work experience in the insurance industry from 1990 through 2006, but no work experience after that. In 2011, she was hired into the IDOT summer technical program making $11.00/hour. On the August 12, 2011 Lavin List, her requested duties included "assisting the Bureau Chief of Administrative Services in the overall development and coordination of policy and directives regarding Division of Aeronautic programs…. She provides policy interpretation and analysis of policies." The Governor's Office approved her hire despite the fact she had zero experience in aeronautics or transportation policy. (*See* Ex. 5).

Similarly, the Governor's Office sent IDOT **[Candidate 6]'s** resume. **[Candidate 6]** worked in the Governor's Office in an administrative role and was responsible for placing work repair orders, investigating and resolving billing issues, auditing travel vouchers, arranging forms of transportation and other similar administrative duties. He had no traffic safety or policy making experience. He appears on the February 3, 2011 Lavin List with a requested position of TM II Safety Issues Analyst responsible for "assisting in the overall development and coordination of policy and directives regarding bureau [traffic safety] programs. … This position monitors conformance to existing policies and conducts reviews or studies issues that are of special interest." The Governor's Office approved his hire even though he had no experience in traffic safety.[38] (*See* Ex. 5).

The Governor's Office sent IDOT **[Staff Asst. 38]'s** resume. From 1993 through 2010, **[Staff Asst. 38]** worked as an Administrative Assistant for the Cook County Department of Highways, serving as a permit inspector and maintenance bureau supervisor. His duties included inspecting job sites in the County to ensure they complied with permitting requirements. At the Governor's Office's urging, IDOT hired **[Staff Asst. 38]** in January of 2011 as a *Rutan*-exempt TM II Staff Assistant utilizing the 60-Day Emergency Hire process. His actual duties on the job included ignition basket cleaning, washing and gradation in the Materials Lab. Internal IDOT emails reflect concerns about **[Staff Asst. 38]'s** qualifications to work in the Materials Lab "due

---

[38] The Governor's Office also pushed **[Staff Asst. 19]** as a candidate. **[Staff Asst. 19]** was a truck driver for the City of Chicago. The Governor's Office approved his ePAR for a TM III Staff Assistant position on April 22, 2010. He had no policy-making experience.

to [his] lack of computer skills and lack of technical knowledge." Nevertheless, he remained in a *Rutan*-exempt TM II temporary Staff Assistant position throughout 2011 and 2012. On September 19, 2012, Jerome Stermer (GOMB) emailed O'Shea and stated that **[Staff Asst. 38]** "is being or has been dismissed" and "the ask will be to save his job." **[Staff Asst. 38]** was not dismissed by IDOT. Rather, he was promoted to a TM III Region I Asset Recovery Analyst position in in the Office of Chief Counsel with the following duties:

> The incumbent is responsible for administering, analyzing and determining third party liability for claims by the Department. …[T]he incumbent must be cognizant of and apply comparative negligence laws to properly investigate, negotiate, compromise and settle each claim. … Additionally, the incumbent determines which cases should be referred to a collection agency and/or the Attorney General's Office or establishes an installment agreement with the claimant for payment of monies owed to the Department.

The Governor's Office approved his promotion despite **[Staff Asst. 38]'s** lack of experience with third party liability claims and comparative negligence laws. (*See* Chronology at 2/25/11, 9/19/12).

Further, emails show that Harris asked Woods for information concerning **[Staff Asst. 60]** before the Governor's Office approved her hire. On August 12, 2011, Woods informed Harris "$26,000 is [[**Staff Asst. 60]'s**] current full time salary as an office assistant with the Illinois State Senate." The same email attached a Lavin List showing **[Staff Asst. 60]** slated for a TM II Staff Assistant position with a requested salary of $45,720 and responsible for assisting the "Deputy Director of Highways in the tactical aspects of developing and/or positions to be taken by the Division on policies and procedures affecting the Department" and "assisting in the overall development and coordination of policy and directives regarding programs for the Division." There is no indication **[Staff Asst. 60]** had any experience in highways or development of policies. The Governor's Office approved her hire and she started in the TM II Staff Assistant position on October 16, 2011. (*See* Chronology at 8/12/11).

Finally, there is some evidence that the Governor's Office had actual knowledge that Staff Assistants were not performing the duties listed in the job description. For example, in February of 2012, emails between O'Shea and IDOT discuss the job duties of TM II Staff Assistant **[Staff Asst. 28]** (who was connected to Congressman Dan Lipinski). In those emails regarding the job duties they note that **[Staff Asst. 28]'s** duties include coordinating litter pick up with the Sheriff's Work Alternative Program and Gateway Green. In the Fall of 2011, emails exchanged between O'Shea (Governor's DCOS) and IDOT discuss the job duties of Staff Assistant **[Staff Asst. 57]**, who was hired with the assistance of the Governor's Office. In those emails, **[Staff Asst. 57]'s** duties are described as coordinating the pre-employment screening for temporary hires; helping with Highway Maintainer new hires and recalls; and, helping to coordinate their physical examinations. (*See* Chronology at 9/6/11).

## B. Red Flags Raised Relating to Increased Staff Assistant Hires

In addition to the above, the Governor's Office was aware that the pace of hiring Staff Assistants in IDOT dramatically accelerated in 2010. In all of 2009, 21 Staff Assistants were hired in IDOT. In 2010, the number of new Staff Assistant hires increased to at least seventy-three. Similarly, in 2011, the number of newly hired Staff Assistants was sixty-two. The increased number of Staff Assistant hires should have raised a red flag.

Moreover, the Governor's Office was alerted to questions regarding Staff Assistants, their political connections, and the duties that they were performing by *at least* September of 2010. In September of 2010, Associated Press reporter John O'Connor submitted a FOIA request seeking information about the hiring of twenty-five IDOT employees, nineteen of whom were Staff Assistants. In discussing the FOIA request, an email between IDOT and the Governor's Office noted that the request "[l]ooks like possible story on mostly new employees who have political connections." Notwithstanding that potential concern, the pace of Staff Assistant hires in 2011 did not appreciably slow. (*See* Chronology at 9/10/10).

Additionally, in October of 2010 and September of 2011, articles appeared in the State Journal-Register that raised questions regarding the hiring of certain Staff Assistants in IDOT. In December of 2011, and shortly thereafter, IDOT received (and forwarded) at least six different complaints about the department misusing the position of Staff Assistants at IDOT.

Also, in 2011, the Assistant Secretary of IDOT, former Congressman David Phelps, resigned after an OEIG finding that he had engaged in hiring fraud and manipulation. The 2011 OEIG Report[39] explains that Phelps was improperly interfering with hiring in favor of applicants that supported him politically. In that same OEIG Report, Danny Clayton, the former Assistant to the Region 5 Engineer, was found to have engaged in hiring fraud related to IDOT's summer hiring program.

Finally, when the Governor's Office transmitted resumes via email, the text of the email often included little or no text. There was little discussion about the candidate's qualifications, background or interests. Often the email text was completely blank or a cryptic message such as

---

[39] The 2011 OEIG Report can be found at: www.illinois.gov/oeig/investigations/Documents/09-00715_ Phelps_Clayton_Nelsen_Lamie_and_Workman.pdf.

"as discussed" or "see attached" or "call me."[40] In a June 30, 2011 email from the Governor's Office checking on the status of a candidate sent to an agency, the official stated "Sorry—inquiring minds …". But there was no explanation of who was inquiring or why they were inquiring. In a May 13, 2011 email chain subject titled "Desperately seeking employment" between Ryan Croke, Simone McNeil, Lou Bertuca and Joey Mak (Lavin's assistant), one participant asked "do you know who/where this person came from?" In response, Croke states "Yes—call for details." The cryptic language and lack of discussion regarding the candidates, including the reluctance to state where a candidate came from, suggests the Governor's Office knew they were engaged in impermissible conduct. (*See* Chronology at 6/30/11, 5/13/11).[41]

In light of the evidence, we conclude that officials in the Governor's Office knew or should have known of the misuse of the Staff Assistant position in IDOT.

## VIII. GOVERNOR'S OFFICE AND ELECTED OFFICIALS MANIPULATED *RUTAN* HIRING PROCESS FOR OTHER POSITIONS AND AT OTHER AGENCIES

During the investigation into the scope of the violations regarding Staff Assistants at IDOT, we discovered documents demonstrating the Governor's Office and/or elected officials closely directed the hiring of politically connected candidates into: (1) *Rutan*-exempt positions at IDOT other than the Staff Assistant position[42]; and, (2) *Rutan*-exempt positions at agencies other than IDOT. The Governor's Office (or elected officials) sent the candidates' resumes, instructed the agency to interview and/or place the candidates (without a particular hiring need), and closely

---

[40] *See, e.g.,* Chronology, Governor's Office emails with resumes or referring to candidates: 12/10/09, "…we should talk about this one"; 5/19/10, "Let's discuss when you have a chance"; 7/14/10, "Please talk to Jack about these two resumes"; 2/23/11, "high priority"; 3/11/11, no text; 6/9/11, Subject: "Resumes", no text; 6/13/11, "Please discuss tomorrow"; 6/22/11, "Here's one. Another will be coming"; 7/3/12, "… Call me for background"; 12/19/12, "add to list of people we like"; 12/19/12, "for discussion"; 2/1/13, "… two more resumes …"; 3/25/13, "there was a resume on my chair this morning"; 4/22/13, "Do you think there is a spot at OSFM…"; 4/24/13, "Fleet job at IDOT"; 5/28/13, "FYI, I had an inquiry about this resume…"; 7/2/13, "Simone, Sean or I can give you background"; 7/2/13, "resume we discussed"; 4/19/13 (forwarded on 8/10/13), "for discussion"; and, 11/24/14, resume from candidate referred by Representative Acevedo's office, "We should discuss in the coming days." *See also*, cryptic communication from elected officials to Governor's Office, specifically from Senate President Cullerton's Office to Ryan Croke: 11/18/13, with no text; 1/31/14, "per discussion"; 4/8/14, "Can you let me know if she receives interview"; 4/14/14, "Illinois Senate Democratic staff"; 4/23/14, no text; and, 5/9/14, subject: "status" and text: ███████████.

[41] A review of the emails provided by the State included several emails wherein state employees were using their private email addresses. *See, e.g.,* Chronology at 3/23/13, 6/19/13, 12/6/13 (emails to and from J. Cajindos private email address) and 5/18/11, 2/13/13, 7/29/13 (emails to and from L. Bertuca private email address).

[42] Those positions included Safety Issues Analyst, Project Manager, Asset Recovery Analyst, Community Liaisons.

monitored and, in some cases, pushed to accelerate the ePAR approval process to ensure the candidates were hired.[43] Our investigation revealed that, in addition to IDOT, the Governor's Office often sent resumes and pushed candidates for hire in the Department of Corrections ("DOC"), Central Management Services ("CMS"), Department of Natural Resources ("DNR") and the Historic Preservation Agency, among others.

As explained more fully below, some politically sponsored candidates were either not qualified to perform policy-level duties and/or were attempting to fill low level positions that could not reasonably be deemed exempt under the applicable law. For example, in April of 2010, the Governor's Office placed **[Candidate 10]**, who was sponsored by Illinois State Senator Tony Munoz, into a high-speed rail position at IDOT, even though she lacked relevant qualifications. In 2011, Illinois State University Trustee Rocky Donahue requested help from the Governor's Office (Lou Bertuca) to find Donahue's son a position in a State agency. When Bertuca failed to secure the son a position at the Illinois Emergency Management Agency ("IEMA") (the son was about to graduate from college and had no relevant work experience), the son was placed into a community relations coordinator position at the Illinois Tollway Authority. In 2013, Illinois State Representative Cory Foster forwarded to the Governor's Office the resume of a candidate whose prior experience was as a bus driver and a security guard—that candidate was hired as an "Office Assistant" in Health and Human Services, through a *Rutan*-exempt appointment. (*See* Chronology at 4/20/10, 5/18/11, 9/12/13).

### A. Governor's Office and Elected Officials Pushed Unqualified Candidates

The following are specific examples where the Governor's Office and/or elected officials were actively involved in directing the hires of politically connected individuals into positions that were improperly treated as *Rutan*-exempt and/or where it was obvious the candidate was either unqualified for the job duties as described or would not be performing those duties listed in the job description.

#### 1. [Candidate 5]

Both the Governor's Office and Bill Houlihan from Senator Durbin's office repeatedly sought to place **[Candidate 5]** into a *Rutan*-exempt position within the State, despite his lack of policy-making or other relevant work experience. In July 2011, the Governor's Office emailed the Department of Corrections about a position for **[Candidate 5]** and followed up less than two weeks later. Again, in July and August 2012, the Governor's Office discussed **[Candidate 5]** as a candidate for a Staff Assistant position at IDOT and sent his resume to IDOT. **[Candidate 5]** was hired as an "Office Clerk" at Healthcare & Family Services ("HFS") in 2012, but Bill Houlihan continued to seek other State job opportunities for **[Candidate 5]** in 2013. In January 2013,

---

[43] These candidates are discussed individually in more detail in section IX of this Report.

Houlihan and the Governor's Office discussed the possibility of **[Candidate 5]'s** hire at IDOT again. The Governor's Office resubmitted **[Candidate 5]'s** resume to IDOT and also sent the resume to the Department of Natural Resources ("DNR"), CMS, and the Historic Preservation Agency in January 2013. Later in 2013, the Governor's Office re-circulated **[Candidate 5]'s** resume, this time to DNR and State Lottery. **[Candidate 5]** remained in his position at HFS as an Office Clerk/Office Specialist from 2012 to 2015. **[Candidate 5]'s** background was as a salesman. (*See* Chronology at 6/30/11, 7/3/12, 1/22/13, 1/30/13, 8/22/13).

### 2.    [Candidate 9]

The Governor's Office actively pushed **[Candidate 9]** as a candidate for hire at various State agencies. From October of 2013 and until March of 2014, the Governor's Office aggressively looked for a *Rutan*-exempt position for **[Candidate 9]**. In October of 2013, O'Shea sent **[Candidate 9]'s** resume to IDOT and asked Woods to have him interviewed. In November of 2013, Croke sent **[Candidate 9]'s** resume to five different agencies (IDOT, DNR, DOC, IEMA, and Tollway) and asked whether there were any openings into which he could be hired. He forwarded the same email to McNeil, the newly appointed Acting Director of CMS (and former Chief of Operations in the Governor's Office). After the Governor's Office failed to secure a position for **[Candidate 9]** in other agencies, IDOT created a new *Rutan*-exempt position, TM VI Advisor to Engineer of Operations, and hired **[Candidate 9]**. The position, as crafted for **[Candidate 9]**, did not require an engineering license, despite its specific role as an advisor to the Engineer of Operations. **[Candidate 9]'s** background was as a Ward Superintendent and Motor Truck Driver for the City of Chicago. (*See* Chronology at 10/21/13, 11/8/13, 11/23/13, 1/6/14, 1/7/14, 1/13/14, 2/28/14, 3/4/14).

### 3.    [Candidate 11]

In early 2013, the Governor's Office repeatedly forwarded and followed up on placing candidate, **[Candidate 11]**, into purportedly exempt jobs, although his background was in sales. On January 8, 2013, Bertuca asked Ryan Croke and John D'Alessandro to "…get this guy some Chicago interviews-low level." Bertuca followed up with Croke regarding **[Candidate 11]** in January, February, and March.[44] On February 14th, Croke emailed personnel liaisons Israel Salazar (CMS), Michele Cusumano (DNR), Mike Woods (IDOT), and Dawn DeFraties (Historical Preservation Agency), cc: Simone McNeil (Governor's Office), providing a list of six different Private Secretary or Administrative Assistant positions, asking the managers: "Can we set up a suitable interview for the attached person asap? Not sure the positions below are a fit, but maybe?" **[Candidate 11]'s** resume was attached to the email. Cusumano and DeFraties both respond to the thread offering to set up interviews. When **[Candidate 11]** was not hired, Croke continued to look for positions. On April 9, 2013, Croke emailed O'Shea, attaching **[Candidate 11]'s** resume and a

---

[44] This thread primarily referred to **[Candidate 30]**, another candidate being pushed by Bertuca, and originated on March 7, 2013. The reference to **[Candidate 11]** occurs in the thread on March 21, 2013.

vacant *Rutan*-exempt Private Secretary II position at the EPA, asking O'Shea to consider **[Candidate 11]** and saying, in part: "[n]ame comes from Lou Bertuca." Two days later, Croke told O'Shea that **[Candidate 11]** is also interested in openings at Tollways. **[Candidate 11]'s** resume shows experience as a wholesaler in the food industry, an account manager at the Chicago Mercantile Exchange, a food and gift basket salesman, and a collection agent. (*See* Chronology at 12/2/12, 1/10/13, 2/11/13, 2/14/13, 4/9/13). It does not appear **[Candidate 11]** was hired. (ITAP).

### 4. [Candidate 20]

The Governor's Office directed IDOT, over its objection, to hire **[Candidate 20]**. In August 2012, the Governor's Office emailed **[Candidate 20]'s** resume to IDOT. A week after forwarding her resume, the Governor's Office followed up and requested that IDOT expedite her hire. In September 2012, **[Candidate 20]** informed the Governor's Office that IDOT had not hired her yet, and the Governor's Office followed up with IDOT again regarding a position for **[Candidate 20]** that same day. Internal IDOT correspondence reveals that in mid-September 2012, to accommodate the Governor's Office, IDOT substituted **[Candidate 20]** into an ePAR for which another candidate was already slated and approved by IDOT. Moreover, the Governor's Office pushed IDOT to hire **[Candidate 20]** so quickly that IDOT's Bureau of Information Processing did not have enough notice to request a network account and email from CMS before her start date. **[Candidate 20]** started at IDOT as a *Rutan*-exempt TM I Region II Claims Assistant on October 1, 2012. **[Candidate 20]'s** background was as an intern coordinator. (*See* Chronology at 8/20/12, 9/14/12, 9/17/12, 10/2/12).

### 5. [Candidate 23]

The Governor's Office secured **[Candidate 23]** a *Rutan*-exempt TM IV Community Outreach Liaison position at IDOT. In a May 2010 email, **[Candidate 23]** discussed getting a job at IDOT with Dan Grant, former Senior Policy Advisor to Lieutenant Governor. In that email he described that he had spoken to Vince Rangel, who had "made all the contacts that he possibly could" and that Governor Quinn might need to personally intervene to finalize his hire. Grant forwarded **[Candidate 23]'s** email to the Governor's Office. Less than ten minutes later, the Governor's Office discussed the specific ePAR (hire) number for **[Candidate 23]**. In June 2010, Governor's Office officials corresponded about **[Candidate 23]'s** hire approval process internally and emailed GOMB to request that it approve the hire. GOMB approved the hire the same day the Governor's Office emailed the request for approval. One week later, on July 6, 2010, **[Candidate 23]** started work at IDOT as a *Rutan*-exempt TM IV Community Outreach Liaison. **[Candidate 23]'s** background was as a Route Driver and Warehouse Manager. (*See* Chronology at 5/19/10, 6/30/10).

### 6. [Candidate 27]

The Governor's Office first appointed **[Candidate 27]**, daughter of City of Chicago Alderman Ariel Reboyras, into a secretarial position at the Illinois Liquor Control Commission in 2011. After complaints from her superiors in October of 2012, Governor's Office employees discussed the "need to find another position for **[Candidate 27]**" because "this is not working out" and circulated her resume internally. The Governor's Office then sent **[Candidate 27]'s** resume to IDOT and requested that an interview be set up. In November 2012, the Governor's Office followed up with IDOT again about whether someone can interview **[Candidate 27]**. After IDOT failed to hire her, the Governor's Office sent her resume to the State of Illinois Racing Board, with instructions to call the Governor's Office after interviewing **[Candidate 27]**. Shortly thereafter, she was appointed as a *Rutan*-exempt Executive Assistant at the Racing Board and worked there from 2013 to 2016. **[Candidate 27]'s** background was as an advisor at a for profit university. (*See* Chronology at 10/2/12, 10/23/12, 10/31/12, 11/20/12).

### 7. [Candidate 31]

The Governor's Office pressured agencies to find a position for **[Candidate 31]** and eventually secured his hire at CMS. In April 2013, **[Candidate 31]** emailed his resume to the Governor's Office and thanked Lou Bertuca for "possible opportunities" they discussed. The Governor's Office circulated the resume internally and filed it in the resume database. In May 2013, the Governor's Office sent **[Candidate 31]'s** resume to CMS with instruction to interview him. The Assistant Director of CMS (Salazar) questioned "[w]hat type of spot" they were looking for, and stated he was "not sure where [CMS] could use him." The Governor's Office responded that "[a]nything is OK." Around the same time, the Governor's Office also pushed **[Candidate 31]'s** candidacy for positions at several other agencies, and reiterated to CMS that "[a]nything" would do. Throughout May 2013, the Governor's Office pressured CMS to hire **[Candidate 31]**, despite that CMS reiterated it did not have a particular need or know where **[Candidate 31]'s** background could be utilized. Internal Governor's Office emails complained about the hold up. Ryan Croke called Salazar directly at CMS to find a spot and get an ePAR started for **[Candidate 31]**. Despite the fact that CMS again (for at least the third time) expressed reticence to hire **[Candidate 31]**, the Governor's Office pushed his hire through in June 2013. **[Candidate 31]** was hired as a Senior Public Service Administrator at CMS in 2013. **[Candidate 31]'s** background was as a restaurant manager and in the food service industry. (*See* Chronology at 6/7/13, 5/29/13).

### B. Elected Officials Sent Unqualified Candidates Directly to Agencies

Some Legislators sent resumes of sponsored candidates directly to agencies. Many of the candidates had little to no qualifications for the policy-making *Rutan*-exempt positions to which

they were hired. Others were hired into *Rutan*-covered positions. A sample of recommendations from elected officials include the following[45]:

A February 22, 2013, email to IDOT from Senator Clayborne's office asked how to find out if an employee was set for a layoff. The email stated: "[T]he Senator is wanting me to check on [a Tech Trainee at IDOT]" and to find out if there are any available positions when the program ends. The Tech Trainee position was *Rutan*-covered. The candidate was hired into a full time *Rutan*-covered position in 2013. A review of that particular hiring sequence revealed that his selection was likely manipulated. *See* Special Master's Second Report at page 6-7. The employee's background was as a summer intern at IDOT during college. (*See* Chronology at 2/22/13).

On November 15, 2011, an email from Senator Clayborne's office stated: "Senator Clayborne asked that I forward this resume on to you…" She attached the resume of **[Candidate 3]**. There were several internal IDOT emails regarding receiving **[Candidate 3]'s** resume and whether he could be placed in a 60 Day Emergency Hire position. **[Candidate 3]** was hired in a *Rutan*-covered Bridge Tender job at IDOT in 2012. **[Candidate 3]'s** background was as a telecom salesman and UPS worker. (*See* Chronology at 11/15/11, 11/29/11, 1/20/12, 4/24/12).

A July 27, 2012 email to IDOT from Senator Clayborne's office with subject: **[Candidate 8]** stated "Anything you can do to help would be great." The email notes that **[Candidate 8]** was interested in a payroll technician position. **[Candidate 8]** was hired at IDOT in a *Rutan*-covered entry level Engineering Tech I position in 2012. In December of 2012, internal IDOT emails reveal a request was made to move **[Candidate 8]** from an Engineering Tech III to an Engineering Tech IV and included the question: "Will we have to post that for interview if we move forward? Please let me know soon as possible so I can get the paperwork started." **[Candidate 8]'s** background was as a temporary IDOT data entry technician and substitute teacher, among other things. His background included no engineering experience or education. (*See* Chronology at 7/27/12, 12/3/12).

On July 8, 2010, Former City of Chicago Alderman Billy Ocasio sent IDOT Secretary Hannig the resumes of **[Candidate 19]** and **[Candidate 21]** and identified them as candidates for "entry level" positions. **[Candidate 19]'s** background was as a carpenter and a truck driver. **[Candidate 21]'s** resume reflected that he had previously been a student intern in City of Chicago Alderman Maldonado's Office and was currently in college. Neither **[Candidate 19]** or **[Candidate 21]** were hired at IDOT. (*See* Chronology at 7/8/10).

---

[45] Senator James Clayborne's office referred numerous candidates to IDOT. Most of the resumes from Clayborne's office were sent by his assistant, Sunshine Clemmons to Matt Hughes and Julie Phelps. Phelps previously worked as a Legislative Assistant for various State Representatives and appeared to be friends with both Senator Clayborne and his assistant. Phelps' personal relationships with elected officials assisted her in obtaining a Staff Assistant position within IDOT's personnel office, and her relationship with elected officials helped to secure jobs for politically connected candidates at IDOT.

On March 31, 2009, Illinois State Representative Eddie Washington's office emailed the resume of **[Candidate 25]** to IDOT with a recommendation "as an employment candidate in the field of engineering." The recipient forwarded it to another IDOT official and stated: "Here is the resume on **[Candidate 25]** that Rep. Washington sent me. As I mentioned this morning, I fully expect that he will be calling to follow up on this as he's mentioned this gentleman to me three different times. I told him I don't have anything to do with hiring, but that I would get it in the hands of the man in charge. …I'd appreciate any update on the status as you move forward so I have an answer if possible." IDOT emails reflect that Representative Washington called for IDOT's Secretary to discuss this candidate and during one call with IDOT, placed **[Candidate 25]** on the phone to discuss his latest interview. **[Candidate 25]'s** background included mostly private security guard positions. (*See* Chronology at 3/31/09).

An August 21, 2012 email to IDOT from Senator Clayborne's office included the resume of **[Candidate 33]** and stated "here is another resume the Senator wanted me to get to Matt! Thanks so much!" **[Candidate 33]** was hired as a Land Acquisition Agent in 2013. **[Candidate 33]'s** background was as a Village Clerk in the town of Washington Park making $11,000 per year. (*See* Chronology at 8/21/12).

### C. Governor's Office Knew Candidates in Non-Staff Assistant Positions Were Not Performing *Rutan*-exempt Duties

In addition to the above, some evidence suggests the Governor's Office knew that individual candidates they approved or proposed for hire into non-Staff Assistant *Rutan*-exempt positions were intended to perform or actually performed *Rutan*-covered duties.

For example, in December of 2010, Governor's Office employees David Vaught, Simone McNeil, Jack Lavin and CMS Assistant Director Steve McCurdy communicated via email about the *Rutan*-exempt hire of **[Candidate 34]**, noting that he will be "a manager for CMS vehicles." The email noted that "He has more potential … but this will get him started in a useful way …" **[Candidate 34]** was hired at CMS as a *Rutan*-exempt Senior Public Service Administrator in 2011. (*See* Chronology at 12/30/10).

Similarly, in January 2013, Governor's Office employees Lou Bertuca, Ryan Croke and John D'Alessandro emailed regarding the proposed *Rutan*-exempt hire of **[Candidate 12]** into an IDOT "vehicle acquisitions job." In March of 2013, O'Shea sent an email to IDOT following up on a "Vehicle Management position resume" he had previously sent to IDOT. In another email, Bertuca forwarded the resume of a potential candidate to O'Shea and D'Allessandro with the simple instruction "Fleet job at IDOT." (*See* Chronology at 1/14/13, 3/20/13, 4/24/13).

In other emails, the Governor's Office described candidates and positions in terms that indicate they were not appropriately *Rutan*-exempt. In October 2010, Hansen Anderson sent Simone McNeil the resume of **[Candidate 1]**. McNeil noted the candidate might be qualified for

"clerical" work. Similarly, in June and July 2013, Croke emailed several resumes to various State officials, with the subject: "Rutan Exempt – Non Union Clericals – interviews?" The body of the email listed five low-level administrative positions such as "Administrative Assistant I and Administrative Assistant II" with the proposed candidates name next to each job title. (*See* Chronology at 10/21/10, 7/8/13).

There are numerous other instances of the Governor's Office's discussing filling purported *Rutan*-exempt positions to perform *Rutan*-covered duties such as: a food and beverage manager, a manufacturing manager, a workers' compensation investigator, a vehicle services position, a property manager, an administrative assistant, and jobs at the State Fair. At a minimum, the Governor's Office should have known that these positions were not properly designated as *Rutan*-exempt. (*See* Chronology at 1/31/12, 11/5/12, 5/23/13, 11/7/13, 4/11/14).

## IX.  EXPANDED DISCUSSION OF LIMITED NUMBER OF SPECIFIC INSTANCES ILLUSTRATE EXTENT OF MANIPULATION

As discussed above, the Governor's Office and/or elected officials helped candidates secure jobs at State agencies, often with little regard to agency need or candidate qualification.[46] As described below, many of the candidates pushed by the Governor's Office had limited *Rutan*-exempt qualifications overall or did not have qualifications that aligned with the *Rutan*-exempt positions for which they were hired.

### A.  Candidate Examples Provide Evidence of Repeated Manipulations

#### 1.  [Staff Asst. 1]

The investigation revealed that the Governor's Office helped **[Staff Asst. 1]** obtain a Staff Assistant job at IDOT. At the time, **[Staff Asst. 1]** was a Fiscal Administrator in Employee Services in the Governor's Office. She performed administrative duties such as payroll, timekeeping, and employee benefits. Before that, she was a manager at a Cold Stone Creamery ice cream store. She listed Ryan Croke and Simone McNeil as references on her application.

On August 15, 2011, Joey Mak (Jack Lavin's assistant), Mark Harris, and Simone McNeil exchanged multiple emails discussing a pending TM III *Rutan*-exempt Staff Assistant ePAR for **[Staff Asst. 1]**. The emails indicate Harris and O'Shea met with Lavin to discuss **[Staff Asst. 1]'s** pending ePAR. On August 16, 2011, Harris emailed Mak and copied McNeil, "Can you pls have him approve tomorrow. This is now time sensitive." McNeil responded less than 15 minutes later stating that she had approved **[Staff Asst. 1]** (and **[Staff Asst. 12]**) ePARs. At the time, there was

---

[46] In a few instances, the candidates' political sponsors were not successful in obtaining a position for the candidates. Those instances are noted within the summaries.

no fully executed IPR for the Staff Assistant position. The IPR was not executed by Michael Woods until August 17, 2011, and was never executed by a requesting director. (*See* Chronology at 8/15/11).

Two days later, on August 18, 2011, **[Staff Asst. 1]** was hired at IDOT as a TM III *Rutan*-exempt Staff Assistant. **[Staff Asst. 1]'s** resume does not reflect qualifications to perform the policy development and coordination duties of the *Rutan*-exempt Staff Assistant position descriptions. Her most recent prior work experience was in administrative duties and she had no experience in policy-making. (*See* Chronology at 8/15/11, 8/16/11).

### 2.  [Staff Asst. 3]

The investigation revealed that the Governor's Office secured **[Staff Asst. 3]** a *Rutan*-exempt Staff Assistant at IDOT. **[Staff Asst. 3]** worked briefly as an administrative assistant for State Representative John O'Sullivan and **[Staff Asst. 3]'s** legal guardian was Michael Joyce, whom Governor Quinn appointed to the Illinois Labor Relations Board in 2011. **[Staff Asst. 3]'s** prior work experience included coaching tennis and football, and being a security guard.

On October 7, 2011, Sean O'Shea emailed **[Staff Asst. 3]'s** resume to Matt Hughes and Mike Woods and asked that **[Staff Asst. 3]** be interviewed. That same day, Hughes emailed Marva Boyd (IDOT Chief of Staff), "The Governor's Office would like for us to interview **[Staff Asst. 3]** (resume is attached)." On October 23, 2011, Woods instructed IDOT personnel to enter ePAR information for **[Staff Asst. 3]**. On October 27, 2011, Woods emailed O'Shea that an ePAR had been created and would be approved by IDOT's Secretary "first thing tomorrow morning." The next day, O'Shea emailed Emily Monk at GOMB asking if she approved **[Staff Asst. 3]'s** ePAR. The ePAR stated that the Staff Assistant was responsible for assisting in the development and coordination of policy and directives for the Department of Public and Intermodal Transportation ("DPIT") and that the "Director [of DPIT] needs assistance to anticipate and identify impending issues surrounding the Division."[47] (*See* Chronology at 10/7/11, 10/27/11, 10/28/11).

However, there was no IPR for the position at the time and the Director of DPIT never requested the position be filled. Hughes first executed an IPR for the position on November 1, 2011, and Woods executed it on November 3, 2011. No requesting director (*i.e.* the Director of DPIT) ever executed the IPR.

On November 1, 2011, Woods emailed O'Shea, saying that candidate information was entered into the ePAR system for **[Staff Asst. 3]** as a TM II Staff Assistant in "DPIT/Cook," with an annual salary of $45,720. Lavin's assistant emailed O'Shea on November 2, 2011, to confirm

---

[47] The ePAR also stated that the *Rutan* status of the position was changed to exempt "per agency request" on October 28, 2011.

that Lavin approved **[Staff Asst. 3]'s** ePAR. **[Staff Asst. 3]** was hired as a TM II Staff Assistant in DPIT on November 28, 2011. **[Staff Asst. 3]'s** resume does not reflect qualifications to fulfill the stated duties of the *Rutan*-exempt Staff Assistant position description. He had no experience in transportation or policymaking. **[Staff Asst. 3]'s** resume stated he was an administrative assistant to State Representative John O'Sullivan from 2010 to 2011. He listed no duties under that position on his resume. His previous experience included being a tennis instructor for Chicago Park District, a football coach at a high school, and a security guard. (*See* Chronology at 10/7/11, 11/1/11).

Further, it is clear his hire was not initiated by IDOT or requested by DPIT. On November 28, 2011, the same day **[Staff Asst. 3]** was hired at DPIT, Joe Shacter, Director of DPIT, emailed Hughes and Woods: "To my surprise, **[Staff Asst. 3]** arrived at the Thompson Center this morning... I have no paperwork on him. Linda Straube is orienting him now, and then she and I are going to meet to discuss where to place him. I'd appreciate one of you sending me his resume, assuming he provided one to you." Woods emailed Shacter a copy of **[Staff Asst. 3]'s** resume in response. (*See* Chronology at 11/28/11). Moreover, the duties **[Staff Asst. 3]** was actually performing did not match the Staff Assistant position description. Rather, per his employee evaluations for the relevant period, the duties he performed as a temporary TM II Staff Assistant included: answering phones, directing visitors, reviewing and processing payments, maintaining time sheets, and preparing spreadsheets for approval.

### 3. [Staff Asst. 5]

The investigation revealed that Illinois State Representative Lisa Hernandez contacted the Governor's Office about a job for **[Staff Asst. 5]**, and the Governor's Office secured him a *Rutan*-exempt position at IDOT. According to an AP reporter, **[Staff Asst. 5]** was on several Democratic campaign payrolls. (*See* Chronology at 5/7/14).

On November 16, and again on December 1, 2010, **[Staff Asst. 5]** sent his resume to Representative Hernandez, telling her: "I appreciate all your help in this matter. Thank you." On December 3, 2010, Representative Hernandez emailed Lindsay Hansen Anderson a copy of **[Staff Asst. 5]'s** resume. **[Staff Asst. 5]'s** resume stated that he obtained his B.A. from Robert Morris College in 2007 and worked as the branch manager of Metropolitan Bank & Trust Co. from 2001 through the date of application. He also served as President of the Hispanic Business Foundation in 2009 and President of the Cicero Chamber of Commerce in 2010. (*See* Chronology 12/1/10, 1/28/11).

Hansen Anderson kept track of Hernandez's personnel request on her December 15, 2010 "to do" list, which included a reminder to call Representative Hernandez regarding **[Staff Asst. 5]**. On January 28, 2011, Hansen Anderson emailed **[Staff Asst. 5]'s** resume to Harris, who forwarded it to Woods the same day. On January 29, 2011, Woods emailed **[Staff Asst. 5]'s** resume to Charles

("Chuck") Klemz (Administrative Manager in District 1) and directed him to call **[Staff Asst. 5]** that week for a *Rutan*-exempt interview. On February 4, 2011, Hansen Anderson emailed Harris about the status of a temporary position for **[Staff Asst. 5]** (and a pending ePAR for another candidate **[Staff Asst. 43]**). (*See* Chronology at 12/17/10, 1/28/11, 2/4/11).

On February 13, 2011, Cheryl Byers, the Executive Director of the Stronger Illinois Committee, which raised money for Democratic candidates in the 2012 General Assembly election, emailed **[Staff Asst. 5]'s** resume to McNeil and Lou Bertuca, stating: "The attached resume is for a young man that Lisa Hernandez has recommended to be part of the administration… I believe that Lindsay has been working on securing interviews for **[Staff Asst. 5]** and Lisa mentioned this request to PQ." Three days later, on February 16, 2011, Hansen Anderson emailed Harris asking "what [was] going on" with **[Staff Asst. 5]**. Harris forwarded the email to Woods with "??" and Woods responded: "I personally called **[Staff Asst. 5]** at 8:00am this morning…he will be going in as a 60-day hire as a TM II position at Dist 1 in the Bureau of Materials. He will be reporting to work at 8 am Tuesday, Feb 22nd." There was no IPR for the position at that time. Hughes and Woods executed an IPR for the 60-Day Emergency position on February 17, 2011, but the IPR was never signed by a requesting director. Nevertheless, **[Staff Asst. 5]** started as a 60-Day Emergency *Rutan*-exempt TM II Staff Assistant on February 22, 2011 with a monthly salary of $4,583. His resume did not reflect qualifications to fulfill the stated duties of the *Rutan*-exempt Staff Assistant position. (*See* Chronology at 2/13/11, 2/16/11).

The Governor's Office also assisted in getting **[Staff Asst. 5]'s** emergency appointment extended. On April 20, 2011, Hansen Anderson emailed Harris and stated: "I am getting frantic phone calls because **[Staff Asst. 5]** got a termination notice. Do you know anything about it?" Five days later, on April 25, 2011, **[Staff Asst. 5]** began his second 60-Day Emergency term as a TM II Staff Assistant. In total, **[Staff Asst. 5]** served four Emergency 60-Day terms as a TM II Staff Assistant, during which his actual duties included road inspections and completing paperwork. None of the IPRs for the 60-Day Emergency appointments were executed by a requesting director. (*See* Chronology at 4/20/11). Moreover, the duties he was actually performing did not match the Staff Assistant position description. Rather, per his employee evaluations for the relevant period, **[Staff Asst. 5]'s** duties while employed as a temporary TM II Staff Assistant included: supervising contractors, documenting contracts, inspecting roads, preparing work orders, and sketching out roads for contractors to paint.

The Governor's Office directed **[Staff Asst. 5]'s** permanent hire at IDOT and IDOT searched to find him a position. In a September 7, 2011, internal IDOT personnel email with the subject "**[Staff Asst. 5]**," a personnel employee asked Woods: "What position do you want to put **[Staff Asst. 5]** in? I've got TM II's open [] same position as **[Candidate 24]** and **[Staff Asst. 58]**…or TM IV's I can AI… No double exempt III's… No double exempt V… Some TM VI's I could AI…." (*See* Chronology at 9/7/11 (*ellipsis in original*)).

The Governor's Office pushed through each stage of the approval process for **[Staff Asst. 5]'s** ePAR for a permanent position. On September 15, 2011, O'Shea emailed Hughes and asked: "Did **[Staff Asst. 5]** get approved by Ann [Schneider] and go to [GOMB] yet?" The next day, on September 16, 2011, O'Shea emailed GOMB about approving **[Staff Asst. 5]'s** ePAR. On September 19, 2011, GOMB responded that it had approved the ePAR, and the ePAR now needed the agency to enter candidate information so that it could go to McNeil for DCOS approval. The October 21, 2011 Lavin List listed **[Staff Asst. 5]** ePAR, as well as seven other requested Staff Assistants. On October 28, 2011, O'Shea emailed Harris that Lavin approved **[Staff Asst. 5]'s** ePAR and asked if Harris needed to tell anyone before he informed IDOT. Harris replied: "Yes, Lindsay will do outreach." (*See* Chronology at 9/15/11, 9/16/11, 10/28/11.)

**[Staff Asst. 5]** was hired permanently as a *Rutan*-exempt TM II Policy Advisor to the Secretary on November 1, 2011. The IPR for **[Staff Asst. 5]** TM II Policy Advisor position contained standard Staff Assistant position description language regarding assisting with "the overall development and coordination of policy and directives…." **[Staff Asst. 5]'s** resume reflects no experience related to the duties of the TM II Policy Advisor position description. Further, his work as a temporary IDOT employee did not qualify him to perform the Policy Analyst duties described in the position description.

### 4. [Staff Asst. 6]

The investigation revealed that Illinois State Senator Gary Forby contacted the Governor's Office to request a job for **[Staff Asst. 6]** and the Governor's Office helped to secure her a Staff Assistant position at IDOT. According to an AP reporter, **[Staff Asst. 6]** served as Franklin County Democratic Chairwoman. (*See* Chronology at 5/7/14.)

On April 29, 2010, Hughes emailed **[Staff Asst. 6]'s** resume to Michelle (Rossetto) Woods and instructed her to "Please place in file." **[Staff Asst. 6]'s** resume stated that she worked in an office staff position for Senator Forby from August 2005 through August 2011.[48] Prior to that, she worked as a travel counselor and deli manager at Walmart and Kroger. She had no college education and no experience in transportation or government policymaking. (*See* Chronology at 4/29/10.)

Hansen Anderson's "to do" lists reveal Senator Forby contacted the Governor's Office to find a job for **[Staff Asst. 6]**. On August 16, 2011, Hansen Anderson emailed Harris and O'Shea (on an email chain started August 15th) whether there was a "pending EPAR for **. . .** (Forby request)?" Harris responded "Forby's is **[Staff Asst. 6]**." **[Staff Asst. 6]** appears on the Lavin List with a current salary of $6,000 and a requested salary of $45,720 for the TM II Staff Assistant

---

[48] On her application, she listed her position as "Receptionist" responsible for answering phones, filing, helping people with state issues and data entry.

position responsible for "assisting in the overall development and coordination of policy and directives regarding bureau programs for the District." The Governor's Office approved her ePAR on August 26, 2011. At the time, there was no fully executed IPR for the position. Woods executed the IPR a day later, on August 27, 2011. When Hansen Anderson learned the ePAR was approved, she responded, "Thanks. I've been waiting for this one—I'll reach out in the morning." (*See* Chronology at 12/17/10; 8/15/11; 8/26/2011).

**[Staff Asst. 6]** was hired as a *Rutan*-exempt TM II Staff Assistant on September 6, 2011. **[Staff Asst. 6]'s** resume does not reflect any qualifications to fulfill the stated duties of the *Rutan*-exempt Staff Assistant position description. Additionally, **[Staff Asst. 6]** evaluations did not match the Staff Assistant position description. Rather, her duties during the relevant time included: handling daily mail, answering phones, assisting supervisors with administrative services, and handling sign in/sign out sheets.

### 5. [Staff Asst. 8]

The investigation revealed that Illinois House Speaker Michael Madigan's office contacted IDOT about a job for **[Staff Asst. 8]**, and the Governor's Office pushed through an unusually high pay raise for him after he was hired as a *Rutan*-exempt Staff Assistant at IDOT. **[Staff Asst. 8]** previously worked at the Metropolitan Water Reclamation District of Greater Chicago for approximately one and a half years, where he did community outreach. His work experience before that was as a bricklayer journeyman, carpenter, and batch maker.

On September 4, 2009, Hughes emailed Vincent Rangel (Deputy Director, Office of Workforce Diversity) and stated, "Just got a call from Speaker Madigan's office regarding *Rutan*-exempt **[Staff Asst. 8]**. I told them to have **[Staff Asst. 8]** arrive at the Thompson Center Tuesday at 8:00 a.m." Rangel responded: "I will be glad to meet him," and asked, "Will he be ours? OSBS?" Hughes responded, "Yes." (*See* Chronology at 9/4/2009).

**[Staff Asst. 8]** was hired as a permanent *Rutan*-exempt TM III Staff Assistant four days later, on September 8, 2009, with a salary of $47,820, and responsible for "assisting in the overall development and coordination of policy and directives regarding programs developed by the Office of Small Business Services." **[Staff Asst. 8]'s** resume does not reflect qualifications to fulfill the stated duties of the TM III Staff Assistant position description. The IPR for this position was never executed by the requesting director. Additionally, **[Staff Asst. 8]'s** evaluations did not match the Staff Assistant position description. Rather, his duties during the relevant time included: creating forms and reporting on activities, monitoring DBE complaints, and maintaining relationships with DBE constituents and OBWD staff.

As discussed above, in May 2011, **[Staff Asst. 8]** received an irregularly high pay raise at the direction of the Governor's Office. His position was "reallocated" from the TM III level to the TM V level and his annual salary went from $52,020 to $67,080, which is a 29% increase. Internal IDOT emails and policies confirm that 4% is the standard pay raise for a reallocation; however, the Governor's Office directed higher[49] pay raises for both **[Staff Asst. 8]** and **[Staff Asst. 36]**. Later that year, an Administrative Technician at IDOT questioned the raises in an email, stating in part, that **[Staff Asst. 8]** received a raise, "For what reason, other than politically connected." (*See* Chronology at 8/9/11).

In February of 2014, internal IDOT and Governor's Office emails reveal that **[Staff Asst. 8]** was arrested for physically assaulting Illinois House Representative Edward Acevedo. According to Governor's Office emails, **[Staff Asst. 8]** was arrested for aggravated battery. Various emails reflect internal discussions regarding how to handle an investigation into the matter. Ultimately, personnel records show that **[Staff Asst. 8]** was allowed to resign on May 15, 2014, approximately three months after the assault. (*See* Chronology at 2/26/14).

### 6. [Staff Asst. 9]

The investigation revealed that **[Staff Asst. 9]** had the backing of several politically connected people who contacted the Governor's Office on his behalf, and the Governor's Office helped him secure a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 9]** background was in mortuary science and he worked for a funeral home from 1982 through 1991. Thereafter, he worked for several State of Illinois agencies in investigative roles. For fourteen years prior to working for IDOT, he owned and managed a concrete contracting company. His resume reflected no experience in transportation or policy development.

On June 23, 2011, Lavin's assistant emailed Harris and McNeil about **[Staff Asst. 9]'s** ePAR and stated "Gene Callahan, former aide to Senator Paul Simon, called…inquiring about this ePAR. He's hoping we can get it moving through the pipeline. It's a significant increase, and I don't know if CMS has even approved a salary justification form, assuming one was submitted." (*See* Chronology at 6/23/11). **[Staff Asst. 9]** appears on the July 6, 2011 Lavin List with a current salary of $2,466 and a requested salary of $52,000 for the TM III Staff Assistant position responsible for "assisting in the overall development and coordination of policy and directives regarding the Office of Quality Compliance and Review ["OQCR"] programs."[50]

---

[49] Emails show the Governor's Office demanded **[Staff Asst. 8]** and **[Staff Asst. 36]** receive 8% raises. However, Chavez received a higher raise because $67,080 was the minimum salary for the TM V position.

[50] This is the office within IDOT that investigates employee complaints regarding improper patronage practices.

Several weeks later, on July 19, 2011, Lavin's assistant again emailed McNeil asking her to approve the ePAR and explaining that the 2009% increase in pay was because **[Staff Asst. 9]** owned a business that did not make much of a profit the previous year. Mak also stated "Jack considers it a priority." (*See* Chronology at 7/19/11). On July 29, 2011, Mak emailed Harris that Lavin approved the ePAR for **[Staff Asst. 9]**, and stated: "I left messages for Bill Houlihan and Jeff Torricelli, both of whom have called me about it." Houlihan was Senator Durbin's Chief of Staff and Torricelli was a Senior Advisor to the Director on Policy and Economic Development at the Illinois Department of Commerce & Economic Development. (*See* Chronology at 7/29/11). The IPR for this position was executed by Woods on August 1, 2011 (after the Governor's Office approved the ePAR) and was never executed by a requesting director.

**[Staff Asst. 9]** was hired at IDOT as a *Rutan-exempt* TM III Staff Assistant in OQCR on August 16, 2011. **[Staff Asst. 9]'s** resume reflects questionable qualifications to fulfill the stated duties of the Staff Assistant position description. His resume reflects no transportation or policy-making experience. For the fourteen years before being hired at IDOT, he owned and managed a concrete contracting company. Prior to that, his resume indicates he was an Administrative Law Judge in the Department of Agriculture, although he does not possess a law degree. Additionally, **[Staff Asst. 9]'s** evaluations did not match the Staff Assistant position description. Rather, his duties during the relevant time included: conducting preliminary investigations, updating and developing databases, assisting with annual ethics in the workplace seminars, and performing inspections for weight checks and traffic control.

### 7. [Staff Asst. 12]

The investigation revealed that the Governor's Office helped **[Staff Asst. 12]** obtain a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 12]** was married to ███████ ████████, the Deputy Fiscal Director for the Governor's Office. **[Staff Asst. 12]'s** previous work experience was in the insurance industry, and her resume reflects no work experience for five years preceding her hire at IDOT.

Croke emailed **[Staff Asst. 12]'s** resume to various agencies in early 2011. On March 30, 2011, Croke emailed her resume to Harris. In June 2011, **[Staff Asst. 12]** was hired for IDOT's 2011 Summer Technical Program, which usually employs college students for the summer to perform administrative duties. As the Summer Program was ending, the August 12, 2011 Lavin List identified **[Staff Asst. 12]'s** current position as "IDOT Summer Technical Program" with a "current salary" of $21,732. The Lavin List showed her requested position as a TM I Staff Assistant in Aeronautics with a proposed salary of $40,140. The Staff Assistant duties for her requested position included accountability for assisting the Bureau Chief "in the overall development and coordination of policy and directives regarding Division of Aeronautic programs." On August 16, 2011, McNeil emailed Lavin's assistant an Excel spreadsheet related to four pending ePARs,

including one for "**[Staff Asst. 12]**—███████ wife," and wrote she wanted to "get the[m] done." (*See* Chronology at 1/27/11, 3/2/11, 3/30/11, 5/13/11, 8/12/11, 8/16/11).

**[Staff Asst. 12]** was hired as a permanent *Rutan*-exempt TM I Staff Assistant on September 1, 2011 in IDOT's Aeronautics division. Her resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. Her resume listed prior experience in the insurance industry from 1990 to 2006 and no work experience after 2006. She had no prior work experience, education or training in transportation or aeronautics. Additionally, **[Staff Asst. 12]'s** evaluations did not match the Staff Assistant position description. Rather, her duties during the relevant time included: coordinating carpools, assisting with air transportation billing, coordinating equipment for events, documenting financial services processes, assisting with State Fair activities, and handling information technology responsibilities.

### 8.   [Staff Asst. 13]

The investigation revealed that Illinois State Representative Frank Mautino pushed for **[Staff Asst. 13]'s** hire at IDOT, and the Governor's Office secured a *Rutan*-exempt Staff Assistant position for her. Her prior work experience was a brief stint as an administrative assistant and as a server at restaurants during college.

**[Staff Asst. 13]** was initially hired as a Winter Temporary Technical Trainee at IDOT in January 2010. Her duties included filing, data entry, copying, faxing and shredding. She remained in that position until she was appointed as a 60-Day Emergency Hire into a *Rutan*-covered Human Resources Associate position on May 17, 2010. Her duties included organizing, filing, copying and answering phones. On June 30, 2010, Hughes emailed IDOT Administrative Manager Dean Devert and stated: "Govs office called about **[Staff Asst. 13]** have Frank [Mautino] call if you can." Devert responded: "He called them and talked to Lindsay [Hansen Anderson]. Jack Lavin is out on vacation. She is supposed to call him back this afternoon." (*See* Chronology at 6/30/10).

**[Staff Asst. 13]'s** emergency appointment was extended a second term on July 16, 2010. On July 21, 2010, Hannig emailed Harris a Lavin List of fourteen temporary employees with ePARS pending DCOS/COS approval, which included **[Staff Asst. 13]'s** ePAR. Hannig stated that Hughes "reduce[d] the pay for temps who are applying for full time. So now their epar will show NO increase. I hope this helps." The "requested positions" for ten of the fourteen listed employees was TM I or TM II Staff Assistant with nearly identical job duties. (*See* Chronology at 7/21/10).

On July 22, 2010, Mautino called Hansen Anderson about the status of **[Staff Asst. 13]'s** ePAR. Hansen Anderson emailed Harris to check the status, and he reported **[Staff Asst. 13]'s** ePAR would be approved that same day. The same day, Harris emailed McNeil (DCOS level

approval), Jerome Stermer (GOMB approval), and Lavin (COS approval) with a list of ePARS to approve, including **[Staff Asst. 13]**. At the time, there was no fully executed IPR for the position. Hughes executed the IPR on July 26, 2010, but the IPR was never signed by a requesting director. (*See* Chronology at 7/22/10).

Eleven days later, on August 2, 2010, **[Staff Asst. 13]** was hired as a *Rutan*-exempt TM II Staff Assistant at IDOT. **[Staff Asst. 13]** resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position, which included the development of policy, development of the best possible solutions to policy issues, and development of position documents which detail specific policy solutions. Her prior work experience included being an administrative assistant at a bank for four months and working as a server at restaurants during college. She obtained a Bachelor's in Finance, Economics, and Actuarial Science, but lacked meaningful work experience relevant to the Staff Assistant position. Additionally, **[Staff Asst. 13]'s** actual duties did not match the Staff Assistant position description. Rather, her duties during the relevant time included: working as an administrative assistant, completing financial reports, making spreadsheets, assembling personnel documents, and responding to constituent services requests.

**[Staff Asst. 13]** moved into a newly created *Rutan*-covered TM II Personnel Services Technician position in May 2011. She was the only candidate interviewed for the job. (*See* Chronology at 5/13/11).

### 9.  **[Candidate 4]**

The investigation revealed that **[Candidate 4]** was pushed as a candidate for State employment by his father, Illinois State University Board of Trustees Chairman Rocky Donahue, and the Governor's Office assisted him.

On May 18, 2011, Rocky Donahue sent an email to Lou Bertuca's personal email account with his son's resume attached. The body of the email stated: "Attached is my son's **[Candidate 4]'s** resume. Thanks for all your help with Director Monken.[51] I will also give you a hard copy here at the Capitol." The same day, Bertuca forwarded the email to his State account and then to Croke, saying: "Send this to John Monkin [*sic*]-he knows what it is. I can't find John's email." On May 29, 2011, Croke followed up with Bertuca, asking: "Has this person received a call from IEMA?" (*See* Chronology at 5/18/11).

**[Candidate 4]** was not hired at IEMA. However, he was hired at the Illinois State Tollway Authority in 2011 as a Commercial Road Corridor Coordinator. (ITAP). His resume shows that he

---

[51] At the time, Jonathon Monken was the Director of the Illinois Emergency Management Agency ("IEMA").

obtained a Bachelor's of Science Degree in Homeland Security in 2011 and an Associate's Degree in Fire Science in 2009. (*See* Chronology at 5/18/11).[52]

### 10. [Candidate 5]

The investigation revealed that over the course of several years, the Governor's Office and Bill Houlihan from Senator Durbin's office pushed **[Candidate 5]** as a candidate at various State agencies. Even after **[Candidate 5]** obtained a job at Healthcare and Family Services in 2012, the Governor's Office and Houlihan continued to circulate his resume and push his candidacy.

On June 30, 2011, Croke emailed Cara Smith at the Department of Corrections ("DOC") with the subject "Any word on **[Candidate 5]**?" and content "Sorry – inquiring minds…" Cara Smith responded that **[Candidate 5]'s** name was familiar to Tim Gleason in personnel at DOC, but that they did not have a resume. On July 13, 2011, Croke emailed again, on the same thread: "Just following up per our chat." Cara Smith asked Croke to remind her of **[Candidate 5]'s** first name. Croke replied, "**[Candidate 5]**? Drug test…." **[Candidate 5]** was not hired at DOC. (*See* Chronology at 6/30/11).

On July 3, 2012, O'Shea emailed McNeil, Croke, and others about "two lower level (staff assistant) positions at IDOT that need to be filled," and asked for candidates. Croke emailed **[Candidate 5]'s** resume as a "possibility for the Sangamon spot. Call me for background." Croke referred to a TM II Staff Assistant position in IDOT's Bureau of Personnel Management. On August 20, 2012, Croke emailed approximately thirty resumes to Schneider, and included **[Candidate 5]'s** resume among them. **[Candidate 5]** was not hired at IDOT. (*See* Chronology at 7/3/12, 8/20/12).

**[Candidate 5]** was hired as a *Rutan*-covered Office Clerk at Healthcare and Family Services ("HFS") in 2012. He continued at HFS as an Office Specialist (*Rutan*-covered) from 2013 to 2015. However, documents show Houlihan sought other State job opportunities for **[Candidate 5]** in 2013. On January 22, 2013, Bill Houlihan emailed Croke for "news" on **[Candidate 5]** and another candidate (**[Candidate 13]**). Croke responded, "Hopefully something new for you this week. Thanks Bill." On January 30, 2013, Croke emailed **[Candidate 5]'s** resume to O'Shea and stated: "Bill H called me yesterday and said you were finding a home for **[Candidate 5]** @ IDOT. True? If so I will stop looking for another place for him." The same day, Croke emailed **[Candidate 5]'s** resume to Woods and personnel liaisons at several other agencies. In August 2013, Croke also forwarded **[Candidate 5]'s** resume to Justin Cajindos and Sara Barnett, who

---

[52] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 4]'s** actual duties were.

were at the Department of Natural Resources and State Lottery, respectively. (*See* Chronology at 1/22/13, 1/30/13).[53]

### 11. [Candidate 6]

The investigation revealed that the Governor's Office helped **[Candidate 6]** obtain a 60-Day Emergency appointment at IDOT as a TM II Safety Issues Analyst, and subsequently permanent employment. **[Candidate 6]** was the former owner of Boone's Tavern in Springfield, Illinois, and he worked as a Fiscal Administrator at the Governor's Office for two years.

On August 26, 2010, Croke sent Hughes a copy of **[Candidate 6]'s** cover letter, resume, and CMS Application dated September 29, 2009. The cover letter stated that **[Candidate 6]** is "applying for the position of ___." No position was stated. On the same day, Croke emailed McNeil and Lavin with the subject, "**[Candidate 6]** and **[Staff Asst. 47]**," and stated, "Just writing to check on their IDOT epar status." Croke then emailed Hughes on September 7, 2010 to call him "ASAP, please. Re: **[Candidate 6]**." (*See* Chronology at 8/26/10, 9/7/10).

**[Candidate 6]** was hired at IDOT 13 days later, on September 20, 2010, as a 60-Day Emergency TM II Safety Issues Analyst, and appears to have been renewed in appointments or permanently hired as a TM II for the next two years. (Lavin List 4/19/12 shows 2 years' service in that position). The April 19, 2012 Lavin List has his current position as TM II Safety Issues Analyst with a requested position of TM IV Assistant to the Director of Traffic Safety. He then moved into a *Rutan*-exempt TM V Safety Data Administrator position in 2013. (ITAP, "2015-01-21 ALL EMPLOYEES by Work Location" spreadsheet). His resume prior to being hired at IDOT did not reflect qualifications to fulfill the duties of these positions. His resume contained no experience, training or education in traffic safety.[54]

### 12. [Staff Asst. 17]

The investigation revealed that the Governor's Office actively sought positions for **[Staff Asst. 17]** at several State agencies and succeeded in getting him a *Rutan*-exempt Staff Assistant position at IDOT. Before being hired at IDOT, **[Staff Asst. 17]** worked in the Governor's Office of Citizen Assistance ("GOCA"), where he performed clerical duties.

---

[53] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 5]'s** actual duties were.

[54] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 6]'s** actual duties were.

In September 2010, Croke emailed **[Staff Asst. 17]'s** resume to Hughes and stated, "Thank you for your help. I will send info on the other 2 individuals we discussed asap." During the first six months of 2011, the Governor's Office (Harris and McNeil) exchanged multiple emails about **[Staff Asst. 17]**,[55] and Harris reached out to Woods about a position for **[Staff Asst. 17]** in IDOT District 1. On June 15, 2011, **[Staff Asst. 17]'s** candidate information was entered into the ePAR for a TM II Staff Assistant position making $45,720/year and responsible for "assisting in the overall development and coordination of policy and directives regarding bureau programs for" the Office of Business and Workforce Diversity. His annual salary at GOCA in 2011 was $29,000, and the 57% increase in salary was reflected on the ePAR. The IPR for the position was never executed by a requesting director. (See Chronology at 9/9/10, 6/15/11).

**[Staff Asst. 17]** was hired on July 16, 2011 in the *Rutan*-exempt TM II Staff Assistant position in the Office of Business and Workforce Diversity ("OBWD") at IDOT. **[Staff Asst. 17]'s** resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. He was a State Service Representative in GOCA from 2005 to 2011. **[Staff Asst. 17]'s** resume describes his duties at GOCA as routing constituents' requests, logging requests into a database, and processing telephone, fax, email and mail inquiries. Additionally, **[Staff Asst. 17]'s** actual duties did not match the Staff Assistant position description. Rather, his duties during the relevant time included: processing DBE annual paperwork, requesting additional information from firms by email or phone, and preparing checklists for DBE certification applications.

Shortly after starting at IDOT, **[Staff Asst. 17]** was investigated for lying on his job application. The investigation revealed that he had three DUIs, including one where he pled guilty and served 30 days in jail. He failed to report this conviction on his job application. Velisha Haddox conducted the investigation of **[Staff Asst. 17]**. On September 21, 2011, Haddox circulated a draft investigation "Final Report" to O'Shea and stated, "Attached for your review and comment is the Final Report we discussed. Please let me know your thoughts." The report's recommendation instructed IDOT to terminate **[Staff Asst. 17]'s** employment within 30 days of the report. Six days later, on September 27, 2011, Haddox emailed O'Shea (and McNeil) again with "the red-lined version of the final OEIG report," and asked if they had any "additional thoughts." The red-lined version of the report changed the recommendation of termination to a recommendation of suspension from IDOT. (*See* Chronology at 9/21/11, 9/27/11).

---

[55] The documents revealed that on March 1, 2011, a co-worker of **[Staff Asst. 17]** at GOCA filed a written sexual harassment complaint against **[Staff Asst. 17]**, which was referred to Velisha Haddox (an attorney in the Governor's Office) for investigation. The complaint was also forwarded to McNeil. The outcome of the investigation is unknown.

### 13. [Candidate 9]

The investigation revealed that the Governor's Office actively sought a job for **[Candidate 9]** at numerous state agencies. **[Candidate 9]** previously worked for the City of Chicago.

On October 18, 2013, Amanda Sutton sent the resumes of **[Candidate 9]** and another candidate to O'Shea, stating, in part: "Ryan asked me to send you the attached resumes." Days later, O'Shea forwarded **[Candidate 9]'s** resume to Woods, stating, "Can you have him interviewed?" Later that same week, Woods asked a senior IDOT manager to interview **[Candidate 9]**. Cryptically, on November 8, 2013, IDOT personnel staff member, Jill Eades, emailed Tony Small and Tom Kirk, subject: "Rutan Exempt Appointment – **[Candidate 9]**." She discussed **[Candidate 9]'s** salary verification and stated that he was scheduled for a "step increase effective January 1, 2014." Small responded, "????" and Kirk replied, "I'll stop by and explain in a bit."

On November 23, 2013, Croke emailed **[Candidate 9]'s** resume to five agencies, including IDOT, and stated in full: "See attached – might this person be suited for any management openings at IDOT, DNR, Corrections, IEMA or Tollway? Please let me know your thoughts." On December 6, 2013, Croke forwarded that same email with **[Candidate 9]'s** resume attached to Simone McNeil, the newly appointed Acting Director of CMS (and former Chief of Operations in the Governor's Office), cc: O'Shea. Croke wrote in full: "Can we set up an interview with him next week? Simone, I should have copied you on the below, if you have ideas."

On December 31, 2013, Woods emailed Kirk, saying: "Please ask [Joe] Shacter to call this candidate in for an interview. Thanks." On January 6, 2014, Woods emailed Shacter, Marva Boyd, cc: Kirk and Small, asking if an interview had been scheduled for **[Candidate 9]** "this week." Woods further stated, in part: "I had told the Governor's Office that he would be scheduled to come in this week to interview with you. I was supposed to inform the Govs Office of the date of the interview. They wanted to know a date by last [F]riday…" The next day, on January 7, 2014, Woods emailed O'Shea, telling him that **[Candidate 9]** was scheduled to meet with Boyd and Shacter the following Monday. O'Shea forwarded Wood's email regarding **[Candidate 9]'s** interview to Croke and John D'Alessandro.

Despite **[Candidate 9]'s** interview at IDOT, Croke continued to follow up with other agencies. In late 2013, the Director of DNR, Marc Miller told Croke that "We [DNR] will take a look" at **[Candidate 9]**. On January 26, 2014, Croke followed up with Miller, replying to the earlier thread, and typing only: "?".

On February 28, 2014, Eades emailed **[Candidate 9]'s** ePAR information to Kirk and Small, copying another member of IDOT's central personnel staff. Two minutes later, Kirk emailed Small, cc: Woods, subject: "59833 – **[Candidate 9]**" Kirk stated, in full: "He is ready to

go if you want to let Sean know." On March 4, 2014, Sean emailed **[Candidate 9]'s** ePAR to Croke asking him to approve it. The ePAR was for a **newly created** *Rutan*-exempt TM VI Advisor to Engineer of Operations. The newly created advisory position did not require an engineering license, despite its specific role as an advisor to the Engineer of Operations. **[Candidate 9]'s** resume reflects that he worked for the City of Chicago as a Ward Superintendent at the Department of Streets and Sanitation, a Lead Man for the Department of Aviation, and a Truck Driver for the Department of Aviation and Chicago Department of Transportation.

According to **[Candidate 9]'s** first evaluation (3 month probationary), his actual duties included: reviewing IDOT policy manuals, reviewing maintenance and traffic operations, reviewing union contracts, and attending pre-disciplinary meetings and grievance hearings. His second review (6 month probationary) was virtually identical to the first, with little to no increase in responsibilities or accomplishments. (*See* Chronology at 10/21/13, 11/8/13, 11/23/13, 1/6/14, 1/7/14, 1/13/14, 2/28/14, 3/4/14).

### 14. [Staff Asst. 19]

The investigation revealed that the Governor's Office helped **[Staff Asst. 19]** obtain a *Rutan*-exempt Staff Assistant position at IDOT. On February 10, 2010, Hughes emailed **[Staff Asst. 19]'s** resume to Michelle (Rossetto) Woods and stated: "We need a [R]utan [E]xempt position in D1 for this person as well. Probably a [S]taff [A]ssistant as well." **[Staff Asst. 19]'s** resume states that his career objective is to "obtain an entry level position with possibility of advancement." His prior work experience was as a "Driver" for the City of Chicago from 1975 through 2008. (*See* Chronology at 2/10/10).

In a March 18, 2010 email, Hughes reported, "Crabtree is calling Grunloh (IDOT Chief of Staff) for this [[**Staff Asst. 19]** ePAR]. Staff Assistant in D1." Jeffrey Crabtree was the Special Assistant on Labor Affairs in the Governor's Office. On April 5, 2010, Lavin's assistant emailed Lavin and Crabtree an update on the status of **[Staff Asst. 19]'s** pending ePAR. Crabtree responded the same day: "Let me know what else I need to do." The Governor's Office approved **[Staff Asst. 19]'s** ePAR on April 22, 2010. The IPR was never executed by a requesting director and was executed by Hughes on the same date the Governor's Office approved the ePAR. (*See* Chronology at 4/5/10).

**[Staff Asst. 19]** was hired as a *Rutan*-exempt TM III Staff Assistant at IDOT on April 27, 2010, with a $56,373 annual salary. **[Staff Asst. 19]'s** resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. He worked for the City of Chicago from 1975-2008 as a Driver and Motor Truck Driver Foreman. He drove garbage trucks and snow plows and managed a crew of drivers throughout the city. Additionally, **[Staff Asst. 19]'s** actual duties did not match the Staff Assistant position description. Rather, his duties during

the relevant time included: coordinating tools for inventories and logs, answering phones, completing mail runs, and handling housekeeping duties.

### 15. [Staff Asst. 21]

The investigation revealed that the Governor's Office helped **[Staff Asst. 21]** obtain a *Rutan*-exempt Staff Assistant position at IDOT. Prior to working at IDOT, **[Staff Asst. 21]** worked in sales for nursing home transportation and as a branch manager and business development manager for mortgage loan providers.

On May 18, 2010, Simone McNeil emailed Hughes the resumes of **[Staff Asst. 21]** and **[Candidate 16]**. The email did not have a subject. McNeil wrote: "Hi Matt, If you could help with these, I would be most appreciative." On the same day, Hughes forwarded the email to Julie Phelps. On May 20, 2010, John Kamis (Senior Advisor to Governor Quinn / Legislative Affairs and Economic Development) forwarded **[Staff Asst. 21]'s** resume to Lavin. On June 9, 2010, in an email with the subject: "Rutan-Exempt Candidate ([**Staff Asst. 21]**)," Hughes asked Marva Boyd (IDOT COS) and Joseph Shacter (Director of DPIT) whether they had the opportunity to speak with **[Staff Asst. 21]**. (*See* Chronology at 5/18/10, 5/20/10, 6/9/10).

On June 11, 2010, Hughes emailed IDOT personnel staff, saying: "Find a TM II/III position in DPIT for this individual, preferably in a position to assist Linda Straube. I believe we will also be doing a 60 day as we try to hire him permanently via Rutan-Exempt appointment." **[Staff Asst. 21]** was placed into an ePAR, but later substituted for **[Staff Asst. 16]** after Hughes spoke to the Governor's Office. Internal IDOT emails reveal that placing **[Staff Asst. 21]** remained a priority. On July 15, 2010, Hughes asked Michelle (Rossetto) Woods whether he could start, and she replied: "I just need a position." Hughes responded: "TM ii in OBWD." (*See* Chronology at 7/11/10, 7/15/10).

Documents show that the paperwork for **[Staff Asst. 21]'s** 60-Day Emergency *Rutan*-exempt TM II Staff Assistant position were prepared on September 9, 2010. Those documents list the effective date of his hire as August 30, 2010, eleven days earlier. **[Staff Asst. 21]** received a series of continuous and sequential 60-Day Emergency Hire appointments, until February 17, 2011, when he was offered a permanent full time Staff Assistant position. His resume reflects questionable qualifications to fulfill the stated duties of the Staff Assistant position description. Prior to IDOT, **[Staff Asst. 21]** owned and operated a transportation service for senior citizens that coordinated with local nursing homes and worked for two different banks as a branch manager and as a business development manager, respectively. Notably, the actual duties performed by **[Staff Asst. 21]** did not match the Staff Assistant position description. Rather, he stated his duties during the relevant time included: assisting disadvantaged business enterprises with applications, providing technical assistance, and conducting workshops for DBE firms and companies.

### 16. [Staff Asst. 22]

The investigation revealed that the Governor's Office helped **[Staff Asst. 22]** obtain a *Rutan*-exempt Staff Assistant position at IDOT. Before being hired at IDOT, **[Staff Asst. 22]** was a summer intern in the Governor's Office of Citizen Action ("GOCA") from June to August 2010. He listed Ryan Croke as a job reference on his IDOT application.

On June 20, 2011, Croke emailed Harris several resumes, including one for **[Staff Asst. 22]**. Harris forwarded the resumes to Hughes on June 22, 2011. Several months later, on December 7, 2011, Woods emailed Hughes about whether Hughes was supportive of removing the name of another candidate, **[Staff Asst. 10]**, from a pending ePAR to replace it with **[Staff Asst. 22]**. **[Staff Asst. 10]'s** ePAR had been approved by IDOT's Secretary on November 4, 2011, and it was pending GOMB approval. **[Staff Asst. 22]** was substituted into the ePAR, and it remained pending GOMB approval and still showed a Secretary approval date of November 4, 2011. The IPR for the position was never executed by a requesting director and was approved by Woods on December 27, 2011. (*See* Chronology at 6/20/11).

On January 16, 2012, **[Staff Asst. 22]** was hired as a *Rutan*-exempt TM II Staff Assistant at IDOT. His resume reflects questionable qualifications to fulfill the stated duties of the Staff Assistant position description. **[Staff Asst. 22]** worked in the food service/hospitality industry and as a tennis instructor. He also served as an intern in the Illinois Department of Public Health for five months and GOCA for three months. His resume reflected no work experience after August 2010, but other records reflect he worked on constituent affairs for the Lieutenant Governor's Office in 2011. Notably, **[Staff Asst. 22]'s** actual duties did not match the Staff Assistant position description. Rather, his duties during the relevant time included: preparing and editing various reports, briefing papers for the Chief Operating Officer, updating statistical data for employee counts, and attending, scribing, or facilitating meetings. Additionally, **[Staff Asst. 22]** performance reviews were marked as unsatisfactory and his supervisor noted issues with his "technical abilities, attendance, team spirit, work quality, and timeliness."

### 17. [Candidate 10]

The investigation revealed that Alderman Billy Ocasio and Senator Munoz advocated for **[Candidate 10]** as a candidate for State employment, and the Governor's Office helped her to obtain a *Rutan*-exempt position at IDOT. **[Candidate 10]'s** resume listed Alderman Edward Burke and Michael Segobiano (City of Chicago Deputy Chief of Staff and Director of Marketing) as references. **[Candidate 10]** previously worked at the Circuit Court of Cook County. (*See* Chronology at 12/10/09, 4/20/10).

On December 10, 2009, Alderman Ocasio emailed **[Candidate 10]'s** resume to Lavin, with the text: "Jack when you get a chance we should talk about this one." On March 11, 2010, Hughes forwarded **[Candidate 10]'s** resume to George Weber (Bureau Chief of Railroads) and copied Bill Grunloh, stating in part: "It's our hope that you will find this candidate extremely qualified for a Staff Assistant (Technical Manager III) position in DPIT/Railroads. Will you please contact this candidate and set up an informal interview to discuss potential employment in your Bureau?" (*See* Chronology at 12/10/09, 3/11/10).

On April 19, 2010, Lavin's assistant emailed Shacter (Director of DPIT) with the subject: "**[Candidate 10]** – from Jack Lavin's office." Lavin's assistant wrote that **[Candidate 10]** was a candidate from Senator Munoz, who was initially being considered for a liaison position at the Governor's Office, but the Governor's Office decided IDOT high-speed rail would be a better fit. He further stated: I believe she's already received an offer from IDOT, probably before you came aboard. Her ePAR # is 47289…." Lavin's assistant also said Lavin wanted to ensure Shacter was comfortable with **[Candidate 10]'s** hire before giving final approval of her ePAR because she would be working under Shacter. An April 26, 2010 email from Lavin to Stermer and McNeil included **[Candidate 10]'s** name and ePAR number for approval. (*See* Chronology at 4/19/10, 4/26/10).

**[Candidate 10]** was hired on May 4, 2010, in DPIT as a *Rutan*-exempt TM VI Local Community and Safety Liaison in Public Transportation. **[Candidate 10]'s** resume shows that she worked as the Latino Outreach Coordinator for the Chicago 2016 Olympic Exploratory Committee and for the Circuit Court of Cook Country for 15 years as a Court Coordinator, Stenographer, and Clerk. However, **[Candidate 10]** had no high-speed rail or transportation experience. Additionally, she was assigned an ePAR and extended an offer to join IDOT without the supervising manager's knowledge. Further, her offer was extended before Lavin approved the ePAR, which does not comply with the requirement that Chief of Staff approval is the final ePAR step <u>before</u> the candidate is offered a position.[56]

### 18. [Candidate 11]

The investigation revealed that the Governor's Office actively sought a job at several agencies for **[Candidate 11]**. **[Candidate 11]'s** previous work experience was in various salesperson positions.

In January of 2013, Bertuca emailed **[Candidate 11]'s** resume to Croke and D'Alessandro, and asked: "Can we get this guy some Chicago interviews?" Bertuca emailed Croke again on February 11, 2013 to ask whether there were any interviews set up for **[Candidate 11]**. Croke

---

[56] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 10]'s** actual duties were.

responded the same day: "This week. Will get you a list." Three days later, on February 14, 2013, Croke emailed **[Candidate 11]'s** resume to personnel liaisons at four State agencies, including Woods at IDOT, and stated: "Can we set up a suitable interview for the attached person asap?" Croke listed several Private Secretary and Administrative Assistant positions at DCFS, EPA, Gaming Board, Medical District Commission, and Public Health Department as potential options. Cusumano (DNR) and DeFraites (HPA) offered to interview **[Candidate 11]**, and Croke offered the Governor's Office's conference room to conduct video conference interviews. (*See* Chronology at 12/2/12, 2/14/13).

On March 21, 2013, Bertuca emailed Croke about a different candidate's resume[57] and added, "Ps any news on **[Candidate 11]**?" On April 9, 2013, Croke emailed **[Candidate 11]'s** resume to O'Shea with the subject "EPA—Chicago Position" and stated: "Sean—would you be OK with the attached guy being considered for this vacancy? Name comes from Lou Bertuca." The vacancy was for a Private Secretary position at the EPA. Croke followed up with O'Shea on April 11, 2013 and stated: "This person is also very interested in any opportunity to work at Tollway." (*See* Chronology at 3/21/13, 4/9/13).

**[Candidate 11]** ultimately was not hired into a State agency. However, as the documents discussed above show, the Governor's Office made repeated efforts to place him in *Rutan*-exempt positions. **[Candidate 11]'s** resume does not reflect qualifications for the *Rutan*-exempt positions the Governor's Office sought for him. Specifically, his resume showed no experience with environmental protection, tollway, natural resources, historic preservation, transportation or being a secretary. **[Candidate 11]'s** work experience was as a salesperson.

### 19. [Staff Asst. 26]

The investigation revealed that Chicago Alderman Michael R. Zalewski contacted the Governor's Office about **[Staff Asst. 26]** as a candidate for State employment, and the Governor's Office helped **[Staff Asst. 26]** obtain a *Rutan*-exempt Staff Assistant position at IDOT. Prior to his hire at IDOT, **[Staff Asst. 26]** was Chief of Staff for Congressman Dan Lipinski. He listed numerous other elected officials as references on his resume.[58]

---

[57] The email thread begins on March 7, 2013, regarding the resume of **[Candidate 30]**, a contact of Chairman Cronin. On March 21, while following up on **[Candidate 30]'s** resume, Bertuca asks for news on **[Candidate 11]**. The email is included in the Chronology by its origination date of March 7, 2013.

[58] **[Staff Asst. 26]** listed the following elected officials as references on his resume: Congressman William Lipinski, Congressman Glenn Poshard, Chicago Alderman Michael Zalewski, Mayor Gene Siegel, and State Representative Robert Molaro.

On November 10, 2009, Governor's Office employee Jeffrey Crabtree emailed Lavin with the subject "zelewski" and stated that he "received another call from Ald. Zelewski" regarding **[Staff Asst. 26]**. (misspelling of Zalewski original). Crabtree asked Lavin whether **[Staff Asst. 26]** had been contacted and Lavin responded that he would ask "Simone" the next day. Lavin was referring to Simone McNeil, the Governor's Chief of Operations at the time. On December 9, 2009, Crabtree emailed Lavin again, stating, "**[Staff Asst. 26]** has called me twice in the last 2 weeks to tell me he has not heard anything from IDOT. Is there anybody I can follow-up with at IDOT on this?" (*See* Chronology at 11/10/09, 12/9/09).

In March 2010, internal IDOT emails show that **[Staff Asst. 26]** contacted IDOT Personnel repeatedly to ask about his "status." In a March 30, 2010 email, Hughes apologized to **[Staff Asst. 26]** and explained that he was "not authorized to offer [[Staff Asst. 26]] a position" because IDOT did not have a position for **[Staff Asst. 26]** to fill at that time. Hughes forwarded his email correspondence with **[Staff Asst. 26]** to IDOT Chief of Staff Bill Grunloh and Secretary Gary Hannig. Grunloh responded to Hughes: "I think we just need to tell him that we're not sure where we could use his talents at this time." (*See* Chronology at 3/26/10, 3/30/10).

Despite IDOT's lack of operational need to hire **[Staff Asst. 26]**, **[Staff Asst. 26]** continued to pressure IDOT about obtaining a position and contacted the Governor's Office to override IDOT's decisions. Internal IDOT emails and emails between IDOT and **[Staff Asst. 26]** in May 2010 discussed potentially placing **[Staff Asst. 26]** into a TM VI Project Manager position in DPIT with a salary offer of $75,000. **[Staff Asst. 26]**, dissatisfied with the title and salary, demanded a Deputy Director position with a salary of $110,000. Hughes explained what position he was authorized to offer and at what salary (TM VI Project Manager at $75,000) several times to no avail. On May 24, 2010, **[Staff Asst. 26]** emailed Grunloh that he had contacted Lavin and Lavin and the Governor were going to discuss **[Staff Asst. 26]'s** candidacy for IDOT. (*See* Chronology at 5/20/10, 5/21/10, 5/24/10).

On June 2, 2010, **[Staff Asst. 26]** asked Hughes the status of his hire at IDOT, and Hughes explained that IDOT had to create a new position for him, which was causing a delay. Soon after, on June 8, 2010, **[Staff Asst. 26]** emailed Hughes that he was having lunch with the Governor, State Representative Michael J. Zalewski, and Alderman Michael R. Zalewski, and that he was "sure this subject" regarding an IDOT position would come up. **[Staff Asst. 26]** continued to follow up with Hughes during June and July 2010 about his ePAR's approval at every stage. (*See* Chronology at 6/2/10, 6/8/10, 6/18/10, 6/28/10, 7/14/10).

On July 6, 2010, Hughes emailed Harris at the Governor's Office with the subject "Rutan Exempt Staffing Requests [*sic*] (Summary)" and stated, in relevant part: "[T]he individuals you may be looking for are either at the Secretary level, … Or they could be at [GOMB]. **[Staff Asst. 26]** is in fact at [GOMB]…." On July 8, 2010, **[Staff Asst. 26]** asked Hughes where his ePAR was

in the approval process. When Hughes responded that the ePAR was at the Governor's Office, **[Staff Asst. 26]** replied he would "have a call made." On July 22, 2010, Harris emailed McNeil and Stermer and copied Lavin, with a list of 21 ePARs to approve, including **[Staff Asst. 26]'s** ePAR. Twelve of the 21 ePARs were for Staff Assistants. Later the same day, Harris emailed Hughes and Hannig that **[Staff Asst. 26]'s** ePAR, as well as the other 20 ePARs on the list, were approved. (*See* Chronology at 7/6/10, 6/28/10, 7/22/10).

**[Staff Asst. 26]** was hired at IDOT on August 16, 2010 into a newly established permanent full time *Rutan*-exempt TM VI Staff Assistant position in DPIT at $92,004 annual salary. **[Staff Asst. 26]'s** hire demonstrates manipulation of the *Rutan*-exempt hiring process: IDOT did not initiate his hire; there was no operational need to hire him; and IDOT's discretion to make its own decisions was removed. **[Staff Asst. 26]'s** background included being Chief of Staff for Congressman Dan Lipinski and Congressman William Lipinski with a focus on transportation issues. Therefore, he may have been qualified to perform the stated duties of the Staff Assistant position description. However, **[Staff Asst. 26]'s** actual duties did not match the Staff Assistant position description. Rather, his duties during the relevant time period, as he described in a May 28, 2011 email regarding his resignation from IDOT, included: "[s]itting in a cubicle scuffling paper." (*See* Chronology at 5/28/11).

### 20. [Candidate 14]

The investigation revealed that the Governor's Office helped Illinois State Senator Emil Jones' nephew, **[Candidate 14]**, get a job at CMS. **[Candidate 14]** previously worked in the IT industry.

A September 18, 2013 email to Woods stated, "Gov's office is asking about him." It was sent with an email dated September 4, 2013, with **[Candidate 14]'s** resume attached. Two days later, on September 20, 2013, McNeil emailed GOMB to check the status of **[Candidate 14]'s** pending ePAR. (*See* Chronology at 9/4/13, 9/20/13).

**[Candidate 14]** was hired as an Administrative Assistant I at CMS in 2013 with the primary duties of providing "info to Deputy Director as to position the Department should take on legislative proposals." **[Candidate 14]'s** resume does not reflect qualifications to fulfill the stated duties of that position. His resume contained no legislative experience; his experience was in computer technical support. He was enrolled at Roosevelt University at the time. (*See* Chronology 9/20/13).[59]

### 21. [Staff Asst. 35]

---

[59] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 14]'s** actual duties were.

The investigation revealed that the Governor's Office helped **[Staff Asst. 35]**, daughter of Staff Assistant Eric McKennie and step-daughter of Senator Lightford, secure a *Rutan*-exempt position at IDOT. Before being hired at IDOT, **[Staff Asst. 35]** was a FedEx package handler making $10.85/hour. Prior to that, she worked as a Ramp Agent at O'Hare Airport making $10/hour.

On February 1 and February 10, 2012, Woods emailed Hughes asking what he should do with **[Staff Asst. 35]'s** resume. Hughes told Woods to "[h]ave Klemz interview her asap," and Woods emailed Klemz on the same day. On May 21, 2012, Woods emailed Hughes "one potential option" for **[Staff Asst. 35]**, with an ePAR for a Region I Asset Recovery Analyst in the Office of Chief Counsel. Another candidate, **[Candidate 35]**, who had a law degree, was already slated for the position. Woods stated: "We do not have any other RM II and TM III rutan exempt epars in the system for Cook County area. If this position doesn't work then we will need to start a new epar from scratch." (*See* Chronology at 2/1/12, 2/10/12, 5/21/12).

On May 31, 2012, Jill Eades emailed Hughes with concerns about using a "spoken for" ePAR for **[Staff Asst. 35]**; OCC submitted the IPR for the position with the other candidate's name and salary level. Eades asked whether she should prepare a new IPR for **[Staff Asst. 35]** and use the same ePAR. She also asked whether the other candidate was no longer being considered. (*See* Chronology at 5/31/12).

The other candidate was never hired by IDOT. **[Candidate 35]** was listed on the May 15, 2012 ePAR list and Lavin List with a current position of "Contract Attorney/Associate Attorney" and a current salary of $54,810. His ePAR had been approved by both GOMB and the Secretary and was awaiting COS approval. However, his name was replaced with **[Staff Asst. 35]** on the June 9, 2012 ePAR list (under the same ePAR and IPR numbers). The Lavin List showed **[Staff Asst. 35]'s** current position as "Package Handler for Fed Ex," and a current salary of $21,240. It listed the requested position of TM III Region I Asset Recovery Analyst with a requested salary of $57,000.

On September 13, 2012, Woods emailed **[Staff Asst. 35]'s** resume and application to O'Shea, both of which indicated her current position as a Federal Express Package Handler. On September 25, 2012, Woods emailed Eades and told her "We need to put **[Staff Asst. 35]** on as a TM II (60-Day Emergency Hire) in D1." Eades informed Klemz the same day. Klemz emailed Woods and Hughes with a "?" and stated, "Never was told, never got a resume to find something or interview." Woods also explained to Klemz: "IDOT has been asked to put **[Staff Asst. 35]** on as an emergency hire." The IPR for this position was never executed by a requesting director and was executed by both Hughes and Woods on the same day Klemz was notified of her hire (*See* Chronology 9/13/12, 9/25/12).

[Staff Asst. 35] started at IDOT as a 60-day Emergency Hire TM II Staff Assistant on October 1, 2012, with an expiration date of November 30, 2012. Her duties included processing invoices, copying, filing documents, and completing special projects for the Financial Services Manager. Leading up to the expiration of [Staff Asst. 35]'s appointment, Eric McKennie sent Lavin several cryptic emails about "time sensitive" matters and "a deadline ... of 11-29-12." [Staff Asst. 35]'s 60-Day appointment was extended from November 29, 2012 to January 28, 2013. In January, Eric McKennie emailed Lavin cryptic messages, such as "1-28-13 is the final day" and "Today [1/28/13] is the deadline." On January 28, 2013, [Staff Asst. 35]'s appointment was extended for a third term. None of the IPRs for her temporary positions were executed by a requesting director. (*See* Chronology at 11/9/12, 11/13/12, 11/26/12, 1/2/13, 1/15/13, 1/24/13, 1/28/13)

[Staff Asst. 35] remained in consecutive 60-Day Emergency Hire appointments until she was hired into a permanent TM III Region I Asset Recovery Analyst position in OCC with a salary of $54,900/year. Once she was hired as a 60-day Emergency Hire appointment, her current position on the Lavin Lists changed from Fed Ex Package Handler making $21,240 to IDOT Temporary Employee making $48,240. Her name was on the Lavin List at the COS level of approval for nearly one year from approximately June 9, 2012 through June 7, 2013, when COS approved it.

When OCC staff was informed of [Staff Asst. 35]'s permanent hire, they commented, "Who is [Staff Asst. 35]?", "Where is s/he located?" and, "No one knows anything about this person." Even IDOT's Chief Counsel, Mike Forti, knew nothing about her hire. In the same thread, Forti stated, "I never heard of him until yesterday... Who started this ball rolling?" James Sterr, the Bureau Chief of the Claims Department at OCC, replied that he did not start the IPR for her position; "[i]t was not made by me as a staffing request. Until yesterday we were unaware of [Staff Asst. 35] and her approval." (*See* Chronology at 6/17/13).

The ePAR was approved by the Governor's Office Chief of Staff around June 7, 2013. OCC was reluctant to hire [Staff Asst. 35] and delayed offering her the job until July 12, 2013, after additional pressure from the Governor's Office. On that date, Hughes emailed Forti and stated: "Seans [*sic*] calling about [Staff Asst. 35]. We need to make that offer." Forti replied that Sean O'Shea had called him too. That same day, Sterr emailed [Staff Asst. 35] the job offer for a TM III Region I Asset Recovery Analyst.

[Staff Asst. 35] started in the TM III Region I Asset Recovery position on July 30, 2013. [Staff Asst. 35]'s resume does not reflect qualifications to fulfill that position, which was responsible for administering claims for damaged property and administering, analyzing and determining "third party liability for claims by the Department." [Staff Asst. 35]'s resume reflected no legal or claims administration experience. Her work experience was as a package handler, an airport ramp agent, a customer service representative, a merchandiser at a toy store, a

telemarketer, a food server, and a cashier. **[Staff Asst. 35]** attended Southern Illinois University for two years and was then enrolled at Governor's State University.

### 22. [Staff Asst. 36]

The investigation revealed that Senators Cullerton and Lightford referred **[Staff Asst. 36]**, Senator Lightford's husband, for a job at IDOT and the Governor's Office pushed through an unusually high pay raise for him after he was hired into a permanent full time position. **[Staff Asst. 36]** previously worked for the City of Chicago in various departments.

On June 8, 2009, **[Staff Asst. 36]** started as a 60-Day Emergency *Rutan*-exempt TM III Staff Assistant in IDOT's Office of Small Business Services. When his 60-Day Emergency Hire appointment was approved, documents reflect that IDOT was confused about where to place **[Staff Asst. 36]** and why he was hired. In one email, the Bureau Chief of Business Services asked where **[Staff Asst. 36]** came from, and Hughes responded, "Cullerton." (*See* Chronology at 7/1/09). The IPR was never executed by the requesting director. In July of 2009, before his 60-Day Emergency Appointment expired, **[Staff Asst. 36]'s** status changed to a permanent full time TM III Staff Assistant.

In May 2011, **[Staff Asst. 36]** received an irregularly high pay raise at the direction of the Governor's Office.[60] At Lavin's request, **[Staff Asst. 36]'s** position was "reallocated" from TM III Staff Assistant to TM V Staff Assistant, and he received significantly more than the standard 4%. On May 6, 2011, Lavin's assistant emailed McNeil for approval of **[Staff Asst. 36]'s** pay raise, and stated: "You already approved it at a lower salary, but the offer was bumped up a few grand per Jack's request." On May 10, 2011, Woods emailed Hughes and stated: "**[Staff Asst. 36]** was approved for an 8 percent reallocation, which is more than the typical 4 percent increase. I told Harris a week or so ago that reallocations are only 4 percent. He indicated that this one needed to be 8 percent." Eades reported in a May 10, 2011 email, "Per direction from Governor's Office, **[Staff Asst. 36]** was re-submitted for 8% last week." (*See* Chronology at 5/6/11, 5/10/11, 5/11/11).

The next day, Woods emailed Hughes and others that he informed **[Staff Asst. 36]** (and **[Staff Asst. 8]**) of their reallocations and pay raises. Hughes emailed Harris the same day and stated, "**[Staff Asst. 36]** was not grateful whatsoever and wanted to know who made the call/decision re: him not being Deputy Director in OBWD." In an August 9, 2011 email, an Administrative Technician stated, in part, that **[Staff Asst. 36]** received a raise, "For what reason, other than politically connected." (*See* Chronology at 5/10/11, 5/11/11, 8/9/11).

---

[60] **[Staff Asst. 36]** and **[Staff Asst. 8]'s** reallocations occurred at the same time. Emails show the Governor's Office demanded **[Staff Asst. 8]** and **[Staff Asst. 36]** receive 8% raises.

Moreover, the duties **[Staff Asst. 36]** actually performed as a TM III and TM V Staff Assistant did not match those in the Staff Assistant position descriptions. Rather, his duties during the relevant times included: monitoring DBE complaints and concerns, supporting and maintaining relationships with DBE firms, and reporting on his activities.

### 23. [Staff Asst. 37]

The investigation revealed that the Governor's Office pushed through **[Staff Asst. 37]'s** hire at IDOT. Per an AP reporter, **[Staff Asst. 37]** was a democratic donor. He previously worked for Orland Township as a community job fair director, food pantry assistant and fleet manager. (*See* Chronology at 5/7/14).

On November 15, 2011, Woods emailed Marva Boyd (IDOT Chief of Staff) and Hughes stating, "O'Shea called last night. He would like us to keep him updated step by step regarding the interview process, etc for **[Staff Asst. 37]** and **[Staff Asst. 41]**."[61] (*See* Chronology at 11/15/11).

A series of emails on December 6, 2011, show O'Shea pushed to have **[Staff Asst. 37]'s** ePAR approved quickly at the GOMB level. One Lavin List dated December 6, 2011 did not include **[Staff Asst. 37]'s** name. Hours later, per O'Shea's request, Woods added **[Staff Asst. 37]** (as well as, **[Staff Asst. 41]** and **[Staff Asst. 49]**)[62] to the list, and issued a second Lavin List dated December 6, 2011. The second Lavin List showed all three candidates' ePARs for TM II Staff Assistant positions pending DCOS and COS approval. On December 8, 2011, Mak asked that someone print the ePARs for **[Staff Asst. 37]** and **[Staff Asst. 41]** and give them to Lavin, saying: "Sean O'Shea already talked to him about this." The requesting director never executed an IPR for **[Staff Asst. 37]** position, and Woods did not sign the IPR until December 15, 2011. (*See* Chronology at 12/6/11, 12/8/11).

**[Staff Asst. 37]'s** ePAR was for a Staff Assistant position in District 1. On December 7, 2011, Woods emailed Klemz (District 1 Administrative Manager) and stated: "The Governor's Office is wanting **[Staff Asst. 37]** on by 12/16/11." **[Staff Asst. 37]** accepted an offer from IDOT on December 15, 2011 (the same date Woods signed the IPR). (*See* Chronology at 12/7/11, 12/14/11).

**[Staff Asst. 37]** started work as a permanent *Rutan*-exempt TM II Staff Assistant at IDOT on January 3, 2012. **[Staff Asst. 37]'s** resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. Moreover, the duties **[Staff Asst. 37]** actually

---

[61] O'Shea pushed **[Staff Asst. 37]** and **[Staff Asst. 41]** as candidates at the same time. Both were hired as Staff Assistants. According to a BGA reporter, **[Staff Asst. 41]** was a former Assistant County Clerk and donor to Dorothy Brown and the 13th Ward Democrats. (*See* Chronology at 5/7/14).

[62] **[Staff Asst. 49]** was another candidate who was pushed for hire around the same time as **[Staff Asst. 37]** and **[Staff Asst. 41]**. **[Staff Asst. 49]** was a campaign worker for Representative Elizabeth Hernandez. She was hired as a Staff Assistant around the same time.

performed as a TM II Staff Assistant did not match those in the Staff Assistant position descriptions. Rather, **[Staff Asst. 37]'s** duties included: picking up, sorting, and delivering mail, assisting with the inventory and distribution of supplies, and delivering and picking up Motor Pool vehicles from the maintenance garage.

### 24. [Staff Asst. 38]

The investigation revealed that the Governor's Office pushed **[Staff Asst. 38]** to be hired at IDOT. On December 14, 2010, Harris emailed Hughes a copy of **[Staff Asst. 38]'s** resume.[63] From 1993 through 2010, **[Staff Asst. 38]** worked as a permit inspector and maintenance bureau supervisor for Cook County Department of Highways. His application reflects that his employment was terminated by the County on January 26, 2010. On January 3, 2011, Harris emailed Hughes and Woods (on the same thread) asking whether **[Staff Asst. 38]** (or **[Candidate 15]**) had been interviewed for jobs at IDOT. The next day, on January 4, 2011, Harris emailed Woods again asking for an update. (*See* Chronology at 12/14/10).

**[Staff Asst. 38]** was hired at IDOT on a 60-Day Emergency appointment as a *Rutan-* exempt TM III Staff Assistant in District 1 on January 24, 2011, making $5,000/month. The IPR for the position was never executed by the requesting director. A February 25, 2011 email sent to Klemz, Woods, and Hughes reported that **[Staff Asst. 38]'s** actual duties on the job included ignition basket cleaning, washing and gradation in the Materials Lab. The email also questioned **[Staff Asst. 38]'s** qualifications for the job "due to lack of computer skills and lack of technical knowledge." His March 30, 2011 employee evaluation reported "[Staff Asst. 38] has been involved in very basic tasks that required minimal training." Despite his lack of qualifications to perform the stated *Rutan-exempt* duties of a Staff Assistant, **[Staff Asst. 38]'s** 60-Day Emergency appointment as a Staff Assistant was extended at least three more times.

On September 19, 2012, Jerome Stermer (GOMB) emailed O'Shea and stated that **[Staff Asst. 38]** "is being or has been dismissed" and "[o]bviously the ask will be to save his job." IDOT did not dismiss **[Staff Asst. 38]**. Documents show he had several additional 60-Day appointments into *Rutan*-covered positions, such as the TM III Inventory and Vehicle Manager position. (*See* Chronology at 9/19/12).

After two years of consecutive 60-Day Emergency appointments into various positions, **[Staff Asst. 38]** was permanently hired at IDOT as a TM III Region I Asset Recovery Analyst in the Office of the Chief Counsel on January 16, 2013. The duties listed on the ePAR included, in

---

[63] Harris also emailed the resume of **[Candidate 15]**, who from 2007 to 2011, worked as a Training Coordinator for Stroger Hospital, checking credentials for positions that require state licensure, assisting with daily filing, and serving as a receptionist. Before that, he was a janitor at Stroger Hospital.

part, being "responsible for administering, analyzing and determining third party liability," and having the ability to "apply comparative negligence laws to properly investigate, negotiate, compromise and settle each claim…." Further, "the incumbent determines which cases should be referred to a collection agency and/or the Attorney General's Office…" O'Shea and Simone McNeil received a copy of the pending ePAR with the above position description language on December 28, 2012.

[Staff Asst. 38]'s resume does not reflect the qualifications to fulfill the above stated duties. From 1993 through 2010, [Staff Asst. 38] worked as an Administrative Assistant for the Cook County Department of Highways as a permit inspector and maintenance bureau supervisor. His duties included inspecting job sites in the County to ensure they complied with permitting requirements. Further, his inability to perform the duties he was assigned as a 60-Day Emergency TM III Staff Assistant at IDOT, as shown in the February 2011 email discussed above, also indicates that he was not qualified for a *Rutan*-exempt position. (*See* Chronology at 12/28/12). Moreover, the duties [Staff Asst. 38] actually performed as a TM II and TM III Staff Assistant did not match those in the position descriptions. Rather, his duties included: organizing, archiving, and disposing of Motor Fuel Tax documents, testing and weighing materials, cleaning equipment, and assisting with other administrative tasks as needed.

### 25. [Candidate 20]

The investigation revealed that the Governor's Office orchestrated [Candidate 20]'s hiring at IDOT. [Candidate 20] previously worked at as an intern coordinator and administrative assistant at the Governor's Office.

On August 20, 2012, Croke emailed Hughes, Woods, and Schneider [Candidate 20]'s resume and stated: "She excels in administrative duties, and is very organized." One week later, on August 27, 2012, Croke emailed Hughes and Woods again regarding [Candidate 20] and stated, "Just following up on this. Any possibility this can move this week?" Woods responded, "I will call [Candidate 20] today to talk to her." (*See* Chronology at 8/20/12).

A few weeks later, on September 14, 2012, [Candidate 20] emailed Croke: "You told me the other day to let you know if I hadn't heard from IDOT come Friday. Well, I haven't heard from IDOT. Thanks again for all your help!" Croke emailed Woods the same day and said, "Ellen [IDOT's Chief Counsel] said she had a position in mind for [Candidate 20]. Just checking in." Woods then asked Hughes if they were supposed to replace another candidate, [Candidate 22], with [Candidate 20], and Hughes responded, "yes." Three days later, Woods instructed IDOT personnel to "replace [Candidate 22] with [Candidate 20]." (*See* Chronology at 9/14/12, 9/17/12).

[Candidate 22] was on the September 13, 2012 Lavin List. Her ePAR had been approved by both the Secretary and GOMB and was pending DCOS and COS approval. Just four days later, however, the Governor's Office approved the same ePAR for [Candidate 20] in the TM I Region II Claims Assistant position in the Chief Counsel's office with a starting salary of $42,360. [Candidate 20] never appeared on any ePAR list or Lavin List for this position. On September 24, 2012, Woods emailed Chief Counsel confirming that [Candidate 20] had been approved. (*See* Chronology at 9/24/12).

On October 2, 2012, the Bureau of Information Processing emailed Woods and stated: "We were just notified about [Candidate 20] needing a Network Account and Email just yesterday. It takes 21 days on average. . . for [CMS] to set up accounts for us... It would be nice if we could know of these new employees before they get here." Woods responded the same day: "Unfortunately, we could not have given you much more than two days notice on this one… We were directed to take another person's name out of an epar and replace it with [Candidate 20]'s name. Then the epar was approved almost immediately." (*See* Chronology at 10/2/12).

[Candidate 20] was hired at IDOT as a permanent *Rutan*-exempt TM I Region II Claims Assistant on October 1, 2012. [Candidate 20]'s resume shows she was an Intern Coordinator in the Governor's Office from 2010 to 2012. Before that, she worked as an administrative assistant in the Governor's Office. Her qualifications did not match the stated duties of the TM I Region I Claims Assistant.[64]

### 26. [Staff Asst. 41]

The investigation revealed the Governor's Office pushed [Staff Asst. 41] as a candidate for IDOT. According to an AP reporter, [Staff Asst. 41] was a former Assistant County Clerk and donor to Dorothy Brown and the 13th Ward Democrats. [Staff Asst. 41] previously worked in the office of the Clerk of the Circuit Court of Cook County. (*See* Chronology at 5/7/14).

On November 15, 2011, Woods emailed Marva Boyd (IDOT Chief of Staff) and Hughes stating "O'Shea called last night. He would like us to keep him updated step by step regarding the interview process, etc. for [Staff Asst. 37] and [Staff Asst. 41]."[65] Boyd responded that she was scheduled to meet with both candidates that morning. (*See* Chronology at 11/15/11).

[Staff Asst. 41] was included on the November 30, 2011 ePAR list as a *Rutan*-exempt TM II Staff Assistant awaiting Director/Secretary level approval and was subsequently approved by the Secretary. A series of emails on December 6, 2011, show O'Shea pushed to have [Staff Asst.

---

[64] Because we did not have access to the personnel file of non-staff assistants, we do not know what [Candidate 20]'s actual duties were.

[65] *See* [Staff Asst. 37], Section IX.A.23.

**41]**'s ePAR approved quickly at the GOMB level. One Lavin List dated December 6, 2011, did not include **[Staff Asst. 41]**'s name. Hours later, per O'Shea's request, Woods added **[Staff Asst. 41]** (as well as, **[Staff Asst. 37]** and **[Staff Asst. 49]**) to the list, and issued a second Lavin List dated December 6, 2011. The second Lavin List showed all three candidates' ePARs for TM II Staff Assistant positions pending DCOS and COS approval. On December 8, 2011, Mak asked that someone print the ePARs for **[Staff Asst. 37]** and **[Staff Asst. 41]** and give them to Lavin, saying: "Sean O'Shea already talked to him about this." The IPR for this position was never executed by a requesting director and was signed by Woods on December 15, 2011 (after **[Staff Asst. 41]** appeared on the Lavin List). (*See* Chronology at 12/6/11, 12/8/11).

 **[Staff Asst. 41]** was hired as a permanent TM II Staff Assistant in the Office of Business and Workforce Diversity at IDOT on January 9, 2012. **[Staff Asst. 41]**'s resume reflects questionable qualifications to fulfill the stated duties of the Staff Assistant position description. In his position at the Clerk of Circuit Court of Cook County, he supervised customer service, information and motion counters, among other things. His most recent experience before that was as a realtor and loan officer. Notably, **[Staff Asst. 41]**'s actual duties did not match those in the Staff Assistant position description. Rather, his duties during the relevant time included: facilitating workshops, creating brochures, interacting with community organizations, and conducting outreach.

### 27. [Candidate 23]

The investigation revealed that the Governor's Office pushed **[Candidate 23]** as a candidate for IDOT. **[Candidate 23]** previously worked as a truck driver.

On May 19, 2010, **[Candidate 23]** emailed Dan Grant with a subject line of "idot." Dan Grant was a Senior Policy Advisor to Lieutenant Governor Quinn, before being appointed as Director of Illinois Department of Veterans Affairs in 2009. **[Candidate 23]** told Grant that Vince Rangel at IDOT said he "made all the contacts that he possibly could and feels he has done all he can." **[Candidate 23]** continued in relevant part: "Vince thinks someone in Governor Quinn's office needs to finalize things, but that Governor Quinn may have to intervene." (*See* Chronology at 5/19/10).

On May 24, 2010, Grant forwarded **[Candidate 23]**'s email (dated May 19, 2010) to McNeil and Lavin, and stated that he "thought [McNeil and Lavin] would want to be looped in on this" and he was "not sure what the hang up is." On the same day, Lavin emailed McNeil saying: "Let's discuss when you have a chance. Thanks." McNeil responded six minutes later, writing only: "47916." Then, on June 9, 2010, McNeil emailed Lavin with a subject line of: "EPAR #47916 **[Candidate 23]**"; the body of the email was completely blank. (*See* Chronology at 5/19/10).

On June 30, 2010, McNeil emailed Joya Miller (GOMB) asking her to approve ePAR 47916 and stating she was available if Miller had any questions. On the same day, Julie O'Brien, the Associate Director of GOMB, emailed McNeil that she "approved the IDOT EPAR 47916." McNeil then forwarded the email a few hours later to Hughes at IDOT, writing only "FYI." (*See* Chronology at 6/30/10).

On July 6, 2010, **[Candidate 23]** was hired at IDOT as a *Rutan*-exempt TM IV Community Outreach Liaison. **[Candidate 23]'s** resume does not reflect qualifications to fulfill the duties of the TM IV Community Outreach Liaison position description. **[Candidate 23]'s** resume shows that he was a "Route Driver," which did not qualify him for the *Rutan*-exempt position.[66]

### 28. [Staff Asst. 46]

The investigation revealed that Illinois State Representative Frank Mautino helped **[Staff Asst. 46]** secure a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 46]'s** resume reflects that his most recent position before being hired at IDOT was as Operations Manager at a trucking company. At one time, he worked as a Warehouse Supervisor at Mautino Distributing Co., owned by the family of Representative Mautino. (*See* Chronology at 11/10/10).

On November 10, 2010, Jill Eades emailed Woods the paperwork for **[Staff Asst. 46]** to be hired full time into a TM III Staff Assistant position in IDOT District 1. Hansen Anderson's December 15, 2010 "to do" list, which included, "Rep Mautino (**[Staff Asst. 46]** 52918)," revealed she communicated with Representative Frank Mautino about **[Staff Asst. 46]'s** ePAR around that time. (*See* Chronology at 11/10/10).

Between December 28 and 30, 2010, Hansen Anderson requested status updates about **[Staff Asst. 46]'s** ePAR numerous times and pushed for the ePAR to be approved quickly. In a December 28, 2010 email to Harris about the status of **[Staff Asst. 46]'s** ePAR, she said "need[ed] an answer on [it] tomorrow." The next day, on December 29, 2010, Hansen Anderson emailed Hughes and Woods requesting ePAR information for **[Staff Asst. 46]**. On December 30, 2010, Hansen Anderson emailed McNeil and Lavin with the subject "FW: **[Staff Asst. 46]**." Hansen Anderson stated, in part: "This EPAR is time sensitive. I am requesting that you both approve this EPAR today." The IPR was never signed by a requesting director. (*See* Chronology 12/28/10).

On January 3, 2011, Woods emailed Klemz (District 1 Administrative Manager) to inform him that the Governor's Office approved the *Rutan*-exempt appointment of **[Staff Asst. 46]**. Klemz

---

[66] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 23]'s** actual duties were.

responded, "Can I get a resume for him. [N]ot sure were [*sic*] to put him." (*See* Chronology at 1/3/11).

**[Staff Asst. 46]** was hired as a TM III Staff Assistant at IDOT on January 5, 2011. **[Staff Asst. 46]'s** resume does not reflect qualifications to fulfill the stated duties of the *Rutan*-exempt TM III Staff Assistant position description. His resume shows truck driving and warehouse experience. Further, it is clear from Klemz's January 3, 2011 email in response to being informed of **[Staff Asst. 46]'s** hire that District 1 did not initiate the hire and did not have a hiring need, as the Administrative Manager of District 1 did not have **[Staff Asst. 46]'s** resume or know where to place him. (*See* Chronology at 1/3/11). Additionally, **[Staff Asst. 46]'s** actual duties did not match the Staff Assistant position description. Rather, his duties during the relevant timeframe included: monitoring service contracts and expenditures for equipment repairs, compiling budget reports and records, maintaining inventory records, entering data, processing purchases, and tracking vehicle mileage.

### 29. [Candidate 26]

The investigation revealed that the Governor's Office pushed **[Candidate 26]** as a candidate for a *Rutan*-exempt position at the Department of Insurance. **[Candidate 26]'s** resume shows that she worked as an office manager, realtor, and receptionist. Additionally, **[Candidate 26]** volunteered as a campaign worker/neighborhood canvasser during elections for the Office of State Representative Edward Acevedo from at least 2005 through 2012, when the resume was circulated.

On July 3, 2012, Croke emailed **[Candidate 26]'s** resume to Salazar (personnel liaison at DOI) with the subject, "Resume," and asked Salazar to call him and then call **[Candidate 26]**. On August 16, 2012, Croke forwarded the same email thread to his assistant Amanda Sutton and asked her to "add this to the resumes database." Less than ten minutes later, Sutton responded, changed the subject line from "Resume" to "Resume and ePAR" and attached two files: "**[Candidate 26]**_ePAR.pdf; **[Candidate 26]**_Resume.pdf." (*See* Chronology at 7/3/12).

**[Candidate 26]** was hired in 2012 at the Department of Insurance in the Financial Regulation division as a Private Secretary II. (ITAP).[67]

### 30. [Candidate 27]

The investigation revealed the Governor's Office helped **[Candidate 27]**, daughter of City of Chicago Alderman Ariel Reboyras, to obtain a position at the Gaming Board, despite knowing

---

[67] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 26]'s** actual duties were.

she had performance issues in her then current job. **[Candidate 27]'s** resume reflects that she volunteered at the 30th Ward Service Office (for her father).

With the Governor's Office's help, **[Candidate 27]** transitioned out of an alleged patronage hire at Illinois Liquor Control Commission ("ILCC"), where she had performance issues, and into another position with the State. On August 29, 2011, Susan Hofer (then Senior Public Services Administrator at CMS) received an email from a journalist, who questioned whether **[Candidate 27]'s** hire at the ILCC was a patronage hire and referred to the Governor's Office's having sent her resume to the ILCC. On October 10, 2012, after Bertuca received an email complaining about **[Candidate 27]'s** poor job performance at the ILCC, he emailed O'Shea, Croke, McNeil, and D'Alessandro, and stated: "We need to find another position for **[Candidate 27]** –This is not working out. Please assist." That same day, Croke asked his assistant Sutton to "pull" **[Candidate 27]'s** resume, but Sutton could not locate it in the resume database at the time. (*See* Chronology at 10/2/12).

On October 22, 2012, **[Candidate 27]** sent her resume to Bertuca. The next day, Bertuca emailed **[Candidate 27]'s** resume to O'Shea and Croke. O'Shea forwarded **[Candidate 27]'s** resume to Woods and Hughes on October 31, 2012 and asked: "Did I send to you to interview? If not please have someone set it up." On November 20, 2012, O'Shea again asked whether someone could interview her. It is not clear whether **[Candidate 27]** was ever interviewed for a position at IDOT, but she was not hired. (*See* Chronology at 10/22/12, 10/31/12, 11/20/12).

On December 3, 2012, McNeil emailed Madonna Wallace, at the Racing Board, and stated: "Here is the resume of the candidate. After you interview, please give me a call." **[Candidate 27]** was hired as an Executive Assistant at the Racing Board and worked there from 2013 to 2016. In addition to volunteer work at the 30th Ward office, **[Candidate 27]'s** resume reflects previous experience as an Academic Advisor at Kaplan University. She obtained a Bachelor of Fine Arts (Journalism Major; Political Science Minor) in 2008. (*See* Chronology at 10/22/12).[68]

### 31. [Staff Asst. 52]

The investigation revealed that the Governor's Office secured **[Staff Asst. 52]** a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 52]** is the daughter of former Alderman Gene Schulter ("Alderman Schulter"). She worked for the 47th Ward (where her father was Alderman) at the City of Chicago as a Legislative Aide during graduate school between 2008 and 2010.

Documents reveal the Governor's Office sent **[Staff Asst. 52]'s** resume to IDOT (and other agencies) and followed up to ensure a position was found for her. On July 14, 2010, Lavin's

---

[68] Because we did not have access to the personnel file of non-staff assistants, we do not know what **[Candidate 27]'s** actual duties were.

assistant (Mak) emailed Harris the resumes of **[Staff Asst. 52]** and another candidate **[Candidate 7]**, and stated: "Please talk to Jack [Lavin] about these two resumes." On July 23, 2010, Harris passed **[Staff Asst. 52]'s** resume on to Andrew Ross and stated: "Let's talk about this on Monday. Perhaps something at IHDA or DCEO." On July 27, 2010, Lavin asked Mak to "[r]emind me to call **[Staff Asst. 52]**[69] this afternoon." That same day, Harris emailed Hughes with **[Staff Asst. 52]'s** resume as a "possible marketing candidate" for IDOT. (*See* Chronology at 7/14/10, 7/23/10, 7/27/10).

On August 3, 2010, Lavin again asked Mak to remind him to call Alderman Schulter. On August 9, 2010, Mak emailed that Robert Rawls from "Schulter's Office" called and left his cell phone number. On August 20, 2010, Harris sent **[Staff Asst. 52]'s** resume to IDOT again, this time to Dean Devert, and copied Hughes, stating, "I don't believe anyone has reached out to interview her yet. Please bring her in and see if there would be a fit for her at IDOT." On September 17, 2010, Stephen Konya (Chief of Staff at DCEO) emailed Harris regarding **[Staff Asst. 52]** and asked: "[H]ave you heard back from her yet?" Harris responded, "There was a fit at idot." (*See* Chronology at 7/27/10, 9/17/10).

**[Staff Asst. 52]** was hired at IDOT on October 4, 2010 as a *Rutan*-exempt TM II Staff Assistant on a 60-Day Emergency appointment. **[Staff Asst. 52]'s** resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. Her work experience included two internships and a data input position during college between 2003 and 2007. As stated above, she then worked for her father's office from 2008 to 2010. She had a Bachelor degree in Communications and was in the process of completing her Master's in Marketing when she was hired at IDOT. Her transportation experience was limited to being a "Transportation Liaison" during her time at the Alderman's office.

**[Staff Asst. 52]'s** appointment was renewed on December 3, 2010. On December 8, 2010, Woods emailed Harris and copied Hughes regarding **[Staff Asst. 52]'s** responsibilities at IDOT, which did not align with the Staff Assistant position description. On December 29, 2010, Woods again emailed Harris and copied Hughes, this time with a list of candidates with ePARs "at dcos level." **[Staff Asst. 52]** was listed as a temporary IDOT employee with TM II Staff Assistant as the requested position for her pending ePAR. **[Staff Asst. 52]** was subsequently hired into a permanent TM II position.[70] None of the IPRs for her 60-Day Emergency appointments or permanent hire were executed by requesting directors. (*See* Chronology at 12/8/10, 12/29/10). Additionally, while employed as a TM II Rutan-exempt Staff Assistant, **[Staff Asst. 52]** was not

---

[69] It is unclear whether Lavin was referring to **[Staff Asst. 52]** or Alderman Gene Schulter.

[70] A comparison of **[Staff Asst. 52]** Personnel File and the Chart provided of "Staff Assistant Hire Dates" revealed conflicting information. It was unclear whether this position was a Staff Assistant position.

performing the duties in the position description. Rather, her employee evaluations during the relevant periods show that her duties included: opening and distributing mail, writing letters, answering phones, scheduling meetings, and assisting Regional Engineers with writing letters.

The Governor's Office kept track of **[Staff Asst. 52]'s** post-hire at IDOT. On October 24, 2011, there was a calendar entry for Mak to meet with **[Staff Asst. 52]** for coffee. In a November 26, 2011 email to Alicia Harris and Charlynn Turner (both of whom worked in the Governor's Office), Mak listed several candidates and whether they were hired at State agencies. He listed **[Staff Asst. 52]** as hired at IDOT and noted "this might be a collective bargaining position, not double-exempt." A January 7, 2012 email from Mak to Alicia Harris and Charlynn Turner again appears to track whether certain candidates were hired and stated regarding **[Staff Asst. 52]**: "She works at IDOT now. Please link her position to profile." **[Staff Asst. 52]** was laterally transferred from a TM II Staff Assistant position to a TM II Policy Advisor to the Secretary position according to the January 10, 2012 Lavin List. On August 6, 2012, O'Shea forwarded an email to Lavin and S. Soto with a list of ePARs to review for approval with Lavin, which included an ePAR for **[Staff Asst. 52]** to receive a raise.[71] **[Staff Asst. 52]** was then transferred to a TM IV Assistant to the Secretary position. *See* Chronology at 10/24/11, 11/26/11, 1/7/12, 1/7/12, 8/3/12).

### 32. [Candidate 31]

The investigation revealed the Governor's Office pressured agencies to find a position for **[Candidate 31]**. **[Candidate 31]** worked in the food service industry and was completing a Bachelor's in Business Organizational Leadership at Benedictine University at the time.

On April 14, 2013, **[Candidate 31]** emailed his resume to Lou Bertuca and stated: "Once again great to meet you today and thank you for the possible opportunities that you discussed with me. I have attached my resume and look forward to talking with you soon." Bertuca forwarded the resume to Croke, who forwarded it to Amanda Sutton and Justin Cajindos. Croke's email stated: "For agencies—Not Hired."[72] (*See* Chronology at 4/14/13).

On May 21, 2013, Bertuca forwarded **[Candidate 31]'s** resume to John D'Alessandro (DCOS in Governor's Office). On the same day, D'Alessandro emailed Chimaobi Enyia (CMS Deputy Chief Operating Officer) and asked him to set up an interview for **[Candidate 31]** "at your

---

[71]Lavin and Alderman Schulter had several meetings during **[Staff Asst. 52]'s** employment at IDOT. On September 30, 2010, Lavin had a meeting scheduled with Alderman Schulter. On March 18, 2011, there was also a calendar entry for a meeting with Lavin, Mak, and Alderman Schulter. On July 18, 2012, there was a calendar entry for Lavin to meet Gene Schulter for coffee. (*See* Chronology at 7/27/10, 3/18/11, 7/18/12).

[72] "Agencies-Not Hired" refers to one of the resume databases maintained by the Governor's Office that we were unable to locate.

earliest convenience." Enyia forwarded the email to Israel Salazar (Assistant Director of CMS) who then asked Croke: "What type of spot would we be looking at here? I'm not sure where we could use him." On the same day, Croke responded: "Anything is OK." (*See* Chronology at 4/14/13).

The Governor's Office was not limiting the push to CMS. On May 24, 2013, Croke also emailed the resume to Michele Cusumano (Director of Human Resources at DNR) and asked whether she had talked with **[Candidate 31]** earlier. She responded that she had not and Croke asked her to do so. In a later correspondence, Salazar made it clear that **[Candidate 31]** also interviewed with the Illinois Tollway Authority. Additionally, Croke responded for a second time to Salazar's email asking about the types of spots, saying only: "Anything." (*See* Chronology at 4/22/13).

D'Alessandro continued to press Salazar on the status of his request. On May 29, 2013, D'Alessandro asked Salazar whether an interview had been set up. Salazar told D'Alessandro "We don't have a lot of open double exempts, but I'll see if I can nail something down." D'Alessandro asked whether a time was set up and Salazar said he had conducted a brief (10 minute) phone interview. D'Alessandro continued to apply pressure, asking Salazar two days later, "Did we get something set up with this gentleman?" Salazar replied:

> I've spoken with him and he's given me his updated resume. Do we know where we want to put him? I can't meet with him in person, he's based in Chicago… So barring another phone call (which would do no good without info on a potential position), I'm not sure what else to do at this point. His resume has some management skills listed. . . Also some classes in communications… Pretty general background. Thoughts?

D'Alessandro forwarded Salazar's email to Croke and stated, "We cannot spend this much time on things like this. Outrageous." Croke responded: "Agreed—called Israel—we found a spot and they will start an epar." In numerous emails between Salazar and Croke on May 31, 2013, Salazar made it clear that there was no hiring need and the agency was struggling to find a place for **[Candidate 31]** in an existing ePAR. Croke ensured Salazar that he would talk to GOMB regarding funding, saying: "Don't worry about funding. Can we get an epar going for him?" (*See* Chronology at 5/29/13).

On June 3, 2013, Salazar emailed Croke to say, "I think I have a spot for him in CMS." Croke responded, "Great – let's get an epar going." Later, when asked what the spot is, Salazar told Croke: "Confidential assistant in Director's office. It's a PSA. I think we can give him a few special projects to run for us." On June 18, 2013, numerous emails were circulated with the subject: "72471 – CMS Double exempt – **[Candidate 31]** – please approve." When Croke checked with

McNeil to see if the ePAR was approved, McNeil responded with only: "who is he." Croke's reply was simply: "JD+Lou." (*See* Chronology at 6/3/13, 6/18/13).

[Candidate 31] was hired as an SPSA at CMS in 2013, making approximately $54,996 a year. His resume reflects that his most recent job was as a General Manager at Francesca's Restaurants in Naperville, Illinois. Before that he worked in several other food service industry positions.[73]

### 33. [Candidate 33]

The investigation revealed that Senator Clayborne and the Governor's Office helped [Candidate 33] get hired as a *Rutan*-exempt Realty Specialist III at IDOT. Prior to working at IDOT, [Candidate 33] was the Village Clerk for the Village of Washington Park and was paid $11,000 per year.

On August 21, 2012, Senator Clayborne's office emailed [Candidate 33]'s resume to Phelps in IDOT Personnel. Phelps sent his resume to Woods. On September 26, 2012, Woods emailed IDOT Bureau of Personnel staff, "Matt and I need to interview this candidate. Would you please set this up?" Documents reflect that [Candidate 33] called IDOT numerous times in December 2012 and January 2013 inquiring about the status of his job offer and the salary he would get. In an email between Woods and Hughes on January 11, 2013, Woods tells Hughes: ""He currently makes approx $11,000 per year. He was telling Jill that I promised he would be brought in around the mid-point (approx $75k) instead of bottom of the bracket (approx $55k). Obviously, I never told him anything of the sort. I don't trust this guy at all." (*See* Chronology at 8/21/12, 9/26/12, 1/11/13).

[Candidate 33]'s name replaced another candidate, [Candidate 2], while the ePAR was pending DCOS and COS approval. [Candidate 2] had been slated for a Realty Specialist III Chief Negotiator position in District 8. Her ePAR was approved by the Secretary on January 4, 2012 and had also received GOMB approval. [Candidate 2]'s ePAR was pending DCOS and COS approval; she appeared on the Lavin Lists from at least June 9, 2012 through September 13, 2012. Her name was removed from the November 21, 2012 ePAR and Lavin List.[74] By February 15, 2013, [Candidate 33]'s name appeared in the same ePAR for which [Candidate 2] had been slated. (*See* Ex. 5).

---

[73] Because we did not have access to the personnel file of non-staff assistants, we do not know what [Candidate 31]'s actual duties were.

[74] The November 21, 2012 ePAR list contains eight ePARS pending DCOS and COS approval without any candidate information.

[**Candidate 33**] was hired as a Realty Specialist III, Chief Negotiator in District 8 in February 2013, with a starting salary of $54,900. The position was responsible for negotiating the purchase of commercial properties, farm properties, complex parcels or individual properties on behalf of taxpayers of the State of Illinois. His resume reflected no qualifications to match the stated job duties.[75]

### 34. [Staff Asst. 59]

The investigation revealed that Illinois State Senator Louis Viverito referred his nephew, [**Staff Asst. 59**], to both Hannig and Hughes and helped him obtained a *Rutan*-exempt Staff Assistant position at IDOT. His resume lists various union-related positions as a grounds man, journeyman, bricklayer, journeyman electrician, as well as experience in municipal tree cutting and wood recycling. Handwritten on his resume is "Sen. Viverito" with a phone number. (*See* Chronology at 10/23/07).

On April 23, 2010, Hughes received an email from his assistant, stating: "Senator Viverito just called and wants you to call him when you get a chance about the issue we discussed this a.m." Three days later, on April 26, 2010, Hughes' assistant sent him another email stating "Viverito says that he gave his nephew [**Staff Asst. 59**]'s resumes, tests, scores, etc. directly to Hanning???" Hughes then told IDOT Bureau of Personnel staff to put [**Staff Asst. 59**]'s name on the "candidate list for Secretary's Picks." (*See* Chronology at 4/23/10, 4/26/10).

[**Staff Asst. 59**] was hired as a 60-Day Emergency Hire TM II Staff Assistant on June 16, 2010 and his emergency appointment was extended for a second 60-day term on August 16, 2010. [**Staff Asst. 59**]'s resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position descriptions. His prior work experience included working with trees, landscaping, and at the City of Chicago water department. During his 60-Day appointments at IDOT, he performed forestry inspections[76] and maintenance along highways.

On September 2, 2010, Hansen Anderson emailed Harris asking for an ePAR number for [**Staff Asst. 59**]. Harris emailed Hansen Anderson the same day with the pending ePAR number. Hansen Anderson then forwarded Harris' email to GOMB, and GOMB approved [**Staff Asst. 59**]'s ePAR the same day. (*See* Chronology at 9/2/10).

[**Staff Asst. 59**] was hired as a permanent TM II Staff Assistant in District 1 on September 16, 2010. As stated above, his resume does not reflect qualifications to perform the Staff Assistant position duties. Additionally, [**Staff Asst. 59**]'s actual duties did not match the Staff Assistant

---

[75] Because we did not have access to the personnel file of non-staff assistants, we do not know what [**Candidate 33**]'s actual duties were.

[76] His initial employment application indicated "Forestry Inspector" as the position for which he applied.

position description. Rather, his duties during the relevant time included: reviewing permit applications, removing trees along roads, performing roadside maintenance, and conducting chainsaw maintenance and safety trainings.

### 35. [Staff Asst. 60]

The investigation revealed that **[Staff Asst. 60]'s** political connections helped her obtain a *Rutan*-exempt Staff Assistant position at IDOT. **[Staff Asst. 60]** served as a legislative assistant intern for Representative Jay Hoffman in 2009 and an assistant for Illinois Senator Toi Hutchinson. According to an AP reporter, she was also the daughter of Macoupin County Board Member **[Staff Asst. 60]** and was on Representative Jay Hoffman's payroll in 2010. (*See* Chronology at 5/7/14).

Woods emailed Harris on August 12, 2011 with "some information [he] requested" and informed him, "$26,000 is **[Staff Asst. 60]'s** current full time salary as an office assistant with the Illinois State Senate." **[Staff Asst. 60]'s** requested position on the Lavin List attached to the email was TM II Staff Assistant with a requested salary of $45,720. The proposed Staff Assistant position's duties included accountability for assisting the "Deputy Director of Highways in the tactical aspects of developing and/or positions to be taken by the Division on policies and procedures affecting the Department" and "assisting in the overall development and coordination of policy and directives regarding programs for the Division." The IPR for this position was never executed by the requesting director and Woods did not sign it until August 26, 2011 (after **[Staff Asst. 60]** appeared on the Lavin List). (*See* Chronology at 8/12/11).

**[Staff Asst. 60]** was hired as a *Rutan*-exempt TM II Staff Assistant position on October 16, 2011. Her resume does not reflect qualifications to fulfill the stated duties of the Staff Assistant position description. Her application lists her most recent positions as "District Assistant" to State Representative Jay Hoffman (8 months), "Legislative Assistant" to State of Illinois Senate President's Office (8 months), and U.S. Postal Carrier/Clerk (20+ years). **[Staff Asst. 60]** described her duties in the legislature as answering phones, answering e-mails, dealing with constituents, maintaining databases, paying bills, and scheduling events.

## X. CONCLUSION

As detailed above in Section II, our investigation concluded that certain individuals within the Governor's Office and a limited number of Elected Officials or their staff members manipulated the *Rutan*-exempt process to favor politically-connected candidates without regard to actual hiring need or candidates' qualifications to perform the stated duties of the *Rutan*-exempt jobs into which they were hired. The manipulation was not just limited to IDOT or the Staff Assistant position.

Over the past two years, the Rauner Administration and IDOT have taken significant steps toward eliminating some of the problematic employment practices identified above and in the 2014 OEIG Report. Comprehensive reform is necessary to eliminate illegal patronage. The elimination of the Staff Assistant position is a positive step; it is, however, one of many remedial actions the State must take to fully address past patronage practices in the State of Illinois. The illegal hiring of the Staff Assistants has a continuing impact on State government. Many individuals hired illegally into the Staff Assistant position remain employed in other positions. Individuals hired illegally into other State positions also remain employed. Many of the individuals who facilitated the illegal hires, continue to work for the State. Additionally, many of the practices that enabled the illegal hiring of Staff Assistants and others continue to exist. We will continue to work with the parties and the Court to recommend measures that are necessary or appropriate to prevent future recurrence of violations and continue to assess the implementation of those efforts.

Dated: April 24, 2017

Respectfully submitted,

/s/ Noelle Brennan_____
Special Master

Noelle Brennan
Leah M. Farmer
Kristin H. Carter
NOELLE BRENNAN & ASSOCIATES, LTD.
20 S. Clark St., Suite 1530
Chicago, IL 60603
(312) 422-0001

/s/ Kristi Nelson_____
Counsel for Special Master

Kristi Nelson
GAIR EBERHARD NELSON DEDINAS, LTD.
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900