IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN, *et. al.* | ) | |
| | ) | No. 69 C 2145 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| DEMOCRATIC ORGANIZATION | ) | |
| OF COOK COUNTY, THE CITY OF | ) | |
| CHICAGO, RICHARD M. DALEY, | ) | |
| INDIVIDUALLY AND AS MAYOR OF | ) | |
| THE CITY OF CHICAGO, | ) | |
| REPUBLICAN STATE CENTRAL | ) | |
| COMMITTEE OF ILLINOIS, | ) | |
| REPUBLICAN COUNTY CENTRAL | ) | |
| COMMITTEE OF COOK COUNTY, | ) | |
| *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On November 18, 2014, this Court appointed a Special Master to investigate and make recommendations with respect to the Illinois Department of Transportation's ("IDOT's") compliance with the 1972 Consent Decree in this case ("Shakman Decree") (doc. # 4020: Special Master Order). The Special Master was appointed due to "the pervasive misuse by IDOT of a position labeled as exempt—that of Staff Assistant—by hiring people into that position and then having them perform non-exempt work." *Shakman v. Democratic Org. of Cook Cty.*, No. 69 C 2145, 2016 WL 7007507, at *1 (N.D. Ill. Nov. 28, 2016). The Governor has now filed a motion seeking an order clarifying how, when considering current or future applications by Staff Assistants ("SAs") for *Rutan*-covered positions, IDOT should treat the knowledge and experience they gained while they were employed as SAs (doc. # 4993: Governor's Mot. to

Clarify at 8).[1] On May 1, 2017, we invited counsel for the Shakman class plaintiffs, the Special Master and the union that represents many former SAs (Teamsters Local 916, or the "Teamsters") to file memoranda expressing their views on the issues raised by the Governor's motion (doc. # 5000). Plaintiffs and the Teamsters have filed responses to the Governor's motion; the Special Master has elected not to file a response memorandum.

We grant the motion for clarification and provide below the Court's guidance on this issue.

## I.

We begin with a brief review of the relevant federal court, state court, and IDOT proceedings that preceded the Governor's motion to clarify.

## A.

As relevant here, the Shakman Decree permanently enjoined the Governor and other government agencies and their successors in office "from directly or indirectly, in whole or in part: (1) conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor. . . . [and] knowingly, inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act." *Shakman, et. al. v. Democratic Organization of Cook County, et. al*, 481 F. Supp. 1315, 1358 (N.D. Ill. 1979) (69 C 2145: Consent Judgment, May 5, 1972, at ¶ E (Appendix)). This injunction was extended to

---

[1] In *Rutan v. Republican Party of Illinois*, the Supreme Court held that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees," and "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75, 78 (1990). As used in this opinion, "non-exempt" positions refer to those positions for which political considerations may not be used in the hiring decision; "exempt" positions refer to those jobs for which political considerations may be used.

2

prohibit government officials from conditioning hiring decisions on an applicant's political affiliation, with limited exceptions for policy-making positions. *Shakman v. City of Chicago*, 426 F.3d 925, 936 n.9 (7th Cir. 2005) (discussing history of Shakman Decree).

In 2011, the Office of Executive Inspector General for the Agencies of the Illinois Governor ("OEIG") began investigating IDOT for hiring practices which violated *Rutan* (*see* doc. # 3944: OEIG Amicus Curiae at 7). After three-plus years of investigation, the OEIG's final report was published on August 22, 2014 (*Id.*). The OEIG concluded that "IDOT used a putatively *Rutan*-exempt 'Staff Assistant' position to improperly hire personnel in circumvention of the merit-based process required for hiring personnel into non-exempt (or *Rutan*-covered) positions" (*Id.* at 8). Labeling the SA position as exempt allowed IDOT to fill the SA position based on political affiliation or other non-merit based considerations even though IDOT generally assigned persons in SA positions to perform duties outside those set forth in the SA position description, all or most of which would not support exempt status (*Id.* at 7-8).

In her own investigation of IDOT's hiring practices, the Special Master has concluded that "certain individuals within the Governor's Office and a limited number of Elected Officials or their staff members manipulated the *Rutan*-exempt process to favor politically-connected candidates without regard to actual hiring need or candidates' qualifications to perform the stated duties of the *Rutan*-exempt jobs into which they were hired," including, but not limited to, IDOT and the Staff Assistant position (doc. # 4988: Fifth Report of the Special Master (04/24/2017) at 88). The Special Master found that the Governor's office and IDOT have taken "significant steps toward eliminating some the problematic employment practices," but that additional reforms and remedies are needed (*Id.* at 89). The Special Master continues to investigate and monitor IDOT's employment practices for potential *Rutan* violations and continues to monitor implementation of

3

previous recommendations and make additional recommendations on an ongoing basis (*see* doc. # 5069: Sixth Report of Special Master (06/06/2017) at 1).

**B.**

In August 2014, IDOT issued layoff notices to all employees who held SA positions (Mot. to Clarify at 3). Shortly thereafter, Teamsters Local 916 filed a lawsuit against IDOT and the Governor's office in state court to prevent the layoffs ("the Teamsters litigation"); during the pendency of that lawsuit, the implementation of the layoffs was suspended (*Id.*). The parties reached a settlement approved by the state court, as memorialized in the following agreements.

The first agreement was concluded in September 2015 and adopted in a state court order (Mot. to Clarify, Ex. 1: 9/14/2015 Stipulation). The agreement provides that SAs would be allowed to continue their employment at IDOT during a "hiring period," which would begin in September 2015 and continue until IDOT posted for hire and filled at least 60 *Rutan*-covered, Teamster Local 916 bargaining unit positions (*Id.*, at ¶¶ 10, 13). The SAs would be allowed to bid and interview for these positions (*Id.*, at ¶ 14). "If a Staff Assistant obtains a score equal to or greater than other applicants for a particular position, then the Staff Assistant shall be awarded the position" (*Id.*). However, if the SA was not selected after interviewing for a posted position and the SA's final score exceeded that of the selected candidate, the Teamsters could challenge the selection, and "[a]bsent extenuating circumstances, the remedy can include awarding the staff assistant the contested position" (*Id.*, at ¶ 16). At the end of the hiring period, all SAs who were not selected for a position would be subject to layoff and the SA title would be abolished, but during a three year recall period, SAs would be notified of and entitled to bid and interview for "those open positions for which they are qualified" (*Id.*, at ¶ 17).

4

The September 14, 2015 stipulation stated that IDOT would not create new positions "solely for the purpose of aligning the duties of that position to the duties any Staff Assistant currently performs or otherwise give any Staff Assistant a real or perceived advantage in being hired for a position" (9/14/2015 Stipulation, at ¶ 8). In addition, SAs had no "right to be selected for a position based on duties performed during the hiring period" (*Id.*, at ¶ 18). On September 21, 2015, IDOT and the Teamsters further agreed that any employee who was appointed or hired into a position at IDOT that was designated as *Rutan*-exempt at the time of appointment or hire and is covered under the collective bargaining agreement: "[s]hall not be transferred, voluntary reduced, job-assigned or promoted into any position that is Rutan-covered without bidding and interviewing for such Rutan-covered position" (Mot. to Clarify, Ex. 3: 9/21/2015 Mem. of Agreement).

On April 8, 2016, the parties to the Teamsters litigation agreed to a Revised Stipulation (Mot. to Clarify, Ex. 2: Revised Stipulation). The Revised Stipulation stated, in relevant part, that the hiring period began on September 30, 2015, and would continue until the 60 *Rutan*-covered, Teamster Local 916 bargaining unit positions, plus ten additional such positions, were posted and filled (*Id.*, at ¶¶ 10-12). SAs would be allowed to bid for these positions as stated in the original stipulation (*Id.*, at ¶ 14). The Revised Stipulation stated that it was intended to fulfill the recommendations made by the Special Master, and that IDOT was not aware of any respect in which the Revised Stipulation was inconsistent with any actions taken or recommendations made by the Special Master (*Id.*, at ¶ 6). In this opinion, we refer collectively to the stipulations and the memorandum of agreement in the Teamsters litigation as the "Teamsters Agreements."

5

**C.**

The Governor filed the instant motion to clarify after an individual, referred to by the parties as "John Doe," applied and interviewed for a position as a Rail Operations Inspector (Mot. to Clarify at 1). In 2011, Doe's legal guardian was appointed to the Illinois Labor Relations Board by the Governor of Illinois. Later that year, though he had no relevant experience and no job opening was posted, Doe was hired to be an SA (Mot. to Clarify at 2, citing doc. # 4988: Special Master 5th Report at 52-53). Doe never performed the duties listed in the SA job description; instead, he performed mostly administrative duties until sometime between June 2013 and 2014, when he began performing the duties of a Rail Operations Inspector (Mot. to Clarify at 3). In August 2014, Doe received a layoff notice from IDOT (*Id.*). After the Teamsters litigation began, Doe's layoff was suspended, and he continued to work at IDOT with the title of SA, but performing the duties of a Rail Operations Inspector, until he and the other remaining SAs were laid off on September 15, 2016 (*Id.* at 3, 5).

On March 26, 2016, during the hiring period, IDOT posted an opening for Rail Operations Inspector, a *Rutan*-covered position (Mot. to Clarify at 5). Doe timely applied for this position, and he and 13 other applicants interviewed for it (*Id.*). Using a scale of 1 to 5 (with 5 being the highest), the interviewers scored the applicants on knowledge and experience (30%), education and training (20%), organizational skills (20%), independence (15%), and attention to detail (15%) (*Id.*). After the top two scoring applicants (who both declined the position), Doe received the highest composite score (3.93), and the next ranked applicant (whom the Governor refers to as "Jane Buck") received a composite score of 3.35 (*Id.*). Doe received 0.30 points more than Buck for knowledge and experience, 0.20 points more for education and training, and 0.08 points more for independence (*Id.*). The Governor states that if IDOT disregarded Doe's work

during the hiring period, his total score would still be higher than Buck's, but if IDOT ignored all experience Doe gained while employed as an SA, his score would be lower than Buck's (*Id*. at 6).

## II.

Initially, we note that none of the parties contest this Court's jurisdiction in this matter, and for good reason. The Shakman Decree provides for the ongoing involvement of the federal district court in certain employment decisions of the defendants who -- like IDOT -- are subject to the decree. Specifically, the district court retained jurisdiction to address the questions of: (a) which governmental employment positions were exempted from the decree by virtue of their policy-making nature; (b) whether and to what extent political sponsorship or other political considerations could be taken into account in hiring employees; and (c) what remedies and implementing procedures ought to be granted and established by the court in connection with the resolution of these questions. Shakman Decree, at ¶ H(1). The Court also retained jurisdiction to enforce compliance with the provisions of the Shakman Decree. *Id*., at ¶ H(2).

The Seventh Circuit has described this Court as having retained jurisdiction "to clarify and to enforce the provisions of the decree." *Shakman*, 426 F.3d at 927. Throughout its history overseeing the Shakman Decree, the district court has periodically exercised its jurisdiction in this way. *See, e.g.*, *Lewis v. Cty. of Cook*, No. 10 C 1313, 2011 WL 839753, at *6 (N.D. Ill. Feb. 24, 2011) (memorandum opinion and order addressing issue of first impression regarding interpretation of SRO with Cook County). The Governor's motion to clarify falls squarely within the jurisdiction of this Court.

7

### III.

In the briefing on the motion to clarify, plaintiffs, the Teamsters and the Governor propose different ways to answer the question of whether or to what extent IDOT should consider the knowledge and experience individuals gained while employed as SAs in the hiring process for non-exempt positions. While the Governor raises this question in the context of the job application of John Doe, each party recognizes that this question has the potential to sweep far beyond its applicability to Doe. We address the parties' different proposals separately below, beginning with the issues raised in the Governor's motion.

### A.

The Governor asserts that under Teamsters Agreements, "the Teamsters expected IDOT to post, as operationally necessary, some of the very positions that Staff Assistants were filling unofficially (such as Rail Operations Inspector) and that those Staff Assistants (such as John Doe) would qualify for those positions based on the knowledge and experience they gained while performing duties those positions required" (Mot. to Clarify at 4-5). The Governor states that if "IDOT cannot credit an applicant's experience gained in a position for which the applicant was improperly hired – then the Governor will not be able to comply with both the Decree and the stipulations in the Teamsters case unless this Court issues an order reconciling the conflicting directives" (*Id.* at 7).

Contrary to the Governor's suggestion, we find that the Teamsters Agreements do not conflict with the Shakman Decree, because we do not read the agreements as invariably requiring IDOT to consider the knowledge and experience applicants gained while they were employed as SAs. "Under Illinois law, the goal of contract interpretation is to ascertain the parties' intent and, in doing so, we first look to the plain and ordinary meaning of the contract

language." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016), as amended (Jan. 25, 2017) (internal quotations omitted). We construe contracts as a whole, in a way that does not render any provision meaningless. *Id.* We also read the agreements in a way that does not conflict with the Shakman Decree, because the Governor's obligations under the Decree cannot be modified by an agreement reached outside the confines of the Decree, such as in the context of the Teamsters litigation. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) (a federal consent decree may only be altered upon a showing under Federal Rule of Civil Procedure 60(b)(5) that there has been '"a significant change either in factual conditions or in law' [that] renders continued enforcement 'detrimental to the public interest'").

The only language in the Teamsters Agreements that specifically refers to the knowledge and experience applicants gained while they were employed as SAs states that SAs have no "right to be selected for a position based on duties performed during the hiring period" (9/14/2015 Stipulation, at ¶ 16). This language makes clear that IDOT is not required to consider an SA's experience obtained while working during the hiring period -- a time period during which SAs were officially authorized to continue to perform non-exempt work (*Id.*, at ¶ 10). It would be incongruous for the agreements then to require IDOT to consider the experience SAs obtained *before* the hiring period began on September 30, 2015 -- experience that was obtained as a result of IDOT's "pervasive misuse" of the SA job title to hire persons as exempt employees but have them perform non-exempt work. *Shakman*, 2016 WL 7007507, at *1. Neither IDOT nor the Teamsters have attempted to explain why or how the agreements require IDOT to consider an SA's pre-hiring period experience.

We recognize that the Teamsters Agreements contemplate that SAs would apply for positions pursuant to the procedures for considering applicants for non-exempt positions, which

provide for consideration of relevant job experience and knowledge (9/14/2015 Stipulation, at ¶ 14; Mot. to Clarify at 5). However, the Teamsters Agreements also make clear that IDOT would not give any SA "a real or perceived advantage in being hired for a position" (9/14/2015 Stipulation, at ¶ 8). That provision is further evidence that the agreements cannot fairly be read to require IDOT to credit applicants in all instances with the job experience they obtained as an SA.

Moreover, the Teamsters Agreements state that if an SA is not selected for a position, but the SA's final score exceeded that of the selected candidate, that selection could be challenged and, "[a]bsent extenuating circumstances, the remedy can include awarding the staff assistant the contested position" (9/14/2015 Stipulation, at ¶ 16). In other words, even if an SA receives a higher score, "extenuating circumstances" may preclude IDOT from awarding the SA the contested position. This exception to hiring an SA with a higher score is further evidence that the Teamsters Agreements do not require IDOT to consider the knowledge and experience applicants gained while they were employed as SAs.

**B.**

That said, a finding that the Teamsters Agreements do not *require* IDOT to consider an SA's prior experience does not mean that IDOT is invariably *prohibited* from doing so. Plaintiffs argue that IDOT is categorically prohibited from considering the experience and knowledge applicants gained while employed as SAs in hiring for non-exempt positions. Plaintiffs contend that this prohibition stems from the Teamsters Agreements, the First Amendment and the Shakman Decree (doc. # 5067: Pls.' Resp. to Governor's Mot.). We address each of plaintiffs' arguments in turn.

10

### 1.

*First*, plaintiffs argue that the Teamsters Agreements prohibit IDOT from considering the experience and knowledge applicants gained while employed as SAs prior to the hiring period because this consideration would give the SAs "a real or perceived advantage in being hired for a position," in violation of the agreements (Pl.'s Resp. at 10). As is evident from our discussion above, we find that plaintiffs read this provision in the Teamsters Agreements too broadly. In our view, the agreements read as a whole do not invariably require -- or forbid -- consideration of the experience SAs gained prior to the hiring period.

### 2.

*Second*, plaintiffs argue that considering the experience and knowledge an applicant gained while employed as an SA would violate the First Amendment as interpreted in *Rutan* because any experience gained as an SA, either during or before the hiring period, was the product of unlawful hiring and transfers (Pls.' Resp. at 2-3, 5). Plaintiffs claim that the Seventh Circuit "addressed this precise issue" in *Tarpley v. Jeffers*, 96 F.3d 921 (7th Cir. 1996) (Pls.' Resp. at 3). Plaintiffs describe *Tarpley* as "rul[ing] that hiring an applicant because of experience gained as a result of an earlier, politically motivated hiring violates the First Amendment" (*Id.*). We conclude that plaintiffs read the Seventh Circuit's holding in *Tarpley* too broadly. While the plaintiff in *Tarpley* argued that such hiring violates the First Amendment, the Seventh Circuit explicitly declined to rule on this issue, instead remanding the case to the district court to determine whether the plaintiff had standing. *Tarpley*, 96 F.3d at 923-24.

Plaintiffs cite to no other case -- and this Court knows of none -- that has held that hiring an applicant based in part on experience gained as a result of an earlier, politically motivated hiring in all instances violates the First Amendment. We decline plaintiffs' invitation to extend

the reach of *Rutan*'s prohibition on political hiring to encompass any experience an individual has gained from an earlier hiring that was based on political considerations. More specifically, we reject plaintiffs' position that an SA's knowledge of the political circumstances of his or her hiring is irrelevant.

### 3.

*Third*, plaintiffs contend that the Shakman Decree categorically prohibits IDOT from considering the experience gained from past unlawful political hiring because: (a) it would violate the Shakman Decree's injunction against affecting any aspect of governmental employment because of any political reason or factor; and (b) the Shakman Decree requires that IDOT remedy -- "remove the taint" -- caused by past violations of the Shakman Decree (Pls.' Resp. at 3-7).

In construing the Shakman Decree, we are mindful that "[c]onsent decrees have elements of both contracts and judicial decrees. A consent decree embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal quotations and citations omitted). As such, "[f]undamental principles of contract interpretation under relevant state law apply when a court is presented with the task of interpreting the provisions of a consent decree." *J.C.C. Food & Liquors v. United States*, 133 F.3d 555 n.3 (7th Cir. 1998).

### a.

We first address plaintiffs' contention that considering the experience gained from past unlawful political hiring would itself violate the Shakman Decree. The terms of the Shakman Decree's injunction are broad on their face, prohibiting defendants from "conditioning, basing or

12

knowingly prejudicing or affecting any term or aspect of governmental employment . . . upon or because of any political reason or factor" or from "knowingly, inducing, aiding, abetting, participating in, cooperating with or encouraging" the commission of any such act (Shakman Decree, at ¶ E).

A fundamental principle of Illinois law is that "a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Sirazi v. Gen. Mediterranean Holding*, 826 F.3d 920, 925 (7th Cir. 2016) (quoting *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002)). Interpreting the Shakman Decree as categorically barring a government agency from considering any knowledge or experience a job applicant for a *Rutan*-covered position gained from a previous position he or she obtained because of a political reason would, in our view, "produce absurd results." *Sirazi*, 826 F.3d at 925. For example, a situation may arise where no job applicant for an open non-exempt position, other than a person who had gained knowledge and experience from a previous unlawful political hiring, would be qualified for that position. In that situation, IDOT would either be forced to leave the open position vacant or to hire an unqualified applicant for the position. It is "very unlikely" that the parties to the Shakman Decree would have agreed to such a broad injunction. *Id.*

### b.

Even though we do not read the Shakman Decree as a categorical bar to considering any experience or knowledge applicants gained while they were employed as SAs, it does not follow that government agencies *always* may consider that prior experience or knowledge. As explained above, this Court has jurisdiction under the Shakman Decree to determine what remedies and

implementing procedures are needed to ensure compliance with the Shakman Decree. Shakman Decree, at ¶ H(1)(c). Remedies under federal consent decrees must be limited to those that are "reasonable and necessary." *Horne*, 557 U.S. at 450 (quoting *Frew*, 540 U.S. at 441). Remedies should not issue a "fresh injunction" by creating new rights or obligations on the parties. *Jones-El v. Berge*, 374 F.3d 541, 544 (7th Cir. 2004) (holding that district court's order was appealable because it substantially and obviously altered the parties' pre-existing relationship under the consent decree).

Plaintiffs argue that to remedy past violations of the Shakman Decree, this Court should "declar[e] that Staff Assistants or other public employees hired, transferred or promoted in violation of the 1972 Decree and/or *Rutan*, may not, when being considered for a subsequent state position, receive credit for the experience and knowledge gained as a result of that violation," in order to remove any advantage that would "victimize other applicants who lacked the clout that gave Doe [and others like him] the relevant experience" (Pls.' Resp. at 6-7, 14-15). With respect, we find that plaintiffs' proposed remedy goes too far. We decline plaintiffs' invitation to create a precedent that applies beyond the specific situation of former SAs at IDOT who are applying for non-exempt positions at IDOT, and we decline to mandate a wholesale ban on considering prior experience gained while an SA every time an SA applies for a non-exempt position. Below, we set forth the Court's conclusions as to the proper remedy and our explanations as to why it is appropriate in this case.

## IV.

This Court has discretion to determine and implement an appropriate and reasonable remedy for violations of the Shakman Decree. *See Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir. 1999) (explaining district court's discretion to implement a consent decree). "When the

consent decree involves a public agency . . . [it] is often necessary [for the district court] to secure complicated, sometimes conflicting, policy objectives." *Bailey v. Roob*, 567 F.3d 930, 937 (7th Cir. 2009). Such complicated policy objectives are at play here.

### A.

As stated above, the remedy we create here will apply only to decisions made by IDOT with respect to applications by SAs for non-exempt positions. Unlike the other government agencies covered by the Shakman Decree, there have already been two separate investigations into IDOT hiring -- by the OEIG and the Special Master -- which have resulted in findings of abuse in the hiring for the SA position at IDOT. In many instances, those abuses have been found to be linked to political circumstances (*see* Fifth Report of the Special Master at 88; OEIG Amicus Curiae at 7-8). It is with these investigatory findings in mind that we have determined the appropriate remedy to resolve the issue in the Governor's motion to clarify.

### B.

A reasonable remedy for this situation is not one that always or never applies, but one that is applied with careful discretion and judgment after consideration of all relevant circumstances. While an individual's experience gained through political hiring could give him or her an advantage in interviewing for future positions that credited that experience, there may be instances in which there is a legitimate reason for IDOT to hire the applicant who gained experience as an SA, such as: (a) the original hiring, transfer or promotion (even if improper) was not politically motivated; (b) they were unaware that they were hired as SAs because of a political reason; or (c) no other applicant is sufficiently qualified for the posted non-exempt position. These considerations are not exhaustive.

15

With the guidance set forth in this opinion, we direct IDOT and the plaintiffs to work with the Special Master to develop a procedure for determining, in specific cases, what consideration IDOT shall give to an SA's experience in that job title when applying for a non-exempt position. We invite the Teamsters to participate in that process. By September 25, 2017, the parties and the Special Master shall file a joint report outlining the procedure that has been developed.

## CONCLUSION

For the foregoing reasons, we grant the motion for clarification (doc. # 4993). We hope that the clarification set forth in this Memorandum Opinion and Order will assist the parties in resolving any remaining issues regarding the SAs who apply for other positions within IDOT.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: July 26, 2017**

16