IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. SHAKMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Number: 69 C 2145 |
| v. ) | |
| ) | Magistrate Judge Schenkier |
| COOK COUNTY RECORDER OF ) | |
| DEEDS, et al., ) | |
| ) | |
| Defendants. ) | |

**SIXTEENTH REPORT OF THE *SHAKMAN* COMPLIANCE ADMINISTRATOR
FOR THE COOK COUNTY RECORDER OF DEEDS**

    Cardelle B. Spangler, *Shakman* Compliance Administrator for the Cook County Recorder of Deeds ("RCA")[1], by and through her attorney, Matthew D. Pryor, pursuant to Art. III.C of the Supplemental Relief Order for the Cook County Recorder of Deeds ("SRO"), submits this Sixteenth Report as follows:

**I.    Introduction**

    On April 21, 2017, the RCA filed her Fifteenth Report to the Court ("Fifteenth Report") (Dkt. 4985) in which she discussed the Cook County Recorder of Deeds[2] Karen Yarbrough's efforts to comply with the SRO. Since the Fifteenth Report, the Recorder hired a new Chief of the Human Resources Division ("HRD"), Director of HRD and DOC – all of whom the RCA has had positive interactions with thus far. The RCA has

---

[1] "RCA" hereinafter shall refer to the Recorder Compliance Administrator and/or her staff.

[2] The "Cook County Recorder of Deeds", the "Recorder", "ROD" and/or "Recorder's Office" hereinafter shall refer to the Recorder, Karen Yarbrough, and/or her staff.

appreciated greatly the transparent, collaborative and deliberative manner in which these new Employees have approached their duties under the SRO, Plan and Manual. They also have been able to make progress on many longstanding issues discussed in prior RCA Reports (e.g. Employment Plan amendments, Job Description revisions, and responses to RCA document requests). The RCA notes that the hiring of the new Chief of HRD and DOC followed the Recorder's termination of the former Chief of HRD, in part, for not being "forthcoming or truthful with information" during the Interim DOC's investigation into the DOC hiring process. Also, the OIIG issued Summary Report IIG17-0080 finding that the ROD committed Unlawful Political Discrimination ("UPD") related to the employment of a *Shakman* Exempt employee who was not performing the duties of the job to which she was hired. Below are updates on these and other issues concerning the Recorder's progress toward Substantial Compliance[3] with the SRO.

## II. The Five Prongs of Substantial Compliance

### A. Prong 1: *Has the Recorder implemented the Employment Plan, including procedures to ensure compliance with the Plan and identify instances of noncompliance?*

The first prong of Substantial Compliance requires the Recorder to implement a Plan and other procedures to ensure compliance with the principles of *Shakman* and

---

[3] The SRO states that "Substantial Compliance" means: (1) the Recorder has implemented the New Employment Plan, including procedures to ensure compliance with the New Employment Plan and identify instances of non-compliance; (2) the Recorder has acted in good faith to remedy instances of noncompliance that have been identified, and prevent a recurrence; (3) the Recorder does not have a policy, custom or practice of making employment decisions based on political reasons or factors except for Exempt Positions; (4) the absence of material noncompliance which frustrates the Recorder's Consent Decree and the SRO's essential purpose. The RCA and the Court may consider the number of post-SRO complaints that have been found to be valid. However, technical violations or isolated incidents of noncompliance shall not be a basis for a finding that the Recorder is not in substantial compliance; and (5) the Recorder has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment with the Recorder. SRO at 13.

2

identify instances of non-compliance. Since the Fifteenth Report, the Interim DOC released her report concerning serious non-compliance by the former Chief of HRD that the Recorder responded to, in part, by terminating the Chief of HRD's employment. With the addition of new leadership in HRD and a new DOC, more earnest efforts to resolve longtime issues (updating the Plan, Manual, and Job Descriptions) have been undertaken. While considerable more work is needed, the RCA is optimistic that the new personnel will help bring these issues to completion.

1. <u>Human Resources</u>

The RCA previously has explained that one issue seriously impacting the ROD's ability to reach Substantial Compliance has been the "lack of a strong, independent, professional human resources department that can effectively implement the Plan and Manual." Fifteenth Report at 3. Since that report, the RCA (as Interim DOC[4]) found that the Recorder's Chief of HRD "knowingly or willfully" did not cooperate and provided false information during an Interim DOC investigation. The Recorder subsequently terminated the Chief of HRD's employment. More details on this development follow.

a. *Interim DOC Report 17-004*

On May 30, 2017, the Interim DOC issued Interim DOC Incident Report 17-004 concerning the DOC hiring process. The Interim DOC initiated the investigation after becoming alarmed at the (now former) Chief of HRD's "lack of transparency" when he recused himself from the DOC hiring process less than an hour before interviews were set to begin. Fifteenth Report at 4. The Interim DOC's investigation focused on the Chief's familiarity with the Candidate selected for the Position, whether the Chief's conduct

---

[4] On account of the prior DOC resigning to pursue other employment, this Court appointed the RCA to serve as Interim DOC pending the Recorder's hire of a permanent DOC replacement. (Dkt. 4900)

complied with the spirit and letter of the Plan, and whether any prior or existing relationship between the Chief and Candidate gave the appearance of partiality such that the Candidate should be disqualified from consideration for the DOC Position. Interim DOC Report 17-004 at 2. The Interim DOC concluded that during her investigation, the Chief was not forthcoming or truthful about: 1) his prior knowledge that the Candidate had applied for the DOC Position; 2) his other recent contacts with the Candidate; and 3) his extensive involvement in the DOC hiring process. *Id.* at 13-15. She also concluded that the Chief "misled his own co-workers on the nature of his relationship" with the Candidate and that had he been transparent with the details, "it is possible that the Recorder and Chief Deputy Recorder might have concluded that permitting [the Candidate] to be considered for the DOC Position was not in the best interests of the Recorder's written goal of hiring a DOC who was 'free from actual and the appearance of political and personal influence…'" *Id.* at 14-15. She concluded that the Chief "violated the principles and spirit of the Plan by attempting to conceal from the ROD and Interim DOC the extent of his relationship with" the Candidate and violated Plan §IV.Q by "knowingly or willfully not cooperating in an investigation and providing false information during the Interim DOC investigation." She recommended the Recorder (1) terminate the Chief's employment consistent "with other ROD employees who were found to have provided false information to the RCA, OIIG or ROD" and (2) place the Chief on the Do Not Rehire List.[5]

---

[5] The Interim DOC also concluded that the selected Candidate provided false information to the Interim DOC to hide his extensive, recent communications with the Chief. She recommended the Recorder disqualify the Candidate from further consideration for the DOC Position and that the Recorder amend the Plan "to require Applicants and Candidates for employment at the ROD who provide false information to the DOC, RCA or OIIG in connection with their application for employment and/or in connection with an investigation be placed on the Ineligible for Rehire List for a period of five years." *Id.* at 16.

On June 2, 2017, Recorder's Counsel issued the Recorder's Report in response to Interim DOC Report 17-004. Recorder's Counsel acknowledged that "it is critical that the Recorder, her staff, and the RCA need to be able to trust the information that is being provided by the HR Department and the Chief of Human Resources" and that "[t]he Interim DOC Report and the supporting documentation show strong evidence that this trust was breached." The Recorder agreed to accept all the recommendations of the Interim DOC and noted that the Recorder already had terminated the Chief of HRD's employment the day after receiving the Interim DOC Report. The Recorder subsequently placed the former Chief's name on the Ineligible for Rehire List where it will remain for five years. The Recorder also disqualified the Candidate from further consideration for the DOC Position and agreed to amend her Do Not Rehire policy to cover Candidates who provide false information relating to their application for employment.

The RCA appreciates the seriousness of the Recorder's response and the extent to which the Recorder openly communicated with her about her reaction to the report and her subsequent efforts to fill the vacancy created by her termination of the Chief. While the RCA recognizes that it is the role of the DOC to identify instances of non-compliance, the RCA hopes that the Recorder uses this Interim DOC finding as a moment to instruct her senior staff on signs of non-compliance that they can (and should) be attuned to in future employment processes.

      b.    *Hiring of new Chief of HRD*

On June 14, 2017, the Recorder hired Patricia Fallon as her new Exempt Chief of HRD. Ms. Fallon had previously represented the ROD in this case as an Assistant State's Attorney and was therefore well versed in *Shakman* matters when she was hired. Since

her hire, Ms. Fallon has been focused on understanding the issues facing the Recorder's Office and the RCA has appreciated her openness to discuss challenges as they arise. Ms. Fallon has worked collaboratively and efficiently with the RCA and her staff and the RCA is thrilled with her working relationship with Ms. Fallon thus far. The RCA has every reason to believe that if Ms. Fallon is given the proper support and discretion[6] she will be able to develop the professional and effective HRD that has been missing.

c. *Updating the Plan and Manual*

The parties and the RCA met several times over recent months to discuss potential edits to the Recorder's Employment Plan. The parties and RCA are at an impasse on a few issues and the RCA anticipates bringing these to the Court for resolution.

d. *Updating Job Descriptions*

Since shortly after their hires, the Chief and Director of HRD have recognized the importance of having updated and accurate Job Descriptions. Over the past few months, HRD has begun updating some Job Descriptions and the DOC and RCA provided recommendations to the Director about how to improve the process and ensure it would be consistently applied over ensuing reviews. The Chief and Director have worked collaboratively with the RCA on this project and are all scheduled to meet next week to make further progress.

---

[6] In her Fifteenth Report, the RCA noted that, "Labor Counsel, who has been found by the former DOC and OIIG to have violated the Plan (*see* Thirteenth Report at 9) and SRO (*see id.* at 14) and is the subject of a pending Motion for Rule to Show Cause by Plaintiffs (*see* Dkt. 4644 (filed July 29, 2016)), continues to expand his influence in human resource matters." Fifteenth Report at 4-5. The RCA notes that since the new Chief of HRD was hired, the Chief has worked toward moving several human resources functions previously under Labor Counsel's control back into HRD. The RCA views this effort as the beginning of the Recorder honoring her stated commitment to supporting a strong and independent HRD. The RCA hopes this momentum continues.

    e. *Do Not Rehire Policy Implementation*

On August 19, 2016, this Court entered an Order amending the Plan's section concerning the "Do Not Rehire Without Further Consideration List" ("DNR Policy"). *See* Dkt. 4687. Based on the Interim DOC's recommendations in Incident Report 17-004, the Recorder ordered that the former Chief of HRD's name be added to List. Since he did not appeal, the List now contains the names of five former employees.

    2. <u>Director of Compliance</u>

On May 1, 2017, the Recorder's new DOC, Alexis Serio, began her employment with the Recorder. Since her hire, the RCA has found Ms. Serio to be a professional, capable DOC dedicated to helping bring the Recorder's Office into Substantial Compliance. Ms. Serio is vocal when she identifies potential compliance concerns and has weighed in on potential amendments to policies to make them easier to understand and implement. The RCA has enjoyed an open and collaborative relationship with the DOC and believes she has the skills to serve successfully in her role.

On August 29, 2017, the DOC submitted to the Chief of HRD a Request to Hire packet for an Assistant DOC Position. The RCA will monitor any actions taken concerning this requested Position and will include any updates in her next report.[7]

    3. <u>Adherence to the Recorder's Plan and Manual</u>

The RCA has continued monitoring all Employment Actions that she is provided notice of by the Recorder's Office some of which are described further below.

    a. *Desk Audit*

Since the Fifteenth Report, the RCA had the opportunity to monitor the new

---

[7] The RCA also notes that the DOC is currently taking an approved leave of absence from the ROD. On September 15, 2017, the Court ordered the RCA to again serve as Interim DOC. (Dkt. 5192)

7

Director of HRD conduct a Desk Audit of an employee that first had been requested by that employee over two years ago. The Chief of HRD took the report and recommendation of the Director and, ultimately, the Chief Deputy Recorder approved a pay increase for the employee largely due to the employee at issue being paid significantly below two similarly positioned employees. While the RCA did not have any concerns with the ultimate decision to increase the employee's pay, the RCA discussed with the Chief of HRD that she did not believe the Manual addressed this situation where a single Position can be approved for a pay increase pursuant to a Desk Audit (the Manual only allows "Desk Audits [to be conducted on a] Section-wide or Division-wide basis" (Manual at 28)), and recommended that the Recorder create a new policy to cover individual employee requests for salary reviews. The RCA even proposed language for such a policy. The Chief ultimately rejected the RCA's recommendation and pursued the salary review under the Desk Audit process. The RCA disagreed with the Chief's decision to proceed in this manner because it fit the mold of past ROD behavior of trying to fit Employment Actions into non-conforming policies. The RCA spoke with the Chief about her concerns and appreciated the Chief's transparency and dialogue on the matter.

      b.    *Layoffs and Performance Evaluations*

Since the Fifteenth Report, the RCA monitored the completion of the 45-day evaluations for employees who were recalled off a Recall List earlier this year. The RCA had similar issues with this process as the last round of evaluations (*see* Fifteenth Report at 11-12) and has discussed these concerns with the new Chief of HRD (who was not employed during this evaluation process). The RCA is encouraged by the Chief's

recognition that more training and HRD involvement will be required for the success of future performance evaluations.

> B. **Prong 2:** *Has the Recorder acted in good faith to remedy instances of non-compliance that have been identified?*

The second prong of Substantial Compliance concerns whether the Recorder has made good faith efforts to cure instances of non-compliance when identified. While they may be self-reported, non-compliance has been identified primarily by the OIIG, DOC and RCA. In the past four months, the OIIG has not made any findings regarding any Post-SRO complaints but did sustain one allegation of UPD (IIG17-0080). The Recorder issued a Recorder's Report in response to a previous OIIG Summary Report (IIG15-0342). The OIIG currently has six pending Post-SRO complaints and seven pending investigations into alleged UPD.

As for DOC findings, the Recorder issued a Recorder's Report in response to DOC Report 16-011 and the Interim DOC issued one finding (17-004, *see* above at 3-5) which the Recorder responded to as well (*see id.*) The Interim DOC currently has several pending investigations into alleged violations of the Plan and Manual. Finally, the new DOC issued two reports concerning violations of the Plan and Manual.[8] Below are updates on several of these reports and responses.

---

[8] In these reports, the DOC found (1) a (now former) Employee violated the Courtesy Policy and (2) 62 of the Recorder's 131 Employees were suspected to have abused the Sick Time Policy and, without justification for their violations, should be placed on Proof Status. The DOC recommended that an additional 31 Employees be put on notice that one more violation would place them on Proof Status as well. The DOC issued these reports on August 3rd and August 21st, respectively, and the Recorder has not yet issued her Recorder's Report in response to the DOC's recommendations. The RCA will discuss the reports and the Recorder's response in her next report.

> 1. <u>OIIG Summary Report IIG17-0080 (finding of UPD as Non-Exempt employee found to be performing essential job duties of an Exempt Position)</u>

On July 10, 2017, the OIIG issued a Summary Report concerning allegations that a *Shakman* Exempt Special Assistant was not performing the essential job duties listed in her Job Description. The Position at issue was created and added to the Exempt List in 2016 after several months of efforts by the Recorder to gain approval of the Plaintiffs and this Court for the Position. *See* Twelfth Report (Dkt. 4603) at 5-7. In his report, the OIIG quoted excerpts of the Recorder's fall 2015 Reply Brief in which the Recorder explained that new Special Assistant "would be 100% dedicated to outreach work and would serve as the face of the Recorder's Office in the community" and "would actually do outreach presentations and field questions from constituent groups." IIG17-0080 at 2-3. The OIIG described that the Recorder also argued that if the Position was approved, it would allow a Director – who had been conducting the outreach events – to focus on property fraud investigations. *Id.* at 3. The Position was ultimately approved by agreement with the Plaintiffs and the Position was filled in October 2016.

The OIIG concluded the Special Assistant "has not been performing the essential job duties that are specified in the Special Assistant's job description and offered to the Court in support of the creation of the [ ] exempt position." *Id.* at 6. The OIIG concluded that the Special Assistant had been employed for eight months yet had not: presented at any community outreach events, offered any policy proposals, or implemented any new programs. *Id.* Rather, the Special Assistant had been scheduling and setting up outreach events while the Director – who the Recorder had said would refocus on property fraud investigations – continued to present at outreach events. *Id.* The OIIG concluded that

10

"[t]he transfer of duties to be performed by an exempt employee to non-exempt personnel is a form of unlawful political discrimination and represents a violation of the Recorder's SRO." *Id.* The OIIG recommended that the Recorder: (1) "reassess the exempt status of the Special Assistant position and seek its removal from the Exempt List" and/or (2) "fully implement the role of the Special Assistant" including reassigning the outreach responsibilities to the Special Assistant on a permanent basis. *Id.*

On September 8, 2017, Recorder's Counsel issued the Recorder's Response and wrote that the OIIG's UPD finding was erroneous because there was no "consideration (or mention) of political factors in play here" and that the Recorder believes the OIIG has a "pattern of finding the Recorder's Office in violation of the SRO, when there is not a legal or factual basis to support such claims." The Recorder explained why she believed the Special Assistant Position was appropriately Exempt because the job description contains "several significant duties that are of a policymaking nature." The Recorder explained that while she believed there was no SRO violation, she was concerned with the OIIG's findings concerning the Special Assistant's failure to perform many of her job duties. She stated that her Chief Deputy met with the Special Assistant the day after the OIIG issued his report to discuss her job description and "informed the Special Assistant that she had thirty (30) days to demonstrate job performance that did meet expectations." When her performance did not improve, the Recorder terminated her employment. Finally, the Recorder stated her intent to retain this Exempt Position and fill it soon.

The RCA is troubled by the OIIG's findings. In proceedings with this Court concerning this Position, the Recorder clearly outlined her vision and explained how the Position would alleviate the outreach-related duties of the Director of Public Information.

11

The Recorder stated that the new Special Assistant "would be 100% dedicated to outreach work and would serve as the face of the Recorder's Office in the community," (IIG17-0080 at 2-3), would "develop[ ] and execut[e] a strategic plan to implement, and participate in, community outreach programs. . . . [and] creat[e] opportunities to further the policy goals of the Recorder." Recorder Reply Brief (Dkt. 4519) at 7-8. Despite these assurances, in the Recorder's Response to the OIIG Report, she seemed to acknowledge that the Special Assistant did not fulfill the key duties of her Position. Recorder's Report at 6-7. Although Exempt Employees may be hired and fired based on Political Reasons or Factors, they still are required to perform the duties of the Positions into which they are hired

Given that the Recorder spent several months petitioning this Court and Plaintiffs on her need for this "vital" Position (Dkt. 4519 at 15), it is difficult to understand how the Special Assistant was employed for eight months without the Recorder or her senior staff members noticing that she was not performing these vital job functions. In her Response to the OIIG, the Recorder states that she "had some issues with the Special Assistant's job performance" even prior to the OIIG's Report. It was not until after the issuance of that Report, however, that the Recorder acted on any such concerns and terminated the Special Assistant's employment. The RCA encourages the Recorder and her senior staff to raise and act upon such concerns promptly in the future. Taking such action before the OIIG, DOC or RCA issue findings and recommendations will help establish the Office's ability to identify and remedy instances of non-compliance with the Plan on its own. .

> 2. Recorder's Report in response to OIIG Summary Report IIG15-0342 finding UPD for Non-Exempt hiring process

In her Fifteenth Report, the RCA discussed at length the OIIG's Summary Report

issued March 2, 2017 wherein the OIIG concluded that "political reasons or factors affected" the Recorder's October 2015 hire of a Candidate into a Non-Exempt Position. *See* Fifteenth Report at 13-15. The OIIG concluded that the Non-Exempt employee, who is the nephew of a Congressman, spent months volunteering at the headquarters of the Proviso Township Democratic Organization (PTDO) in an effort, the employee admitted to the OIIG, to secure employment at the Recorder's Office. *Id.* at 13-15. The OIIG found that during this time, an Exempt employee from the Recorder's Office – with the support of the Recorder herself – announced Recorder employment opportunities to PTDO volunteers that established "an association or nexus between the Recorder of Deeds' political organization and ROD employment." *Id.* at 14. The OIIG described frustrated attempts to develop evidence of a pattern of hiring Non-Exempt employees who had "a prior political or personal relationship to the Recorder of Deeds" due to the PTDO and the Recorder not responding to information requested by the OIIG. *Id.*

The OIIG ultimately made three findings with corresponding recommendations:

(1) Because the OIIG concluded that "political reasons or factors affected the hiring" of the Non-Exempt employee, the OIIG recommended that the Recorder of Deeds "suspend all external recruitment efforts as contemplated by Sections V.A.1-3 of the Employment Plan until such time when the ROD establishes a policy formulating a politically-neutral approach to recruitment activities." *Id.* at 14-15.

(2) The Recorder herself violated SRO Section V.A.6 by not cooperating with the OIIG during the investigation and that "taken as a whole, the Recorder of Deeds has demonstrated a near complete disregard to her obligations to cooperate in this case." The OIIG recommended that the Recorder comply with the OIIG's numerous requests for records and present herself for an interview within 21 days. *Id.* at 15.

(3) Exempt Employee C violated Section V.A.2 of the Plan by announcing Recorder employment opportunities to PTDO volunteers without having been properly trained. The OIIG recommended that all Recorder employees "obtain the necessary training before engaging in future recruitment activities"

that are subject to the Plan. *Id.* at 15.

On May 1, 2017, Recorder's Counsel issued a Recorder's Report wherein the Recorder rejected the above findings of the OIIG arguing that the findings did not "have a basis in law or fact" and that the OIIG failed to establish a "factual basis for a finding of political discrimination." Recorder's Report re IIG15-0342 at 20. Recorder's Counsel argued that the ROD followed the steps in the General Hiring Process in the Plan for this hire – all of which were monitored by the DOC and RCA – and "neither the DOC nor the RCA raised any concerns indicating that the General Hiring Process was not being implemented correctly." *Id.* at 4. Recorder's Counsel further argued that, contrary to the OIIG's findings, the Recorder cooperated with the investigation and the PTDO's refusal to provide the OIIG with requested documents was both proper (as, Recorder's Counsel argued in part, the PTDO is not subject to the OIIG's jurisdiction) and the Recorder "does not have the authority to respond to subpoenas on behalf of PTDO or otherwise provide membership information of PTDO." *Id.* at 14. On the issue of the recruiting violation, Recorder's Counsel argued that when Exempt Employee C was encouraging volunteers at the PTDO to apply for Recorder Positions, he was "doing so as an officer of PTDO, not as an employee of the Recorder's Office" and thus could not have been violating the Recorder's Plan since PTDO officers are not subject to the Plan. *Id.* at 18-19. Recorder's Counsel also argued that Exempt Employee C's actions were not "recruitment"; he "simply provided publicly available information regarding job postings and directed individuals to the Recorder's website if individuals wished to apply or if they knew anyone that would like to apply." *Id.* at 19.

The RCA finds is very concerning that the Recorder is taking position that it is

14

not a violation of the Consent Decree or SRO for members of the highest ranks of her administration to suggest that volunteering at political offices or events is a way to learn about vacancies at the Recorder's Office. The natural consequence of this approach is for those individuals to believe that the best way for them to obtain employment is to volunteer at political offices – a belief which strikes at the very heart of the *Shakman* case. While the RCA agrees that Applicants cannot be discriminated against for being politically active, members of the elected officials' control group should not give the appearance – either directly or indirectly – that being politically active will enhance an Applicant's potential for employment in a *Shakman* covered Position.

       3.   <u>Recorder's Report in response to DOC Incident Report 16-011 (Courtesy Policy violation by Exempt employee)</u>

The RCA's Fifteenth Report described the former DOC's Incident Report wherein he concluded the Deputy Recorder of Finance violated the Office's Courtesy Policy by making "inappropriate and demeaning" statements to her subordinates and that her disciplinary actions against two subordinates for allegedly mocking her were unfounded. Fifteenth Report at 21. The DOC wrote that when he asked the Deputy Recorder direct questions about what she said to her employees, on five separate occasions she responded, "I do not recall." Further, when he asked her why she subsequently wrote up two employees for the Major Cause Infractions, she said she "did not wish to answer unless she had legal counsel." In pertinent part, the DOC recommended that: (1) "an appropriate level of discipline be applied [to the Deputy Recorder] to correct this conduct"; (2) the ROD rescind the Incident Reports against the Non-Exempt employees "and make the employees whole." *Id.*

On June 2, 2017, the Recorder issued her Recorder's Report in response to the

15

former DOC's findings. In lieu of accepting the DOC's recommendation of discipline for the Deputy Recorder, the Recorder stated that she counseled the Deputy Recorder and directed her to "participate[e] in a course designed to improve communication skills in an employment setting." The Recorder reported that "[t]he Deputy Recorder found this course to be enlightening and believes that this course will assist her in better communicating with, and responding to, her staff and other employees of CCRD." The Recorder also agreed to rescind the discipline issued to the two subordinate employees and grant them back pay for the one-day suspensions already served. The RCA appreciates the Recorder's actions in response to this report and encourages her to remind her senior staff of the need to cooperate fully with the DOC (as well as the RCA and OIIG).

4. <u>Other Ongoing Noncompliance with Plan and Manual</u>

The Recorder's Office continues to work toward compliance with other sections of the Plan and Manual some of which are included below.

a. *Plan and Manual Training Requirements*

The Recorder's Office last conducted Plan and Manual training in February 2015; however, both are required annually (Plan §§ IV.D-F). The RCA hopes the Plan and Manual are updated soon so employees can receive this valuable training.

b. *Compensatory Time Tracking*

The Manual permits the Recorder to award Compensatory Time to employees in certain circumstances and charges HRD with responsibility for maintaining records related to such Compensatory Time grants and usage. Manual at 6-8. The RCA has been attempting to get accurate Compensatory Time records from the ROD since March 2013.

Thirteenth Report at 11-12. While the Recorder provided the RCA some records on November 30, 2016, the records had multiple inconsistencies with prior reports and did not capture employees who the RCA knows accrued Compensatory Time. The RCA provided additional questions on December 9, 2016 and Recorder's Counsel provided a response to the same on April 21, 2017. Since then, the RCA and Recorder Counsel discussed the response and the RCA provided follow-up questions on June 5th. Recorder's Counsel has not yet responded. While some issues noted in this report are progressing (e.g. job description updates and Plan amendments), this issue is taking an inordinate amount of time to resolve.

      **C.**    **Prong 3:** *Is there a policy, custom or practice of making employment decisions based on political factors except for Exempt Positions?*

The third prong of Substantial Compliance concerns whether the Recorder has a policy, custom or practice of making Non-Exempt employment decisions based on political reasons or factors. The OIIG's finding that the Recorder's recent Exempt hire has not been performing the duties of her Position and instead a Non-Exempt employee has been doing so, is another in a long line of findings that the Recorder has a custom or practice of making employment decisions based on impermissible political factors. Without sustained hiring and non-hiring Employment Actions that are apolitical and free from appearances of impropriety, the Recorder will continue to fall short with this prong of Substantial Compliance.

The RCA's ability to effectively monitor Recorder employment decisions is predicated in part on the Recorder's willingness to provide the RCA with requested documents concerning Employment Actions. The RCA is encouraged by the new Chief and Director of HRD's efforts (in conjunction with the new DOC) to provide more timely

17

responses to these requests. The RCA has begun providing HRD and the DOC with tracking spreadsheets noting the outstanding requests. The RCA recognizes current HRD leadership's concerted efforts to more expeditiously respond to the outstanding requests.

> D. **Prong 4:** *Is there an absence of material noncompliance which frustrates the Recorder's Consent Decrees and the SRO's essential purpose?*

The fourth prong of Substantial Compliance concerns whether the Recorder has materially not complied with the SRO. The RCA believes that there is not yet an absence of material noncompliance with the ROD's Consent Decree and SRO's essential purposes. Since the Fifteenth Report, the OIIG issued a report wherein it found UPD due to a Non-Exempt employee conducting the essential job duties of an Exempt employee. *See above* at 9-12. Additionally, the OIIG has received two new Post-SRO Complaints since the RCA's Fifteenth Report and has informed the RCA that it has six additional active investigations into alleged UPD – all of which have been filed since December 1, 2016.

> E. **Prong 5:** *Has the Recorder implemented procedures that will effect long-term prevention of the use of impermissible political considerations?*

The last component of Substantial Compliance requires the Recorder to have implemented procedures to ensure that the principles that form the basis of the *Shakman* litigation will carry on long into the future. The RCA looks forward to working with the new Chief and Director of HRD and DOC on finalizing a revised Plan updating the Manual, training on the same, and implementing them consistently.

### III. Conclusion

The RCA will continue to work closely with the Recorder's Office on resolving the issues noted above and will continue to be a resource for the Office in its efforts to reach Substantial Compliance.

                                              Respectfully Submitted,

                                              Cardelle B. Spangler
                                              Recorder Compliance Administrator

                                              By: /s/ Matthew D. Pryor
                                              Matthew D. Pryor
                                              Her Attorney

                                              Matthew D Pryor
                                              (mpryor@shakmancompliance.com)
                                              Counsel to the RCA
                                              69 West Washington, Suite 840
                                              Chicago, IL 60602
                                              Telephone: (312) 603-8911
                                              Fax: (312) 603-9505