# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL L. SHAKMAN, *et al.*         )
                                        )
         Plaintiffs,           )
                                        )    No. 69 C 2145
         v.                )
                                        )    Magistrate Judge Schenkier
DEMOCRATIC ORGANIZATION OF COOK  )
COUNTY, *et al.,*                )
                                        )
         Defendants.        )
                                        )

## PLAINTIFFS' MOTION FOR CLARIFICATION REGARDING, OR, IN THE ALTERNATIVE, TO EXPAND THE SCOPE OF THE SPECIAL MASTER'S RESPONSIBILITIES

The Governor[1] has stated that he intends to move to terminate the 1972 Decree. Plaintiffs hope to reach a point where they can support the Governor's motion to terminate. But a motion to terminate must be supported by facts, not assertions or promises. Such facts can only come from three sources: those the Governor chooses to proffer; those the Special Master provides based on her own investigation; and/or those Plaintiffs develop through extensive discovery. Of the latter two sources, Plaintiffs believe the Special Master route is more thorough, less expensive, and more likely to provide a reliable record on which the Court can make an informed decision regarding termination of the 1972 Decree.

The Governor appears not to agree. He has stated, through counsel, that he believes that the Special Master has completed her responsibilities as set forth in this Court's supplemental relief orders and that he has "difficulty understanding the basis for requests [from the Special Master] for additional Statewide information." (Ex. 1, Gov.'s Ltr. to N. Brennan, Mar. 3, 2020.) Plaintiffs

---

[1] This Motion uses "Governor," the "Governor's Office," and the "State" interchangeably and to mean the Office of the Governor of Illinois and the entities and agencies under the Governor's jurisdiction.

interpret this Court's prior orders to provide the Special Master with a broader scope of authority over all agencies under the jurisdiction of the Governor. Clarity regarding the Special Master's authority is critical. Plaintiffs accordingly move the Court to clarify or expand the authority of the Special Master to include monitoring the compliance of all agencies under the jurisdiction of the Governor with all the injunctive provisions of the Court's 1972 Decree and supplemental relief orders and *Rutan vs. Republican Party of Illinois*, 497 U.S. 62 (1990).

This Motion is brought pursuant to the Court's retained jurisdiction under the 1972 Decree and based upon events occurring subsequent to that Order, including the order appointing the Special Master that states that it "may be amended at any time after notice to the parties and an opportunity to be heard." (Dkt. 4020, Nov. 18, 2014 Order ¶ 13.)[2]

 In support of this motion, Plaintiffs respectfully state as follows:

**A.     A Review of State Employment Practices by the Special Master Is Needed to Determine If Termination of the 1972 Decree Is Warranted.**

1.     In 1972, the Court entered an order ("1972 Decree") enjoining the Governor and other government agencies and their successors in office under his jurisdiction from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor. . . . [and] knowingly, inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act." (Ex. 2, 1972 Decree ¶¶ E(1, 3).)

---

[2] Plaintiffs have discussed this Motion with the Special Master before filing it. The Special Master has stated that she has no objection to the clarification or expansion of her authority as requested in this Motion. Plaintiffs shared this Motion with counsel for the Governor, who stated that the Governor objects to the Motion.

2.      In addition to the Court's inherent right to enforce its order, under the terms of the 1972 Decree, the Court retained jurisdiction to determine: (i) which employment positions are exempt from the rules prohibiting consideration of political factors in setting conditions of employment, (*id.* ¶ H(1)(a)), and (ii) whether political sponsorship or other political consideration can be taken into account in hiring employees (*id.* ¶ H(1)(b)).  The Court also retained jurisdiction to determine "[w]hat remedies and implementing procedures ought to be granted and established by the court in connection with the resolution of" the issues over which the Court retained jurisdiction.  (*id.* ¶ H(1)(c).)  Additionally, the Court retained jurisdiction under the 1972 Decree:

> To enable the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the enforcement of compliance with the provisions contained herein, and for the punishment of violations of such provisions.

(*id.* ¶ H(2).)

3.      The United States Supreme Court decision in *Rutan vs. Republican Party of Illinois*, 497 U.S. 62 (1990), also held that except with respect to a very limited number of exempt positions, political sponsorship or other political consideration cannot be taken into account in promoting, transferring, or hiring public employees.

4.      In 2014, as a result of revelations regarding violations of the 1972 Decree related to the Illinois Department of Transportation ("IDOT") discussed below, the Court appointed the Special Master (the "2014 Order").  (Dkt. 3989, Oct. 24, 2014 Order Appointing Special Master; Dkt. 4020, Nov. 18, 2014 Order.)  The Court expanded the Special Master's authority in 2017 to include all *Rutan*-exempt positions under the jurisdiction of the Governor (the "2017 Order"). (Dkt. 4798, Nov. 28, 2016 Order; Dkt. 5004, May 1, 2017 Agreed Order.)

5.     The Governor has stated that he believes the State has "achieved the objectives" of the 2014 and 2017 Orders and intends to file a motion to terminate or modify the 1972 Decree under Rule 60(b) of the Federal Rules of Civil Procedure ("Rule") and the 2014 and 2017 Orders. (*E.g.*, Ex. 3, Gov.'s Ltr. to Magistrate J. Schenkier, Jan. 22, 2020, at 2.; Dkt. 6714, Gov.'s Mot. To Reset Briefing Schedule.)

6.     While the parties have not reached consensus on the precise standard for determining whether the Governor has met the requirements of Rule 60(b) for termination of the 1972 Decree, they agree that the Governor bears the burden of establishing the changed circumstances warranting relief under Rule 60(b) and that "critical questions" include whether (1) "the objective of the [original order] has been achieved" and (2) "a durable remedy has been implemented[.]" (Ex. 3, Gov.'s Ltr. to Magistrate J. Schenkier, Jan. 22, 2020, at 2 (quoting Fed. R. Civ. P. 60(b)(5) and *Horne v. Flores*, 557 U.S. 433 (2009).)[3]  The answers to these questions

---

[3]  Given the parties agreement on the fact-intensive "critical questions" to the inquiry, the Court need not resolve the standards question in order to grant the relief requested in this Motion. However, Plaintiffs proffer, for the Court's consideration, their proposed standard modeled after the standards in *Board of Education v. Dowell*, 498 U.S. 237, 249-50 (1991), that are similar to standards used in other supplemental relief orders for other defendants that have led to their termination from the *Shakman* litigation:

a.     the Governor's Office has implemented a new Employment Plan, including procedures to ensure compliance with the new Plan and identify instances of non-compliance;

b.     the Governor's Office has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence;

c.     the Governor's Office does not have a policy, custom, or practice of making employment decisions based on political factors except for positions that are exempt under *Branti v. Finkel*;

d.     the absence of material noncompliance which frustrates the consent judgment's essential purpose.  The Court may consider the number of complaints of unlawful political discrimination that the Inspector General has found to be valid.  However, technical violations or isolated incidents of noncompliance shall not be a basis for finding that the Governor's Office is not in substantial compliance; and

are fact-intensive, and determining whether the State has met the standards under Rule 60(b) requires "up-to-date factual findings." *Horne* 557 U.S. at 469.

7.      Given the Special Master's expertise and experience, of which the Court is well-aware, she is able "to provide the most effective and efficient means" of providing the factual information to assist the Court in determining whether the State has met the standards under Rule 60(b) for terminating the 1972 Decree and subsequent orders. (*See* Dkt. 4798, Nov. 28, 2016 Order at 4 (expanding the Special Master's authority to oversee review of Exempt employment positions Statewide because of the Special Master's ability "to provide the most effective and efficient means to oversee this review").)

8.      The Governor appears to agree that the Special Master can offer important guidance to the parties and the Court regarding his forthcoming motion to modify or terminate the 1972 Decree, but believes her report should only "detail[] what she was tasked with doing under the 2014 and 2017 orders, what has been accomplished, and what remains to be done." (Dkt. 6714, Gov.'s Mot. To Reset Briefing Schedule ¶¶ 4-5.) However, the 1972 Decree that the Governor soon seeks to sunset is not limited to IDOT or Exempt positions. It applies to the Governor and all of the agencies under his jurisdiction. If the Special Master were limited to investigating and reporting merely about IDOT and Exempt positions, a factual vacuum would exist regarding the remainder of State government apart from what the Governor would choose to proffer as evidence in support of termination. Case law requiring the Court to make extensive and up-to-date factual findings, *e.g., Horne*, 557 U.S. at 450, and fundamental fairness dictate that Plaintiffs have a right

---

e.      the Governor's Office has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment decisions.

to discover and proffer evidence in response to such a motion. Investigation and reporting by the Special Master co-extensive with the scope of the 1972 Decree is far superior to discovery in generating such evidence, just as it was when the Court approved the termination of the decrees governing the City of Chicago, Cook County, Cook County Sheriff, and Forest Preserve District of Cook County. The Special Master's authority should therefore be clarified or expanded to reflect the scope of the 1972 Decree the Governor intends to move to terminate.

**B.      Prior Practice Shows the Efficacy of the Requested Relief
and the Ineffectiveness of Self-Policing.**

9.      The history of non-compliance by defendants in this case shows that the best way to determine if the employment practices of a government entity have been sufficiently reformed so as to warrant termination of the Decree is by having the Special Master conduct an investigation to review the relevant practices and remedies to determine if the violations that led to the original decree and to the appointment of the Special Master in the past have been corrected. This tried-and-true approach has been repeatedly applied in this case successfully, leading to agreed terminations of federal oversight of other governmental entities that had serious patronage violations.

10.      Special masters or compliance monitors undertook this role and accomplished termination for Cook County, the City of Chicago, the Sheriff of Cook County and the Forest Preserve District. In each instance, the special master or compliance administrator ultimately recommended the termination of the 1972 Decree and other applicable decrees as to that defendant. In each case Plaintiffs agreed with the monitor's recommendations because they had confidence in the review of the special master and the factual basis for the recommendations. (Dkt. 1984, Dec. 2, 2010 Agreed Order Substantial Compliance Sheriff of Cook Cnty.; Dkt. 3256, Feb. 4, 2013 Agreed Order Substantial Compliance Forest Preserve Dist.; Dkt. 3861, June 16, 2014 Order

Substantial Compliance City of Chicago; Dkt. 6078, Oct. 31, 2018 Agreed Order Substantial Compliance Cook Cnty.)

11.    The detailed involvement of special masters to monitor and evaluate the employment practices arose in 2005 because defendants could not be trusted to operate on the honor system when it came to compliance.

12.    In 2005 Plaintiffs learned that self-policing did not work as to the City as a result of indictments brought by the United States Attorney's office in Chicago.  *See United States vs. Sorich*, 523 F.3d. 702, 704-05 (7th Cir. 2008) (affirming criminal convictions of individuals who managed the City of Chicago's continuing illegal patronage operations).  As the Seventh Circuit stated:  "Despite the existence of a federal consent decree [in the *Shakman* case] and other measures that for decades have sought to bring more transparency and legitimacy to the City of Chicago's civil service hiring, patronage appointments have continued to flourish. These defendants were key players in a corrupt and far-reaching scheme, . . ."  *Id.* at 704-05.

13.    The revelations of continued violations of the 1972 Decree, other related decrees, and *Rutan* led Plaintiffs to move for more robust enforcement of their mandates and the appointments of special masters and compliance monitors.  The Court agreed and provided for a method to monitor and enforce existing decrees, while at the same time, to assist each defendant in coming into compliance with the decrees, thereby earning the right to be dismissed from the *Shakman* litigation.  The monitors and compliance administrators (other names for special masters) have observed first-hand the defendants' employment actions and reported to the Court.  They also have assisted the defendants in developing non-political employment plans and procedures.

14.    The goal of the involvement of special masters is to end the *Shakman* litigation.  As other defendants have come into substantial compliance with the requirements for non-political

hiring, promotion, and other employment actions under the terms of their respective supplemental relief orders, they have been dismissed from the *Shakman* litigation, with the Plaintiffs' support. As discussed above, the monitors for Cook County, the City, the Sheriff, and the Forest Preserve all recommended termination of the Decree as to those defendants. This is the model Plaintiffs hope to see applied to the Governor. But it requires the Special Master to have the authority to review the relevant practices and remedies Statewide to see if the violations that led to the 1972 Decree and her appointment in 2014 have been corrected.

**C.   The State Has a History of Serious Patronage Violations.**

15.   Because the State was self-policing its compliance with the 1972 Decree, political manipulation of employment practices continued to flourish for decades under various administrations.

16.   In 2004, the Office of the Executive Inspector General ("Inspector General") issued a report regarding "multiple complaints alleging hiring improprieties" at the Illinois Department of Employment Security ("IDES"). (Dkt. 4988, Special Master's Fifth Rpt. at 2 (citing Rpt. at 1).) The Inspector General found that "the HR Department of IDES, in conjunction with individuals in the Governor's Office of Intergovernmental Affairs ('GOIA'), manipulated titles, credentials, positions, position location, or other criteria to fit candidates sponsored by GOIA into positions at IDES without following State law or normal State hiring protocol." (*Id.*) Former IDES HR Director Walker testified that Director Cini from GOIA told him that: (1) "GOIA needed to place people in positions for which they have no experience, and they 'can be dealt with later'"; and (2) "the Governor's Office determines the hiring process, not the agency, (in this case, IDES)." (*Id.* at 2-3 (citing Rpt. at 9).)

17.     The Inspector General's report noted that (a) the Governor's Office sent an unqualified candidate who was hired as a *Rutan*-exempt employee because of her connections; (b) qualified candidates who did not come through GOIA were denied employment; (c) the politically connected candidates hired did not perform the duties described in their written position descriptions; (d) candidates were placed into *Rutan*-exempt positions temporarily with the intention that they would later be hired into permanent positions; and (e) employees who did not cooperate in the scheme faced retaliation.  (*Id.* at 3 (citing Rpt. at 2, 4, 7-9, 17-18, 20).)

18.     Another Inspector General report in September 2004 found political manipulation of employment practices at the Department of Corrections ("DOC").  (Dkt. 4988, Special Master's Fifth Rpt. at 3.)  Specifically, two employees were hired illegally into DOC positions that were mandated to be filled by veterans through a *Rutan*-covered process.  The two employees were a former State Representative, who had recently been fired by the City of Chicago for poor performance, and the brother of a State Representative, who was hired as an "intern" to bypass the *Rutan* hiring requirements.  (*Id.*)

19.     In 2009, the special task force on reforming Illinois government known as the "Illinois Reform Commission" or "Collins Commission" issued a report that confirmed the pervasive nature of patronage abuses in Illinois government.  The Collins Commission report stated, in part:

> Altering Illinois' culture of patronage and cronyism requires multi-faceted reform. In addressing this broad challenge, the Commission heard testimony and reviewed research regarding *widespread abuse of patronage hiring, manipulation of the personnel system, and weaknesses in the State's ethics training. To combat the culture of corruption and its crushing effects on employee morale, structural and ethical reforms are required.*  Accordingly, the Commission recommends:
>
> 1) combating patronage by *reforming the personnel system to better protect non-political positions and the employees who hold them, revising the hiring process, and potentially reducing the number of political positions not subject to the protections of the personnel system,*

* * * * *

4)  more clearly defining whistleblower protections to ensure and expand coverage for state employees, and

5) creating additional safeguards to protect against ethical violations by those exiting state employment.

(Ex. 4, Collins Report at 73-74 (emphasis added).)

20.    Violations of this Court's 1972 Decree and other applicable legal rules were also confirmed by a series of articles in the Chicago *Sun-Times* appearing in October 2009.  Those articles, and the documents upon which they are based, disclosed the existence of several hundred "clout lists" maintained by the Governor's office under the Blagojevich administration, involving thousands of State jobs.

21.    A *Sun-Times* article dated October 16, 2009 (Ex. 5 hereto[4]) stated:

Behind the scenes, . . . Blagojevich aides flouted the supposed [hiring] freeze, forging a patronage machine that . . . eventually would provide state jobs or promotions to nearly 2,500 people with enough clout to have political sponsors, a secret trove of Blagojevich hiring records obtained by the Chicago Sun-Times shows.

Among those who sponsored candidates to the Blagojevich administration for jobs and promotions between 2003 and 2005 were members of Chicago's City Council and members of Congress.  Lobbyists and Blagojevich's own top fund-raisers asked for and got people state jobs, too.

* * * * *

In all, the Blagojevich hiring database lists 386 political sponsors and 5,700 candidates for jobs or promotions controlled by Blagojevich's administration. Beyond the nearly 2,500 people who got hired or promoted, dozens more were appointed by the governor to paid and unpaid state board positions.

22.    On December 22, 2009, Plaintiffs filed a Motion for Entry of Supplemental Relief with Respect to the Governor of Illinois ("2009 Motion") (Dkt. 1460, Pls.' Mot. Suppl. Relief),

---

[4] This article and related articles in the Chicago *Sun-Times*' "Inside Blago's Jobs Machine: A special report" series can be found at https://www.dave-mckinney.com/inside-blagos-jobs-machine-a-special-report.html.

based upon certain patronage-based hiring practices of Governor Blagojevich. In February 2010, the Governor (by then, Patrick Quinn) filed a Response seeking dismissal of the 2009 Motion (Dkt. 1551, Gov.'s Resp.), after which the parties engaged in several months of unsuccessful negotiations in an attempt to fashion an agreed order resolving the 2009 Motion.

23. In 2013, additional violations of the 1972 Decree and *Rutan* by the State were brought to light by an investigation and report by the Better Government Association ("BGA") and Freedom of Information Act ("FOIA") requests by Plaintiffs. Based upon the BGA report, the FOIA responses, and other information, it appeared that the Governor's office and personnel of the Illinois Department of Transportation ("IDOT") under the direction of the Governor were involved in systematic evasion and violation of both *Rutan* and the 1972 Decree in connection with hiring and later reassigning within IDOT numerous individuals, perhaps over 200, based on political considerations. (*E.g.*, Ex. 6, Aug. 14, 2014 BGA article.) These practices were occurring in or about 2003 under Governor Blagojevich and continued under Governor Quinn.

24. On April 22, 2014, Plaintiffs filed an Amended Motion for Entry of Supplemental Relief with Respect to the Governor of Illinois ("2014 Motion"), seeking supplemental relief including the appointment of a special master to work with IDOT and the Governor's Office. Plaintiffs also sought to take discovery. (Dkt. 3744, Pls.' Am. Mot. Suppl. Relief.) During the briefing of the 2014 Motion, press reports of illegal practices continued, including an interview with IDOT's then-Secretary Ann Schneider in which she admitted significant violations.[5] In August 2014, the Inspector General released a report from a three-plus year investigation that also established that violations of the 1972 Decree had continued.

---

[5] Patrick McCraney, *IDOT Secretary Talks About BGA's Clout Hiring Investigation*, Better Government Association, April 29, 2014, www.bettergov.org/blogs/investigators_notebook/idot_secretary_talks_about_bgas_clout_hiring_investigation/.

25.     On October 22, 2014, the Court granted Plaintiffs' request for appointment of a Special Master, and appointed Noelle C. Brennan of Noelle Brennan & Associates, Ltd., as Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure and the Court's equitable power to enforce its judgments.  (Dkt. 3989, Oct. 24, 2014 Order Appointing Special Master.)  The Court provided the details of the appointment of Ms. Brennan as Special Master in an order on November 18, 2014.  (Dkt. 4020, Nov. 18, 2014 Order.)  (The Court's oral ruling on October 22, 2014, its related minute entry, and the order dated November 18, 2014, are referred to collectively as the "2014 Order.")  The 2014 Order required the Special Master to, *inter alia*, investigate the scope and reason for any violations of the 1972 Decree regarding IDOT and recommend and assess the implementation of measures to prevent and remedy violations.  (Dkt. 4020, Nov. 18, 2014 Order ¶ 3.)  The 2014 Order states that it "may be amended at any time after notice to the parties and an opportunity to be heard."  (*Id*. ¶ 13.)

26.     In appointing the Special Master, the Court reasoned:

I again conclude that compliance with the decree is best served by having a transparent process in which an agent of the Court is involved in further investigating the scope and reason for what occurred, recommending the measures that may be necessary to prevent any recurrence and then in assessing the implementation of those efforts to ensure that they are effective.

\* \* \* \* \*

In our system, judges are not the people who uncover and assemble the evidence. We consider the evidence that is presented to us.  And that assembly and presentation of evidence is generally done by attorneys as part of an adversarial litigation process.  I don't consider that to be the best course in a situation like this. My experience is that more progress is made in achieving what we are all interested in, and that is compliance with the decree.  When the process is not an adversarial one, but instead is one that is shepherded through a well-defined mandate that is developed with the input of the parties.

(Ex. 7, Hearing Tr. 16:25-18:17, Oct. 22, 2014.)

12

27.     In opposing the 2014 Motion, the Governor argued that a special master was unnecessary because legislation had recently been passed expanding the Office of the Inspector General and the Inspector General had commenced, and then completed, an investigation into the alleged wrongful practices.  (Dkt. 3809, Gov.'s Resp. to Am. Mot. at 15-17; Dkt. 3945, Gov.'s Sur-Resp. to Am. Mot.)  Plaintiffs expressed concerned that the Inspector General did not fully investigate the role of the Governor's Office in the misuse of the Staff Assistant Position at IDOT (Dkt. 3949, Pls.' Sur-Reply at 5-8), and the Inspector General's Report, published August 22, 2014, stated: "[The Inspector General was] unable to conclude that the Office of the Governor was aware of IDOT's misuse of the Staff Assistant position or who was aware that IDOT was circumventing the *Rutan* hiring process."  (Ex. 8, 2014 OEIG Rpt. at 232.)

28.     After she was appointed, the Special Master discovered evidence of the Governor's Office's involvement that warranted further investigation, (Dkt. 4128, Special Master's Initial Rpt. at 15), and, as discussed below, she ultimately found that certain members of the Governor's Office had been involved in practices to evade the requirements of *Rutan*.

29.     On August 15, 2016, Plaintiffs moved for an order expanding the authority and responsibilities of the Special Master appointed pursuant to the 2014 Order to include not only a review of positions at IDOT which had been designated Exempt, but also the positions labeled as Exempt at all of the agencies, boards, commissions, or other instrumentalities under the jurisdiction of the Office of the Governor (with certain exceptions).  (Dkt. 4676, Pls.' Mot. to Expand Special Master's Responsibilities.)  The Court granted the motion, finding that the State's potential violations of the 1972 Decree were not limited to IDOT:

> The structural and procedural weaknesses that led to the ability to manipulate exempt positions at IDOT are not unique to IDOT; indeed, the Special Master's work has revealed that part of the problem at IDOT resulted from a lack of effective oversight policies at the Department of Central Management Services ("CMS"),

which has authority to approve exempt job designations statewide. A review of the exempt positions at the other agencies will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case.

(Dkt. 4798, Nov. 28, 2016 Order at 3.)

30.     Pointing to the expertise of the Special Master, the Court rejected the Governor's argument that the review of Exempt positions in other agencies by the Special Master was unnecessary because it could be handled by the newly-created Hiring and Employment Monitoring ("HEM") unit of the Inspector General. (Dkt. 4798, Nov. 28, 2016 Order at 3-4.) The Court stated:

We are confident in the ability of the Special Master to provide the most effective and efficient means to oversee this review – and with good reason. Her breadth and depth of experience stem not only from her nearly two years working with IDOT under the Special Master Order, but also from the nine years before that overseeing – and successfully shepherding – the City of Chicago through a far more complex process that resulted in the *Shakman* decree being terminated as to the City.

*****

[The Special Master] has developed detailed knowledge about the way that exempt and non-exempt hiring and job classification has been undertaken in Illinois, as well as on-the-ground understanding of what types of problems may exist with respect to compliance with the 1972 decree across the State.

(Dkt. 4798, Nov. 28, 2016 Order at 4-5.)

31.     On May 1, 2017, the Court entered an agreed order negotiated by the parties regarded the expanded responsibilities of the Special Master. (Dkt. 5004, May 1, 2017 Agreed Order.) (The Court's Nov. 28, 2016 Order (Dkt. 4798) and the May 1, 2017 agreed order (Dkt. 5004) are referred to as the "2017 Order.") The 2017 Order provided the Special Master authority regarding, *inter alia*, the creation and monitoring of an "Exempt List" of all positions under the jurisdiction of the Governor that are exempt from restrictions on hiring or affecting conditions of

employment on the basis of political reasons or factors.  (Dkt. 5004, May 1, 2017 Agreed Order ¶¶ A, C.)

32.     After her appointment, the Special Master investigated violations of the 1972 Decree by the State between 2009 and 2014, focusing on IDOT and the Staff Assistant positions, and issued a report.  (Dkt. 5012, Special Master's Initial Rpt. at 6.)  The investigation concluded that "certain individuals in the Governor's Office and a limited number of Elected Officials or their staff members manipulated the *Rutan*-exempt process to favor politically-connected candidates without regard to actual hiring need or candidates' qualifications to perform the stated duties of the *Rutan*-exempt jobs into which they were hired."  (*Id.* at 88.)

33.     While the Special Master's investigation focused on IDOT and the Staff Assistant positions, she also discovered information relating to other positions and agencies that led her to conclude that the "manipulation was not just limited to IDOT or the Staff Assistant Position."  (*Id.*)

**D.     Recent Evidence Indicates the Objectives of the 1972 Decree Have Not Yet Been Achieved and the State Has Not Yet Implemented a Durable Remedy.**

34.     Recent evidence shows that there is good reason to believe that the State has not yet eliminated past violations and created a durable remedy.

35.     While reviewing and investigating Exempt positions at State agencies under the jurisdiction of the Governor pursuant to the 2017 Order and collaborating in the development of a Statewide Comprehensive Employment Plan ("CEP"), the Special Master has observed "several areas of concern with respect to the State's current and historical employment system[,]" including concerns that "raise systemic issues that implicate potential Shakman violations[.]"  (Dkt. 6710, Special Master's Sixth Rpt. at 5.)

15

36. In her most recent report regarding Statewide Compliance under the 2016 Order (the "Sixth Report"), the Special Master discussed several areas of concern regarding non-Exempt positions with Statewide reach, including:

(1) the use of the concept of "reachability" of candidates hired for positions covered by jurisdiction B of the Personnel Code that excludes the consideration of most individuals who are not currently (or previously) employed by the State (*id.* at 5-8);

(2) the use of promotions through temporary and interim assignments that are unilaterally decided by managers and not subject to the competitive process (*id.* at 8-11); and

(3) the ability for State agencies to cancel hiring sequences and select favored candidates through Personal Service Contracts, (*id.* at 11-15).

37. The Special Master also noted concerns about potentially violative employment actions related to non-Exempt positions at agencies other than IDOT, including Department of Human Services ("DHS") (*id.* at 12-14), the Department of Natural Resources (*id.* at 14-15), the Department of Information and Technology (*id.* 16-18), and the Illinois Environmental Protection Agency (*id.* at 18). The Special Master concluded that she "continues to be concerned about the State's current employment system, which in certain circumstances allows for single candidate interviews and extremely limited candidate pools that often favor existing State employees and exclude external candidates." (*Id.* at 19.)

38. In the Sixth Report, the Special Master also provided an update on the progress of the State's Comprehensive Employment Plan, including the roll-out and implementation of the State's Electronic Hiring Process, which aims to eliminate some of the opportunities for manipulation and inefficiencies identified by the Special Master. (*Id.* at 19-27.) On November 25, 2019, the State filed a proposed CEP with the Court. (Dkt. 6612, CEP.) Some of the components of the CEP have not been agreed to, and many key components have not been rolled

out Statewide.  (Dkt. 6710, Special Master's Sixth Rpt. at 4.)  The Special Master also provided recommendations regarding the CEP aimed at preventing future violations, some of which the State has not adopted.  (*Id.* at 21-27.)

39.     Since the filing of the Sixth Report, the Special Master has learned, and shared with Plaintiffs, that the Inspector General had issued a public report in 2018 finding *Rutan* violations in the use of Personal Services Contracts and seasonal hiring at the Department of Agriculture ("Agriculture") between 2007 and 2015.  (Ex. 9, N. Brennan Ltr. to A. Spillane, Feb. 25, 2020.) Although the Governor's Office and the Special Master have been in frequent communication about Personal Service Contracts and their vulnerability to political bias and motivation, no one from the State provided a copy of report with the founded violations to the Special Master.  (*Id.*) (The report was made public, but the Special Master stated that she should not "be expected to scour the public record for information about violations when [the Special Master and the State] are having live conversations about this specific topic." (*Id.*)  The Governor's Office has stated that the report was released under the prior administration, and the prior administration either provided to the Special Master or inadvertently failed to do so.  (Ex. 1, Gov.'s Ltr. to N. Brennan, Mar. 3, 2020.))

40.     The Inspector General's report found that Agriculture had entered 633 Personal Service Contracts between 2007 and 2015 and could not demonstrate that it adhered to *Rutan* hiring guidance or related administrative orders in the majority of the cases.  (Ex. 9, N. Brennan Ltr. to A. Spillane at 3, Feb. 25, 2020.)  The Inspector General also found *Rutan* violations in the hiring of State Fair workers.  (*Id.*)

41.     According to the Inspector General, the use of Personal Service Contracts was not limited to Agriculture; DHS, a department about which the Special Master has previously raised concerns, entered 803 Personal Service Contracts between 2013 and 2016. (*Id.* at 4.)

42.     Additionally, the Special Master has received, and shared with Plaintiffs, an extensive list of summaries of complaints submitted to the Inspector General related to employment practices and actions at multiple agencies under the jurisdiction of the Governor in 2018 and 2019. The complaints include allegations regarding ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████[6] These complaints may or may not turn out to be meritorious. But they underscore why the Special Master needs to review the practices of agencies in addition to IDOT with regard to compliance with the core provisions of the 1972 Decree that prohibit political discrimination in employment.

---

[6] Because the list of complaints is a document designated "Confidential" and subject to the protective order in this case, Plaintiffs have redacted the information obtained from the list of complaints from the publicly-filed Motion and have not attached the list as an exhibit. However, upon request from the Court, Plaintiffs will file the list under seal.

43.     The Special Master's concerns in her Sixth Report, the Inspector General's report, and the recent complaints to the Inspector General all show that there is good reason to doubt that past violations have been remedied and no assurance that a durable remedy has been put in place in most agencies under the jurisdiction of the Governor.  The Special Master should be allowed to investigate these issues and report her findings to the Court so that it may make an informed decision on the Governor's forthcoming motion with the benefit of the insight of Special Master, who, as the Court has recognized, was the special master for the City and is an expert on developing remedies for patronage and reviewing employment practices.  (*See* Dkt. 4798, Nov. 28, 2016 Order at 4-5.)

**E.      The Special Master Is Already Involved In Statewide Employment Practices.**

44.     Granting the requested relief should not impose significant new burdens on the State because the Special Master has a history of collaborating with the State, CMS, and the OEIG's HEM on the CEP to replace and reform the State's employment practices.  (*E.g.,* Dkt. 6710, Special Master's Sixth Rpt. at 3-4, 19-27.)  The dispute between the State and the Special Master and Plaintiffs regarding the scope of the Special Master's responsibilities and authority is new, first raised only a few months ago.

45.     Prior to the recent disagreement, the Special Master had made many recommendations regarding the State's employment practices aimed at preventing future violations and worked collaboratively with the Governor's Office and State agencies, including HEM and CMS, to operationalize and implement her recommendations.  There has been a recognition that State employment issues do not fall into neat and separate silos.  Addressing one issue necessarily intersects with many related issues.

46.    For example, developing a Statewide Exempt List is an issue expressly within the scope of both the 1972 Decree and the 2017 Order.  But creating such a list required review and analysis of numerous positions, both Exempt and non-Exempt, to determine the positions and job descriptions subject to a new Exempt List.  Assessing whether the Governor is in compliance with the 1972 Decree and has created a durable remedy will require review and analysis, Statewide, of whether the Exempt List has been implemented appropriately and, on the other side of the coin, whether non-Exempt positions are being filled without improper political considerations. Termination of the 1972 Decree cannot properly occur without such review and assessment.

47.    One essential component of making such an assessment is the development and implementation of a Statewide CEP.  The parties recognized, wisely and pragmatically, that IDOT is not a State hiring island unto itself.  Rather, the processes for filling Exempt and non-Exempt positions at IDOT should be integrated with and part of the general Statewide hiring scheme. Likewise, compliance with the 1972 Decree and *Rutan* require a well-structured employment plan statewide designed to minimize the risk of political factors influencing employment decisions for non-Exempt positions. Thus, it is no surprise that since early 2018, CMS, HEM, the Governor's Office, and the Special Master have been collaborating to develop the concrete provisions to include in the CEP, which would apply not solely to IDOT, but Statewide; Plaintiffs have been involved in the negotiations since late 2018.  (Dkt. 6710, Special Master's Sixth Rpt. at 19.)  Put another way, the State fully appreciates the value the Special Master adds to the development of policies and procedures because of her experience and invited and welcomed the Special Master's involvement in creating a Statewide CEP that would help provide a durable remedy not merely for the problems at IDOT, but throughout the State system.

48.     In October 2017, the Acting Director of CMS stated in a memo to all State agencies:

> We have made great progress in removing improper political influence from the personnel practices of agencies and other entities under the Governor's authority ("Agencies"). ***Working together among ourselves and with the court-appointed Special Master in the Shakman case, we will accelerate that progress.*** Our goal is to improve our personnel system to ensure Agencies have the necessary tools and training to hire the most qualified people for available positions while preventing improper political influence and enabling all Illinois residents to compete for permanent state jobs.

(*Id.* at 19 (quoting 10/5/2017 Memo) (emphasis added).)

49.     Plaintiffs agree with the sentiment expressed by that state official: The Special Master is essential in assisting the Governor and the agencies under his jurisdiction to achieve compliance with the 1972 Decree. Experience in this case has shown that monitors provide the information, oversight and accountability that have led to real changes and have provided a basis for a finding of substantial compliance to end federal court oversight in government employment. Based on her nine years as monitor for the now-dissolved decree for the City of Chicago and her five-plus years as Special Master with regard to the State, no one is more experienced or knowledgeable than Ms. Brennan about how to identify *Shakman-Rutan* problems and formulate and evaluate remedies.

50.     Unfortunately, recent statements by the Governor regarding what he has deemed a more limited scope of the Special Master's jurisdiction suggest a retreat from the prior era of Statewide collaboration. The Special Master has also recently noted that "[a]lthough the level of cooperation and communication between the Governor's Office, CMS, the Special Master's office and the individual agencies has been very productive over the years, that communication has been diminished by new restrictions placed on the Special Master's ability to communication freely with agency personnel." (Dkt. 6710, Special Master's Sixth Rpt. at 4.) (The Governor disputes

that he has placed new restrictions on the Special Master's ability to communicate with agency personnel. (Dkt. 6712, Gov.'s Resp. to Special Master's Sixth Rpt.))

51. The Court is well-aware of Plaintiffs' desire to see all of the defendants achieve substantial compliance in this case so that the 1972 Decree can sunset. But termination requires evidence, not hope; demonstrated compliance, not promises. Plaintiffs expect that the Governor's Office, like several other defendants, can and will join with Plaintiffs in a motion to terminate application of the Decree at some point. Expanding the Special Master's authority provides Plaintiffs, the Court, and the public with the information needed to determine with confidence when that day comes.

WHEREFORE, Plaintiffs respectfully request that the Court clarify, or in the alternative, expand, the scope of the Special Monitor's responsibilities to include the power to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental relief orders and *Rutan*, and grant such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Michael L. Shakman
One of Plaintiffs' attorneys

Dated: March 10, 2020

Michael L. Shakman
Edward W. Feldman
Mary Eileen C. Wells
Miller Shakman Levine & Feldman LLP
180 N. LaSalle Street
Chicago, IL 60601
312-263-3700

Brian I. Hays
Locke Lord LLP
111 S. Wacker Drive
Chicago, IL 60606
312-443-1800

<u>CERTIFICATE OF SERVICE</u>

I, Michael L. Shakman, hereby certify that I caused the foregoing to be served on all counsel of record to matter 69-CV-02145 via ECF Filing on March 10, 2020.

<u>*/s/ Michael L. Shakman*</u>