```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
      MICHAEL L. SHAKMAN and         )
 4    PAUL M. LURIE, et al.,         )
                                     )
 5              Plaintiffs,          )
                                     )  No. 69 C 2145
 6         vs.                       )  Chicago, Illinois
                                     )  March 3, 2020
 7    CLERK OF COOK COUNTY, et al.,  )  9:00 a.m.
                                     )
 8              Defendants.          )

 9
                    TRANSCRIPT OF PROCEEDINGS - HEARING
10
                 BEFORE THE HONORABLE SIDNEY I. SCHENKIER
11

12    APPEARANCES:

13    For the Plaintiffs:       LOCKE LORD LLP
                                111 South Wacker Drive
14                              Chicago, Illinois 60606
                                BY:  MR. BRIAN I. HAYS
15                                   MR. ERNESTO R. PALOMO
                                     MS. IRINA DASHEVSKY
16
      For the Defendants:       HINSHAW & CULBERTSON LLP
17                              151 North Franklin St., Suite 2500
                                Chicago, Illinois 60606
18                              BY:  MR. ADAM R. VAUGHT
                                     MS. LARI DIERKS
19

20

21

22

23    Official Court Reporter:  JENNIFER S. COSTALES, CRR, RMR
                                219 S. Dearborn St., Room 2342
24                              Chicago, Illinois 60604
                                (312) 435-5895
25                              jenny.uscra@yahoo.com
```

1    detain her on the stand for this?  We can probably deal with

2    this separately.

3            MR. HAYS:  Certainly, Your Honor.

4            THE COURT:  Why don't we focus on what we need for

09:37:59    5    Ms. Nowak so that she can then go about her business.

6            MR. HAYS:  Okay, Your Honor.

7            THE COURT:  Thank you.

8    BY MR. HAYS:

9    Q.  Thank you for your patience, Ms. Nowak.

09:38:14    10           The next thing that I would like to talk to you about

11   is getting into the rotation policy for the supervisors in the

12   vital records department.

13           When did you first learn about the supervisor

14   rotation program?

09:38:28    15   A.  May 9th of 2019.

16   Q.  And how did you hear about it?

17   A.  We were called down to 69 West Washington to the

18   conference room.

19   Q.  And when you say "we," does that include all of the

09:38:39    20   satellite office supervisors?

21   A.  Yes.

22   Q.  And who else was present?

23   A.  Ken Otis, who was a downtown supervisor, as well as

24   Jameeka Davis, Erica Sanchez, Byron Steele, Tawanna Gill and

09:38:53    25   Scondreka Lee.

1  Q.  And Mr. Torres' wife was the sister of Alderman Munoz,

2  correct?

3          MR. VAUGHT:  Objection, leading, also lack of

4  foundation.

09:55:39  5          THE COURT:  Sustained to the form.  Leading.

6  BY MR. HAYS:

7  Q.  Do you know if Ms. Torres was related to any elected

8  officials?

9  A.  So Ms. Torres, in regard to Morris Torres' wife?

09:56:01  10  Q.  Yes.

11  A.  I don't know that.  But Morris Torres' sister at a point

12  in time was our human resource director.  Her name was Betty

13  Torres Munoz.

14  Q.  My apologies.  I mistook the in-law there.

09:56:18  15          So it was Mr. Torres' sister who was married to the

16  former alderman?

17  A.  That's correct.

18  Q.  And are you aware of any political connections that Angela

19  Wright Madison has?

09:56:30  20  A.  It's my understanding with a conversation I had with

21  Brenski Coleman, who was the --

22          MR. VAUGHT:  Objection on hearsay, Your Honor.

23  BY MR. HAYS:

24  Q.  What is Mr. Coleman's role?

09:56:39  25  A.  He was the Director of Vital Records.

|  | 1 | MR. HAYS: So, again, at the time that was an exempt |
| | 2 | position, Your Honor. That's on the official exempt list |
| | 3 | approved by the Court. |
| | 4 | MR. VAUGHT: Your Honor, when are we talking about? |
| 09:56:52 | 5 | THE COURT: When did you have the conversation with |
| | 6 | Mr. Coleman? |
| | 7 | THE WITNESS: I don't recall when. |
| | 8 | THE COURT: General time frame? |
| | 9 | THE WITNESS: Probably he -- so Mr. Coleman was the |
| 09:57:05 | 10 | Director of Vital Records before Connie Myers took office. So |
| | 11 | does that help? |
| | 12 | MR. HAYS: It would have been some number of years |
| | 13 | ago, Your Honor. |
| | 14 | THE COURT: All right. So you had this conversation |
| 09:57:20 | 15 | you are talking about during a time that Mr. Coleman was the |
| | 16 | Director of Vital Records? |
| | 17 | THE WITNESS: That is correct. |
| | 18 | MR. HAYS: And that position is on the Shakman exempt |
| | 19 | list, Your Honor. |
| 09:57:28 | 20 | THE COURT: So put your question. |
| | 21 | BY MR. HAYS: |
| | 22 | Q. So the question was: How do you know that Ms. Madison had |
| | 23 | political connections? |
| | 24 | A. So Brenski Coleman, who was the Director, stated that he |
| 09:57:42 | 25 | worked with Angela Wright Madison under Cook County President |

1    removed, so that if it was a 30-day timeframe, if the Clerk's

2    Office took 45 days to get back to us with it, they would

3    still be within reason.  So time constraints were removed.

4    Q.  If I could turn your attention now to Exhibit 21.

10:14:08    5        This is a copy of the Office of the Independent

6    Inspector General summary report, number IIG 19-0222, the

7    rotational transfer policy.

8        MR. HAYS:  The copy here, Your Honor, does not have a

9    Bates label on it, but the Bates label that is part of the

10:14:25    10   exhibits that the Clerk's Office has presented to the Court is

11   CCC00141 through 143.  So this document has been admitted into

12   evidence already.

13       THE COURT:  Any objection?

14       MR. VAUGHT:  Yeah, we've produced it.  We also

10:14:38    15   attached it to the response to the motion.

16       THE COURT:  Okay.  So no objection?

17       MR. VAUGHT:  No objection.  Yes, Your Honor.

18   BY MR. HAYS:

19   Q.  So in addition to the grievance, did you also file a

10:14:49    20   complaint with the Inspector General?

21   A.  I did.

22   Q.  And were you interviewed by the investigator?

23   A.  Yes.

24   Q.  Now, did you tell the investigator that the union had

10:15:02    25   filed the grievance?

Nowak - direct by Hays

63

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:24:19 | 5 |

1  of the exhibit so we don't have confusion.

2  BY MR. HAYS:

3  Q.  So Exhibit 94 then.  So this is a screenshot from your

4  cellphone?

5  A.  Yes, it is.

6  Q.  And you said it's a text message exchange between yourself

7  and Ms. Sanchez, correct?

8  A.  Yes, that's correct.

9  Q.  And what is going on in this exchange?

10  A.  So as you can see, I texted Erica Sanchez May 2nd at 5:56

11  a.m. telling her that I had a staff member call off, and that

12  I had just texted Carolyn, who was the Markham supervisor, to

13  see if she could give me help for the day.

14  Q.  So it was a work-related text message, correct?

15  A.  Yes, it was.

16  Q.  And then you received in response to your work-related

17  text message, first Ms. Sanchez responded "Ugh" and then "Let

18  me know how it goes."  And then she sent you this flyer for a

19  fundraising event for Ms. Yarbrough, correct?

20  A.  Yes.

21  Q.  And the event was called The Summer Soltice?

22  A.  Yes.

23  Q.  Had you asked Ms. Sanchez to send you flyers about or

24  announcements about political fundraisers for Ms. Yarbrough?

25  A.  No.

1   Q.  And do you know why Ms. Sanchez would have been sending

2   this to you?

3   A.  I had a conversation with Erica, and I don't recall the

4   date.  She told me that she thought it would be beneficial for

10:25:30   5   myself and Lana Yacilla, who was the Rolling Meadows

6   supervisor, to attend Clerk Yarbrough's events.

7   Q.  And what was your understanding of when she said it would

8   be beneficial for you to attend?

9   A.  I took it that, you know, she wanted Clerk Yarbrough to

10:25:48  10   see that we support her as the supervisors.  Myself and Lana

11   Yacilla were the longest, most-senior supervisors in the

12   suburban offices.

13   Q.  And would that support be as the clerk or would that

14   support be as a candidate for office?

10:26:06  15   A.  I don't know.

16   Q.  And if I could focus your attention now on Exhibit 95.  Is

17   it fair to say this is just a continuation, so it shows the

18   continuing conversation about the individual who had called in

19   sick?

10:26:37  20   A.  Yes.

21   Q.  And are you aware of any other hires while you were at the

22   Clerk's Office who did political campaign work for

23   Ms. Yarbrough?

24   A.  Yes.

10:26:54  25   Q.  And who is that?

A.   Hernan Ramirez.  He was supposed to be the person who came

to Bridgeview.  He trained downtown and then he was supposed

to come to Bridgeview I think four weeks after his training.

He never showed up there.  So I happened to be scrolling on

10:27:12   Facebook and I seen that he was marching in the pride parade

under Karen Yarbrough.

Q.   And is marching in parades, is that something that is part

of the normal duties of a clerk employee?

A.   No.

10:27:27   Q.   It's not something they do on county time?

A.   No.

Q.   And are you aware of any other individuals who were hired

by the office that have political connections?

A.   Yes.

10:27:41   Q.   And who is that?

A.   She's a clerk in Maywood.  Her name is Valirie, I believe

her last name is Bryant.

Q.   Okay.  What are her political connections?

A.   Her mother or aunt --

10:27:49        MR. VAUGHT:  Objection, foundation.  This is going to

be hearsay.

        THE COURT:  Why don't we go with the foundation for

any knowledge.

BY MR. HAYS:

10:27:56   Q.   Okay.  And how are you aware of Ms. Bryant's political

1    time it was filed?

2    A.  No.

3    Q.  Did anyone from the Clerk's Office ever tell you that you

4    should preserve evidence relating to the plaintiffs' motion

10:30:03   5    for supplemental relief?

6    A.  No.

7    Q.  Did anyone from the Clerk's Office ever tell you that the

8    plaintiffs had requested information and documents related to

9    their motion for supplemental relief?

10:30:14   10   A.  No.  But there was a conversation during the interview

11   process.  Scondreka Lee made a comment to myself and

12   Mr. Steele that we have to be accurate in our notes in case

13   the Shakman attorneys request these documents.

14   Q.  And this was during one of the interview sequences that

10:30:37   15   you participated in for the jobs?

16   A.  That's correct.

17   Q.  Did anyone from the Clerk's Office ever ask you to search

18   for and produce any documents relating to the rotation policy

19   or any other issues in the motion for supplemental relief?

10:30:50   20   A.  No.

21   Q.  Did anyone from the Clerk's Office ever ask you to search

22   your personal emails or your personal cellphone to provide any

23   information in response to the issues, that might be relevant

24   to the issues in the motion for supplemental relief?

10:31:03   25   A.  No.

1    receipts that were taken in for the day.

2    Q.   Does the money have to be precise or is there like a 10

3    cent variance that's allowed or anything like that?

4    A.   Well, we are required to balance every day.  And if we are

10:53:00    5    out of balance, we have to go back and give them a reason why

6    we're out of balance.

7    Q.   Do you balance each cash register separately?

8    A.   Yes.

9    Q.   How many cash registers were in the office that you

10:53:11    10    supervised?

11    A.   In Bridgeview there were four.

12    Q.   So were the balancings put in a separate envelope for each

13    cash register or were they all put together?

14    A.   They were done individually.  And then after they were

10:53:23    15    balanced individually and our accounting sheets were filled

16    out, I personally bundled them together and sent them down

17    with our interoffice work.

18    Q.   Okay.  And then where did the money go?

19    A.   Then it was picked up by our carrier.  I don't recall the

10:53:38    20    name of the company that we used.  It was picked up daily.

21    They scan it.  They sign off that they're taking our bag.  And

22    then the next day it's delivered to our downtown location.

23    Q.   Okay.  When it gets to the downtown location, then what

24    happens with the money?

10:53:50    25    A.   To be honest, I don't know what that procedure is just

1    because I've never worked in the cashier cage.

2    Q.  But that's what Mr. Torres supervises?

3    A.  He not only supervises that, but in the mornings he was

4    opening the vital records office.

10:54:08    5    Q.  But in that cage, you don't know how it operates?

6    A.  I do not.

7    Q.  So when you said your jobs were the same, that's not

8    accurate?

9    A.  The function of them balancing, they have, I believe, 20

10:54:23    10    something registers, so I'm sure that they balance just like

11    we do those registers.  I don't know how, what the procedure

12    is once it goes downtown and then how the accounting goes

13    upstairs, I don't know that procedure, no.

14    Q.  You said the accounting goes upstairs.  Where upstairs?

10:54:38    15    A.  I believe to Carolyn Wilhight.

16    Q.  And then do you know where it goes?

17    A.  I do not.

18    Q.  Do you know where the money -- how the money is given to

19    the county?

10:54:47    20    A.  I do not.

21    Q.  Do you know the process or the procedure on that at all?

22    A.  I do not.

23    Q.  Let me ask you about Angela Wright Madison's job at the

24    time as the head of genealogy.  Now, you said in the suburban

10:54:59    25    offices that genealogy is -- genealogy requests were made,

1    with pulling these books since they hold these old records.

2    A.   No.  That's incorrect.

3    Q.   Okay.  How is the checkout process done?

4    A.   There is no checkout process.  The clerk who is assigned

10:56:17    5    to look in the books literally takes the request form, looks

6    where the request is, goes and pulls the book, copies it, puts

7    it back.

8    Q.   How do they know what book to go to?

9    A.   That's their job.  That's what the clerk's position is.

10:56:29    10   They're responsible to know that room.

11   Q.   Do you know how that room operates?

12   A.   It's books.  Yeah, I've been in the room.  I know how -- I

13   worked downtown for 10 years, so yes.

14   Q.   So you know how it works from when you were working

10:56:41    15   downtown?

16   A.   Correct.

17   Q.   Not as a supervisor?

18   A.   I was a supervisor downtown as well.

19   Q.   Okay.  How long were you a supervisor downtown?

10:56:47    20   A.   Again, approximately 6 years.

21   Q.   Okay.  And so you know the microfiche process?

22   A.   I do.

23   Q.   Would the supervisors in the other suburban offices who've

24   never had the opportunity to work downtown either as a clerk

10:57:02    25   or supervisor know the process in that room where the books

Nowak - cross by Vaught

82

|  |  |  |
|--|--|--|
|  | 1 | A.  I am. |
|  | 2 | Q.  And what is your office? |
|  | 3 | A.  I am Alderman of the City of Palos Hills. |
|  | 4 | Q.  Did Ms. Sanchez ever say it would be beneficial to your |
| 11:04:35 | 5 | job in the Clerk's Office? |
|  | 6 | A.  No. |
|  | 7 | Q.  Is it possible she was referring to your position as an |
|  | 8 | alderman? |
|  | 9 | A.  I don't -- |
| 11:04:41 | 10 | MR. HAYS:  Objection, foundation and speculation. |
|  | 11 | THE COURT:  Overruled. |
|  | 12 | BY THE WITNESS: |
|  | 13 | A.  I don't believe so. |
|  | 14 | BY MR. VAUGHT: |
| 11:04:49 | 15 | Q.  But, well, you've never had a discussion one way or the |
|  | 16 | other? |
|  | 17 | A.  When the discussion of the fundraising event came up, my |
|  | 18 | political office was never brought into the conversation. |
|  | 19 | Q.  Was the Clerk's Office part brought into the conversation, |
| 11:05:06 | 20 | other than Karen Yarbrough is the Clerk? |
|  | 21 | A.  Karen Yarbrough is the Clerk, so yes. |
|  | 22 | Q.  But other than that? |
|  | 23 | A.  Well, I can't answer that, because she definitely is the |
|  | 24 | Clerk and it does have to do with her position.  So my answer |
| 11:05:19 | 25 | would be -- |

Nowak - cross by Vaught

83

1   Q.  Well, but why it's beneficial to you?

2   A.  Because I worked for the Clerk.  And I was a long-term

3   supervisor.  Actually I was the longest-serving supervisor, as

4   Lana was the second longest-serving supervisor, so.

11:05:32   5   Q.  I understand that.  But did Ms. Sanchez ever say it would

6   be beneficial to you for your work in the Clerk's Office?

7   A.  No.

8   Q.  What was your reaction when you got this text message?

9   A.  I didn't react.  As you can see through the text message,

11:05:45   10   I never even responded to -- I was clearly talking about

11   getting coverage for my office in Bridgeview, because I had a

12   staff member call off.  And you can see she sent it.  And then

13   my response again, I don't even acknowledge the text.

14   Q.  You ignored it?

11:05:58   15   A.  I did.

16   Q.  Did you attend the event?

17   A.  I did not.

18   Q.  Did you ever donate to the Clerk?

19   A.  I did not.

11:06:04   20   Q.  Did anybody say, anybody from the Clerk's Office say

21   anything to you about donating or attending this event other

22   than Ms. Sanchez?

23   A.  No.

24   Q.  Did Ms. Sanchez ever follow up on this?

11:06:15   25   A.  No.

Nowak - cross by Vaught

86

1    Office of the Inspector General about the rotation program, is

2    that correct?

3    A.   Yes.

4    Q.   Do you remember when that was?

11:08:55    5    A.   I would guess right around the time we found out.  So I

6    would say maybe a week after we were given the rotation

7    policy.

8    Q.   So I kind of want to break down a timeline here.  You were

9    given the policy, was it May 3rd?

11:09:17    10   A.   9th.

11   Q.   May 9th.  Apologies.

12        What was the first complaint you made?  You said you

13   made a grievance, you complained to the union.  Was that the

14   first step you took?

11:09:29    15   A.   Well, I recall again asking if I can ask a question to

16   Erica Sanchez and Byron Steele.  I was told no.  So then I

17   left.  I had to go back to Bridgeview after we were given that

18   rotation folder.  And on my way back to Bridgeview is when I

19   initially called the union on my cellphone, from my cellphone.

11:09:51    20   Q.   So it was the same day you called the union?

21   A.   Yes.

22   Q.   And what did you tell the union?

23   A.   I didn't tell them anything.  I left a message for a

24   return call.

11:09:58    25   Q.   Did you get a return call?

1          We process death records.  And there is a system

2     called VitalChek that the funeral directors can use online.

3     And they'll place the order online.  And then what we will do

4     is we will print the record once we receive the order.  We

11:42:44   5     will then process the order in a point-of-sale system and

6     enter the information into the point-of-sale system.  That is,

7     the point-of-sale system is where you create the application

8     as well.  So it's not only the application, but it's also the

9     receipt of payment.

11:43:00  10          And she was saying that she really wanted us to push

11     the VitalChek system a lot harder with funeral directors.

12     Many funeral directors pushed back, because there are extra

13     fees associated with VitalChek.  I think they pay something

14     perhaps something like $5 per application.  And a lot of them

11:43:19  15     said:  Why should I pay this extra money if I can just come

16     into the office and wait and obtain it?

17          So when she -- and I told her, I said it also takes a

18     lot of time on our end, because we were short-staffed, at

19     least I always felt we always needed more staff.  But in

11:43:36  20     order -- you have to find the record on VitalChek, print the

21     order, order form off of VitalChek.  Then you have to go to a

22     separate application, the Illinois Vital Records System, what

23     we call the IVRS, find the death certificate, print it and

24     then go to the point-of-sale system, enter -- create a

11:44:02  25     receipt, enter the information on the death certificate.

1          We were told many years ago by our accounting staff

2     that whenever you have an application for a death certificate,

3     the name of the decedent must be on the record -- I'm sorry,

4     on the application, the date of the death, the city the death

11:44:20    5     occurred in, and the state file number.

6          So on the order form that we receive from VitalChek,

7     it gives us the name of the deceased, that's the document that

8     is created at the funeral home, the name of the deceased, the

9     date of the death and the city.

11:44:36   10          So it's easy to go and print once you have those

11    orders.  But then you have to go back to the point-of-sale

12    system and enter that state file number.

13          And I mentioned to her that that takes time, you

14    know.  It pulls an employee away from the counter when they

11:44:53   15    could be helping the public.  And I want to make sure people

16    aren't waiting a long time in the office.

17          So I said, you know, funeral directors don't like

18    this system because they have to pay for it, and it also takes

19    a lot of time on our end.

11:45:06   20          So she said:  Well, then just don't put the state

21    file number on the application.

22          I said:  Well, my understanding is I'm supposed to.

23    It's in the statute.  That's my understanding.

24          And she said:  Well, I'm telling you not to do it.

11:45:17   25          And I said:  Okay, if that's what you wish.  Can you

1   forms to Ms. Lee and never heard a thing from them again.

2   When I say "them," from the human resource department, either

3   from Tawanna Gill or from Scondreka Lee.

4   Q.  Did you ever meet with the other people who interviewed

12:09:43   5   these candidates to discuss the candidates?

6   A.  No.

7   Q.  Did anyone ask you for who your top choices were?

8   A.  No.

9   Q.  Anyone tell you who the top candidates that were being

12:09:53   10   considered are?

11   A.  No.

12   Q.  Was there any follow-up at all?

13   A.  No follow-up.

14   Q.  Did you have any opportunity to provide input on the

12:10:01   15   candidates that you had interviewed, other than these score

16   sheets?

17   A.  No.

18   Q.  Who was ultimately hired for the position?

19   A.  Valirie Bryant.

12:10:11   20   Q.  Was she your top choice?

21   A.  No, she was not.

22   Q.  And you are Ms. Bryant's current supervisor?

23   A.  I am.

24   Q.  And how is she as an employee?

12:10:23   25   A.  Lackluster.  She's having trouble learning a lot of the

1    A.   No.

2    Q.   Take a minute and look it over, but what would you say are

3    the differences in this revised description from your job

4    description that you had prior to this?

12:18:15    5    A.   The one item that stands out is the last sentence under

6    Job Summary where it states, "Perform other duties as needed

7    at any of the six customer points of service located

8    throughout Cook County."

9    Q.   And is that because you'd never have to, you had never had

12:19:11    10    to do that before?

11    A.   That is correct, I've never had to travel to other

12    locations.

13    Q.   Okay.  And then I would like to direct you to the second

14    page of the job description.  Under "Knowledge, skills,

12:19:23    15    abilities and other characteristics," fourth bullet point, it

16    says, "Work extended hours or travel to other offices as

17    needed to address operational needs."

18    A.   Yeah.  That's new.

19    Q.   Is that new?

12:19:36    20    A.   That is new.  That never was like that before.

21    Q.   Are you a member of a union?

22    A.   Pardon?

23    Q.   Are you a member of a union?

24    A.   Yes, SEIU Local 73.

12:19:47    25    Q.   Do you know if changing a job description is permitted

Case: 1:69-cv-02145 Document #: 6802 Filed: 03/20/20 Page 20 of 37 PageID #:60843
Tserotas - direct by Dashevsky
146

1   A.   There were three supervisors that were excluded from the

2   rotation, one being Morris Torres; Angela Wright Madison, who

3   was a supervisor at the time; and Shelly Coleman.

4   Q.   And where -- let's go through those people.  Where was

01:40:08   5   Morris Torres a supervisor?

6   A.   Downtown.

7   Q.   And where was Angela Wright Madison a supervisor?

8   A.   Downtown.

9   Q.   And where was Shelly Coleman a supervisor?

01:40:16   10   A.   Downtown.

11   Q.   And do you know whether the supervisors had the same job

12   title as you?

13   A.   Yes, they have the same job title.

14   Q.   Are they the same grade as you?

01:40:29   15   A.   Yes.

16   Q.   Do you know what's different about their jobs than your

17   job?

18   A.   Well, downtown, like I said earlier, it's set up a little

19   bit differently.  It's a larger office.  So for Morris Torres,

01:40:44   20   he is strictly accounting.  He's responsible for registers

21   having money, collecting the money at the end of the day.

22   Anything related to accounting Morris handles, him and his

23   staff.

24   Q.   Do you handle accounting as part of your job?

01:41:02   25   A.   I do.

Case: 1:69-cv-02145 Document #: 6802 Filed: 03/20/20 Page 21 of 37 PageID #:60844
Tserotas - direct by Dashevsky
147

| | |
|---|---|
| 1 | Q.  Do you also open up registers? |
| 2 | A.  I do. |
| 3 | Q.  And what was the other thing you mentioned, close them out |
| 4 | and account for them? |
| 01:41:10  5 | A.  At the end of the day, yes, I do that as well. |
| 6 | Q.  All right.  And what about Ms. Wright Madison? |
| 7 | A.  Her job was with genealogy, doing genealogical records. |
| 8 | Q.  And I recall you testified earlier that she had actually |
| 9 | filled in for you as supervisor at your Maywood office? |
| 01:41:26  10 | A.  She did in December of 2018. |
| 11 | Q.  And so to your knowledge, does she know how to do the |
| 12 | other things that are required, like the front-of-house |
| 13 | things? |
| 14 | A.  Yes. |
| 01:41:35  15 | Q.  Did you end up working at the downtown location? |
| 16 | A.  I did. |
| 17 | Q.  Did you do -- strike that. |
| 18 | Did you witness Ms. Madison or Mr. Torres doing any |
| 19 | of the front-of-house duties that you do? |
| 01:42:11  20 | A.  No. |
| 21 | Q.  Did you do any of the things that they were doing as part |
| 22 | of your rotation? |
| 23 | A.  They have their own offices downtown.  I did not work in |
| 24 | those offices, if I understand your question correctly. |
| 01:42:24  25 | Q.  Yes.  And you are familiar with what their tasks are? |

1    Q.  And looking to -- so this would potentially have been the

2    report that Ken Otis submitted to Mr. Steele, correct?

3    A.  I would assume that, yes.

4    Q.  Looking at the third paragraph down, Mr. Otis stated, "Our

02:36:50    5    new hire, Valirie Bryant, has picked up the policies and

6    procedures very well," is that correct?

7    A.  Yes.

8    Q.  And Ken Otis was the supervisor in Maywood at the time

9    after Valirie Bryant was hired, correct?

02:37:03    10   A.  That is correct.

11   Q.  You also mentioned that you were part of the interview

12   process when Valirie Bryant was hired, is that correct?

13   A.  That is correct.

14   Q.  Prior to December 2018, were you involved in the hiring

02:37:28    15   process at all?

16   A.  No.

17   Q.  And so did you have any involvement with hiring under

18   Clerk Orr?

19   A.  No, I did not.

02:37:37    20   Q.  Did you work with Tawanna Gill under Clerk Orr?

21   A.  She was the human resource director under Clerk Orr.

22   Q.  So she was employed under Clerk Orr as well as into when

23   Clerk Yarbrough took office, correct?

24   A.  Yes.

02:37:56    25   Q.  You also talked a little bit about the complaints that you

Tserotas - cross by Dierks

192

1  communications with the Office of the Inspector General.  Did

2  you have more communication with the Office of the Inspector

3  General?

4  A.  If I remember correctly, I may have had a telephone call.

02:42:36  5  Q.  And you reported the complaints that you had related to

6  the rotation policy to the Inspector General at that time?

7  A.  That is correct.

8  Q.  After your conversations with the Office of the Inspector

9  General, your lawyer and the union, did you contact anyone

02:42:55  10  else about your complaint?

11  A.  I don't recall.

12  Q.  Did you contact the lawyers in this lawsuit, the Shakman

13  lawsuit?

14  A.  I don't recall if I made any contact.

02:43:17  15  Q.  Do you recall if those lawyers contacted you?

16  A.  I don't recall.

17  Q.  Just a moment.

18       Another follow-up on Ken Otis.  You mentioned that he

19  was a part of the rotation policy as well, correct?

02:43:41  20  A.  Yes.

21  Q.  And Mr. Otis was a supervisor in the downtown office,

22  correct?

23  A.  Yes.

24  Q.  Do you know what his duties were?

02:43:49  25  A.  Yes.  He's a supervisor.  His job description is, other

1    than accounting, it's pretty much the same as what I do in

2    Maywood.

3    Q.   So he was in the downtown office, but unlike, unlike

4    Mr. Torres and Ms. Wright, he had broader duties related to

02:44:16   5    the front office as well as accounting and other duties.

6    A.   Right.  He is in charge of the front office.

7    Q.   So he was more similar to what a supervisor in the

8    suburban locations would do as more encompassing duties,

9    correct?

02:44:34   10    A.   It's part of what I do.

11    Q.   And you also mentioned that Mr. Steele came to the office

12    several times with -- well, Mr. Steele and Ms. Sanchez came to

13    the office while you were the supervisor in Maywood, correct?

14    A.   That is correct.

02:44:59   15    Q.   But after you started rotating, started the rotation

16    program, you wouldn't know if Mr. Steele made more visits to

17    the Maywood office, correct?

18    A.   I would not know.

19    Q.   You also mentioned that there were weekly meetings for the

02:45:19   20    supervisors, correct?

21    A.   Yes.

22    Q.   Did you have similar supervisor meetings under Clerk Orr?

23    A.   Yes.

24    Q.   And were those weekly as well?

02:45:28   25    A.   They were not as common.  A lot of times they came up as

Case: 1:59-cv-02145 Document #: 6802 Filed: 03/20/20 Page 25 of 37 PageID #:60848
Tserotas - cross by Dierks
193

1    than accounting, it's pretty much the same as what I do in

2    Maywood.

3    Q.  So he was in the downtown office, but unlike, unlike

4    Mr. Torres and Ms. Wright, he had broader duties related to

02:44:16    5    the front office as well as accounting and other duties.

6    A.  Right.  He is in charge of the front office.

7    Q.  So he was more similar to what a supervisor in the

8    suburban locations would do as more encompassing duties,

9    correct?

02:44:34    10   A.  It's part of what I do.

11   Q.  And you also mentioned that Mr. Steele came to the office

12   several times with -- well, Mr. Steele and Ms. Sanchez came to

13   the office while you were the supervisor in Maywood, correct?

14   A.  That is correct.

02:44:59    15   Q.  But after you started rotating, started the rotation

16   program, you wouldn't know if Mr. Steele made more visits to

17   the Maywood office, correct?

18   A.  I would not know.

19   Q.  You also mentioned that there were weekly meetings for the

02:45:19    20   supervisors, correct?

21   A.  Yes.

22   Q.  Did you have similar supervisor meetings under Clerk Orr?

23   A.  Yes.

24   Q.  And were those weekly as well?

02:45:28    25   A.  They were not as common.  A lot of times they came up as

Yacilla - redirect by Palomo

238

1    Q.   How many days did you work there?

2    A.   A couple days.

3    Q.   It wasn't 90 days, was it?

4    A.   Absolutely not.

04:00:10    5    Q.   Would you have volunteered to work there for 90 days

6    straight?

7    A.   I would have never thought so.  Not only that, I lived

8    closer then to Skokie.  I lived in Des Plaines then.

9             MR. PALOMO:  No further questions.

04:00:22    10            THE COURT:  All right.  You may step down.  Thank

11   you.

12            THE WITNESS:  Thank you, Your Honor.

13       (Witness excused)

14            THE COURT:  Time for another?

04:00:33    15            MR. PALOMO:  I'm trying to keep to your directive to

16   move through this quickly.

17            THE COURT:  I thought it was a suggestion, not a

18   directive.  But if you want to interpret it that way, that's

19   okay.

04:01:01    20            MR. PALOMO:  Fair enough.

21            Your Honor, plaintiffs call Carolyn Harris as an

22   adverse witness.

23            THE CLERK:  Please raise your right hand.

24       (Witness duly sworn)

04:01:52    25            THE COURT:  All right.  Have a seat.

Harris - direct by Palomo

239

|  |  |  |
|--|--|--|
| | 1 | You may examine when you are ready. |
| | 2 | CAROLYN HARRIS, PLAINTIFFS' ADVERSE WITNESS, SWORN |
| | 3 | DIRECT EXAMINATION |
| | 4 | BY MR. PALOMO: |
| 04:01:56 | 5 | Q.  Good afternoon, Ms. Harris. |
| | 6 | A.  Hi. |
| | 7 | Q.  Could you please state your name and spell it. |
| | 8 | A.  Carolyn Harris, C-A-R-O-L-Y-N H-A-R-R-I-S. |
| | 9 | Q.  All right.  At the time you filed, the supervisors filed a |
| 04:02:13 | 10 | grievance in May 2019, did anyone from the Clerk's Office ever |
| | 11 | tell you to preserve documents relating to the allegations in |
| | 12 | the grievance? |
| | 13 | A.  To preserve them? |
| | 14 | Q.  Yes. |
| 04:02:23 | 15 | A.  No. |
| | 16 | Q.  No one from the Clerk's Office ever told you that the |
| | 17 | plaintiffs requested information and documents about this |
| | 18 | case, correct? |
| | 19 | A.  No. |
| 04:02:30 | 20 | Q.  No one from the Clerk's Office ever asked you to produce |
| | 21 | any documents that were relevant to this case, correct? |
| | 22 | A.  No. |
| | 23 | Q.  No one from the Clerk's Office ever asked you to search |
| | 24 | your emails or phones or hard copy files to provide any |
| 04:02:41 | 25 | information relevant to this case, correct? |

Harris - direct by Palomo

239

1    You may examine when you are ready.

2    CAROLYN HARRIS, PLAINTIFFS' ADVERSE WITNESS, SWORN

3    DIRECT EXAMINATION

4    BY MR. PALOMO:

04:01:56    5    Q.   Good afternoon, Ms. Harris.

6    A.   Hi.

7    Q.   Could you please state your name and spell it.

8    A.   Carolyn Harris, C-A-R-O-L-Y-N H-A-R-R-I-S.

9    Q.   All right.  At the time you filed, the supervisors filed a

04:02:13    10    grievance in May 2019, did anyone from the Clerk's Office ever

11    tell you to preserve documents relating to the allegations in

12    the grievance?

13    A.   To preserve them?

14    Q.   Yes.

04:02:23    15    A.   No.

16    Q.   No one from the Clerk's Office ever told you that the

17    plaintiffs requested information and documents about this

18    case, correct?

19    A.   No.

04:02:30    20    Q.   No one from the Clerk's Office ever asked you to produce

21    any documents that were relevant to this case, correct?

22    A.   No.

23    Q.   No one from the Clerk's Office ever asked you to search

24    your emails or phones or hard copy files to provide any

04:02:41    25    information relevant to this case, correct?

Harris - cross by Vaught

266

| | | |
|---|---|---|
| | 1 | Q. How long were you at the Chicago office? |
| | 2 | A. I'm still there. |
| | 3 | Q. Okay. So you stayed after the last rotation ended? |
| | 4 | A. Yes. |
| 04:31:05 | 5 | Q. And how long is your commute to Chicago from your house? |
| | 6 | A. About 30 minutes. |
| | 7 | Q. Is that roughly the same as it is to Markham? |
| | 8 | A. Yes. |
| | 9 | Q. Okay. Have you gone back to Markham? |
| 04:31:16 | 10 | A. No. |
| | 11 | Q. Do you want to go back to Markham? |
| | 12 | A. It doesn't matter. |
| | 13 | Q. So you enjoy working in Chicago now? |
| | 14 | A. Yeah. |
| 04:31:24 | 15 | Q. Okay. Do you think that it's been a benefit to the |
| | 16 | Chicago office to have the rotation program? |
| | 17 | A. For them, yes. |
| | 18 | Q. I want to ask you about the two supervisors who were not |
| | 19 | part of the rotation program in the Chicago office, Mr. Torres |
| 04:31:47 | 20 | and Angela Wright. I'm forgetting her last name. |
| | 21 | A. Madison. |
| | 22 | Q. They were not included in the program, is that correct? |
| | 23 | A. No. |
| | 24 | Q. Did you understand why they would have been excluded? |
| 04:31:59 | 25 | A. Yes. |

Harris - redirect by Palomo

277

| | | |
|---|---|---|
| | 1 | Q. Who do you know? |
| | 2 | A. That Morris Torres' sister is married to one of the |
| | 3 | aldermen. |
| | 4 | MR. PALOMO: All right. I think that's all I've got. |
| 04:43:18 | 5 | MR. VAUGHT: Nothing more, Your Honor. |
| | 6 | THE COURT: I just have like a couple quick |
| | 7 | questions. |
| | 8 | THE WITNESS: Yes, sir. |
| | 9 | THE COURT: Could you go back to Exhibit 23 at tab |
| 04:43:28 | 10 | 23. So that's the kind of memo that you did when you arrived |
| | 11 | or a couple days after you arrived at Bridgeview, right? |
| | 12 | BY THE WITNESS: Yes. |
| | 13 | THE COURT: So if you look at the first page, I think |
| | 14 | you've testified about this, you prepared this and emailed it |
| 04:44:00 | 15 | to yourself? |
| | 16 | THE WITNESS: Yes. |
| | 17 | THE COURT: Okay. Why did you do that? |
| | 18 | THE WITNESS: To have it for myself. I didn't save |
| | 19 | it on the computer. |
| 04:44:09 | 20 | THE COURT: Okay. |
| | 21 | THE WITNESS: I just saved it to my email. |
| | 22 | THE COURT: You saved it to what? |
| | 23 | THE WITNESS: My email. |
| | 24 | THE COURT: Your email. What email? Your office |
| 04:44:16 | 25 | email? |

283

1              IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3
   MICHAEL L. SHAKMAN and        )
4  PAUL M. LURIE, et al.,        )
                                 )
5           Plaintiffs,          )
                                 )  No. 69 C 2145
6         vs.                    )  Chicago, Illinois
                                 )  March 10, 2020
7  CLERK OF COOK COUNTY, et al., )  9:00 a.m.
                                 )
8           Defendants.          )

9
              TRANSCRIPT OF PROCEEDINGS - HEARING
10
         BEFORE THE HONORABLE SIDNEY I. SCHENKIER
11

12  APPEARANCES:

13  For the Plaintiffs:      LOCKE LORD LLP
                             111 South Wacker Drive
14                           Chicago, Illinois 60606
                             BY:  MR. BRIAN I. HAYS
15                                MR. ERNESTO R. PALOMO

16  For the Defendants:      HINSHAW & CULBERTSON LLP
                             151 North Franklin St., Suite 2500
17                           Chicago, Illinois 60606
                             BY:  MR. ADAM R. VAUGHT
18                                MS. LARI DIERKS

19

20

21

22
   Official Court Reporter:  JENNIFER S. COSTALES, CRR, RMR
23                           219 S. Dearborn St., Room 2342
                             Chicago, Illinois 60604
24                           (312) 435-5895
                             jenny.uscra@yahoo.com
25

Steele - direct by Dierks

365

1    Q.  Do you interview -- have you interviewed multiple people

2    during your time at the Clerk's Office?

3    A.  Yes, I have.

4    Q.  I'll have you flip back to the last page of that exhibit,

11:08:40    5    which is CCC0031986.

6    A.  Okay.

7    Q.  Could you read the paragraph just above interviewer

8    signature?

9    A.  "With respect to all jobs under the jurisdiction of the

11:09:02    10    Cook County Clerk, I certify under penalty of perjury as

11    provided by the law that to the best of my knowledge, I am

12    strictly prohibited from conditioning, basing or knowingly

13    prejudicing or affecting any term or aspect of the Cook County

14    Clerk's employment or hiring, including the interview of the

11:09:24    15    above candidate."

16    Q.  And is that your signature below?

17    A.  That is.

18    Q.  Does that signal that you reviewed and agreed to that

19    statement?

11:09:32    20    A.  Yes.

21    Q.  Did you know Valirie Bryant before her interview?

22    A.  No.

23    Q.  Had you ever met her?

24    A.  No.

11:09:38    25    Q.  Do you know who her mother is?

Steele - direct by Dierks

366

1   A.   No.

2   Q.   Who made the final decision to hire Valirie Bryant?

3   A.   I think it was a collective decision based on the scoring

4   and averaging.  And it was a collective decision based on the

11:09:52   5   numbers.

6   Q.   And who would have sent the offer to Valirie Bryant and

7   made that final decision?

8   A.   HR would have done that.

9   Q.   Would that have been Tawanna Gill at the time?

11:10:02   10   A.   Tawanna Gill or Scondreka, I don't know which one

11   specifically sent that document.

12   Q.   But whoever was in the HR position at that time?

13   A.   Yes, it would have been, I imagine it would have been one

14   of the two.

11:10:13   15   Q.   Have you ever worked for Karen Yarbrough on any election?

16   A.   No.

17   Q.   Have you ever attended any events for Karen Yarbrough?

18   A.   I think maybe two since I've been employed with, with

19   Clerk Yarbrough.

11:10:33   20   Q.   Were you required to attend those?

21   A.   No.

22   Q.   Was that a voluntary decision on your part?

23   A.   Absolutely.

24   Q.   Did anyone ever tell you you were required to attend

11:10:43   25   events?

Steele - direct by Dierks

367

```
 1   A.  No.
 2   Q.  Did anyone ever tell you you were required to pass
 3   petitions?
 4   A.  No.
```
11:10:49
```
 5   Q.  Did anyone ever tell you you were required to donate money
 6   to Karen Yarbrough?
 7   A.  No.
 8   Q.  Have you ever asked a nonexempt employee to do political
 9   work?
```
11:10:58
```
10   A.  No.
11   Q.  Have you ever asked a nonexempt employee to contribute to
12   Karen Yarbrough?
13   A.  No.
14   Q.  Are you familiar with the Chicago Pride Parade?
```
11:11:07
```
15   A.  Yes.
16   Q.  Did you attend the Chicago Pride Parade in 2019?
17   A.  I did.
18   Q.  And who did you attend on behalf of?
19   A.  Karen Yarbrough.
```
11:11:20
```
20   Q.  Is that Karen Yarbrough in her individual capacity or as
21   the Clerk's Office?
22   A.  As the Clerk's Office.
23   Q.  Were there other offices also in the parade at that time?
24   A.  Offices under the Clerk?
```
11:11:34
```
25   Q.  Other government offices, not political offices, such as
```

Steele - direct by Dierks

368

1  the Treasurer, the Comptroller.

2  A.  Absolutely, yes, ma'am.

3  Q.  And did other employees attend in their capacity with the

4  Clerk's Office?

11:11:49  5  A.  Yes.

6  Q.  And was that involved in the Citizens to Elect Karen

7  Yarbrough or a political committee in any way?

8  A.  No.

9  Q.  Did Karen Yarbrough attend the pride parade?

11:12:04  10  A.  No.

11  Q.  Did Cedric Giles attend the pride parade?

12  A.  No.

13  Q.  Are you familiar with a Hernan Ramirez?

14  A.  Yes.

11:12:12  15  Q.  How are you familiar with him?

16  A.  Hernan Ramirez is an employee within the vital records

17  department.

18  Q.  And does he work -- which office does he work at?

19  A.  The downtown office.

11:12:24  20  Q.  Was he originally hired to work downtown?

21  A.  He was originally hired and it was thought that he would

22  go to Markham.

23  Q.  Did he go to Markham?

24  A.  No.

11:12:33  25  Q.  Why?

415

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
      MICHAEL L. SHAKMAN and          )
 4    PAUL M. LURIE, et al.,          )
                                      )
 5              Plaintiffs,           )
                                      )  No. 69 C 2145
 6         vs.                        )  Chicago, Illinois
                                      )  March 16, 2020
 7    CLERK OF COOK COUNTY, et al.,   )  2:07 p.m.
                                      )
 8              Defendants.           )

 9                  TRANSCRIPT OF PROCEEDINGS - Hearing
                  BEFORE THE HONORABLE SIDNEY I. SCHENKIER
10

11    APPEARANCES:

12    For the Plaintiffs:        LOCKE LORD LLP
                                 111 South Wacker Drive
13                               Chicago, IL 60606
                                 BY:  MR. BRIAN I. HAYS
14                                    MR. ERNESTO R. PALOMO
                                      MS. IRINA DASHEVSKY
15
      For the Defendants:        HINSHAW & CULBERTSON LLP
16                               151 North Franklin St., Suite 2500
                                 Chicago, IL 60606
17                               BY:  MR. ADAM R. VAUGHT
                                      MS. LARI DIERKS
18

19

20

21

22    Court Reporter:           AMY M. SPEE, CSR, RPR, CRR
                                 Federal Official Court Reporter
23                               United States District Court
                                 219 South Dearborn Street, Room 2318A
24                               Chicago, Illinois  60604
                                 Telephone:  (312) 818-6531
25                               amy_spee@ilnd.uscourts.gov
</pre>

Sanchez - direct by Vaught

423

1   A.  I did, yes.

2   Q.  Okay.  Why did you send that?

3   A.  She requested it from me.

4   Q.  Okay.  Did you ever tell Ms. Nowak that it would be a good

5   idea for her to attend --

6   A.  No.

7   Q.  -- that event?

8           Okay.  Did she attend that event?

9   A.  I don't know if she attended that event.

10  Q.  Did you attend the event?

11  A.  I did not.

12  Q.  Did you ever talk to her about this after you sent it?

13  A.  No.

14  Q.  Okay.  Did you report to anybody in the Clerk's Office

15  that you had sent this text message to Ms. Nowak?

16  A.  No.

17  Q.  Did anybody in the Clerk's Office ever ask you to send

18  this text message to Ms. Nowak?

19  A.  No.

20  Q.  Had anybody in the Clerk's Office ever asked you to send a

21  text message to any nonexempted employee regarding a campaign

22  event?

23  A.  No.

24  Q.  Had you ever sent this flyer to any other clerk employee?

25  A.  No.