**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL L. SHAKMAN, and PAUL M. LURIE,** *et. al.* | ) ) ) | |
| | ) | **No. 69 C 2145** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Magistrate Judge Sidney I. Schenkier** |
| | ) | |
| **CLERK OF COOK COUNTY,** *et. al.,* | ) ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On May 5, 1972, a number of governmental entities in Illinois, including the Clerk of Cook County ("the County Clerk"), entered into a consent decree ("1972 Consent Decree") barring them from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor" (1972 Consent Decree at 3). Nineteen years later, on November 1, 1991, the County Clerk entered into a separate consent judgment ("1991 Consent Judgment") that barred it from "conditioning, basing or knowingly prejudicing or affecting the hiring of any person as a Governmental Employee (other than Exempt Positions), upon or because of any political reason or factor . . ." (1991 Consent Judgment at 4). For nearly 28 years thereafter, the 1972 Consent Decree and the 1991 Consent Judgment (collectively, sometimes referred to as "the Consent Orders") have remained in effect without either challenges by plaintiffs to the County Clerk's compliance with those court orders, or efforts by the County Clerk to terminate those orders.

That long period of quiescence came to an end on September 6, 2019, when plaintiffs filed a motion for supplemental relief (doc. # 6486: Pls.' Mot. Suppl. Relief). In that motion, plaintiffs assert that the County Clerk has violated the 1972 Consent Decree and the 1991 Consent Judgment in various ways, and seek appointment of a special master to perform certain tasks in order to bring the County Clerk into compliance with the Consent Orders. For her part, the County Clerk filed a response denying any violations of the Consent Orders (doc. # 6588: County Clerk's Resp.). In addition, perhaps mindful of the saying that "the best defense is a good offense," the County Clerk argues that the Court should not even consider the question of whether she violated the Consent Orders on the grounds that plaintiffs lack standing to bring the motion and that the motion presents non-justiciable questions that the Court is powerless to address (County Clerk's Resp. at 4-8). The County Clerk argues in the alternative that even if the plaintiffs have standing and the claims they present are justiciable, under Federal Rule of Civil Procedure 60(b)(5) the Court should vacate the Consent Orders due to changes in the law and the factual landscape since their entry decades ago (*Id.* at 17-20).

The motion has been fully briefed (doc # 6669: Pls.' Reply; doc. # 6760: County Clerk's Sur-Reply). In addition, because the briefing disclosed factual disputes, we permitted the parties to engage in limited discovery and convened an evidentiary hearing that took place on March 3, March 10 and March 16, 2020. We received testimony from nine witnesses in court or through depositions, and accepted into evidence 118 exhibits. We also received closing arguments in writing from the parties (doc. # 6801: County Clerk's Submission; doc. # 6803: Pls.' Submission).

For the reasons that follow, we grant in part the plaintiffs' motion. We find that plaintiffs have standing to present the claims they assert in the motion and that those claims are justiciable. While we do not find the level of violations of the Consent Orders asserted by plaintiffs, we agree

that the County Clerk has violated certain aspects of the Consent Orders and that the evidence raises concerns about the County Clerk's compliance with other aspects of those orders. In light of those findings we cannot agree that the time has come for the Consent Orders to be vacated as to the County Clerk under Rule 60(b)(5). To the contrary, we agree with plaintiffs that the violations and concerns disclosed by the evidence warrant the appointment of a special master, not only to better ensure compliance with the Consent Orders but — just as importantly — to lay the groundwork for the day when those orders should indeed be vacated as to the County Clerk.

In Part I of this opinion, we explain why plaintiffs have standing to present the claims raised by their motion and why those claims are justiciable. In Part II, we explain our findings that the County Clerk has violated the 1991 Consent Judgment in her use of the exempt list and in hiring employees without the required public posting of job openings, as well as our concern that the ill-fated rotation policy for supervisors in the Vital Records Offices and the evidence of political solicitations suggest the improper use of political considerations in connection with existing employees that is barred by the 1972 Consent Decree. In Part III, we explain why terminating the Consent Orders is not warranted at this time under Rule 60(b)(5). In Part IV, we explain the reasons for our appointment of a special master and the scope of the work we authorize her to perform.

## I.

The County Clerk challenges the standing of plaintiffs to enforce the Consent Orders, and further argues that the claims plaintiffs raise under the Consent Orders are not justiciable. For the reasons set forth below, we disagree.

## A.

According to the County Clerk, plaintiffs lack standing to seek relief under the Consent Orders because any injuries that voters and candidates allege cannot be fairly traced to the actions of the County Clerk, and because IVI-IPO—a named plaintiff—is not even a party to the orders it seeks to enforce (County Clerk's Resp. at 4-6; County Clerk's Sur-Reply at 1-10; County Clerk's Submission at 10-11). In response, plaintiffs stress, at the threshold, that not only has the Seventh Circuit affirmed voters' and candidates' standing in this case, but it also has made clear that a defendant cannot raise a standing challenge—as the County Clerk does here—after entry of a consent judgment, as if the case were being litigated for the first time (Pls.' Reply at 1-12; doc. Pls.' Submission at 13-18). Instead, plaintiffs say, the County Clerk must meet the equitable standards for modifying or vacating a consent decree under Federal Rule of Civil Procedure 60(b), which they contend the Clerk has not done (Pls.' Reply at 4-5). In any event, plaintiffs argue, not only do voters and candidates have standing to seek enforcement of the Consent Orders, but so too does IVI-IPO, both in its own right and on behalf of its members (*Id.*).

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, -- U.S. --, 137 S.Ct. 1645, 1650 (2017). "Standing to sue is a doctrine rooted in the traditional understanding of case or controversy." *Spokeo, Inc. v. Robbins*, -- U.S. --, 136 S.Ct. 1540, 1547 (2016). The "'irreducible constitutional minimum' of standing consists of three elements . . . : The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Spokeo*, 136 S.Ct. at 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). When there are

multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 137 S.Ct. at 1651.

"Standing is evaluated at the time suit is filed." *Milwaukee Police Assn v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (*citing Friends of the Earth, Inc. v. Laidlaw Envtl. Serv*s., 528 U.S. 167, 180 (2000)). "In contrast, when a party with standing at the inception of the litigation loses it due to intervening events, the inquiry is really one of mootness." *Id.* (internal quotations omitted).

To explain why we conclude that plaintiffs have standing, we begin with a brief review of the pertinent history of this 50-year-old case.

### 1.

In *Shakman v. The Democratic Org. of Cook Cty*, 435 F.2d 267 (7th Cir. 1970) ("*Shakman I*"), the Seventh Circuit found that voters' and candidates' interest in (or right to) an equal chance and equal voice was entitled to constitutional protection, and was allegedly impaired by the misuse of official power over public employees to create the substantial patronage force that plaintiffs complained of. *Id.* at 268. The Seventh Circuit found that voters and candidates had standing for their claims, and that these claims were justiciable because the right asserted was judicially identified and its breach could be judicially determined. *Id.* at 270. The case was remanded to the district court, where the 1972 Consent Decree was ultimately reached, prohibiting defendants—including the County Clerk—from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor" (doc. # 6486-1, Pls.' Mot. Suppl, Relief, Ex. A., 1972 Consent Decree). The 1972 Consent Decree left open the issue of whether political considerations could be used in hiring new employees.

The parties continued to litigate the hiring claim, and the district court ultimately granted plaintiffs partial summary judgment on it, finding that patronage hiring practices infringed upon voters' and candidates' rights by giving the incumbent an unfair advantage. *Shakman v. Democratic Org. of Cook Cty.*, 481 F. Supp. 1315 (N.D. Ill. 1979). The plaintiffs and certain defendants then reached a consent decree on hiring ("the 1983 Decree"), while certain other defendants—including the County Clerk—appealed the summary judgment ruling.

In *Shakman v. Dunne*, 829 F.2d 1387, 1399 (7th Cir. 1987) ("*Shakman II*"), the Seventh Circuit reversed the district court, and found that voters and candidates did not have standing to challenge governmental hiring practices. In reaching its decision, the Seventh Circuit emphasized, among other things, the significant developments in the law of standing that had occurred after entry of the 1972 Consent Decree. *Id.* at 1392-93. The Seventh Circuit noted that reconsideration of the decision in *Shakman I* that voters and candidates had standing to pursue all the claims raised in the complaint would typically be foreclosed by the doctrine of the law of the case. However, the Seventh Circuit found it appropriate to revisit that issue with respect to the hiring claims presented in the appeal, and concluded that the connection between the complained of patronage hiring practices and a dilution of the voters' political voice was too attenuated to meet the requirements for standing. *Id* at 1397. The Seventh Circuit reasoned that because any candidate could promise to discriminate against applicants on the basis of political considerations just like incumbents, any injury to voters from the defendants' patronage practices was too speculative to be fairly traceable to the defendants' actions. *Id.* at 1397.

The Seventh Circuit was careful to note the limits of its decision, explaining that the appeal raised "only the constitutionality of politically-motivated *hiring* practices without any reference to the other patronage-based employment practices—including the discharge scheme now forbidden

6

by the [1972] consent decree." *Id.* at 1393 (internal citation omitted) (emphasis in original). As a result, the Seventh Circuit stated that its ruling did "*not* address the substantially different question of whether the plaintiffs would have standing to attack the constitutionality of coerced political work demanded of those already employed by the government as a condition of continued employment." *Id.* at 1399 (emphasis in original).

Several years later, the Supreme Court handed down its decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), in which it held that the First Amendment's proscription against patronage dismissals similarly applied to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement. 497 U.S. at 68. In the wake of *Rutan*, IVI-IPO joined this lawsuit to represent its members' interests as public employees and applicants as well as its own interest, and to address any standing issues on plaintiffs' hiring claim that had been created by the Seventh Circuit's decision in *Shakman II* (doc. # 6803-1, Pls.' Submission, Ex. A, Pls.' Mot. to Leave to Suppl.).[1] And, the County Clerk entered into a separate consent judgment—the 1991 Consent Judgment—which barred it from using political considerations in hiring employees into positions for which party affiliation is not an appropriate requirement ("non-exempt positions").

The Seventh Circuit addressed issues in this litigation for the third time in 2005, when the City of Chicago challenged the standing of two police officers who had sought enforcement of the 1983 Decree. *O'Sullivan v. City of Chi.*, 396 F.3d 843 (7th Cir. 2005) ("*Shakman III*"). The district court had granted the City's motion to dismiss for lack of standing. On appeal, the Seventh Circuit reversed. In so doing, the Seventh Circuit rejected the City's attempt to assert a lack of standing at that juncture, as if the question were being raised for the first time, when that question had already

---

[1] We cite to this docket entry and certain other re-submitted filings (as opposed to their original docket entries) for the convenience of the parties since the older docket entries are not electronically available.

been litigated fully and resolved against the City (which had not appealed the 1979 summary judgment ruling, but instead had entered into the 1983 Decree). As the Seventh Circuit explained: "After a case has become final by exhaustion of all appellate remedies, only an egregious want of jurisdiction will allow the judgment to be undone by someone who, having participated in the case, cannot complain that his rights were infringed without his knowledge." *Id.* at 859 (internal quotation omitted). Accordingly, the appeals court remanded the case to the district court to consider the issue of standing, but only in the context of an equitable analysis under Federal Rule of Civil Procedure 60(b). *Id.* at 868. The Seventh Circuit reiterated this reasoning several months later in a decision remanding to the district court for consideration under Rule 60(b) the City's motion to vacate the 1983 Decree. *Shakman v. City of Chi.*, 426 F.3d 925 (7th Cir. 2005) ("*Shakman IV*").

These decisions make clear to us that the County Clerk's standing objections must be considered in light of the procedural posture of the case. As with the plaintiffs in *Shakman III*, plaintiffs here move for relief under a previously entered consent decree. "Once entered, a consent decree may be enforced." *Shakman III*, 396 F.3d at 867 (quoting *Frew v. Hawkins*, 540 U.S. 431, 440 (2004)). "[C]ontinuing respect for the valid decrees of a court commands that they be obeyed until changed." *Id.* at 865 (citations omitted). Thus, although we consider the County Clerk's objection to Plaintiffs' standing, we do so cognizant that it is not a basis for disregard of the existing Consent Orders and that it is but one component of the County Clerk's request to vacate the decrees (which is discussed more fully in Part III below).

### 2.

We begin with the County Clerk's argument that IVI-IPO not only lacks standing, but that it is not even a party to the decrees under which plaintiffs seek relief (County Clerk's Sur-Reply

at 2-3). IVI-IPO cannot be a party to the Consent Orders, the County Clerk says, because it was not added as a party to this action until years after entry of the 1972 Consent Decree and several months after entry of the 1991 Consent Judgment (*Id*.). Further, the County Clerk argues, the language of the 1991 Consent Judgment makes clear that it was only intended to be between the voters and candidates class and the County Clerk (*See Id.*).

Plaintiffs view the record differently, arguing that IVI-IPO has standing to assert claims under the Consent Orders. In particular, they point out that their motion to add IVI-IPO as a plaintiff was pending for a year before the 1991 Consent Judgment was entered, and that their motion was specifically held in abeyance while the parties negotiated their settlement without any objection by the Clerk (Pls.' Submission at 14-15). Once the terms of their agreement had been finalized, plaintiffs say, they renewed their motion to add IVI-IPO which was granted shortly thereafter (*See Id.*). According to plaintiffs, the County Clerk thus knew at the time that the 1991 Consent Judgment was entered that the motion to add IVI-IPO had been renewed as part of the settlement, agreed to its entry, and took steps to comply with that agreement for years without objection. The County Clerk points to no evidence to dispute these assertions. It was not until plaintiffs brought the current motion for supplemental relief that the County Clerk raised an attack on plaintiffs' standing (Pls.' Submission at 15).

At the threshold, we note that the sense of the County Clerk's argument is that it entered into the 1991 Consent Judgement knowing that no plaintiff had standing to enforce that judgment (since voters and candidates lacked standing to pursue hiring claims under *Shakman II* and the County Clerk says IVI-IPO could not do so). We seriously doubt that the County Clerk would have entered into such a consent judgment. And, to the contrary, we find that IVI-IPO is a party with standing to seek relief under the Consent Orders.

9

The 1972 Consent Decree enabled "parties to this Judgment to apply to this Court at any time for such further orders and directions" (1972 Consent Decree). The 1991 Consent Judgment, in turn, was entered into by all plaintiffs, identified as: "Plaintiffs Michael L. Shakman, et al.," both to "carry out and implement the [1972] Consent Judgment, and to settle "all of the plaintiffs' claims in this case" (Pls.' Mot. Suppl. Relief, Ex. B., 1991 Consent Judgment at 1-2)—which included, of course, the hiring claims which the 1991 Consent Judgment squarely addressed. The "purpose of the [1991 Consent] Judgement [was] to eliminate the conditioning, basing or affecting of employment within the Cook County Clerk on political reasons or factors" which it sought to do by way of declaratory relief and the issuance of an injunction affecting the hiring of any person as a governmental employee based on a political reason (*Id.* at 2, 4). At the time the 1991 Consent Judgment was entered, it was a matter of record that plaintiffs intended to add IVI-IPO with the express purpose of addressing any standing issue that had been raised under *Shakman II* for voters and candidates on their hiring claim (Pls.' Mot. to Leave to Suppl.). The settlement of that claim was embodied in the 1991 Consent Judgment.

Contrary to the County Clerk's argument, nothing in the language of the 1991 Consent Judgment excludes IVI-IPO. We are unpersuaded by the County Clerk's argument that such a limitation should be found in the motion that presented the proposed judgment because it recited it had been brought on behalf of "Michael L. Shakman and Paul M. Lurie, individually and on behalf of the classes they represent" (*See* Pls.' Mot. Suppl. Relief, Ex. B. at 18, Agreement, Consent & Mot. of Pls. & the Cook County Clerk). Since the Court had not yet granted the motion to add IVI-IPO as plaintiff at that time, it would have been premature for IVI-IPO to have been identified as a party. Regardless, it is the language of the 1991 Consent Judgment, and not its presenting motion, which drives our analysis.

10

Nor are we convinced by the County Clerk's argument that because IVI-IPO was incorporated in 2002 and gained its Internal Revenue Code Section 501(c)(4) status in 2006, plaintiffs have not established that the IVI-IPO that exists today is the same entity that joined this litigation nearly 30 years ago (County Clerk's Sur-Reply at 3). Notwithstanding the County Clerk's argument, no showing to this effect need be made. Under Illinois law, all of the rights and obligations of a previously unincorporated association become the rights and obligations of the new corporation automatically upon its incorporation. 805 ILCS 105/102.35. Further, plaintiffs' undisputed evidence shows that IVI merged with IPO in 1978, and since then IVI-IPO has operated as a continuing entity with substantially the same structure, constitution and bylaws (Igasaki Dep. at 18:13-18, 30:03-08, 38:14-41:5). The County Clerk's argument to the contrary fails.

Finally, we observe that even if IVI-IPO were not a party to the 1991 Consent Judgment, that fact would not be determinative with respect to its standing since IVI-IPO also asserts associational standing to pursue the claims of its members. The 1991 Consent Judgment reserved the Court's jurisdiction for the purpose of enabling applications to enforce its provisions not only by "any party," but also by "any aggrieved employee, aggrieved former employee or aggrieved applicant for employment with the Clerk's office" (1991 Consent Judgment at 11-12). We find no merit in the County Clerk's argument that because IVI-IPO is an entity, it cannot be an "employee" under the decree. One of its members is an employee, and IVI-IPO can assert the interests of its employee member. *See, e.g., Milwaukee Police Ass'n*, 708 F.3d at 928. Nothing in the 1991 Consent Judgment imposes the kind of limitation on IVI-IPO's ability to seek its enforcement that the County Clerk suggests.

11

### 3.

"An association has standing to bring suit on behalf of one of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181 (2000); *accord Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1977). "The first two of these requirements derive from Article III, while the third is prudential." *Milwaukee Police Ass'n*, 708 F.3d at 928.

As alleged in Plaintiffs' Supplement to the First Amended Complaint, some of IVI-IPO's members were excluded from being hired for County Clerk's Office positions, and others who were employees were pressured to pledge political allegiance and to provide financial support to candidates whom they did not support (doc. # 6669-1, Pls.' Reply, Ex. A, Suppl. to First Am. Compl. ¶¶ 14, 19). Indeed, at least one IVI-IPO member, George Tserotas, testified that he is a current County Clerk employee who was directly affected by one of the County Clerk's policies of which plaintiffs complain (March 3, 2020 Hrg. Trans. at 99:07-101:13). There is no question that at least one of IVI-IPO's members therefore has standing to seek the relief that plaintiffs seek. *See Friends of the Earth*, 528 U.S. at 182-183 (organization had standing to challenge defendant's failure to comply with environmental statute where at least one member alleged his enjoyment of the affected river had been diminished by defendant's violation); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd* 533 U.S. 181, 189 n.7 (political party had standing to assert challenge to statute on behalf of its members who would be prevented by it from voting).

Contrary to the County Clerk's argument, the interests IVI-IPO seeks to protect are germane not only to its members, but also to its organizational mission. Based on language from

the IVI-IPO's articles of incorporation, the County Clerk argues that IVI-IPO's singular mission is to provide information about government and politics, and not to act as an employment rights group (County Clerk Sur-Reply at 5-6). But this mis-frames the issue and sets too high a bar for the determination of what is "germane." The County Clerk fails to submit authority for its assertion that what is germane is limited to that which is identified in an articles of incorporation, and we are unaware of any.

Although plaintiffs' enforcement claims may affect IVI-IPO's members' employment, they do so based on the right to be free in one's employment from political discrimination. As plaintiffs observe, fighting unlawful political patronage and protecting the First Amendment rights of individuals to associate with the political parties and organizations of their choice has been a core principle of the IVI-IPO since at least 1971 (Stern Dep. at 13:01-24, 36:21-41:24; Igasaki Dep. 23:11-21, 31:12-33:24). Notwithstanding the County Clerk's assertions, this is not a situation like in *Sierra Club v. Morton*, 405 U.S. 727 (1972), where an organization sought to vindicate its value preference through litigation. Here, IVI-IPO alleges injury to its members and itself based on a practice that as an organization it competes against and works to prevent. By any reasonable interpretation, the interests IVI-IPO seeks to vindicate are germane to its mission.

Nor does a conflict exist within the membership of IVI-IPO that would bar a claim of associational standing. The County Clerk argues that because Karen Yarbrough, who currently serves as County Clerk, at one time was a member of IVI-IPO, the claims that IVI-IPO asserts here are internally conflicted and thus cannot be germane to its mission (County Clerk's Sur-Reply at 6 (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*, 830 F.2d 1374 (7th Cir. 1987) (group lacked standing to bring associational claims where at least three of its members were also named defendants))). We see at least two problems with this theory. *First*,

13

even if the evidence of Ms. Yarbrough's membership that the County Clerk submits were admissible (which the County Clerk did not even try to establish), that evidence suggests only that Ms. Yarbrough was a member of IVI-IPO in 2014, not that she is a member now (*See* County Clerk's Sur-Reply Ex. D). Past membership falls short of establishing current membership. *Second*, and more importantly, Ms. Yarbrough's personal membership, *vel non*, in the organization is irrelevant: the claims raised in the current motion are against the County Clerk's Office, not Ms. Yarbrough personally. So, even if Ms. Yarbrough were still a member of IVI-IPO, it would not raise a conflict among its members that would bar associational standing. *See Ret. Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 863 (7th Cir. 1996); *Southwest Suburban Bd. of Realtors, Inc*., 830 F.2d at 1381. Unlike the authorities cited by the County Clerk, there is no suggestion here that claims against the County Clerk's Office pit one of IVI-IPO's members against the other.

Finally, we see no need for the individual participation of IVI-IPO's members in obtaining the relief plaintiffs seek. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554 (1996) (individual participation is not necessary where association seeks prospective relief for its members). Because plaintiffs seek only appointment of a special master and other declaratory and prospective relief, there is no need for individualized proof of damages or other individualized participation. For each of these reasons then, we find that IVI-IPO has associational standing to pursue the claims set forth in the motion.

**4.**

We also find that IVI-IPO possesses standing in its own right. "To bring suit in its own right, an organization must itself satisfy the requirements of standing." *Milwaukee Police Ass'n*, 708 F.3d at 926. Just like an individual plaintiff then, the IVI-IPO must allege a concrete and particularized injury that is actual or imminent, fairly traceable to the defendant, and that is likely to be redressed by a favorable decision. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Milwaukee Police Ass'n*, 708 F.3d at 926 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)). The injury alleged must be to itself as an entity; alleged injuries to its members are insufficient to establish standing of an organization on its own behalf. *Milwaukee Police Ass'n*, 708 F.3d at 926.

In joining this litigation, IVI-IPO alleged that the patronage practices complained of injure IVI-IPO and frustrate its mission by making it more difficult to attract members, reducing the financial contributions and other support it can attract, and reducing its political effectiveness (Suppl. to First Am. Compl. ¶ 18). IVI-IPO further alleged that it depends on volunteer campaign work and financial contributions to advance its political activities, and that it has no patronage jobs to dispense to its supporters (*Id.* ¶ 13).

According to the County Clerk, however, these allegations demonstrate only that IVI-IPO has a "mere interest" in the litigation which is insufficient to confer standing. The County Clerk argues that IVI-IPO cannot allege an injury sufficient for standing both because it is a Section 501(c)(4) organization that is prohibited from participating in partisan politics, and because it fails to show that IVI-IPO's complained of decline in membership is causally related to the County Clerk's alleged patronage practices (County Clerk's Sur-Reply at 7-9). We find these arguments unpersuasive.

15

Conduct that is alleged to frustrate an organization's mission and drain its resources constitutes injury sufficient to confer organizational standing. *Havens Realty*, 455 U.S. at 379 (fair housing organization had standing to challenge discriminatory housing practice that frustrated ability to provide housing counseling and referral services by diverting its resources); *Crawford*, 472 F.3d at 951 (political party's diversion of resources resulting from challenged law sufficiently alleged injury in fact). In its 1991 supplement to the first amended complaint, IVI-IPO alleged such impairment through the depletion of its resources, and negative impact on its fundraising and membership efforts as a direct result of the complained of patronage practices. (Suppl. to First Am. Compl. ¶¶ 13-16, 18, 20). Economic harm is "the prototypical injury-in-fact." *Milwaukee Police Ass'n*, 708 F.3d at 927. While we agree with the County Clerk's observation that IVI-IPO's State Chair Stephen Stern acknowledged in deposition testimony in February 2020 that IVI-IPO's declining membership might be based on factors unrelated to the County Clerk's actions, his testimony does not defeat IVI-IPO's allegations that the County Clerk's patronage practices also have frustrated its organizational goal of eliminating patronage and decreased its political efficacy.

Nor do we find merit in the County Clerk's assertion that IVI-IPO's status as a Section 501(c)(4) organization means it cannot claim injury to its political efficacy. An organization need not participate in partisan politics to advance a goal of eliminating the use of partisan politics from employment decisions involving non-exempt positions. Moreover, "*Havens* makes clear . . . that the only injury which need be shown to confer standing on [an] agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) (finding under *Havens* that nonprofit had standing for civil rights action because time spent investigating discrimination was time deflected from its counseling services). As discussed above, the claims here are not like those

raised in *Sierra Club*, 405 U.S. at 739, in that IVI-IPO not only has an interest in the subject matter of patronage practices that is the heart of this litigation, but also alleges direct injury as a result of them.

Similarly, IVI-IPO's injuries are fairly traceable to the County Clerk's alleged conduct. As IVI-IPO alleged upon entry to this case, it has no patronage jobs to dispense to its supporters and is competitively disadvantaged by politicians and political parties that offer unlawful political patronage jobs to supporters (Suppl. to First Am. Compl. ¶¶ 13-16, 18). Moreover, while the measuring stick for IVI-IPO's standing is at the time of their entry into the case, *Milwaukee Police Ass'n*, 708 F.3d at 928, IVI-IPO submitted testimony to show that the complained of conduct continues to cause it to expend some time and resources fighting against the County Clerk's alleged patronage practices instead of engaging in other educational activities (Stern Dep. at 28:16-35:04). That the County Clerk's alleged conduct causes IVI-IPO to devote resources which otherwise would be available for other organizational purposes is enough for purposes of standing. *Havens Realty*, 455 U.S. at 379; *Village of Bellwood*, 895 F.2d at 1526.

Finally, the relief IVI-IPO requests will address and seek to remedy the harm that it alleges. An order requiring the County Clerk's Office to comply with its obligations under the Consent Orders would address the alleged patronage practices of the County Clerk and would remove a barrier to IVI-IPO's ability to further its mission as well as to raise and utilize money towards its organizational goals. For these reasons, IVI-IPO has standing in its own right to pursue the current claims here.

**5.**

We now consider the claim by the County Clerk that plaintiffs as voters and candidates lack standing to pursue claims under the 1972 Consent Decree. For the reasons that follow, we reject that claim.

The 1972 Consent Decree was negotiated and entered into based on the claims of the voters and candidates, after the Seventh Circuit specifically affirmed their standing in *Shakman I*, 435 F.2d at 270, ruling that the patronage system harmed voters and candidates by forcing them to expend resources to counter patronage tactics. *Id.* As the Court explained:

> The interests of candidates in official treatment free from intentional or purposeful discrimination are entitled to constitutional protection. Where discrimination is sufficiently shown, the right to equal protection under the equal protection clause is not diminished by the fact that the discrimination relates to political rights.

*Id.* (citation omitted).

Contrary to the County Clerk's argument, the Seventh Circuit's decision in *Shakman II*, 829 F.3d 1387, did not question this reasoning. The Seventh Circuit explained that its focus in *Shakman II* was limited to the specific issue of whether voters and candidates lacked standing to challenge governmental *hiring* policies; as a result, the decision in *Shakman II* that voters and candidates lacked standing on the hiring claim "did *not* apply to the substantially different question of whether the plaintiffs would have standing to attack the constitutionality of the coerced political work demanded of those already employed by the government as a condition of continued employment." *Shakman II*, 829 F.2d at 1398-99 (emphasis in original). As the Seventh Circuit reaffirmed in a later decision, *Shakman II* "did not encompass all voter challenges of *any* patronage practices; it was limited to 'plaintiff's standing to attack the constitutionality of the defendants' hiring practices.'" *Shakman III*, 396 F.3d at 850 (quoting *Shakman II*, 829 F.2d at

18

1399). Accordingly, the holding of *Shakman I*—that voters and candidates have standing to challenge unlawful political discrimination against employees—remains controlling here.[2]

In accordance with the Seventh Circuit's decisions, we find the standing of voters and candidates to pursue claims under the 1972 Consent Decree to be well-settled.[3]

## B.

Despite the Seventh Circuit's determination in *Shakman I* that the claims raised by plaintiffs are justiciable, and despite the fact that the County Clerk settled those claims by entering the 1972 Consent Decree and 1991 Consent Judgment, the County Clerk now reverses course and asks that we find these claims non-justiciable (County Clerk's Resp. at 6-8; County Clerk's Sur-Reply at 10-15). According to the County Clerk, the Supreme Court's recent decision in *Rucho v. Common Cause*, -- U.S. --, 139 S. Ct. 2484 (2019), that partisan gerrymandering claims present non-justiciable political fairness questions, applies to the claims here which the County Clerk says are based on negating the electoral advantage of patronage and obtaining "fairer" outcomes (County Clerk's Sur-Reply at 12-13). Because the *Rucho* Court held that such matters of fairness are not judicially manageable, the County Clerk says, this case would be dismissed for lack of jurisdiction if it were filed today (*Id.* at 13). Since the 1972 Consent Decree was thus based on a

---

[2] We do not agree with plaintiffs, however, that *Rutan* casts doubt on the continued vitality of the standing decision in *Shakman II*. As the Seventh Circuit has explained, "*Rutan* did not speak to standing requirements but made clear that basing hiring decisions on political patronage was impermissible." *Shakman III*, 396 F.3d at 851.

[3] In light of *Shakman I*, we need not address plaintiffs' argument that the Seventh Circuit has recognized that a candidate whose competitor obtains an advantage through a government practice, thereby causing the candidate to engage in additional campaigning and expend additional funds, has standing to challenge that practice. *See Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990) (third party candidate had standing to challenge state's decision to allow major parties' candidates on ballot after deadline which forced candidate to face increased competition requiring additional campaigning and outlay of funds). Other courts have similarly applied the doctrine of competitor standing where the government is alleged to have taken action that benefits a plaintiff's competitor to the detriment of the plaintiff. *E.g.*, *Buchanan v. Fed Elec. Comm'n.*, 112 F. Supp. 2d 58, 63-64 (D.D.C. Cir. 2000). Notably, plaintiffs specifically allege candidates' economic injury resulting from the alleged patronage practices (Suppl. to First Am. Compl. ¶¶ 18, 20). *See Milwaukee Police Ass'n*, 708 F.3d at 927 (noting economic injury is "prototypical injury-in-fact").

complaint raising non-justiciable political questions, the Clerk argues, we lack subject matter jurisdiction to adjudicate plaintiffs' claims for supplemental relief (*Id.* at 15).

Plaintiffs disagree that *Rucho* has any application here (Pls.' Reply at 12-13). According to plaintiffs, they do not seek to vindicate partisan preferences or ask this Court to make a political judgment about an appropriate number of patronage jobs based on proportional voter support. (*Id.* at 14). To the contrary, plaintiffs say, they seek only to vindicate claims of unlawful political patronage that both the Supreme Court and Seventh Circuit have recognized are actionable (*Id.* at 13). Here, too, we agree with plaintiffs.

In *Rucho*, the Court held that partisan gerrymandering claims present political questions "beyond the reach of the federal courts" because resolving such claims would require federal courts to "reallocate political power between two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Rucho*, 139 S.Ct. at 2506-07. In reaching its decision, the Supreme Court emphasized the constitutionally prescribed role of the federal courts to "vindicate the individual rights of the people appearing before it," and not "generalized partisan preferences." *Id.* at 2501. Because a governmental entity may engage in some level of constitutional political gerrymandering and federal judges have no license to reallocate political power between parties, the Court stated that there are no manageable judicial standards to enable a determination of when partisan gerrymandering had "gone too far." *Id.* at 2497, 2506 (internal quotation omitted).

The Supreme Court further reasoned that declining judicial consideration of partisan gerrymandering claims was consistent with constitutional structure and history. *Id.* at 2495-96. Specifically, it observed, the Constitution's Elections Clause delegates the right to prescribe the time, places and manners of holding elections, "expressly checked and balanced by the Federal

Congress." *Id.* at 2496. Noting that the Framers were aware of electoral districting problems and had considered what to do about them, the Court found it instructive that no suggestion had been made on this point "that the federal courts had a role to play." *Id.*

Importantly, the Court distinguished partisan gerrymandering from racial gerrymandering, which presents a justiciable claim. As the Supreme Court explained:

> Unlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship.

*Id.* at 2502.

The considerations leading the *Rucho* Court to find claims of political gerrymandering non-justiciable are not implicated here. Instead, the right asserted here is more akin to the prohibition against racial gerrymandering that the *Rucho* Court distinguished from political gerrymandering. Plaintiffs do not bring general claims for partisan fairness and proportional representation, but instead assert their rights to be free from political discrimination resulting from the use of political considerations in the employment process. The Supreme Court has consistently recognized the justiciability of such challenges to unlawful patronage practices in the public employment setting. *E.g., Rutan*, 479 U.S. at 65; *Elrod v. Burns*, 427 U.S. 347 (1976) (recognizing First Amendment claim of government employees who alleged termination based on political affiliation or belief); *Branti v. Finkel*, 445 U.S. 507 (1980) (same). In reaching its decision in *Rucho*, the majority did not discuss, let alone overrule this line of cases. We do not treat *Rucho* as *sub silentio* undoing some 45 years of Supreme Court precedent.

Moreover, the impediments to relief identified by the *Rucho* Court are not present here. And, unlike in *Rucho*, plaintiffs' claims are based on their own individualized interests and not on a community perspective of fairness. Accordingly, the claims plaintiffs present fall squarely within

the constitutionally prescribed role of the federal courts to decide. *See, e.g., Rucho*, 139 S.Ct at 2501. We follow the Seventh Circuit precedent in *Shakman I*, and find plaintiffs' claims justiciable.

## II.

We now turn to plaintiffs' claims that the County Clerk has violated the 1991 Consent Judgment and the 1972 Consent Decree. In doing so, at the outset, we must first determine the legal standard by which to assess plaintiffs' claims. The County Clerk argues that plaintiffs must prove any violations by clear and convincing standard, because a violation of the Consent Orders amounts to contempt of court (County Clerk's Submission at 2). However, nowhere in plaintiffs' prayer for relief do they seek a contempt order and moreover, in their post-hearing filing, plaintiffs specifically state they are not seeking to hold the County Clerk or her staff in contempt but rather are seeking oversight of the County Clerk's office to bring it to substantial compliance with the Consent Orders (Pls.' Mot. Suppl. Relief at 10-11, Pls.' Submission at 5). Therefore, we are not bound by a clear and convincing standard. Rather, we consider whether plaintiffs have provided enough evidence to show conduct within the County Clerk's office that warrants appointment of a special master and/or other relief. *See People Who Care v. Rockford Bd. of Educ. Sch. Dist. 205*, 89 C 20168, 1991 WL 166960 (N.D. Ill. Jan. 14, 1991) (appointing a Special Master to assess compliance with the court's previous orders); *In re Pearson*, 990 F.2d 653 (1st Cir. 1993) (affirming court's decision to appoint a special master to assess continuing efficacy of permanent injunctive relief).

## A.

Plaintiffs claim that the County Clerk maintains and operates an illegal patronage employment system that violates the Consent Orders (Pls.' Mot. Suppl. Relief at 3). Plaintiffs have raised four main concerns for their contention that violations by the County Clerk warrant relief:

(1) the placement of political allies into positions that are not on the Court-approved exempt list; (2) oral modifications to written employment policies and selective enforcement of these policies; (3) the selective enforcement of the rotation policy for supervisors in the Bureau of Vital Records; and (4) the solicitation of political contributions from non-exempt employees. We address each in turn.

### 1.

The 1991 Consent Judgment included a List of Exempt Positions ("1991 List") and an exclusive means by which to amend the list – filing a motion with the Court (1991 Consent Judgment at 10, List of Exempt Positions).[4] The 1991 Consent Judgment also provided that "[p]rior to entry of an order of Court determining a position, other than one in the [1991 List], to be an Exempt Position, no such position shall be exempt from this Judgment and no action with respect to any such position shall be exempt from inquiry under this Judgment" (*Id.* at 11). The parties agree that the 1991 List has never been amended with Court approval (Pls.' Submission at 9, County Clerk's Resp. at 12-13). Therefore, any hiring by the County Clerk for exempt positions that are not on the 1991 List does not comply with the 1991 Consent Judgment.

The County Clerk claims in her response brief (County Clerk's Resp. at 14) that the "current list" of exempt employees in the County Clerk's office is Exhibit D to her response brief (doc. # 6588-5 at 6), which is titled "DRAFT 8/22/2019 SHAKMAN EXEMPT EMPLOYEES" ("Draft 2019 List"). Thus, the most "current" list available to us is the Draft 2019 List. The 1991 Consent Judgment provides that the number of exempt positions cannot be expanded without a motion before the Court (1991 Consent Judgment at 10). The 1991 List

---

[4] The List of Exempt Positions can be found at doc. # 6486-2 at 17 of 23.

contains 22 positions while the Draft 2019 List contains 21 positions (doc. # 6486-2 at 17; doc. # 6588-5 at 6). Neither party argues that the number of positions is an issue.

Rather, the County Clerk argues that the titles on the Draft 2019 List are "substantively equivalent" to the 1991 List (County Clerk's Resp. at 14). We disagree. Of the 21 positions on the Draft 2019 List, only four are identical title matches to the 1991 List, 10 can reasonably be considered to be close to the title of the positions on the 1991 List, and seven are not listed on the 1991 List (examples are IT director and chief legal counsel).[5] The County Clerk claims that although the titles may not be exact, the responsibilities and duties of the positions are the same. However, the County Clerk has failed to offer evidence to support that proposition for many of the positions. We are mindful that over the almost 30 years since the 1991 Consent Judgment was enacted, the way in which government offices and departments function has evolved to include positions (such as an IT Director) that may not have existed in 1991. That said, the changes in the County Clerk's office over the years do not excuse the County Clerk from complying with the 1991 Consent Judgment by seeking and obtaining court approval for any changes in the exempt list. The point of that requirement is to ensure that the positions on the exempt list in fact have responsibilities that make it appropriate for the County Clerk to use political considerations in filling them. The County Clerk's unilateral revisions to the exempt list without court approval violates the 1991 Consent Judgment.[6]

---

[5] The four identical titles are (the number in parenthesis represents the number on the 1991 List) Deputy Clerk of the Board (8), Director of Elections (14), Director of Real Estate and Tax Services (10), and Director of Vital Records (17); the ten similar titles are Chief Deputy Clerk (2), Deputy Clerk of Security (20), Deputy Clerk of Policy (7), Clerk of the Board & Procurement Director (9), Deputy Clerk of Elections (15), Executive Assistant to Director of Elections (16) (two individuals with this title), Deputy Clerk of Human Resources (6), Accounting and Tax Extension Manager (13), Deputy Clerk of Vital Records (18); the seven titles not listed on the 1991 List are Special Assistant to the Clerk for Government Affairs, Director of Communication, Manager of Outreach and Education, Chief Legal Counsel, IT Director, Warehouse Manager, and Deputy Clerk of Real Estate and Tax Services.

[6] The County Clerk complains that the exempt list she is using was put into place by her predecessor, David Orr, without court approval – and without objection by plaintiffs (County Clerk's Resp. at 13-14). The fact that a prior

**2.**

In their motion for supplemental relief, plaintiffs alleged there were oral modifications to written employment policies (Pls.' Mot. Suppl. Relief at 6). And, indeed, the evidence showed that the County Clerk often did not follow her own policies regarding posting of job openings for non-exempt positions (Pls.' Submission at 6-9; Clerk 30(b)(6) Dep. at 50:8-53:14, 56:3-58:24; Sanchez Dep. at 56:3-58:24). For example, the County Clerk hired two Executive Assistants to the Assistant to the Clerk for Government Affairs and a Storekeeper III without posting the positions, allowing people to apply, or conducting interviews (Pls.' Hrg. Exs. 69, 75, 76). The County Clerk does not know who made the decision not to post these positions or who decided to hire these individuals (Clerk 30(b)(6) Dep. at 61:9-1, 62:23-2, 62:24-65:21). In failing to publicly post for job openings for non-exempt positions, the County Clerk did not merely disregard her own policies – she violated the 1991 Consent Judgment, which unequivocally states that the County Clerk must publicly post notice of openings for non-exempt job positions (1991 Consent Judgment at 5, ¶ G).

The County Clerk claims that her hiring plan that was required under the 1991 Consent Judgment terminated on June 1, 2002, and therefore all the hiring procedures required under the plan also terminated at that time (County Clerk's Submission at 4). Thus, the County Clerk argues that the 1991 Consent Judgment does not require the posting for openings for non-exempt positions, but only prohibits the County Clerk's office from basing those hiring decision on a political condition or factor (*Id*.). The County Clerk's view, however, fails to recognize that the 1991 Consent Judgment *permanently enjoined* the Clerk's office from "hiring any person for any Governmental Employment position (except Exempt Positions …) unless prior public notice of

---

violation of the 1991 Consent Judgment went unnoticed or unremedied is not a defense to the County Clerk's current violation. Had plaintiffs brought this issue to our attention under Clerk Orr's administration, we would have responded in a similar fashion.

the opportunity to apply for and be hired for the job has been given" (Pls.' Submission, Ex. A, Pls.' Mot. to Leave to Suppl. at 29). Therefore, even though the County Clerk's hiring plan terminated on June 1, 2002, the County Clerk was still mandated by the 1991 Consent Judgment to provide public notice of all employment positions other than exempt or emergency positions. The evidence shows without question that the County Clerk violated this unequivocal mandate.

### 3.

Clerk Yarbrough took office as the County Clerk in December 2018.[7] Vital Records is one of the departments within the County Clerk's Office with a downtown location and five suburban offices located in Bridgeview, Markham, Maywood, Rolling Meadows and Skokie. The Vital Records department has nine supervisors – one for each suburban office and four in the downtown office. On May 9, 2019, the County Clerk announced a "rotation policy" (sometimes also referred to as the "summer rotation policy") wherein the supervisors for all five suburban offices and one of the downtown supervisors would rotate to all six offices for 90-day back-to-back periods at each location for a total of 15 months away from his or her home office.[8]

The first rotation began on June 10, 2019. The second rotation began on September 11, 2019. The rotation policy was suspended in December 2019, several months after the filing of the instant motion, and was ultimately terminated on February 27, 2020, on the eve of the evidentiary hearing that commenced on March 3, 2020.

The County Clerk claims that the rotation policy was necessary because the suburban offices did not operate with the same policy and procedures as the downtown office. However, the

---

[7] Prior to that, Clerk Yarbrough was the Cook County Recorder of Deeds from 2012-2018.

[8] Three supervisors were exempt from the rotation policy: Mr. Torres, Ms. Wright-Madison and one other supervisor who was set to retire were exempt from the rotation policy. We will further discuss the exemption of Mr. Torres and Ms. Wright-Madison below.

evidence undercut this rationale, as it revealed that it was actually the downtown office that needed improvements rather than the suburban offices. The evidence also showed that the rotation policy imposed significant hardship on the supervisors to whom it applied.

Four current or former Vital Records Supervisors testified during the evidentiary hearing: Dawn Nowak, George Tserotas, Lana Yacilla and Carolyn Harris. The four supervisors testified to their long tenures in the office (each more than 20 years), the location of the office listed on their original job description for the supervisor position, the details of the rotation policy, the onerous nature of their new assignments including the long distances they were required to commute, and how the rotation policy was sprung on each of the supervisors without their input or any advance notice from the County Clerk.

Ms. Nowak worked in the Vital Records department for a total of 33 years, the last 26 years as Bridgeview's supervisor. When she applied for the supervisor role in Bridgeview, the location of the office – Bridgeview – was part of the written job description. Ms. Nowak spent the first 90-day rotation, beginning on June 10, 2019, at the Markham office and testified there were no differences in the policies or procedures of that office as compared to her home office of Bridgeview. She was assigned to the Skokie office for the second 90-day rotation and testified as to the hardship this long commute placed on her as a single parent and the health issues that she experienced as a result. Ms. Nowak resigned in October 2019 as a Vital Records supervisor after the implementation of the rotation policy due to her health concerns.

Ms. Nowak explained that on May 9, 2019, she and the other five affected Vital Records supervisors attended a meeting at the downtown location wherein Ms. Erica Sanchez, Deputy Clerk of Vital Records, presented each supervisor with a folder describing the summer rotation policy, a new job description that did not include a specific office location (*e.g.*, stating "Vital

Records Supervisor" instead of "Bridgeview Supervisor") and a start date, end date and rotation location. Ms. Nowak described the shock and uncertainty she and the other supervisors felt by the imposition of this new policy being sprung on them without notice or their input.

In a similar fashion, Mr. Tserotas testified that he worked at the Maywood office for a total of 30 years, the last 15 as the supervisor. When he applied to be a supervisor at Maywood, the job posting specifically stated the job was for the Maywood office. Mr. Tserotas also was blindsided at the May 9, 2019 meeting wherein the rotation policy was presented to the supervisors. The job description presented to him at that meeting had been changed to state that he would be performing his duties at any of the six points of service throughout the County and that he would need to travel to other offices as needed (Pls.' Hrg. Ex. 7). Mr. Tserotas testified that under the union's collective bargaining agreement, a change in job description can only be discussed during contract negotiations and this change had not been negotiated. And, indeed, the County Clerk's Rule 30(b)(6) witness testified to a lack of knowledge as to whether the change in the job description had received prior approval by the Human Resources department or was discussed with Service Employees International Union "(SEIU") prior to being implemented (Clerk 30(b)(6) Dep. at 63:3-12). Mr. Tserotas first rotated to the downtown office, and considered this assignment to be a punishment because he had told Ms. Sanchez that he never wanted to work downtown. His commute grew from 35 to 45 minutes to two hours each way, he felt he was set up for failure, and he explained the personal hardships this change caused him.

Ms. Yacilla has worked for the County Clerk for 26 years, the majority of which time – 24 years – she served as the Rolling Meadows supervisor. When she applied for the position, the supervisor job description specified Rolling Meadows as the location, which was important to Ms. Yacilla because it was close to her home. Like her fellow supervisors, she also testified that all of

the offices followed the same policies and procedures as required by the Vital Records Act. Ms. Yacilla's first rotation was to Skokie and her second to Markham. Both rotation locations significantly increased her commute time and created a hardship to her, and she experienced both physical and mental health issues as a result.

Finally, Ms. Harris had worked as the Markham supervisor since 2005. She rotated to Bridgeview and the downtown office and ultimately decided to remain in the downtown office (her commute to Markham and downtown was the same). Ms. Harris stated that the rotation policy caused stress to her and her family, and she was concerned about commuting a longer distance to work because of her daughter's health issues. Although the rotation policy was allegedly implemented so the suburban offices would mirror the downtown office, Ms. Harris testified that she found the opposite to be true – the downtown office was not functioning properly, and the supervisors were not doing what their counterparts in the suburbs were doing. Ms. Harris changed the downtown office to function like the suburban offices. Ms. Harris testified that if the rotation policy was implemented again, she would retire.

The plaintiffs argue that the rotation policy implemented by the County Clerk served no legitimate purpose and was motivated by unlawful political discrimination ("UPD") (Pls.' Submission at 9). They further argue that the rotation policy was instituted to inflict hardship on six of the nine Vital Records Supervisors in an effort to constructively discharge them, and that the hearing evidence proved these assignments were politically motivated (*Id.*). The County Clerk argues that the rotation policy was not implemented for a political purpose, but instead for legitimate reasons concerning the effective operations of the office (County Clerk's Submission at 12).

The County Clerk's stated rationale for the rotation policy of inconsistency of operations between the suburban offices from the downtown office is not supported by the evidence. The evidence of any major inconsistencies between the offices was exceedingly thin. To the extent the County Clerk argues there were inconsistencies, the testimony elicited showed there were not inconsistencies in applying policy and procedures – as each office was mandated by statute to follow the Vital Records Act – but rather only inconsistency in professionalism of the various offices (*i.e.* demeanor, and how the staff dealt with the public). While these concerns may be significant, they are personnel issues and not policy issues to be addressed by rotating supervisors.

Additionally, there were no contemporaneous documents about any investigation or deliberative process that went into formation of the rotation policy. The County Clerk did not lay out evidence about observations that would warrant the rotation policy. The policy was announced on May 9, 2019, some five months after Ms. Yarbrough became the County Clerk. The evidence showed that she and her senior staff made only a few visits to the suburban offices, and there was no evidence offered to show major inconsistencies in the implementation of policies or practices in these offices.

The County Clerk's stated rationale for the rotation policy was to bring the suburban offices to the same standard of operation as the downtown office. The evidence failed to support that rationale. Ms. Harris, a supervisor in the Vital Records department, and Mr. Byron Steele, Director of Vital Records, both testified that the downtown office was the problem office, not the suburban offices. Ms. Erica Sanchez, Director Clerk of the Board, testified that the only issue in the suburban offices was the need for a Spanish speaking employee in one of the locations, but again, that is a personnel issue not a policy issue.[9] Moreover, the contemporaneous reports of the supervisors after

---

[9] Ms. Sanchez's position changed to Director Clerk of the Board in November 2019 (March 16, 2020 Hrg. Trans. at 418:15-23).

each rotation at a different location support their testimony that all of the policies and procedures were the same for each office as they all must follow the Vital Records Act.

The evidence strongly suggests that the rotation policy was instituted for the purpose of making life miserable for the long-time supervisors who had settled expectations of a work – life balance. The supervisors testified that they each applied to work at a specific location and that the location was included on their original job descriptions. As part of the rotation program, these job descriptions were changed, without advance notice to or input from the supervisors, to eliminate location as part of the description. And the structure of the rotation policy maximized the negative impact on the supervisors. The supervisors were sent to office locations far away from their home office base rather than the closer office locations. The testimony showed that prior to the rotation policy, when an office was short a supervisor and lead for the day, a supervisor from an office close in proximity would cover for the day. The pattern was to fill in from nearby offices – the Skokie and Rolling Meadows offices were matched up as well as the Maywood and Bridgeview offices. That approach was disregarded when implementing the rotation policy.

In addition, the length of the rotation policy appears to have been calculated to maximize this adverse impact. The original policy explained to the supervisors at the May 9, 2019 meeting stated that each rotation would last 90 days and that the supervisors would rotate to the other five locations, meaning the rotations would last for 15 consecutive months. Testimony uncovered that there was some prior discussion of a 30-day rotation, but ultimately, the County Clerk implemented a 90-day rotation at each site. There were no contemporaneous documents or testimony offered by the County Clerk to explain the basis for a 90-day versus a shorter stint in each office; or the basis for the rotations to be stacked one on top of the other for a 15-month

period. The absence of any explanation for the length and structure of the program left no credible reason for that structure other than to inflict hardship on the supervisors who were subject to it.

The timeline of the rotation policy and the County Clerk's ultimate decision to discontinue it also raises questions. The supervisors were told of the rotation policy on May 9, 2019. It began in June 2019, with each of the six supervisors reporting to their first 90-day rotation office. The second rotation began in September 2019; however adjustments were made to the original locations published to the supervisors on May 9, 2019 for their second rotation. This adjustment occurred around the time of the filing of plaintiffs' motion for supplemental relief on September 6, 2019 (Pls.' Mot. Suppl. Relief). Sometime later, the rotation policy was put on hold for the winter months beginning in December 2019. Finally, on the eve of the evidentiary hearing in this matter, the rotation policy was rescinded on February 27, 2020.

We note that on the eve of the evidentiary hearing, on March 1, 2020, the County Clerk also announced a new policy manual and implemented written procedures for operation of the Vital Records office. Mr. Steele testified that work on these documents commenced in January 2020, well after the rotation policy was first announced to the supervisors on May 9, 2019 and implemented in June 2019. The County Clerk is to be commended for implementing these new policies. But she offered no evidence as to why the rotation program preceded the work on these policies; there certainly was no evidence that anything was learned from the rotation policy that informed the creation of the new written policies.

The County Clerk relies on the Office of the Independent Inspector General ("OIIG") investigation and report dated August 8, 2019, that found the rotation policy was based on a legitimate goal unrelated to political considerations (County Clerk's Submission at 14). However, everything was not revealed to the OIIG in its investigation; nor did the OIIG have the benefit of

all the evidence introduced at the evidentiary hearing. The OIIG report states the SEIU signed off on the rotation policy, which was the information conveyed by the County Clerk (County Clerk's Hrg. Ex. 3 at CCC00142). But, the SEIU had filed a grievance on June 3, 2019, regarding the rotation policy and the County Clerk did not inform the OIIG of this grievance. Therefore, without the complete picture, little weight can be assigned to the OIIG report.

We therefore conclude that the County Clerk has not offered evidence to support the stated rationale for the rotation program. To the contrary, the evidence is that this program was structured in a way to impact great hardship on the supervisors to whom it applied, suggesting an intent to drive them to quit. And, indeed, the rotation policy caused Ms. Nowak to resign, and caused Ms. Harris to say she would resign if the policy was reinstated.

That said, developing a policy calculated to drive out long term, more highly paid people may be viewed as unwise, or it may be seen as hard-headed economics – but either motivation alone would not constitute a violation of the Consent Orders. And, there is no evidence that the people to whom the rotation policy applied were selected for political reasons. But it would violate the Consent Orders to exempt some employees from the policy because they are politically favored. Plaintiffs argue that is what occurred here.

Plaintiffs argue that the exemption of Mr. Torres and Ms. Wright-Madison from the supervisor rotation was due to political reasons. The evidence revealed that Mr. Torres and Ms. Wright-Madison did have a certain political pedigree. It was common knowledge that Mr. Torres' brother-in-law is the former Chicago Alderman, Ricardo Munoz (March 3, 2020 Hrg. Trans. at 41:4-11). Additionally, Mr. Torres' sister, Betty Torres Munoz who was married to Alderman Munoz, was the County Clerk's human resources director for a period of time (March 3, 2020 Hrg. Trans. at 42:11-17). Ms. Wright-Madison also had worked with Mr. Coleman, Director of Vital

Records and a Shakman exempt employee in the County Clerk's office, under Cook County President Toni Preckwinkle (March 3, 2020 Hrg. Trans. at 42:18-44:1). There is no evidence that the supervisors subject to the rotation had a similar political pedigree.

The County Clerk argues that these two supervisors performed different jobs than the other six supervisors and were exempt from it for that reason. The evidence on this argument does not strongly support the County Clerk's position. Mr. Torres and Ms. Wright-Madison worked in the downtown office and supervised the accounting and genealogy departments, respectively. While there was some testimony that Mr. Torres and Ms. Wright-Madison did different work than the other supervisors, there was also testimony that they did the same work as the six supervisors in that they would perform the same tasks Wednesdays at the downtown office, and filled in at the suburban offices when a supervisor was out of the office.

Moreover, the May 9, 2019 memorandum to the supervisors discussing the implementation of the rotation policy mentioned a key component of the policy was to enhance the current skill set of the supervisors. Mr. Steele testified that a focus of the policy was to cross-train the supervisors. If the goal of the policy was truly to enhance skill sets and cross-train employees, the evidence did not indicate why Mr. Torres and Ms. Wright-Madison were wholly excluded from the rotation.

The evidence of exclusion due to political reasons is a close call. But there are significant indications to lead to the conclusion that Mr. Torres' and Ms. Wright-Madison's political pedigree is why the County Clerk excluded them from an onerous program that the other supervisors were forced to endure.

34

**4.**

Plaintiffs claim that the County Clerk improperly solicited non-exempt employees for contributions. They offered two examples of political appointees soliciting non-exempt employees to attend a political fundraiser for Clerk Yarbrough: *first*, a May 2, 2019 text from Ms. Sanchez to Ms. Nowak sent in the middle of a work text exchange and *second*, a May 20, 2019 text from exempt employee Jamica Davis to Sonia Khalil (a non-exempt employee) during work hours (Pls.' Submission at 2 citing Pls.' Hrg. Exs. 94-95, 109).

Solicitation of non-exempt employees is not barred so long as it is not coerced and not made the basis for exempt position decisions (1972 Consent Decree at 3). While the evidence and testimony submitted by plaintiffs suggests the defendants solicited non-exempt employees to politically support Clerk Yarbrough, the evidence does not show that the solicitation rose to the level of coercion. Ms. Nowak testified that Ms. Sanchez said it would be "beneficial" for her to show support for Ms. Yarbrough (March 3, 2020 Hrg. Trans. at 64:1-6), suggesting perhaps a level of attempted coercion in the situation.[10] But in the end, plaintiffs offered no evidence that the solicitation was successful, that Ms. Nowak felt coerced by it, or that it was linked in anyway to her inclusion in the rotation policy. Moreover, the plaintiffs offered no evidence to flesh out the details of the solicitation of Ms. Khalil.

Although we find Ms. Nowak's testimony was credible and did raise a flag about the solicitation of non-exempt employees, in the constellation of flags it is not the reddest nor the brightest flag. Furthermore, while plaintiffs assert that the County Clerk's failure to implement a

---

[10] While Ms. Sanchez testified that Ms. Nowak had requested the solicitation (March 16, 2020 Hrg. Trans. at 422:20 – 423:3), we do not find Ms. Sanchez's testimony credible. Ms. Sanchez also enjoys a political pedigree (her father-in-law owns a banquet hall that often hosts political fundraisers and campaign events, her husband is an elected official (*Id.* at 427:7 – 428:10), and Ms. Sanchez worked for Clerk Yarbrough when she was the Recorder as well. And, Ms. Nowak testified that she did not ask for the solicitation, which we find credible in light of her unrebutted testimony that she ignored it – the County Clerk has offered no reason why Ms. Nowak would seek out a solicitation that she ultimately disregarded.

35

litigation hold raises the prospects that additional evidence of solicitation of non-exempt employees may have been destroyed, we are not prepared to say that a failure to preserve certain text messages and e-mail messages would have led to a treasure trove of evidence. Thus, we do not find a violation of the Consent Orders by the solicitations.

## III.

Rule 60(b)(5) provides that "the court may relieve a party … from a final judgment, order, or proceeding … [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." The party seeking to modify or vacate a consent decree pursuant to Rule 60(b)(5) "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). The significant change may either be a change in "factual conditions or in law." *Id.* Invoking this rule, the County Clerk asks us to vacate the Consent Orders claiming there has been a change in fact and law (County Clerk's Submission at 16). The County Clerk has failed to establish a sound basis to do so.

## A.

As a factual matter, the Consent Orders have not been satisfied. The evidence, based on limited discovery, fails to show rampant violations of the decree. That said, the evidence showed a general disregard for certain aspects of the Consent Orders. As discussed in greater detail above, the County Clerk ignored that changes to the exempt list require Court approval; the County Clerk ignored that hiring employees without posting of the job opening is a violation of the 1991 Consent Judgment, and the County Clerk's effort to engraft a 10-year sunset into that portion of the decree is not a faithful reading of it; and the rotation policy, both in its origin and application and the way it was terminated – suspended in the shadow of the motion and terminated on the eve of the hearing

36

– gives us concern. While we are encouraged that defendants put into place an employment plan and a manual, this did not happen until March 2020 and the procedures and plan were not even on the drawing board until January 2020 – several months after plaintiffs filed the instant motion. The hearing evidence of this conduct does not show that there has been the kind of compliance with the Consent Orders that, as a factual matter, weighs in favor of their termination.

## B.

Similarly, there has not been a change in law that makes it inequitable to continue to enforce the Consent Orders. We measure whether there has been a change in law from the point that the Consent Orders were entered, and begin with the 1972 Consent Decree.

There has been no change in law that would make in inequitable to enforce the 1972 Consent Decree. The 1972 Consent Decree was entered in the shadow of *Shakman I*, which held that voters and candidates had standing to pursue the claims that applicant's and employee's rights were violated by the use of political consideration in employment decisions concerning non-exempt employees. *Shakman II* did not change that precedent as it applied to existing employees. Similarly, *Rutan* also did not address the standing of voters or candidates to assert such claims. Consistent with the Seventh Circuit's law of the case, our inquiry into standing "shall be not on the law of standing as a jurisdictional concept but on the equitable standards embodied in Rule 60(b)(5)." *Shakman III,* 396 F.3d at 868. In any event, neither *Shakman II* nor *Rutan* effected any change in the law making it unjust to continue to enforce the 1972 Consent Decree.

Nor has any change in the relevant law occurred since the 1991 Consent Judgment. The 1991 Consent Judgment followed upon *Rutan,* which ruled that hiring decisions cannot be based on political considerations. That legal principle was settled at the time that the 1991 Consent Judgment was entered, and that legal principle has not changed since that time. With eyes wide

open, the County Clerk entered into the 1991 Consent Judgment in light of *Rutan* and despite knowing *Shakman II* stated voters and candidates did not have standing to raise hiring claims, but also mindful that the plaintiffs were adding IVI-IPO as a party to fill that gap. Thus, the law that existed as of 1991 when the consent judgment was entered into, remains the law today. We therefore find that there has not been a change in fact or law to warrant the termination of the Consent Orders. We see no equitable circumstances that lead us to conclude the Consent Orders should not be enforced against the office that voluntarily entered into them. The fact that the identity of the County Clerk has changed is not a sufficient basis to terminate the Consent Orders: the enforceability of those orders does not turn on who is in office.

**IV.**

We now turn to the relief that is warranted in view of the findings and conclusions we have reached. In their motion, plaintiffs identified seven specific items of relief that they seek (Pls.' Mot. Suppl. Relief at 10-11). One item of requested relief — rescinding the rotation policy for the Bureau of Vital Records Offices — is moot in light of the County Clerk's decision to rescind that policy shortly before the evidentiary hearing in this case. Another item of requested relief — prohibiting the solicitation of political donations from non-exempt employees — sweeps too far. While the Consent Orders bar the County Clerk from basing employment decisions on political donations or other political activity (1972 Consent Decree at 3; 1991 Consent Judgment at ¶¶ D and E), they do not entirely bar any and all solicitations for political donations or other political activity. What the Consent Orders bar is coerced political support from non-exempt employees as the price for getting or maintaining a job.

We conclude that in some form, the other requests for relief that plaintiffs seek are warranted here. Chief among those is the request that we appoint a special master. We do not take

that step lightly. But the evidence here has shown clear violations of the 1991 Consent Judgment with respect to the use of a non-Court approved exempt list and the disregard for the pubic posting of job openings. The evidence also has raised concerns about compliance with certain aspects of the 1972 Consent Decree with respect to whether certain employees with political pedigree were exempted from the application of a burdensome rotation policy that applied to others, and with respect to political solicitations.

Our decision to appoint a special master also is informed by the fact that as of December 2020, the Cook County Office of the Recorder of Deeds ("Recorder's Office") will be dissolved as an independent governmental entity and its functions will be absorbed by the County Clerk. The Recorder's Office is also subject to the 1972 Consent Decree, and to a Consent Judgment entered into in 1992 ("1992 Consent Judgement") that parallels the 1991 Consent Judgment which binds the County Clerk. In July 2010, the Recorder's Office entered into an agreed supplemental relief order ("Recorder SRO") that provides, among other things, for a court appointed monitor ("RCA") to oversee the Recorder's Office level of compliance with the 1972 and 1992 orders, to identify instances where that office has fallen short of that requirement, and to assist that office in developing procedures to better assure compliance (doc. # 1759: Recorder SRO).

The goal of the active monitoring was to help the Recorder's Office achieve "substantial compliance" with the requirements of the 1972 and 1992 orders, and thus to allow for the termination of those orders as they apply to the Recorder's Office.[11] This Court has terminated

---

[11] "Substantial Compliance means: (1) the Recorder has implemented the New Employment Plan, including procedures to ensure compliance with the New Employment Plan and identify instances of non-compliance; (2) the Recorder has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence; (3) the Recorder does not have a policy, custom or practice of making employment decisions based on political reasons or factors except for Exempt Positions; (4) the absence of material noncompliance which frustrates the Recorder's Consent Decree and the SRO's essential purpose. The RCA and the Court may consider the number of post-SRO complaints that have been found to be valid. However, technical violations or isolated incidents of noncompliance shall not be a basis for a finding that the Recorder is not in substantial compliance; and (5) the Recorder

consent decrees governing the use of political considerations for a number of other governmental entities that entered into supplemental relief orders — the City of Chicago, Cook County, the Sheriff of Cook County and the Cook County Forest Preserve District — because they each achieved substantial compliance.

The same cannot be said for the Recorder's Office. Despite the office being of very modest size as compared to other entities that have achieved substantial compliance, after nearly 10 years the Recorder's Office still has some distance to travel in order to meet that standard. We note that for six years of that period, from December 2012 to December 2018, the current County Clerk served as the Recorder of Deeds. While progress toward substantial compliance was made at various points during that period, the Recorder's Office also came under fire on a number of occasions from the RCA, the plaintiffs and the OIIG for conduct that they said suggested or constituted unlawful political discrimination in violation of the SRO and the Consent Orders underlying them. (Pls.' Exs. 88, 91 – 93, 107, 110).

We need not today pass on those charges leveled against the Recorder's Office during the tenure of the current County Clerk. What is significant is that under her tenure as Recorder the office did not approach substantial compliance. And now, the Recorder's Office has recently lost important employees in Human Resources and other functions critical to achieving substantial compliance, and will have difficulty replacing them in light of the office being phased out of existence by the end of the year. This will make it challenging at best for the Recorder's Office to achieve in the next several months the substantial compliance target that has eluded it for more than nine years.

---

has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment with the Recorder" (Recorder SRO at 12-13).

As a result, it is likely that the Recorder's Office will remain under the SRO and active monitoring by the RCA as of December 2020 when that office is absorbed by the County Clerk. We have concern about an office that is under active monitoring because of a failure to achieve substantial compliance for many years (the Recorder's Office) being subsumed by an office (the County Clerk) that has recently engaged in violations of the Consent Orders and other conduct raising concerns about compliance with those orders.

Thus, pursuant to Federal Rule of Civil Procedure 53 and the Court's equitable powers to enforce its orders, we appoint Cardelle B. Spangler to serve as special master, subject to the supervision and orders of the Court. Ms. Spangler has served as the RCA since 2010, and her experience in that capacity will be invaluable in permitting her to hit the ground running for this appointment and to efficiently and effectively discharge the duties set forth below. The appointment shall be effective upon the filing required by Fed. R. Civ. P. 53 (b)(3)(A) and the Court's determination that it shows no ground for disqualification under 28 U.S.C. § 455.

We appoint the Special Master to do the following with all reasonable diligence:

1. Work with the County Clerk to develop (with the input of plaintiffs' counsel) a list of exempt positions to be approved by the Court. Pending approval of any new list, the County Clerk may not hire persons as non-exempt employees for positions which are not on the 1991 List of Exempt Positions without prior court approval;

2. Review the County Clerk's recently adopted personnel policy and monitor the County Clerk's application of that policy to determine whether the policy is in fact applied in the observance rather than the breach (which we deem important in light of the evidence that there has been frequent disregard of the prior policies concerning applications for employment), identify any discrepancies in the application of the policy, and propose any appropriate revisions;

3.  Recommend policies to govern the solicitation of political donations or support and the reporting of any such solicitations;

4.  Review the incorporation of the Recorder's Office into the County Clerk, to determine, among other things, whether political considerations are improperly used in deciding which Recorder' Office non-exempt employees are retained by the County Clerk; and

5.  Make recommendations as to how to remedy any violations of the Consent Orders that she might find in conducting the foregoing activities.

The Special Master shall have the right to retain counsel and to employ staff in order to fulfill the duties of her appointment as set forth above. The Special Master, her counsel and her staff, as well as the parties and their counsel, shall be permitted to have *ex parte* communications with the Court. The Special Master, her counsel and her staff shall be permitted have *ex parte* communications with the parties and the parties' counsel. During the pendency of any contested motion, the Court shall not have any *ex parte* communications with the parties or their counsel relating to the motion.

In the course of performing the duties hereunder, the Special Master and her counsel shall have the power to cause subpoenas to be issued, and to take testimony to the same extent as a lawyer for a party in discovery proceedings in civil litigation pursuant to the Federal Rules of Civil Procedure. The County Clerk and her employees shall cooperate with the Special Master in connection with her activities pursuant to this Memorandum Opinion and Order and any further orders of this Court, including providing reasonable access to all relevant, non-privileged documents and reasonable access to employees at all levels. The County Clerk shall provide the Special Master access to non-privileged information, in whatever form it is maintained in the ordinary course of business, that is necessary or appropriate to the exercise of her authority. Any

42

non-privileged but confidential information provided to the Special Master shall be subject to a confidentiality order to be submitted to the Court for entry by May 8, 2020. The Special Master shall use her best efforts to minimize disruption to the workplace during the course of her activities.

The Special Master shall periodically file written reports concerning her work, including any findings and recommendations. The Special Master shall serve on the parties a draft of her initial report by August 3, 2020. The parties shall provide any comments on the draft report by August 10, 2020. The Special Master shall file her initial report by August 17, 2020.   The Special Master shall file reports every 120 days thereafter, with the same advance time period for providing drafts to the parties and for the parties to offer any comments. Any party who wishes to file an objection to a report the Special Master has filed must do so within 14 days after the report has been filed.

The County Clerk shall compensate the Special Master and her counsel at the hourly rate of $250.00. The County Clerk shall compensate any employees or contractors the Special Master deems necessary to fulfill her duties at such other rates that are agreed upon among the parties and the Special Master or, in the absence agreement, ordered by the Court. The County Clerk shall pay the reasonable costs necessary to fulfill the work of the Special Master. The Special Master and her counsel shall submit itemized bills for their services and costs on or before the fifteenth day of each calendar month for the previous month ('the billing period"). The Special Master and the County Clerk shall cooperate informally to resolve any billing disputes without the need for Court intervention. On or before the last day of the month following the billing period, the Special Master and her counsel shall file the finalized bills for their services for the preceding billing period and shall served copies of the same on counsel for the County Clerk and the plaintiffs. The County Clerk shall have 10 days to file with the Court any specific written objections to any time billed or

costs incurred; any objections not filed within this time period are shall be deemed waived. The County Clerk shall pay the Special Master and her counsel the fees and costs within 60 days after the Court order approving the fee and cost bill.

The appointment of the Special Master to perform the foregoing tasks is for a defined period of time, extending through August 31, 2021. By June 30, 2021, the Special Master and the parties shall advise the Court as to their views concerning whether the period of appointment should be extended. All provisions in this Memorandum Opinion and concerning the appointment of the Special Master, including the duration of the appointment, may be amended at any time after notice to the parties and an opportunity to be heard.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: April 17, 2020**