**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 69-2145 |
| DEMOCRATIC ORGANIZATION OF COOK | ) | |
| COUNTY, *et al.,* | ) | Judge Edmond E. Chang |
| | ) | |
| Defendants. | ) | |

**<u>GOVERNOR'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO VACATE THE MAY 5, 1972 CONSENT DECREE</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

   I.   HISTORY OF THE *SHAKMAN* LITIGATION ................................................. 3

      a.   The Beginning of this Litigation ................................................................. 3

      b.   The 1972 Decree ......................................................................................... 5

      c.   Relevant Proceedings Subsequent to the Consent Decree ........................... 6

      d.   *Shakman* Proceedings with Respect to the Governor and the State ............... 9

      e.   Summary of the State's history as it relates to the current motion ............... 20

  II.   ARGUMENT ......................................................................................................... 22

      a.   Legal Standard ........................................................................................... 23

      b.   Significant changes in factual conditions compel termination of the decree. ............... 24

          i.   The State has a comprehensive Exempt List and an Exempt Employment Plan. ...... 24

         ii.   The State has an independent, permanent Office of Executive Inspector General with a dedicated Hiring and Employment Monitoring Division ........................................ 26

       iii.   The State has adopted many other significant improvements in its employment procedures ................................................................................................. 28

       iv.   The objective of the 1972 decree has been achieved ................................. 30

        v.   There is no basis for systemic intervention. .............................................. 33

      c.   Significant changes in the law compel termination of the decree. ................ 35

      d.   There is no ongoing violation of federal law, and any additional requirements imposed on the State would be aimed at eliminating conditions that do not implicate federal law. ................................................................................................. 39

i

## TABLE OF AUTHORITIES

### Cases

*Evans v. City of Chicago*, 10 F.3d 474 (7th Cir. 1993)....................................................... 3, 40, 42

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) .................................................. 38

*Gordon v. Caribbean Cruise Line, Inc.*, 2019 WL 498937, at *8 (N.D. Ill. Feb. 8, 2019) .......... 37

*Horne v. Flores*, 557 U.S. 433 (2009) ....................................................... 23, 24, 41, 42

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011) ................................... 32

*Komyatti v. Bayh*, 96 F.3d 955 (7th Cir. 1996)........................................................................ 39

*Loertscher v. Anderson*, 893 F.3d 386, (7th Cir. 2018),

    *reh'g and suggestion for reh'g en banc denied* (July 17, 2018)................................................. 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 2

*O'Sullivan v. City of Chicago*, 396 F.3d 843 (7th Cir. 2005)................................................ *passim*

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. 205*,

    246 F.3d 1073 (7th Cir. 2001) ................................................................ 1, 23, 24, 34

*People Who Care* v. *Rockford Bd. of Educ., Sch. Dist. 205*,

    961 F.2d 1335 (7th Cir. 1992) .............................................................................. 30, 34

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................................. 38

*Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001)...................................................................... 34, 35

*Plotkin v. Ryan*, 1999 WL 965718, at *3 (N.D. Ill. Sept. 29, 1999),

    *aff'd*, 239 F.3d 882 (7th Cir. 2001)............................................................................ 35

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)................................................ 7, 36, 37

*Rutan v. Republican Party of Illinois*, 868 F.2d 943 (7th Cir. 1989),

    *aff'd in part, rev'd in part*, 497 U.S. 62 (1990) ........................................................ 7, 36, 37, 40

*Salazar by Salazar v. D.C.*, 896 F.3d 489 (D.C. Cir. 2018) ........................................... 32, 33, 34

*Shakman v. City of Chicago*, 426 F.3d 925 (7th Cir. 2005)................................................. *passim*

*Shakman v. Democratic Org. of Cook Cnty.*, 310 F. Supp. 1398 (N.D. Ill. 1969) ........................ 4

*Shakman v. Democratic Org. of Cook Cnty.*, 356 F. Supp. 1241 (N.D. Ill. 1972) ........................ 6

*Shakman v. Democratic Org. of Cook Cnty.*, 435 F.2d 267 (7th Cir. 1970), *cert denied* 91 S.Ct.

    1383 (1971) ........................................................................................................ 4, 20

*Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315 (N.D. Ill. 1979), *vacated*,
 *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied*, 484 U.S. 1065 (1988)........... 3

*Shakman v. Democratic Org. of Cook Cnty.*, 829 F.2d 1387 (7th Cir. 1987)....................... *passim*

*United States v. Armour & Co.*, 402 U.S. 673 (1971) .................................................... 32

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................... 37

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................... 37

*Winpisinger v. Watson*, 628 F.2d 133 (D.C. Cir. 1980)................................................ 35

**Statutes**

42 U.S.C. § 1983 ............................................................................................ 7

5 ILCS 430/20-10 ................................................................................... 15, 16, 26

5 ILCS 430/20-20 ........................................................................................ 16, 26

5 ILCS 430/20-70 ............................................................................................ 16

5 ILCS 430/5-15 .............................................................................................. 30

**Treatises**

Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.2 (2003) ........................................... 38

JB Pritzker, in his official capacity as Governor of the State of Illinois, by his attorney, Kwame Raoul, Attorney General of Illinois, moves this Court, pursuant to Federal Rule of Civil Procedure 60(b), to vacate the consent decree entered on May 5, 1972 by Judge Abraham Marovitz.  In support of this motion, the Governor states as follows:

## INTRODUCTION

For the past 48 years, the State of Illinois has been subject to the 1972 *Shakman* consent decree.  Governor Richard Ogilvie agreed to the decree; eight administrations since then inherited it.  The 1972 decree is attached as Exhibit A.  Since Plaintiffs sought supplemental relief in 2014, a Special Master has overseen the employment policies, practices, and decisions made by the State.  "[S]tates … have a right to the restoration of control over the institutions of state [] government as soon as the objectives of the federal remedial decree have been achieved." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. 205*, 246 F.3d 1073, 1075–76 (7th Cir. 2001).  For two principal, independent reasons, that time has come.

*First*, the State has reformed its employment practices to unquestionably pass constitutional muster.  The State has instituted a durable solution to prevent future patronage employment practices.  It has a comprehensive "exempt list" – approved by the Plaintiffs, the Special Master, and the Court – which the Court identified as the central infirmity of the State's prior employment practices when Plaintiffs sought supplemental relief in 2014 and 2016.[1]  In addition, the State, by statute, has instituted an independent oversight structure in the Office of Executive Inspector General, which has within it a dedicated Hiring and Employment Monitoring Division – comprised of ten professionals with expertise and experience in

---

[1] "Exempt" positions are those for which political affiliation is an appropriate consideration because they involve policymaking or confidential roles.  "Non-exempt" positions are those for which political affiliation is not an appropriate consideration.

monitoring the State's employment practices to prevent and uncover political and other forms of discrimination, misconduct, and inefficiency.

In addition, the Special Master exhaustively has monitored the State's employment policies and practices for the past six years, and has filed 350 pages of detailed reports describing her work and her findings. Those reports acknowledge the State's "significant progress," *e.g.*, Dkt. 6565 at 1, and do not identify a single patronage violation during that timeframe – let alone the kind of widespread illegal policies or practices to justify continued systemic intervention.

*Second*, during the protracted life of the decree, this case has become unmoored from the Constitution. Article III confines courts to cases and controversies involving individual federal rights. To ensure the presence of a case and controversy, Article III requires, as an irreducible constitutional minimum, an injury that is fairly traceable to the defendant's allegedly unlawful conduct, and that is likely to be redressed by the requested relief. *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs are two private lawyers who, regardless of how they came to be litigants in 1969, now in no respects satisfy this constitutional minimum. They simply are not affected, let alone injured, by the State's employment policies – they are not State employees and have no desire to become State employees.

A half century ago, Plaintiffs obtained a foothold to standing and to a federal forum by complaining of a specific patronage scheme. Plaintiffs alleged that as an independent candidate for the 1970 Illinois Constitutional Convention and a voter supporting that candidate, they were injured by a systemic practice whereby incumbents forced public employees to do political work and make political donations at the risk of being fired. Plaintiffs alleged that this army of campaign workers co-opted from the ranks of public employees tipped the electoral playing field such that candidates and voters themselves suffered cognizable injury.

Now, almost five decades since the decree was entered, Plaintiffs do not and cannot plausibly assert that the State is perpetuating any such scheme. Similarly, the standing jurisprudence that originally (although tenuously) recognized Plaintiffs' claim to involve a justiciable case-and-controversy has evolved to unequivocally preclude litigating generalized grievances and policy preferences in the federal courts. The factual and legal predicates upon which the federal court originally entered the 1972 decree therefore no longer exist.

As a result, the Constitution compels termination of the decree, not its continued existence. In evaluating whether to vacate a consent decree, "concerns of federalism should factor strongly into the court's analysis." *O'Sullivan v. City of Chicago*, 396 F.3d 843, 868 (7th Cir. 2005). "Unless there is a substantial claim under federal law, the district judge should not enter or continue to enforce a consent decree affecting the operation of a governmental body." *Evans v. City of Chicago*, 10 F.3d 474, 482 (7th Cir. 1993). There remains no case-and-controversy and no federal interest in this case to justify the extraordinary intrusion of a federal court into sovereign State affairs.

As explained further below, these developments compel an unequivocal conclusion: there is no basis for continued federal court involvement in the State's employment practices. After nearly half a century, it is time for the 1972 decree to sunset.

I.  **HISTORY OF THE *SHAKMAN* LITIGATION**

   a.  **The Beginning of this Litigation**

Plaintiffs Michael Shakman and Paul Lurie filed this action in 1969. Shakman was an unsuccessful candidate in the November 1969 election for delegates to the 1970 Illinois Constitutional Convention. *See Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1320 (N.D. Ill. 1979), *vacated*, *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied*,

484 U.S. 1065 (1988).  Lurie was a resident of the same voting district and supported Shakman's

candidacy.  *Id.* at 1320.  Shakman claimed injury to his ability to compete as a candidate for

public office, and both plaintiffs claimed injuries as voters.  *Id.* at 1321.  "Plaintiffs' principal

theory [was] that the use of state and local government patronage power to coerce political

support for the regular Party organizations and their candidates violate[d] independents' rights to

fair and equal participation in the electoral process."  *Id.* at 1320.  Neither plaintiff claimed

injury as a public employee or an applicant for public employment.

The district court initially dismissed Plaintiffs' complaint.  *Shakman v. Democratic Org.

of Cook Cnty.*, 310 F. Supp. 1398 (N.D. Ill. 1969).  It held that plaintiffs lacked standing to assert

the constitutional rights of public employees, and that, even if plaintiffs could assert their own

rights had been violated, those violations were derivative of the claims of public employees who

were coerced to engage in political activities, and plaintiffs could not represent the interests of

those persons.  *Id.* at 1400-01.

In a 2-1 decision, the Seventh Circuit reversed.  *Shakman v. Democratic Org. of Cook

Cnty.*, 435 F.2d 267 (7th Cir. 1970) ("*Shakman I*").  The Seventh Circuit explained that plaintiffs

alleged that public employees "are required, as a condition of keeping their jobs, or in order to

escape discipline, to contribute money to the county democratic organization, or its affiliates, or

endorse candidates, and to do political work for such organizations and candidates.  Some of

such allegedly coerced work is done during regular working hours and some on the [employee's]

own time.  The defendants, it is alleged, coerce [employees] by this means to give votes, political

support, campaign work, and money to candidates endorsed by the organization and its

affiliates."  *Id.* at 269.

Because this alleged scheme of coerced political work and donations favored incumbent

candidates to the detriment of their challengers, the Court held that plaintiff candidates and

voters were "seeking redress for injuries to their own interests" and had standing in that capacity.

*Id.* Defendants filed a petition for certiorari which was denied. 402 U.S. 909 (1971).

**b. The 1972 Decree**

Following denial of certiorari, forty-two Defendants including the then-Governor of

Illinois Richard B. Ogilvie, agreed to the 1972 consent decree. The section of the decree

enjoining Defendants' conduct is narrow and prohibitory. It states in relevant part:

> E.     Each and all of the defendants and others named or referred to in paragraph C
> above are permanently enjoined from directly or indirectly, in whole or in part:
>
>> (1) conditioning, basing or knowingly prejudicing or affecting any term or aspect
>> of governmental employment, with respect to one who is at the time already a
>> governmental employee, upon or because of any political reason or factor.
>
>> (2) knowingly causing or permitting any employee to do any partisan political
>> work during the regular working hours of his or her governmental
>> employment, or during time paid for by public funds; provided that nothing
>> contained in this subparagraph (2) shall prohibit governmental employees
>> from voluntarily using vacation time, personal leave time or from taking
>> nonpaid leaves of absence to do political work, but permission to do so must
>> be granted nondiscriminatorily.
>
>> (3) knowingly inducing, aiding, abetting, participating in, cooperating with or
>> encouraging the commission of any act which is proscribed by this paragraph
>> E, or threatening to commit any such act.

The decree at its core thus prohibits elected officials from forcing government employees to

perform campaign work or else be fired or otherwise punished. As the Seventh Circuit put it, the

decree prohibits "a system of coerced political work demanded of those already employed by the

government as a condition of continued employment." *Shakman v. Democratic Org. of Cook

Cnty.*, 829 F.2d 1387, 1398 (7th Cir. 1987) (*"Shakman II"*). The decree by its terms is limited

geographically to "employment within the Northern District of Illinois." 1972 consent decree ¶

B.

### c.  Relevant Proceedings Subsequent to the Consent Decree

Since this case was filed in 1969, the district court, the Seventh Circuit, and the Supreme Court have issued numerous decisions relevant to this motion.

**1972: District Court holds that *Shakman* prohibits only political considerations which affect voter and candidate rights – *i.e.*, coerced political work.**  In 1972, the district court heard motions to dismiss by the defendants that had not signed on to the consent decree. *Shakman v. Democratic Org. of Cook Cnty.*, 356 F. Supp. 1241 (N.D. Ill. 1972).  The Court affirmed that "*Shakman* prohibits only political considerations *which [a]ffect voter and candidate rights.*"  *Id.* at 1248.

**1987: Seventh Circuit holds that voters and candidates do not have standing to challenge governmental hiring practices.**  In 1987, the Seventh Circuit held that voters and candidates for public office do not have standing to challenge governmental hiring policies. *Shakman II*, 829 F.2d at 1399 ("Because we have determined that the plaintiffs do not have standing to assert the claim they bring to this court, we can proceed no further…. Those aspects of the complaint which challenge the patronage hiring practice of the defendants are dismissed.").  In reaching this holding, the Court noted that, in the years between the 1972 decree and its 1987 decision, "the Supreme Court has engaged in a thorough examination of 'justiciability,' the limitations imposed on federal courts by the 'case-and-controversy' provision of article III."  *Id.* at 1393.  The Court found the "line of causation between the appellants' activity" – alleged patronage hiring practices – "and the appellee's asserted injury to be particularly attenuated."  *Id.* at 1397.

The *Shakman II* Court explained that its holding did not address the "question of whether the plaintiffs would have standing to attack the constitutionality of the coerced political work

demanded of those already employed by the government as a condition of continued employment" – therefore not "affecting the continued validity of the *Shakman* decree." *Id.* at 1399.

**1990: Supreme Court issues the decision in *Rutan*.** In 1990, the Supreme Court issued its decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990). *Rutan* held that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Id.* at 75. The decision affirmed that allegations of political discrimination brought by public employees state claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments. Thus, since 1990, non-exempt State employees have been able to bring their own First Amendment claims if their employment status changed because of political considerations.

The Supreme Court left undisturbed the Seventh Circuit's holding that the *voters* who were plaintiffs in *Rutan* did not have standing to bring *Rutan* claims. *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 958 (7th Cir. 1989), *aff'd in part, rev'd in part*, 497 U.S. 62 (1990).

**2005: Seventh Circuit expresses serious concerns about voter standing and federalism.** In 2005, the Seventh Circuit held that in order to exit the *Shakman* decree, Rule 60(b) governs. *O'Sullivan v. City of Chicago*, 396 F.3d 843 (7th Cir. 2005) ("*Shakman III*"). When performing that analysis, "[t]he district court should consider critically whether changes in the legal landscape … require modification or vacatur," and that "two important developments … should guide the district court's analysis." *Id.* at 868. The first is that "concerns of federalism should factor strongly into the court's analysis." *Id.* The second is that "the court must consider the significant changes in the law of voter standing since the entry of the [decree]." *Id.* The Court made clear that "the focus of the district court shall be not on the law

of standing as a jurisdictional concept but on the equitable standards embodied in Rule 60(b)(5)," and that the district court "should consider whether the class of voters has the incentive to vigorously litigate and present the matter of political patronage to the court in the manner best suited for judicial resolution." *Id.* It explained: "As *Shakman II* makes clear, we have serious concerns whether the plaintiffs as voters bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*," adding that "a decree fashioned in litigation in which one of the litigants did not have a sufficient concrete stake in the outcome might contain provisions that are not worthy of continued enforcement by a federal court." *Id.*

**2005: Seventh Circuit reverses and remands the district court's denial of the City's Rule 60(b) motion.** Shortly thereafter, the *Shakman* case again came before the Seventh Circuit on the City of Chicago's appeal of the district court's denial of its Rule 60(b) motion. *Shakman v. City of Chicago*, 426 F.3d 925 (7th Cir. 2005) ("*Shakman IV*"). The Seventh Circuit reversed and remanded, explaining that "[i]n sum, we do not believe that the district court's denial of the City's Rule 60(b) motion can be reconciled with this Court's decision in *O'Sullivan* or the decisions of the Supreme Court in *Rufo* [*v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992)] and *Frew* [*v. Hawkins*, 540 U.S. 431 (2004)]." *Id.* at 936. Those authorities make clear that, when considering a Rule 60(b) motion with respect to public litigation, the nature of that litigation must factor into the district court's decision-making process; the public interest and 'concerns of federalism' should guide the court's analysis." *Id.* at 936 (citing *Shakman III*, 396 F.3d at 868). The Court stressed that "[a] very important fact in this case is that the 1983 Consent Decree provides for the ongoing involvement of a federal district court in the hiring decisions of the City of Chicago," and that "[t]he decisions of the Supreme Court and of this court have noted the need to avoid, when possible, interference in the decision-making process of

local governmental leaders by extending, unnecessarily, the life of a consent decree whose objectives have been achieved or have become unjust, illegal, or unattainable." *Id.* at 933 (citing cases).

The Seventh Circuit further explained that on remand "the district court's Rule 60(b) analysis must account for 'the significant changes in the law of voter standing since the entry of the … decree." *Id.* at 936. It instructed the district court, "guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation … or whether that task is best left to individuals directly impacted by hiring decisions made by the City." *Id.*

### d. *Shakman* Proceedings with Respect to the Governor and the State

In the fifty years that this case has been litigated, it has proceeded differently for various Defendant governmental units. The specific posture of this case with respect to the State is important to understand the specific aspects of *Shakman* that apply and do not apply to the State.

**Between 1972 and 2009: Other governments enter additional consent decrees and Supplemental Relief Orders, but there is no case activity with respect to the State.** After then-Governor Richard B. Ogilvie entered the consent decree at issue in 1972, a number of other governments signed on to additional decrees and Supplemental Relief Orders that imposed requirements beyond the 1972 decree. For instance, many governments including the City of Chicago agreed to a 1983 consent judgment that extended the prohibitions to include patronage hiring. In 2006, Cook County entered a Supplemental Relief Order that imposed a number of additional obligations on the County, including obligations relating to hiring. Dkt. 531. The City of Chicago entered a similar Agreed Settlement Order and Accord in 2007. Dkt. 601. The County Clerk entered a "Hiring and Exemptions" consent judgment in 1991. Dkt. 6486-2. In contrast, the State has not agreed to additional relief or obligations, and it remains bound by only

the 1972 consent decree. This means that, unlike the cases against other defendants, only voter and candidate interests are at issue, and "hiring" remains off the table in this case.

**2009-2010: Plaintiffs move for supplemental relief.** In December 2009, Plaintiffs sought against the State "supplemental relief with respect to the 1972 Order similar to the supplemental relief orders entered by this Court in the last several years with respect to the City of Chicago, Cook County and other governmental offices." Dkt. 1460 ¶ 11. Then-Governor Patrick Quinn opposed the request for supplemental relief. Dkt. 1551. Plaintiffs did not file a reply and never sought a ruling on their motion.

**2014: Plaintiffs again seek supplemental relief for the entire State; the Court appoints a special master for the Illinois Department of Transportation (IDOT).** In 2014 – forty-two years after entry of the decree – Plaintiffs filed what they called an "Amended Motion for Entry of Supplemental Relief." Dkt. 3744. The Plaintiffs cited as the principal basis for their motion an August 14, 2013 report by the Better Government Association. *Id.* at 6. The Plaintiffs' motion centered on the argument that IDOT had taken advantage of the fact that the State did not have a single, comprehensive, and accurate list of "exempt" job positions. They argued that IDOT inappropriately placed political hires into "staff assistant" positions that should have been filled without regard to political preference. As Plaintiffs described in their motion:

> The scheme worked as follows: IDOT created or re-designated numerous "staff assistant" or "executive secretary" positions, which it designated as *Rutan*-exempt even though the jobs performed by those placed in the positions did not in actuality require the sort of policy-making tasks that would qualify the positions as exempt. These *faux*-exempt positions were filled with employees based on political considerations rather than qualifications. Many of these hires were 'dumped' on IDOT managers who did not ask for or want to manage the employees. Later … the politically-hired employees were promoted or transferred into non-exempt, often unionized positions in order to make it harder to terminate the employees. These promotions or transfers were motivated by political considerations, in violation of both *Rutan* and the 1972 Order.

*Id.* at 7; *see also* Dkt. 4128 at 5 ("[T]he Plaintiffs filed an Amended Motion for Entry of

10

Supplemental Relief in 2014, alleging that IDOT improperly created or reclassified numerous 'Staff Assistant' or 'Executive Secretary' positions as *Rutan*-exempt (e.g., positions where party affiliation is an appropriate requirement for the effective performance of the job) even though the work performed by those employees should be *Rutan*-covered.  The Plaintiffs further alleged that the 'faux-exempt positions' were improperly filled with employees based on political consideration rather than qualifications—in violation of *Rutan* and the 1972 Decree.").  Plaintiffs specified that the complained-of practices "began in or about 2003 under Governor Blagojevich and continued until the end of 2011 or early 2012 under Governor Quinn."  *Id.* at 6.

Plaintiffs sought "authority to take discovery" and obtain relief including "additional injunctive relief"; the "appointment of a special master … to investigate and recommend appropriate reforms in the employment practices for non-exempt jobs under the jurisdiction of the Governor within the Northern District of Illinois"; "Development … of a hiring, promotion, reassignment and employment plan for non-exempt positions"; and "Development … of a list of employment positions that are properly exempt from the rules against political sponsorship or conditioning employment upon political factors or considerations."  *Id.* at 9-10.

The Court awarded Plaintiffs the relief it determined was appropriate.  Specifically, the Court appointed a Special Master for IDOT, finding "that compliance with the decree is best served by having a transparent process in which an agent of the Court is involved in further investigating the scope and reason for what occurred, recommending the measures that may be necessary to prevent any recurrence and then in assessing the implementation of those efforts to ensure that they are effective."  *Id.* 16:25-17:6. The Court explained that "[a] special master performing those very targeted functions will not usurp the responsibilities of officials to run the affairs at IDOT, but rather will help ensure that IDOT's employment practices comply with the

11

requirements of the decree." *Id.* 17:7-11.

The Court declined to afford Plaintiffs the additional relief that they had sought, however. It declined to order relief as to agencies under the Governor's jurisdiction except IDOT; it declined additional injunctive relief; and it declined to allow Plaintiffs to take discovery. 10/22/14 Hr'g Tr. 9:12-22 (attached as Exhibit B). While Plaintiffs argued that their 2014 evidence "establishe[d] the need for supplemental relief with respect to the 1972 Order similar to the supplemental relief orders entered by the Court in the last several years with respect to" a number of other defendants, Dkt. 3744 at 9, the Court did not impose such an order.

The Court entered its Order appointing Noelle C. Brennan as Special Master pursuant to Rule 53 on November 18, 2014. Dkt. 4020. The Court charged the Special Master with investigating IDOT's misuse of the "staff assistant" position, and with recommending measures to prevent recurrence and to remedy the past violations. That Order instructed that "[t]he Special Master … shall with all reasonable diligence":

(i)     investigate the scope and reason for any violation of the 1972 Decree regarding the Illinois Department of Transportation ("IDOT"),

(ii)    recommend measures that may be necessary or appropriate to prevent any recurrence,

(iii)   assess the implementation of those efforts to ensure that they are effective,

(iv)    address whether positions in IDOT labeled as exempt were properly exempt under applicable legal principles, and

(v)     make recommendations for how to remedy any violations of the 1972 Decree.

*Id.* ¶ 3.

**2016-2017: Plaintiffs move for and the Court orders expansion of the Special Master's responsibilities to cover aspects of exempt employment beyond IDOT.** In 2016, Plaintiffs moved to expand the Special Master's responsibilities to include certain aspects of

exempt employment at all of the Governor's other agencies, not just with respect to IDOT. Dkt. 4676. Specifically, Plaintiffs requested to expand the Special Master's responsibilities to include:

    (i)    Reviewing all positions under the jurisdiction of the Governor designated as "exempt";

    (ii)    Developing a single and comprehensive list of all "exempt" positions – an "Exempt List";

    (iii)    Developing procedures for revision of the Exempt List; and

    (iv)    Investigating whether certain positions designated as "exempt" qualify under applicable law.

*Id.* at 1-2.

Plaintiffs argued that "[t]he relief sought in this Motion" – expansion of a Special Master's jurisdiction – "is warranted because the process of developing an Exempt List has not proceeded with reasonable speed …." *Id.* at 4. They characterized their "prior motions that led to the appointment of the Special Master in 2014 resulted from the widespread unlawful practices in defining and filling exempt positions under the Quinn Administration." *Id.* They repeated their core concern that "[t]he lack of a single comprehensive list of Exempt Positions and of an established procedure for revising the list of Exempt Positions permitted the Quinn administration to appoint approximately 300 individuals as purportedly exempt IDOT 'technical assistants' despite the fact that they did not warrant exempt status." *Id.*

Over the State's objection (Dkt. 4725), the Court granted the motion and expanded the Special Master's responsibilities to extend to the Governor's other agencies beyond IDOT ("Statewide"). Dkt. 4798. The Court explained that "[a] review of the exempt positions at the other agencies [besides IDOT] will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt

status receive that label, and that robust processes are in place to ensure that remains the case."
*Id.* at 3.  The State had agreed that a review of exempt positions was appropriate, but argued that
"expansion of the Special Master's authority will needlessly duplicate the work of the newly
established Hiring and Employment Monitoring unit in the Office of the Executive Inspector
General."  Dkt. 4725 at 1.

The Court reasoned that "in our judgment, involving the Special Master in the endeavor
from the outset will better promote effectiveness of the review, and will cost the State less
money in the long run," and that "[t]he support and assistance of the Special Master is vital to
ensure that review of exempt positions across the State occurs within a reasonable time frame."
Dkt. 4798 at 4, 6.  Although the Court "applaud[ed] the creation of" the HEM unit, it reasoned
that "we are not convinced that the newly-created HEM unit currently possesses the experience
or expertise to take on the investigation and review of exempt positions – and the process for
determining which positions are exempt – for the entire state of Illinois without the active
involvement of the Special Master."  *Id.* at 5.  At the same time, the Court explained that "[o]ne
goal of our order is to encourage the fastest and most efficient transfer of knowledge and
experience from the Special Master to HEM unit employees so that they may carry more of the
burden."  *Id.* at 6.

The Court therefore expanded the authority of the Special Master to encompass the four
responsibilities listed above that the Plaintiffs had set out in their motion.  *Id.* at 6-7.  Those
responsibilities were formalized in an Order expanding the Special Master's responsibilities
under Rule 53.  Dkt. 5004.  The four responsibilities reduce to two principal ones: developing a
comprehensive "Exempt List" and developing procedures for revising that list.  *Id.*

**2014-present: Extensive monitoring and oversight by the Special Master.** From 2014 to present, the Special Master and her team have performed extensive monitoring at IDOT. The Special Master has filed eleven reports with respect to IDOT, totaling approximately 250 pages. Those reports contain a number of recommendations for IDOT to adopt, most of which have been adopted. From 2017 to present, the Special Master and her team likewise have had significant involvement in Statewide exempt employment. The Special Master has filed six reports and a supplement with respect to the State, totaling another 100 pages. The Special Master solicits and investigates both anonymous and named complaints regarding the State's employment practices through the website www.ShakmanIllinois.com. *See* Dkt. 4128 at 3. To give the Court a sense of the thoroughness of the Special Master's work, the cost outlay to the State with respect to the Special Master's team, which is currently comprised of six people, has been over $4 million – which equates to approximately 16,000 hours of work at the Special Master's compensated rate of $250 per hour.

**2016-present: Extensive monitoring and oversight by the Office of Executive Inspector General and Hiring & Employment Monitoring Division.** In the State Officials and Employees Ethics Act ("Ethics Act"), 5 ILCS 430/20-10(a), the Illinois General Assembly created the Illinois Office of Executive Inspector General ("OEIG"), "a fully independent office with separate appropriations" under "the direction and supervision of an Executive Inspector General." The Executive Inspector General is appointed by the Governor, with the advice and consent of three-fifths of the Illinois Senate, to a five-year term from which she can only be removed for cause. 5 ILCS 430/20-10(b), (f). The current Executive Inspector General, Susan M. Haling, was appointed by Governor Bruce Rauner and reappointed by Governor Pritzker. The OEIG has approximately 72 full-time equivalent employees and had an annual operating

budget in fiscal year 2020 of approximately $7.75 million.

Under the Ethics Act, the OEIG has broad jurisdiction "to investigate allegations of fraud, waste, abuse, mismanagement, misconduct, nonfeasance, misfeasance, malfeasance, or violations or this Act or violations of other related laws and rules." 5 ILCS 430/20-10(c). The statute specifically charges OEIG with "review[ing] hiring and employment files of each State agency … to ensure compliance with *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), and with all applicable employment laws." 5 ILCS 430/20-20(9). To fulfill its statutory role, the OEIG has the authority to issue subpoenas and compel the attendance of witnesses, and a person refusing to comply with a subpoena "shall be subject to punishment as may be determined by a court of competent jurisdiction." 5 ILCS 430/20-20(2), (3) and 20-35. State officers and employees have a specific duty "to cooperate with the [EIG] … in any investigation undertaken pursuant to [the Ethics] Act." 5 ILCS 430/20-70. And the failure to cooperate with the OEIG "is grounds for disciplinary action, including dismissal." *Id*.

In 2015, the OEIG created a separate compliance division known as the Hiring & Employment Monitoring Division – referred to as "HEM." The Executive Inspector General submitted a memorandum to the Court that describes in detail the OEIG's role in monitoring and investigating State hiring and employment. Dkt. 6936. In it, the Executive Inspector General notes that the OEIG's "investigations … have brought many hiring issues to the attention of the State and the public, including the IDOT investigation that prompted these proceedings." *Id*. at 24. The Executive Inspector General's Memorandum further describes how "[i]n addition to identifying hiring issues through its investigations, the OEIG recognized the necessity of a vigorous compliance role, and thus expended significant time and resources to create a 10-person compliance unit, HEM, to work directly with agencies to implement, monitor, and enforce

16

proper State hiring practices and procedures." *Id*. HEM's ten employees "include[e] a director, three attorneys, a supervising analyst, four analysts, and a project manager." *Id*. at 3. As that staffing reflects, the OEIG has devoted significant resources to "its mission of ensuring competitive State hiring free of political or any other manipulation." *Id*. at 24.

**2017: The Special Master completes her IDOT investigation.**  With respect to IDOT, the Court in 2014 ordered the Special Master to investigate IDOT's use of the "staff assistant" positions.  As the Court explained, "plaintiffs ask that I appoint an officer to conduct an investigation in the wake of evidence … in the OEIG report … at IDOT regarding the use of staff assistant positions that were labeled as exempt, meaning that partisan political considerations could be used in determining who would receive these positions.  But that, in fact, the people who went into the positions performed job duties that largely or exclusively fell into the category of non-exempt positions, meaning that the people who filled jobs of that character had to be selected without regard to partisan political considerations." 10/22/14 Hr'g Tr. 7:23-8:8; *see also id.* 8:15-21 ("[A]ccording to the Inspector General report, some of the people who were hired into the staff assistant positions but who actually performed non-exempt work, had partisan political connections. … [The Plaintiffs] say that this conduct violates the 1972 consent decree.").

The Special Master accordingly was tasked with "very targeted functions," 10/22/14 Hr'g Tr. 9:21-22, relating to investigating misuse of the "staff assistant" position that led to her assignment and recommending measures to prevent recurrence and to remedy the past violations. The Special Master completed her investigation in an 89-page report filed on April 24, 2017. Dkt. 4988; *see also* Dkt. 5069 at 1 ("[T]he Special Master and her staff completed the investigation into the Governor's Office's involvement in the misuse of the Staff Assistant

position at IDOT ….").  In the three years since then, the Special Master has made myriad recommendations and assessed implementation of those recommendations, such that the functions the Court assigned her with respect to IDOT and misuse of the Staff Assistant position now are complete.

Two principal developments merit specific mention.  First, on December 4, 2017, the Court issued an Order Creating a Review Process for Applications of Former Staff Assistant for Positions at IDOT.  Dkt. 5644.  This created "a procedure for determining, in specific cases, what consideration [IDOT] is to give a Staff Assistant's experience when applying for a non-exempt, Rutan-covered position." *Id.* at 1.  As the Special Master noted, this process "minimize[s] the ongoing impact of previous violations of the 1972 Decree with respect to the Staff Assistant position." Dkt. 5699 at 2.  Second, and as explained further below, the State now has a comprehensive Exempt List.  The Special Master has explained that "[h]aving a finite list ensures that *improper* political hiring is less likely to occur, because no department can simply create and fill an unlimited number of new positions, as was the case with the Staff Assistant positions at IDOT." Dkt. 6306 at 2.

**2019: The Court approves the Governor's Employment Plan for Exempt Positions and Statewide Exempt List.**  As described above, in 2016, the Court expanded the Special Master's duties beyond IDOT to include reviewing positions designated as "exempt" and developing both a comprehensive list of "exempt" positions – an "Exempt List" – and procedures for revising that list. Dkt. 4798.  The Court described this work as "allow[ing] the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case." Dkt. 4798 at 3. The Parties finished that

18

work in 2019.  On January 7, 2019, the Court entered an Agreed Order approving the Governor's

Employment Plan for Exempt Positions, which includes a process for changing the status of

positions from exempt to non-exempt and vice versa.  Dkt. 6158.  On January 22, 2019, the

Court entered an Agreed Order approving the statewide Exempt List (which included IDOT's

exempt positions).  See Dkt. 6180.  The State's Exempt List is updated monthly and available

online at https://www2.illinois.gov/cms/Documents/ExemptList_w_Incumbents.pdf.  The

Employment Plan for Exempt Positions contemplates that, even once the 1972 decree is

terminated, OEIG, HEM, and the State's Civil Service Commission will continue to have

oversight over the addition and deletion of positions on the Exempt List.  Dkt. 6158.

**2019-2020: The State discusses with Plaintiffs and the Special Master its hope to exit**

**the decree.**  As the parties achieved these milestones and the State completed its obligations

under the Special Master's Orders, in late 2019 the State began discussions with the Plaintiffs,

the Special Master, and the Court regarding the State's exit from the decree.  *See* Dkt. 6712 at 2

("The State has been very upfront in stating its intention to seek to exit the 1972 Decree given all

it has accomplished to comply with this Court's orders.").  The State had hoped to exit the decree

during Judge Schenkier's tenure, given all of the progress that he had overseen and his

familiarity with the 2014 and 2017 orders.  However, discussions with the Plaintiffs made clear

that the parties had different understandings regarding the requirements to exit the decree.  In the

Plaintiffs' view, the State could not exit the decree without first adopting and implementing a

"Comprehensive Employment Plan," which would dictate all aspects of State hiring and

employment.  Once implemented, the Plaintiffs believe that they and the Special Master should

monitor the entirety of the Comprehensive Employment Plan and evaluate the State's

performance for at least a year.[2]  Plaintiffs also have indicated their belief that the State must submit to and have its progress measured by a "supplemental relief order" similar to the ones that applied to the City and County before they exited the decree, even though those entities agreed to supplemental relief orders as a means of settling disputes and the State has not.  *See* Dkt. 6789 at 22.

As it became clear that the State could not agree to the Plaintiffs' additional conditions for exiting the decree, the State requested a briefing schedule for its Rule 60(b) motion.  *See* Dkt. 6674.  The State's target date for filing its motion was pushed back, including because its efforts turned exclusively to addressing the Coronavirus pandemic beginning in March 2020.

e.  **Summary of the State's history as it relates to the current motion**

Because the 50+ year history of this case and its nearly 7,000 docket entries are not easily distilled, the State believes the following are the most salient aspects of its specific history for purposes of the present motion:

*First*, the 1972 decree is limited.  It contains a prohibitory injunction, not a mandatory injunction – forbidding "a system of coerced political work demanded of those already employed by the government as a condition of continued employment."  *Shakman II*, 829 F.2d at 1398. There remains a case-and-controversy and a federal claim – if at all – only insofar as Plaintiffs are affected as candidates and voters, such as when challengers are disadvantaged by the structural advantages that coerced political work provides incumbents.  *Shakman I*, 435 F.2d at 269.  The decree is limited geographically to "employment within the Northern District of

---

[2] While the Parties did not reach full agreement on a Comprehensive Employment Plan, the Plaintiffs, the Special Master, and OEIG HEM reviewed and commented on drafts and the State made numerous changes based on those discussions.  The State filed the Comprehensive Employment Plan for the Court's awareness on November 25, 2019.  Dkt. 6612.  The State has begun implementing and training human resources and personnel staff on the Comprehensive Employment Plan, in coordination with HEM.

Illinois." 1972 consent decree ¶ B. The decree does not and, under the Seventh Circuit's decision in *Shakman II*, cannot cover the State's "hiring" policies and practices. 1972 consent decree ¶ E; *Shakman II*, 829 F.2d at 1399.

*Second*, for the first 37 years the decree was in place, Plaintiffs took no action and sought no relief regarding the State's employment policies or practices. In 2009, they filed a motion for supplemental relief and let it languish. Thus, for a full 42 years, Plaintiffs did not seek the additional employment reforms they now attempt to cast as constitutional imperatives. Notably, Plaintiffs did not obtain against the State the supplemental relief orders that ultimately dictated the course of their litigation against other Defendants, including the City and County, and the State did not agree to additional consent judgments like the County Clerk.

*Third*, developments in case law – particularly regarding the case-and-controversy requirement – have left the 1972 decree on dubious legal footing. As the Seventh Circuit explained in *Shakman III*, "we have serious concerns whether the plaintiffs as voters bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*," and "a decree fashioned in litigation in which one of the litigants did not have a sufficient concrete stake in the outcome might contain provisions that are not worthy of continued enforcement by a federal court." 396 F.3d at 868. The Plaintiffs are lawyers who are not and do not want to be State employees. And they are only "candidates" and "voters" in the abstract – not with respect to any particular election that is somehow affected by the State's employment policies.

*Fourth*, when Plaintiffs sought broad new relief as to the State in 2014 and 2016, they focused on the lack of an accurate and comprehensive Exempt List and procedures for revising that list. In ordering a Special Master pursuant to Rule 53, the Court rejected significant aspects of the relief Plaintiffs sought and imposed the relief it determined was warranted. Accordingly,

the Orders relating to the Special Master were limited. The Court's 2014 order was limited to IDOT (not the rest of the Governor's agencies), and the Court described the Special Master as assuming "very targeted functions," 10/22/14 Hr'g Tr. 9:21-22, which are set out in the Rule 53 Order and which necessarily tie back to the violation involving misuse of the "staff assistant" position. Dkt. 4020. The Court's 2017 order was limited to Statewide "exempt" employment. That order requires two significant tasks that encompass the rest: development of a comprehensive "Exempt List" and procedures for revising that list. The Court "encourage[d] the fastest and most efficient transfer of knowledge and experience from the Special Master to HEM unit employees" so that HEM could assume her responsibilities on an ongoing basis. *Id.* at 5.

*Fifth*, the State has accomplished the objectives identified by the Court to address the requirements of the 1972 decree. For eighteen months now, the State has had a comprehensive Exempt List and an Employment Plan for Exempt Positions – agreed to by the Plaintiffs and the Special Master, and approved by the Court. Dkt. 6154; Dkt. 6180. The State also has instituted a robust and permanent oversight structure in OEIG and HEM, which ensures that allegations of political discrimination and patronage in hiring and employment will receive thorough review and investigation by an experienced and independent team of oversight professionals.

## II.   <u>ARGUMENT</u>

After 48 years under the 1972 consent decree, with the past six involving extensive investigation, monitoring, and oversight from the Special Master regarding State employment, it is time for this litigation to come to a close. The State has achieved the objectives of the decree and has instituted an independent and vigorous oversight structure. Further federal involvement would violate the principles of federalism central to our constitutional democracy.

### a. **Legal Standard**

Rule 60(b) "provides a means by which a party can ask a court to modify or vacate a

judgment or order if a significant change either in factual conditions or in law renders continued

enforcement detrimental to the public interest …. The party seeking relief bears the burden of

establishing that changed circumstances warrant relief, but once a party carries this burden, a

court abuses its discretion when it refuses to modify an injunction or consent decree in light of

such changes." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citations omitted).

When a decree imposes "institutional reform" of State government, courts must take a

"flexible approach … to ensure that responsibility for discharging the State's obligations is

returned promptly to the State and its officials when the circumstances warrant." *Id*. at 450. "In

applying this flexible approach, courts must remain attentive to the fact that federal-court decrees

exceed appropriate limits if they are aimed at eliminating a condition that does not violate

[federal law] or does not flow from such a violation.  If [a federal consent decree is] not limited

to reasonable and necessary implementations of federal law, it may improperly deprive future

officials of their designated legislative and executive powers." *Id*. (citations omitted); *Shakman*

*IV*, 426 F.3d at 936 ("[T]he public interest and concerns of federalism should guide the court's

analysis.").

For these reasons, "a critical question in this Rule 60(b)(5) inquiry is whether the

objective of [the original order] has been achieved. If a durable remedy has been implemented,

continued enforcement of the order is not only unnecessary, but improper." *Horne*, 557 U.S. at

450 (citation omitted); *see also People Who Care*, 246 F.3d at 1075–76 ("[T]he states and their

subdivisions have a right to the restoration of control over the institutions of state and local

government as soon as the objectives of the federal remedial decree have been achieved");

*Shakman IV*, 426 F.3d at 933 ("The decisions of the Supreme Court and of this court have noted the need to avoid, when possible, interference in the decision-making process of local governmental leaders by extending, unnecessarily, the life of a consent decree whose objectives have been achieved ….").

A related and equally critical question is "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Horne*, 557 U.S. at 454; *see also People Who Care*, 246 F.3d at 1078 (terminating decree where "[p]ressed at argument, the plaintiffs' able lawyer could not cite an instance in which the school board has violated any of the numerous provisions of the decree").

### b. Significant changes in factual conditions compel termination of the decree.

There have been myriad significant changes in factual conditions since the 1972 consent decree was entered. Two fundamental factual developments – the development of a comprehensive Exempt List (along with the institution and implementation of a detailed process to modify that list as needed) and the permanent statutory oversight provided by OEIG HEM – demonstrate that the State has in place a durable remedy to prevent violations of the law. The absence of any substantiated violations of the decree or instances of patronage in the period of the Special Master's monitoring – now spanning eighteen months of the current administration and the entirety of the prior one – further underscores that the objectives of the decree have been achieved. There remains no basis for any continued federal court oversight, let alone continued systemic oversight, which is improper without a systemic violation.

### i. The State has a comprehensive Exempt List and an Exempt Employment Plan.

The State now has a comprehensive Exempt List and an Employment Plan for Exempt Positions, each approved by the Plaintiffs, the Special Master, and the Court. Dkt. 6154; Dkt.

6180. The creation of the Exempt List and the Exempt Employment Plan satisfies Plaintiffs' requests and principal complaints that led to the appointment of the Special Master. *See* Dkt. 4676 at 4 ("Plaintiffs' prior motions that led to the appointment of the Special Master in 2014 resulted from the widespread unlawful practices in defining and filling exempt positions under the Quinn Administration. The lack of a single comprehensive list of Exempt Positions and of an established procedure for revising the list of Exempt Positions permitted the Quinn administration to appoint approximately 300 individuals as purportedly exempt IDOT 'technical assistants' despite the fact that they did not warrant exempt status.").

The Court previously determined that "[a] review of the exempt positions [at all agencies under the jurisdiction of the Governor] will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case." Dkt. 4798 at 3. The Special Master likewise has noted that "[h]aving a finite list ensures that *improper* political hiring is less likely to occur, because no department can simply create and fill an unlimited number of new positions, as was the case with the Staff Assistant positions at IDOT." Dkt. 6306 at 2. The Special Master explained that the corresponding "Exempt Employment Plan … describes the process by which the Governor's Office … may, from time to time, request to make changes to the Exempt List by adding, removing, or amending the titles of positions on the list." *Id.* at 6. The Plan also "includes the process by which a position that currently has an incumbent may be changed from exempt to non-exempt if it is determined, through the request to change process, that the position no longer qualifies for the Exempt List under the applicable standards." *Id.* at 7.

For over eighteen months, the Special Master has observed the Exempt List and the

Exempt Employment Plan at work. As the Special Master noted in her latest Statewide report, over this period, positions have been both added and deleted from the Exempt List pursuant to the Exempt Employment Plan. Dkt. 6710 at 28. And "[s]ince January of 2019, the Pritzker Administration has made more than 500 appointments into Exempt List positions. HEM reviews the appointment paperwork for each appointment. To avoid duplication of efforts, the Special Master's office has not played an active role in reviewing each appointment in recent months." *Id*. The presence of a comprehensive exempt list and an agreed mechanism for revising that list addresses the principal deficiency that Plaintiffs claimed undermined the State's past employment practices.

### ii. The State has an independent, permanent Office of Executive Inspector General with a dedicated Hiring and Employment Monitoring Division.

The second dispositive aspect of the State's durable remedy is the existence of the Office of Executive Inspector General ("OEIG"), and a dedicated Hiring and Employment Monitoring Division ("HEM") within OEIG.

The Illinois General Assembly created the OEIG as part of the Ethics Act. *See* 5 ILCS 430/20-10(a). In 2009, the Illinois legislature amended the law to expand the OEIG's jurisdiction to including investigating allegations of prohibited employment practices, including the requirements of *Rutan*. *See* 5 ILCS 430/20-20(9) (adding power to "review hiring and employment files of each State agency within the Executive Inspector General's jurisdiction to ensure compliance with *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), and with all applicable employment laws."). In 2015, the OEIG created the Division of Hiring & Employment Monitoring (HEM), which conducts compliance-based reviews of State hiring and employment procedures and decisions to ensure that they are lawful, merit-based, and justifiable. HEM conducts both file reviews and on-site monitoring of agency hiring decisions. The OEIG

submitted a memorandum to the Court that describes in detail its extensive role in monitoring

and investigating state hiring and employment.  Dkt. 6936.  OEIG also publishes quarterly

reports detailing its activities, which are found at

https://www2.illinois.gov/oeig/HEM/Pages/HEM%20Reports.aspx.

When the Court in 2017 expanded the Special Master's jurisdiction to exempt

employment beyond IDOT, one of its bases for doing so was that HEM was still new.  The Court

explained that "we are not convinced that the newly-created HEM unit currently possesses the

experience or expertise to take on the investigation and review of exempt positions – and the

process for determining which positions are exempt – for the entire state of Illinois without the

active involvement of the Special Master."  Dkt. 4798 at 5.  The Court concluded that

"[a]llowing the HEM unit to handle that task 'flying solo' would create the unacceptable risk that

the unit would miss critical issues as it climbs the analytical learning curve, or make improvident

decisions that could require costly unraveling later."  *Id.*  To address that risk going forward, the

Court explained that "[o]ne goal of our order is to encourage the fastest and most efficient

transfer of knowledge and experience from the Special Master to HEM unit employees so that

they may carry more of the burden."  *Id.* at 6.

Now, after years of work and building a staff that is larger than the Special Master's team

and dedicated full time to hiring and employment monitoring, there is no doubt about HEM's

experience or expertise, and there is no question concerning the integrity, competency, or rigor

of their monitoring of the State's hiring and employment.  The HEM unit that began as one

person in 2015 now has ten full-time employees.  Indeed, in her recently-filed Sixth Report

regarding Statewide employment, the Special Master noted that HEM now reviews appointment

paperwork, and "[t]o avoid duplication of efforts, the Special Master's office has not played an

active role in reviewing each appointment in recent months." Dkt. 6710 at 28. There is no basis

for duplication of oversight and investigation that can be – and is being – done by an

independent hiring and employment monitor.

### iii. The State has adopted many other significant improvements in its employment procedures.

While the exempt list and the existence of OEIG/HEM should be dispositive in

evaluating changed circumstances and a durable remedy, the State has adopted myriad other

improvements during the six years the Special Master has been making recommendations for

IDOT and the three years she has been making recommendations Statewide.

With respect to IDOT, the Special Master recently identified a number of

accomplishments, which included:

- IDOT, the Special Master, and HEM agreed on the list of truly "technical" positions that should remain excluded from the Personnel Code under Section 4c(12).

- IDOT and HEM, with participation of the Special Master's office, have been creating minimum required qualifications ("MRQs") that demonstrate the technical nature of those positions and revising them as necessary.

- IDOT, the Special Master, and HEM agreed on the list of positions that should be reclassified as Personnel Code-covered.

- IDOT, in collaboration with CMS, the Special Master's office, and HEM, established Personnel Code position descriptions for non-technical, exempt positions, such that those positions can be included on the Exempt List.

Dkt. 6458 at 2. The Special Master recently noted that, "[s]ince filing the Tenth IDOT

Report … on August 16, 2019 (Dkt. 6458), several of the Special Master's long-standing

recommendations to IDOT have been accomplished or are on track for completion." Dkt. 6900

at 1. The Special Master listed:

- Finalizing and filing the Technical List – representing a "significant accomplishment."

- Presenting and finalizing [minimum required qualifications] for all technical classifications.

- Creating a detailed plan with target dates for conversion of titles that will no longer be technical to the Personnel Code.

- Presenting all proposed 4d(3) positions at IDOT to [the Civil Service Commission] for 4d(3) determination.

- Converting formerly *Rutan*-exempt positions not included on the *Shakman* Exempt List to non-exempt status.

- Creating and presenting a plan to ensure a wider applicant pool for seasonal internship positions.

*Id.* at 2-3.

With respect to the State (those agencies beyond IDOT), the Special Master likewise has noted "significant progress." Dkt. 6565 at 1. "[T]he parties have accomplished the following with respect to *Shakman*-exempt positions":

- Reducing the number of positions where political factors may be considered in hiring from approximately 3500 positions to approximately 1100 positions.

- Eliminating all job protection for any Shakman-exempt positions.

- Agreeing upon minimum qualifications for all Shakman-exempt positions.

- Implementing a hiring process for Shakman-exempt positions that requires certification from the hiring agency that the candidate is qualified and will be performing exempt work, with oversight by the Office of Inspector General's Hiring and Employment Monitoring Division ("HEM").

*Id.*

The Special Master further acknowledged the State has begun the process of rolling out for all State hiring an Electronic Hiring Process that "is a vast improvement to the State's historical hiring system, and we commend the CMS personnel who have worked diligently over the past few years to develop the new system." Dkt. 6710 at 21. At this point, HEM is well-positioned to assume the responsibility of recommending additional reforms to the State's hiring

and employment practices, and to monitor the State's implementation of those reforms.

### iv. **The objective of the 1972 decree has been achieved.**

In light of the factual changes listed above, the objective of the 1972 decree has been achieved. This analysis requires stepping back and analyzing what the State agreed to – and what it did not agree to – in 1972. "Consent decrees are fundamentally contracts. True, when the imprimatur of the injunction joins the parties' agreement, the result is more than a contract, but the source of authority to require the parties to act remains their acquiescence rather than rules of law." *People Who Care*, 961 F.2d 1335, 1337 (7th Cir. 1992).

The State agreed in the 1972 decree *not* to do something – at its core, not to require employees to perform coerced political work at the risk of being terminated or punished if they refused. 1972 consent decree ¶ E. The Plaintiffs do not allege that the State is perpetrating this type of coerced political work scheme. The Ethics Act, 5 ILCS 430/5-15, which OEIG enforces and investigates, codifies the prohibitions that:

- "[A]t no time shall any executive or legislative branch constitutional officer or any official, director, supervisor, or State employee intentionally misappropriate the services of any State employee by requiring that State employee to perform any prohibited political activity (i) as a part of that employee's State duties, (ii) as a condition of State employment, or (iii) during any time off that is compensated by the State,"

- "A State employee shall not be required at any time to participate in any prohibited political activity in consideration for that State employee being awarded any additional compensation or employee benefit, in the form of a salary adjustment, bonus, compensatory time off, continued employment, or otherwise," and

- "A State employee shall not be awarded any additional compensation or employee benefit, in the form of a salary adjustment, bonus, compensatory time off, continued employment, or otherwise, in consideration for the State employee's participation in any prohibited political activity."

In the six years that the Special Master has investigated and monitored, she has not identified in any of her reports an allegation or finding that the State has maintained a coerced

political work scheme, or that any employee has been fired or otherwise punished for refusing to participate in political work. Indeed, neither the Special Master in her reports nor the Plaintiffs in their recent motion (Dkt. 6789) point to any finding of illegal political discrimination during the past six years. Coupling the absence of any evidence of violations of the 1972 consent decree (during a period of extensive investigation and monitoring by both the Special Master and OEIG HEM) with the durable remedies embodied in the Exempt List and OEIG/HEM oversight, the decree has achieved its purpose.

Plaintiffs believe the State should be subject to the same "supplemental relief orders" as the City and the County. *See* Dkt. 6789 at 22. But for the City and the County, those "supplemental relief orders" reflect negotiated settlement compromises agreed to by the parties. *See* Dkt. 531, Dkt. 601. Here, the State has not agreed to supplemental relief, and the Court has never awarded it (outside of appointing the Special Master). The Court in 2014 determined that a Special Master was warranted to perform "very targeted functions," 10/22/14 Hr'g Tr. 9:21-22, but a supplemental relief order was not, even though Plaintiffs argued that their 2014 evidence "establishes the need for supplemental relief with respect to the 1972 Order similar to the supplemental relief orders entered by the Court in the last several years with respect to" a number of other defendants. Dkt. 3744 at 9. Just because the City and the County litigation took a specific path does not mean that the State must follow the same one.

Indeed, the narrow, prohibitory text of the 1972 decree (which is very different from the later decrees and orders to which the City, the County, and the County Clerk are parties) provides no basis for the Court to take the extraordinary step of mandating a "supplemental relief order" or a "Comprehensive Employment Plan." The additional obligations that the Plaintiffs seek to impose on the State – whether through a supplemental relief order, a Comprehensive

31

Employment Plan, or otherwise – thus would be tantamount to modifications of the 1972 decree. "Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?" *Salazar by Salazar v. D.C.*, 896 F.3d 489, 500 (D.C. Cir. 2018). These additional requirements would convert the narrow prohibitory injunction of the 1972 decree into a massive mandatory injunction to adopt employment practices and a "Comprehensive Employment Plan" – and then to have the Special Master monitor all aspects of the Comprehensive Employment Plan. *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011) ("A mandatory injunction imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order."). The Plaintiffs acknowledge that they hope to have the Special Master "replace and reform the State's employment practices." Dkt. 6789 at 19.

But the Plaintiffs have not moved to convert the injunction from prohibitory to mandatory, and such a modification would be improper in any event. "When a plaintiff seeks to enhance a consent decree's terms, courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree. Courts may not, under the guise of modification, impose entirely new injunctive relief. That practice would end run the demanding standards for obtaining injunctive relief in the first instance, would deny the enjoined party the contractual bargain it struck in agreeing to the consent decree at the time of its entry, and would destroy the predictability and stability that final judgments are meant to provide." *Salazar*, 896 F.3d at 498; *see also United States v. Armour & Co.,* 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

32

**v.  There is no basis for systemic intervention.**

Finally, there remains no factual or legal basis to sustain the extraordinary systemwide and systemic intervention that, under the Plaintiffs' view of it, the decree imposes.  "Systemwide relief is never appropriate in the absence of a systemwide violation, and even then should be no broader and last no longer than necessary to remedy the discrete constitutional violation."  *Lewis v. Casey*, 518 U.S. 343, 392–93 (1996); *Salazar*, 896 F.3d at 500 ("[A] local government cannot be subjected to ongoing classwide structural relief simply because a problem has not been 100% eradicated."); *Salazar*, 896 F.3d at 500 ("Expansive, classwide structural relief that judicially superintends local government operations cannot issue based on a factual predicate consisting only of one-off errors that have, at best, a marginal connection to the only remaining executory portions of the Consent Decree.").  With approximately 50,000 State employees in agencies under the jurisdiction of the Governor, even if the record in this case revealed several instances of political discrimination – which it does not – those instances would represent a tiny fraction of the State workforce and would not provide a legal basis for systemwide and systemic relief.  In addition, without evidence linking the Governor (the only State defendant in this case) to any purported violation, the 1972 decree would not be implicated.

There is no basis to conclude that the State's current employment policies or practices violate the Constitution, or bear any resemblance to the coerced political work scheme that led to the decree in 1972.  "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation."  *People Who Care*, 961 F.2d at 1338 (citation omitted).  While the State's policies and practices no doubt leave room for improvement and likely always will, and while rogue actors theoretically could violate those policies and practices in a way that leads to some form of illegal discrimination, that potentiality cannot sustain

systemic judicial intervention. *See Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001) ("Plaintiffs make no allegations that the bribes-for-commercial-drivers'-licenses scheme is continuing under Secretary White's administration, contending only that '[t]here exists in the Secretary of State's office a deep-seated culture and policy or custom of intertwining and requiring coerced partisan political work together with the official duties of the office,' and as a result, '[t]here is a substantial likelihood that without remedial steps being taken that such or similar unlawful conduct will continue.' These allegations are purely speculative."); *Salazar*, 896 F.3d at 500-01 ("The burden was on the Plaintiffs to prove the existence of a continuing and widespread problem. By shoehorning the Plaintiffs' new injunction into a Rule 60(b) modification, the district court evaded that proof problem, finding it sufficient to enter a sweeping injunction just because it had 'no assurance' that already-solved problems 'w[ould] not arise again.' That gets Rule 60(b) exactly backwards.") (citation omitted).

Failproof employment policies (or, stated differently, employment policies that cannot be manipulated for any reason) are the type of "unattainable" goal that cannot sustain continuing a decree. *Shakman IV*, 426 F.3d at 933; *People Who Care*, 246 F.3d at 1075 ("Nothing in the logic of … the plaintiffs' brief … suggests any natural terminus to the decree."). In addition, beyond the State's own commitment to continuous improvement, HEM is fully capable of identifying and recommending further enhancements to State employment processes and ensuring that the State continues to improve. *See* Dkt. 6936 at 2 ("HEM reviews and makes recommendations to agencies regarding hiring actions and then follows up through continued monitoring of agency hiring activities. HEM staff work directly with Agency Personnel Officers and staff, the Department of Central Management Services (CMS), and the Office of the Governor to ensure necessary changes are implemented based on its reviews.").

**c.  Significant changes in the law compel termination of the decree.**

There are also substantial legal changes since 1972 that separately and additionally require termination of the decree.  The Seventh Circuit has stated expressly that "since our decision in *Shakman I*, the Supreme Court has reexamined justiciability and its limitations under the case-and-controversy provision of Article III."  *Plotkin*, 239 F.3d at 884.  And it has instructed expressly that a district court evaluating a Rule 60(b) motion in the context of this case "must account for the significant changes in the law of voter standing" since entry of the decree. *Shakman IV*, 426 F.3d at 936.  In that regard, the Seventh Circuit – while not presented with a question that forced it to rule on the correctness of *Shakman I* – expressed its "serious concerns whether the plaintiffs as voters bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*."  *Shakman III*, 396 F.3d at 868.

Other courts similarly have questioned the continued vitality of *Shakman I*.  As the Seventh Circuit observed, while the D.C. Circuit in *Winpisinger v. Watson*, 628 F.2d 133, 141 (D.C. Cir. 1980) "found it unnecessary to repudiate directly this circuit's holding in *Shakman I*, it also made it clear that it had serious reservations as to its correctness."  *Shakman II*, 829 F.2d at 1398 n.11.  Similarly, in a decision later affirmed by the Seventh Circuit, Judge Zagel found that the subsequent *Shakman* decisions in the Seventh Circuit "do cast considerable doubt as to the continuing validity of the *Shakman I* reasoning and limit its persuasive power."  *Plotkin v. Ryan*, No. 99 C 53, 1999 WL 965718, at *3 (N.D. Ill. Sept. 29, 1999), *aff'd*, 239 F.3d 882 (7th Cir. 2001).  The State is aware of no caselaw outside of the *Shakman* case suggesting that voters – or a candidate from an election held 50+ years ago – have a federal interest sufficiently concrete to constitute a case-and-controversy such to exert extended oversight of a public body's systemwide employment practices.  The *sui generis* nature of litigation lasting more than half a

century – given that every State and thousands of local governments have employment policies and practices that could be challenged under a similar theory by any one of millions of aggrieved candidates or voters – casts substantial doubt on the correctness of the 1970 standing decision that is the thin reed upon which this litigation has expanded for half a century.[3]

Plaintiffs likely will respond with *Rutan*, given that they apparently believe that they are empowered to police "*Shakman-Rutan* problems." Dkt. 6789 at 21. But *Rutan* held that *public employees* state a claim under the First and Fourteenth Amendments when they are denied "promotions, transfers, or rehires for failure to affiliate with and support" a political party. 497 U.S. at 76. Plaintiffs in *Rutan* also brought claims as *voters* – asserting that "patronage has created an advantage in favor of the incumbents." *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 958 (7th Cir. 1989), *aff'd in part, rev'd in part*, 497 U.S. 62 (1990). The Seventh Circuit rejected those claims, holding that "[t]his does not confer standing on voters." *Id.* It explained that "[t]he causal link between any 'loss' in their votes' impact and the challenged actions is too tenuous. Indeed, plaintiffs' statewide challenge presents a more tenuous causal relationship than the challenge mounted by voters and candidates in *Shakman* to patronage hiring in a single county. Because the injury asserted in the complaint is not fairly traceable to the

---

[3] To be clear, the State is not arguing or requesting a finding that Plaintiffs lacked standing when this case was filed in 1969. The State recognizes that question is not material, as, in the interest of finality, "[a]fter a case has become final … only an egregious want of jurisdiction will allow the judgment to be undone by someone who, having participated in the case, cannot complain that his rights were infringed without his knowledge." *Shakman III*, 396 F.3d at 859 (citation omitted). Because "the focus of the district court shall be not on the law of standing as a jurisdictional concept but on the equitable standards embodied in Rule 60(b)(5)," *id.* at 868, the State's argument is that due to "significant changes in the law of voter standing since the entry of" the consent decree, at this juncture, the decree is "fashioned in litigation in which one of the litigants [does] not have a sufficient concrete stake in the outcome" such that its provisions "are not worthy of continued enforcement by a federal court." *Id.*; *see also Shakman IV*, 426 F.3d at 936 ("[T]he district court should be guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation to vigorously litigate and present the matter of political patronage to the court in the manner best suited for judicial resolution, or whether that task is best left to individuals directly impacted by hiring decisions made by the City.").

challenged action, the district court properly dismissed plaintiffs' claims as voters for lack of standing." *Id*. The Supreme Court left this holding as to voter standing intact. 497 U.S. at 62. Given that the Seventh Circuit in *Rutan* was evaluating, like here, a "statewide challenge" against the Governor as a defendant, with respect to employment practices such as "transferring, and promoting state employees," 868 F.2d at 944, 958, the holding that voters lack standing is instructive as Plaintiffs now hope to dictate the State's policies for employment actions like transfer and promotion.

Against case law that has evolved significantly over the past fifty years to increasingly demand that plaintiffs have a direct and concrete stake in the outcome, it is no longer tenable that a lawyer in private practice, as class representative[4] and class counsel,[5] should patrol the employment rights of all State employees, while deciding which hiring and employment policies State officials may or must adopt. As the Supreme Court has explained:

> This Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

*Warth v. Seldin*, 422 U.S. 490, 499–500 (1975) (citations omitted). The notion that any of the hundreds of candidates for elected office or any one of the millions of voters in the Northern

---

[4] The Supreme Court has severely constrained when employment actions can be maintained as class actions. Where "the crux of the inquiry is 'the reason for a particular employment decision,'" the Court explained that "[w]ithout some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011).

[5] "[A] majority of courts ... have refused to permit class attorneys, their relatives, or business associates from acting as the class representative." *Gordon v. Caribbean Cruise Line, Inc.*, No. 14 C 5848, 2019 WL 498937, at *8 (N.D. Ill. Feb. 8, 2019) (citing cases).

District of Illinois who happens to disagree with the State's employment practices have recourse through the federal courts simply has no purchase under modern jurisprudence. That problem is heightened at this juncture, where even candidate and voter rights are at issue only in the abstract, without any specific candidate, specific voter, or specific contested election – and only theoretical notions about how the State's employment practices may impact votes and election outcomes.

"[T]he judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100 (1979)). "The court should consider whether the class of voters has the 'incentive to vigorously litigate and present the matter [of political patronage] to the court in the manner best suited for judicial resolution.'" *Shakman III*, 396 F.3d at 868 (bracketed text in original) (citing Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.2 (2003)). State employees are best suited to assert claims relating to their own State employment, and they have ample recourse to do so – through union representation in the enforcement of collective bargaining agreements, through complaints to OEIG and HEM, and through civil suits brought under *Rutan*.

Against this backdrop, if there remains a case-and-controversy in this litigation, it is solely with respect to the narrow and specific facts of the coerced political work scheme that formed the basis of Plaintiffs' Complaint and allowed them to assert injury 50 years ago. Plaintiffs recently affirmed that their original complaint, and the reason they believe they retain standing, is that "[p]atronage employees were forced to support the dominant political parties by donating to campaign funds and performing campaign work." Dkt. 6669 at 11. In arguing that

"traceability" and "redressability" continue to be satisfied, plaintiffs contend that enjoining coerced political work means that "independent candidates are not forced to spend time and effort raising and expending additional funds to compete against the major parties' army of patronage employees." *Id.* at 12. Plaintiffs no longer even attempt to argue that this practice continues with respect to the State, and do not identify any particular "independent candidate" or voter purportedly impacted, which should end this case. As the Seventh Circuit has explained:

> [A] plaintiff must show a 'personal stake' in the outcome of the action. This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved.

*Loertscher v. Anderson*, 893 F.3d 386, 392–93 (7th Cir. 2018), *reh'g and suggestion for reh'g en banc denied* (July 17, 2018) (citation omitted). "[T]his requirement must be met at all stages of review," and "Article III, § 2 of the Constitution grants jurisdiction to federal courts to adjudicate only actual, ongoing controversies." *Id.* (citations omitted).

> **d.** **There is no ongoing violation of federal law, and any additional requirements imposed on the State would be aimed at eliminating conditions that do not implicate federal law.**

A federal court may only "enforce the terms of a consent decree as long as they are tailored to rectify the federal constitutional violation." *Komyatti v. Bayh*, 96 F.3d 955, 961 (7th Cir. 1996). Modification of a consent decree is, therefore, appropriate "to relieve . . . officials from a provision that no longer serves any valid federal purpose." *Id.* "[T]he court must ensure that there is a substantial federal claim, not only when the decree is entered but also when it is enforced, and that the obligations imposed by the decree rest on this rule of federal law rather than the bare consent of the officeholder. When making these inquiries, courts are bound by principles of federalism (and by the fundamental differences between judicial and political branches of government) to preserve the maximum leeway for democratic governance. … [The

Seventh Circuit] has emphasized the district court's responsibility to identify the rule of federal law supporting a consent decree binding the political arms of government, and the corresponding obligation to permit new public officials to set their own policy within the limits established by federal law." *Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993).

There remains no substantial federal claim in this case and no credible assertion that there is an ongoing or systemic violation of federal law – neither the Special Master's reports nor the Plaintiffs' recent motion to expand the scope of her responsibilities identify a single purported violation in the last six years. There is no suggestion that the State has a policy or practice of coercing political work or donations and punishing those employees who fail to participate. In the half century of this litigation, the essential questions of whose constitutional rights allegedly are being violated, and when, and how, and by whom, have been relegated to the margin – and at this stage have no answer.

*Rutan*, again, supports the State's view. *Rutan* vests rights in *public employees*, not candidates or voters. *See Rutan*, 868 F.2d at 957, *aff'd in part, rev'd in part*, 497 U.S. 62 ("Besides challenging the alleged patronage system as employees, plaintiffs, as voters, also claim that the patronage system deprived them of 'equal access and effectiveness of elections.' Plaintiffs allege that the patronage system gives Governor Thompson and his supporters a significant advantage over their opposition in elections. The district court never reached the merits of this claim on the ground that the plaintiffs lacked standing. We agree."). The fact that employees themselves have a cause of action for political discrimination under *Rutan* does not mean that unaffected parties such as the Plaintiffs have a federal interest in the State's employment policies. Employees may invoke federal law to sue the State for sex discrimination, race discrimination, religious discrimination, as well as political discrimination in its hiring and

employment decisions – but the fact that employees have this recourse does not mean that every candidate or voter in the State has a federal interest allowing him to force the State to adopt different employment policies. In fact, it means the opposite. State employees have myriad avenues to challenge patronage if they suspect it – including through the OEIG and HEM, union grievances, and civil suits under *Rutan*. This available recourse demonstrates that ending the decree does not mean an end to oversight and accountability – just that the right parties and forums will provide it.

The additional demands from Plaintiffs before they deem the State to be ready to exit the consent decree are not rooted in the Constitution or in a federal right. "[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Horne*, 557 U.S. at 447. Plaintiffs' additional demands – such as a Comprehensive Employment Plan, a supplemental relief order, and continued monitoring for at least a year after implementation of a Comprehensive Employment Plan – merely reflect one set of views on what good comprehensive hiring and employment policies and practices should look like. In a constitutional democracy, those questions are reserved for sovereign State and local governments – not the federal courts, and not Plaintiffs who are unaffected by those policies and practices. For the State specifically, responsibility for improving the State's employment practices rests not only with the Governor and his designees, but also with the State's independent monitor, HEM – which lends its extensive expertise and resources to that exact undertaking. *See* Dkt. 6936.

The sole federal interest that remains at stake in this case is federalism – which requires terminating this decree, not extending it. For 48 years, the sovereign State of Illinois has been subject to a federal consent decree relating to its employment policies and practices. "[T]he

longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Horne*, 557 U.S. at 453. For the past six years, a Special Master – an arm of the federal court – has monitored employment decisions at IDOT; all State agencies under the authority of the Governor have been subject to this oversight for more than three years. In the context of evaluating when the valuable life of a consent decree has run, the Seventh Circuit has emphasized the importance of "preserving democratic governance, separating the judicial and political spheres, [and] respecting state autonomy in the absence of a federal rule." *Evans*, 10 F.3d at 482. After the past six years of extensive and meaningful reform, which accomplished the Court's stated goals and the decree's objectives, it is time to reanimate those principles and restore control of State employment to the State.

July 14, 2020

Respectfully Submitted,

KWAME RAOUL
Illinois Attorney General

JB Pritzker, in his official capacity
as the Governor of the State of Illinois

By:    /s/ Brent D. Stratton
Brent D. Stratton
Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-4499

**CERTIFICATE OF SERVICE**

The undersigned, an attorney of record, hereby certifies that, on July 14, 2020, he caused to be filed through the Court's CM/ECF system a copy of Governor's Memorandum in Support of His Motion to Vacate the May 5, 1972 Consent Decree.  Parties of record may obtain a copy of this filing through the Court's CM/ECF system.

/s/ Brent D. Stratton

Brent D. Stratton