**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SHAKMAN, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:69-CV-02145 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| OFFICE OF THE GOVERNOR OF THE | ) | |
| STATE OF ILLINOIS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this long-running case, the Governor of Illinois[1] seeks to exit its decades-long obligations under a Consent Decree entered in 1972. To that end, the State has moved to vacate the Consent Decree, which enjoins the State from engaging in certain politically motivated employment practices. R. 6946.[2] In contrast, the Plaintiffs have moved to expand the Consent Decree, or in the alternative, to clarify the mandate of the Court-appointed Special Master, whose authority is delineated by orders entered in 2014 and 2017. R. 6789. In response, the State has filed a cross-motion to vacate those orders and discharge the Special Master. R. 6947. For the reasons explained in this Opinion, the State's motion to vacate and the cross-motion to discharge are denied. The Plaintiffs' motion is denied in part and granted in part.

---

[1]In this Opinion "the Governor" refers to the Office of the Governor and not any particular administration.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Background

In 1969, Michael Shakman, a candidate in an Illinois election, as well as one of his supporters, alleged that State and local government employment practices stood in the way of the Plaintiffs' right to participate fairly in the electoral process. *Shakman v. Democratic Org. of Cook Cty.,* 481 F. Supp. 1315, 1320 (N.D. Ill. 1979), *vacated and remanded sub nom. Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987). The Plaintiffs' theory was that political patronage in State and local government agencies coerced political support from government employees, and thereby violated the rights of voters and candidates. *Id.* at 1320–21. The patronage system required some government employees, as a condition for obtaining and keeping their jobs, to secure political sponsorship of an individual with a party connection. R. 277-2, First. Am. Compl ¶¶ 24–26. And obtaining a sponsorship required, not surprisingly, political contributions or performing political work for the party or a candidate. *Id.* ¶ 29.

In 1972, the parties entered into a Consent Decree, which set forth both injunctive-relief and jurisdiction-retention provisions. Under the provisions for injunctive relief, various government entities, including the Office of the Governor, were permanently enjoined from:

> (1) conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor.

> (2) knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment, or during time paid for by public funds […]

      (3) knowingly inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act.

R. 6946-1, Exh. A, Consent Decree ¶¶ E(1)–(3). Under its jurisdictional provisions, the Consent Decree "enable[d] the parties to this Judgment to continue to litigate the following questions before this court":

      (a) Certain governmental employment positions under the jurisdiction of the defendants who are parties to this Judgment by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which governmental employment positions under such defendants' jurisdiction are so exempt for the foregoing reasons.

      (b) Can political sponsorship or other political considerations be taken into account in hiring employees? If so, to what extent can such considerations be taken into account?

      (c) What remedies and implementing procedures ought to be granted and established by the Court in connection with the resolution of the questions raised in the foregoing subparagraphs (a) and (b)?

*Id.* ¶ H(1)(a)–(c). Over the years, other government entities have agreed to supplemental relief orders, *see*, *e.g.*, R. 531, but the Governor is not subject to any other orders.

      Fast forward to 2014. In April of that year, the Plaintiffs sought supplemental relief, alleging that the Illinois Department of Transportation (IDOT) was filling *faux*-exempt[3] "Staff Assistant" positions based on political considerations. R. 3744 at

---

      [3]Exempt positions are those for which political affiliation is an appropriate consideration because the positions involve policymaking or some other compelling interest. Non-exempt or "covered" positions are those for which political affiliation is not an appropriate consideration. *See Elrod v. Burns*, 427 U.S. 347, 367 (1976); *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

7. According to the Plaintiffs, these practices began under Governor Blagojevich and continued under Governor Quinn. *Id.* at 6. In August 2014, the Executive Ethics Commission published a report of the Office of the Executive Inspector General (OEIG), which was based on a multi-year investigation into hiring practices at IDOT. *See* 3944 at 7–8. Applying a "reasonable cause" standard, the OEIG concluded that IDOT had approved the hiring of persons into the nominally exempt Staff Assistant positions to perform non-exempt work, and then transferred some of those employees to other non-exempt positions—all without following the *Rutan*[4] hiring process. R. 3944-2 at iii-iv; R. 3944-4 at 181. A number of these Staff Assistants conceded that they were hired because of some sort of political affiliation. R. 3944-4 at 197–98. In November 2014, the previously assigned judge relied on the OEIG's findings to appoint a Special Master to investigate IDOT's Staff Assistant hiring practices.  R. 4020 ¶ 3; R. 6946-2 at 12:25–14:7.

In 2016, the Plaintiffs moved to expand the scope of the Special Master's responsibilities to include a review of exempt employment at *all* agencies under the Governor's jurisdiction. R. 4676 at 1–2. In May 2017, the Court expanded the Special Master's authority to include development of a comprehensive statewide list of exempt positions. *See* R. 4798 at 6–7; R. 5004.

---

[4]In *Rutan v. Republican Party of Illinois*, the Supreme Court held that: (1) promotions, transfers, and recalls based on political affiliation or support are impermissible infringements on public employees' First Amendment rights; and (2) conditioning hiring decisions on political belief and association violates applicants' First Amendment rights in the absence of a vital governmental interest. 497 U.S. 62, 62–63 (1990).

4

Meanwhile, the Special Master concluded her investigation of IDOT Staff Assistant practices and filed a report in May 2017. R. 4988; R. 5069 at 1. The investigation focused on the time period from 2009 to 2014. R. 4988 at 6. During her investigation, the Special Master interviewed IDOT employees and reviewed tens of thousands of documents. *Id.* at 6–7. The Special Master concluded that "the Governor's Office played a key role in the Staff Assistant abuse at IDOT." *Id.* at 5.

To address fallout from the political hiring of IDOT Staff Assistants, in December 2017, the Court issued an Order Creating a Review Process For Applications of Former Staff Assistant For Positions at IDOT. R. 5644. This is also known by a shorthand moniker, the "John Doe" Process, through which the Court and the parties evaluate what, if any, limits should be placed on the employment advantages that former IDOT Staff Assistants might reap from holding that position when applying for other non-exempt employment. R. 7083 at 17.

On exempt positions, in January 2019, the Court approved the Governor's Employment Plan for Exempt Positions and The General Principles and Commitments Applicable to Hiring. R. 6158. This plan outlined the process for converting positions from exempt status to non-exempt status and vice versa. R. 6158. On January 22, 2019, the Court approved the statewide Exempt List, which included exempt positions in IDOT. R. 6180. The Exempt List is updated monthly.

Beginning in late 2019, the parties began discussing the State's exit from the Consent Decree. *See* R. 6712 at 2 ("[t]he State has been very upfront in stating its intention to seek to exit the 1972 Decree"). In order to remedy concerns in statewide

5

hiring processes, the State proposed the implementation of a Comprehensive Employment Plan (often referred to as the CEP). R. 7083 at 44–45. The State filed the CEP with the Court on November 25, 2019. R. 6612-1, CEP. According to the Special Master, as of September 2020, significant parts of the CEP have yet to be implemented. R. 7083 at 46.

## II. Analysis

## A. Motion to Vacate

It makes sense to first tackle the State's motion to vacate the consent decree, R. 6946, because a win on that motion for the State would render the other motions moot. A consent decree, although contractual in nature, is enforceable as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 378 (1992). As a judgment, then, a consent decree is subject to modification or to vacatur via Federal Rule of Civil Procedure 60(b). *United States v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002) ("parties wishing to modify or vacate a consent decree may do so by resorting to Rule 60(b)"). Under Civil Rule 60(b)(5), the "court may relieve a party … from a final judgment, order, or proceeding … [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne v. Flores*, 557 U.S. 433,

447 (2009) (cleaned up).[5] The movant's burden is met by showing a significant change either in fact or in law. *Rufo*, 502 U.S. at 384. Having said that, federal courts take special care to approach vacatur motions with flexibility when an "institutional reform" injunction is under scrutiny. *Horne*, 557 U.S. at 450. This ensures that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant. *Id.*

To apply a more concrete standard for evaluating whether to terminate the Consent Decree, in early 2020, the parties conferred and expressed different viewpoints to the previously assigned judge, Magistrate Judge Schenkier. *See* R. 6789-1, Exh. 3 (letter of Jan. 22, 2020). In a January 2020 letter to Judge Schenkier, the State expressed its belief that Rule 60(b), and the legal precedent interpreting it, provided the standard. *Id.* at 12.[6] This included the principles that (1) a "critical question" is whether the objective of the original order has been achieved; and (2) if a "durable remedy" is in place, then the decree must end. *Id.* at 13 (citing *Horne*, 557 U.S. at 450). In contrast, the Plaintiffs suggested applying the "substantial compliance" standard[7] contained in the supplemental relief orders that applied to other *Shakman*

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[6]This page citation refers to the PDF page numbering in CM/ECF entry. R. 6789-1, which is a single PDF comprising multiple exhibits.

[7]The Plaintiffs' proposed standard also set forth specific benchmarks:

> a. the Governor's Office has implemented a new Employment Plan, including procedures to ensure compliance with the new Plan and identify instances of non-compliance;

defendants. *Id.* at 13. Later, in briefing the motion to vacate, the Plaintiffs have-acknowledged that the critical questions are (1) whether the objective of the original order has been achieved and (2) whether a durable remedy has been implemented. R. 6789 at 4.[8]

## 1. Changes in Law

As evidence of a significant change in the law, the State argues that, under contemporary Article III standing doctrine, the Plaintiffs would not have standing to pursue this case. R. 6946 at 35–39. Given the Consent Decree and the procedural posture of the case, however, the State is not requesting a formal finding that the Plaintiffs lacked standing to bring their suit in 1969. *Id.* at 36 n.3. Rather, the State

---

b. the Governor's Office has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence;

c. the Governor's Office does not have a policy, custom, or practice of making employment decisions based on political factors except for positions that are exempt under *Branti v. Finkel*;

d. the absence of material noncompliance which frustrates the consent judgment's essential purpose. The Court may consider the number of complaints of unlawful political discrimination that the Inspector General has found to be valid. However, technical violations or isolated incidents of noncompliance shall not be a basis for finding that the Governor's Office is not in substantial compliance; and the Governor's Office has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment decisions.

R. 6789 at 4–5 n.3.

[8]It is worth noting that "durable remedy" too is not necessarily a self-defining term. In *Jackson v. Los Lunas Community Program,* the Tenth Circuit interpreted *Horne*'s reference to "durable remedy" simply "as recognition that fleeting federal compliance is insufficient to warrant relief." 880 F.3d 1176, 1202 (10th Cir. 2018). *Jackson* added that "a district court in assessing whether further oversight is equitable, may and should consider the totality of defendants' efforts to comply with federal law and defendants' commitment to remaining in compliance with federal law." *Id.* at 1202–03.

raises the weakened underpinning of standing as an equitable consideration under the Rule 60(b) analysis. *Id.*

Given the procedural history of the case and the entry of judgment decades ago, the State is right to refrain from making an outright subject matter jurisdiction challenge. "To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." *Rufo*, 502 U.S. at 389. Way back in 1970, before the entry of the Consent Decree, the Seventh Circuit upheld the Plaintiffs' claims against a challenge to standing. *Shakman v. Democratic Org. of Cook Cty.*, 435 F.2d 267, 270–71 (7th Cir. 1970) *("Shakman I")*. This specific holding has not been overturned. *See Shakman v. Clerk of Cook Cty.,* 2020 WL 1904094, at *9 (N.D. Ill. Apr. 17, 2020) ("we find the standing of voters and candidates to pursue claims under the 1972 Consent Decree to be well-settled"). In 1987, the Seventh Circuit re-examined the standing of independent candidates, voters, and taxpayers, but only as to "the constitutionality of politically-motivated *hiring* practices without any reference to other patronage-based employment practices—including the discharge scheme now forbidden by the [1972] consent decree." *Shakman v. Dunne*, 829 F.2d 1387, 1393 (7th Cir. 1987) (*Shakman II*) (emphasis in original). *Shakman II* clarified that the "combined impact of political hiring and firing practices—a significant part of the plaintiffs' original case—is therefore not before us on this appeal." *Id.* So *Shakman II* explicitly left intact the validity of the 1972 Consent Decree. *Id.* at 1399 ("we explicitly note that

nothing in our holding today can be construed as affecting the continued validity of the *Shakman* decree").

Having said that, in 2015, the Seventh Circuit instructed that the district court *must* consider the significant changes in voter standing as an *equitable* consideration in deciding Rule 60(b)(5) motions, even if an outright jurisdictional challenge to a decades-old decree was off the table. In *O'Sullivan v. City of Chicago*, the Seventh Circuit did express "serious concerns whether [voters] bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*." 396 F.3d 843, 868 (7th Cir. 2005). Although *O'Sullivan* did not overturn *Shakman I*, the Seventh Circuit directed the district court to consider whether voters have the "incentive to vigorously litigate and present the matter of political patronage to the court in the manner best suited for judicial resolution." *Id.* (cleaned up). After *O'Sullivan* was decided, the City of Chicago filed a motion, back in the district court, under Rule 60(b) to vacate the 1983 consent decree. On appeal from the denial of that motion, the Seventh Circuit again instructed that the "district court should be guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation." *Shakman v. City of Chicago*, 426 F.3d 925, 936 (7th Cir. 2005).[9] But the opinion emphasized again that the Rule 60(b) decision on the 1983 consent decree would not affect the 1972 Consent Decree. *Id.* ("the protections contained in the 1972 Consent Decree … will remain in full force regardless").[10]

---

[9]The parties label this case as *Shakman IV*.

[10]Other cases cited by the State in its reply brief do not shed much light on the question at hand. *See* R. 7140 at 51–52. Two of them simply affirmed dismissals based on lack of standing (in one case) and mootness (in the other), but neither involved a motion to vacate a

The upshot of all this is that this Court must bear in mind—as it has throughout its oversight of the decree since its reassignment to this Court's calendar—that the concrete protection of First Amendment rights of public *employees* is the crucial purpose of the Consent Decree, not an amorphous vindication of voter interests and not an amorphous application of private-sector best-employment practices. That concrete First Amendment interest is what the Court has emphasized time and again during the periodic status hearings, balanced with the weighty governmental and public interest in alleviating federal-court oversight of State and local government institutions. In its analysis of the pending motions, the Court will maintain a laser focus on the First Amendment rights of public employees.

## 2. Changes in Fact

The State argues that factual developments, including the lack of ongoing federal law violations, render federal court oversight unnecessary. R. 6946 at 24–34, 39–42. Each of the State's specific contentions requires close examination—but first to put those factual contentions into the proper context, an explanation of the scope of the Consent Decree is needed.

---

consent decree. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145 (2011); *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 480 (7th Cir. 2013). Another actually undermines the State's position, because the Supreme Court held that Title VII did not preclude entry of a consent decree that would benefit non-victims of a defendant's discriminatory practices. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 515 (1986). Still two others involved appeals of the *entry* of judgments. *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 380 (7th Cir. 2019); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 215 (7th Cir. 1995). Neither case involved a Rule 60(b) motion. The final case is inapposite because there the Seventh Circuit decided that the Eleventh Amendment deprived the district court of subject matter jurisdiction, *David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir. 1998), not that a lack of standing stood in the way.

### a. Scope of the Consent Decree

The State argues that the forced coercion of political work is the only possible violation of federal law under the Consent Decree. R. 7140 at 3. To the State's way of thinking, to the extent that the Decree sweeps broadly beyond coerced political work, these prohibitions "exceed the appropriate limits because they aim to eliminate conditions that do not violate federal law." *Id.* at 6 (*citing Horne*, 557 U.S. at 550). This characterization of the Consent Decree is too narrow.

The first problem with the narrow view is that the plain text of the Consent Decree says otherwise. Remember that Paragraph (E)(1) of the Consent Decree forbids the Office of the Governor from "conditioning, basing or knowingly prejudicing or affecting *any term or aspect* of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of *any political reason or factor*." Consent Decree ¶ (E)(1) (emphasis added). The ban on affecting "any term or aspect" of employment does not read like a ban solely on coerced political work. Nor does the forbidden motive—"any political reason or factor"—cover only a refusal to perform political work. As noted earlier, a consent decree functions both like a contract and a judgment. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519 (1986). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.,* 402 U.S. 673, 681 (1971). "In addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." *Firefighters*, 478 U.S. at 525. Although "consent decrees

12

bear some of the earmarks of judgments entered after litigation … at the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." *Id.* at 519. "For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour & Co.,* 402 U.S. at 682. The text of the Consent Decree protects current employees from more than just coerced political work: no "term or aspect" of employment (for non-exempt employees) can be prejudiced by "any political reason or factor." Consent Decree ¶ E(1).

It is true that "[c]onsent alone is insufficient to support a commitment by a public official that ties the hands of his successor." *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1993). There must be some rule of law that binds the public official's conduct because a "state official's promise to follow a rule of federal law retains its force because of the continuing effect of the law, which the state cannot alter." *Id.* No problem there for the Consent Decree: Paragraph (E)(1) is on sound legal footing. The First Amendment protects non-exempt public employees from more than just coerced political work. This legal principle is well established by the *Elrod-Branti-Rutan* trilogy, as the State concedes. R. 7140 at 4 n.2; *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that First Amendment forbids employment dismissals based on political patronage); *Branti v. Finkel*, 445 U.S. 507, 517 (1980) (holding that a patronage dismissal violates the First Amendment even if there is no aspect of coerced political work); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 62 (1990) (holding that pro-

13

motions, transfers, and recalls based on political affiliation violates the First Amendment). So, for non-exempt public employees, a violation of Paragraph (E)(1) likely violates the First Amendment.

The State tries to distinguish the *Elrod*, *Branti*, and *Rutan* line of precedent based on *whose* rights are violated. R. 7140 at 4 n.2. Those cases hold, the State points out, that partisan employment actions violate public employees' rights rather than those of candidates or voters. *Id*. But this argument conflates standing to pursue claims that have already resulted in a decades-old consent decree with the evaluation of a Rule 60(b)(5) motion to vacate or to modify the decree. Indeed, there is no strict requirement that consent decrees must provide relief solely to individuals who would continue to have standing. Instead, a "federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Firefighters*, 478 U.S. 501 at 525 (upholding consent decree benefiting individuals who did not suffer injuries resulting from the illegal discriminatory practices). It is no surprise that consent decrees often secure protections beyond what is strictly required by the Constitution—the *remedy* for a past constitutional violation or to prevent future violations might very well go beyond what the government would have been required to do if it had just complied with the Constitution in the first place. *See Rufo*, 502 U.S. at 389 (explaining that "we have no doubt that, to save themselves the time, expense, and inevitable risk of litigation … petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself

14

requires … but also more than what a court would have ordered absent the settlement") (cleaned up); *Kindred v. Duckworth,* 9 F.3d 638, 641 (7th Cir. 1993) (explaining that "consent decrees often embody outcomes that reach beyond basic constitutional protections"). Courts are under no continual obligation to modify a consent decree so "that it conforms to the constitutional floor." *Rufo*, 502 U.S. at 391. In *Kindred v. Duckworth,* for example, the Seventh Circuit held that even state policies that otherwise withstand constitutional scrutiny are subject to consent decrees enjoining their implementation. 9 F.3d at 642. Of course, as *Kindred* instructs, if an institution believes that an otherwise-constitutional policy is unfairly enjoined by a consent decree, then the government may file a Rule 60(b) motion, and the district court will consider the legality of the policy as one of the equitable points in the balance. *Id.* at 644. As explained earlier, however, the current mismatch between the Plaintiffs and the public employees is just that—an important equitable consideration, not an as-a-matter-of-law-dispositive one.

Nor is the Consent Decree a mismatch for the First Amendment protections afforded to public employees, as the State argues. R. 7140 at 6. The State cites *Horne* for the "bedrock principle" that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or … flow from such a violation." 557 U.S. at 450. That is perfectly accurate—but the Consent Decree does not exceed appropriate limits because it aims to eliminate conditions that violate the First Amendment, as held in *Elrod, Branti,* and *Rutan*. And *Horne* says nothing about whether courts have an ongoing obligation to update consent decrees

to afford relief only to those who have standing under contemporary Article III doctrine. The cases cited by the State do not require otherwise. R. 7140 at 6; *Evans*, 10 F.3d at 480–82 (vacating consent decree because the underlying substantive rule of law was overruled); *See Komyatti v. Bayh* 96 F.3d 955, 963. (7th Cir. 1996) (holding that "a federal consent decree can contain a provision not explicitly required by the Constitution as long as the criteria set forth in *Firefighters* are met").

Lastly, the State's reliance on the district judge's 1972 opinion in the case does not alter the scope of the Consent Decree. R. 7140 at 4–5. First, the opinion did not forecast the Supreme Court's eventual decisions on the scope of the First Amendment's protection against partisan employment decisions. The opinion held that political hiring and firing is lawful so long as there is no political *coercion. Shakman v. Democratic Org. of Cook Cty.,* 356 F. Supp. 1241, 1248 (N.D. Ill. 1972). The Supreme Court rejected this view in *Branti.* 445 U.S. at 517. Also, although the opinion commented in *dicta* that Paragraph E(1) was "unnecessary" and "neither mandated by the Court of Appeals or any case-law," the district court did not go so far as to modify the Decree. *Shakman*, 356 F. Supp. at 1248. Rather, the district court offered to "entertain motions to eliminate that clause from the consent decree." *Id.* at 1248–49. No motions asked for that. *See* R. 7166 at 3. All in all, then, the Consent Decree does protect public employees from First Amendment violations beyond just coerced political work.[11]

---

[11]The State also argues that the Decree only applies to employment within the Northern District of Illinois. R. 7140 at 7–8; Consent Decree ¶ B. In response, the Plaintiffs contend that the State never proposed that a different employment plan should apply outside the Northern District. R. 7104 at 22. The State also does not explain how this factors into the

Although the Consent Decree goes beyond coerced political work, the Decree's outer limits also require examination. Although there is some overlap in the employment practices banned by the Consent Decree and *Rutan*, their mandates are not co-extensive. The Consent Decree specifies that it protects persons who are already State employees; it enjoins the State from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time *already a governmental employee*, upon or because of any political reason or factor." Consent Decree ¶ (E)(1) (emphasis added). *Rutan* held that promotion, transfer, recall, and *hiring* decisions based political patronage violates the First Amendment in the absence of compelling government interest. *Rutan*, 497 U.S. at 79. Because the First Amendment forbids hiring decisions for non-exempt positions to be infected with political considerations, even applicants who are not already public employees are protected by *Rutan*.

So, unlike *Rutan*, the text of the 1972 Consent Decree only covers employment decisions that affect current government employees. It is true that the Consent Decree retained jurisdiction to address certain questions: (1) whether positions are legitimately exempt; that is, whether those positions can be properly filled based on political considerations, Consent Decree ¶ (H)(1)(a); *see also* R. 6946-2 at 14:16–19; and (2) whether political sponsorship or other political considerations be taken into

---

motion to vacate: on its own, the geographical restriction is not a reason to vacate the Consent Decree. What's more, the State never raised this issue in its response to the Plaintiffs' motion to appoint the Special Master, which sought an investigation into IDOT's statewide hiring practices. *See* R. 3809. The State declined another opportunity to raise this issue when responding to the Plaintiffs' motion to expand the Special Master's authority to statewide exempt-hiring process with respect to other agencies. *See* R. 4725.

17

account in hiring employees, Consent Decree ¶ (H)(1)(b). But it does not appear that, with regard to the State of Illinois, the district court ever formally decided those questions and, more importantly, incorporated them into an Order (except in limited part, as discussed later in the Opinion).

Having said that, the Consent Decree's ban on employment decisions "prejudicing or affecting" current government employees based on political reasons can require some level of monitoring of hiring decisions. First and foremost, if a current employee applies for another State job opening, then Paragraph E(1) still bans political consideration in that hiring decision. Hiring an applicant for that job based on a political reason or factor would affect a current employee—and the Consent Decree forbids that. Second, partisan hiring into non-exempt positions would likely be significant circumstantial evidence that partisanship is infecting *other* employment decisions too, including those that affect current employees. It would be naïve to believe that a supervisor or decision-maker could be trusted to simply wall-off partisanship in hiring from partisanship in other important employment decisions, like promotions and firings. Third—as proven by the IDOT Staff Assistant debacle—political preference at the hiring phase *does* affect current employees when the politics-based job winners are later transferred or promoted to other State jobs sought after by current employees.[12] That is why Judge Schenkier, when appointing the Special Master,

---

[12]In the reply brief, the State argues, apparently for the first time, that the IDOT Staff Assistant employment decisions did not violate the Consent Decree to begin with. R. 7140. at 19–23. This argument is unpersuasive. First, the burden is not on the Plaintiffs or the Special Master to make findings of ongoing violations. The burden is upon the State to demonstrate that changed circumstances warrant relief. *Horne*, 557 U.S. at 447. Second, if the State is

agreed that "post-hiring practices regarding transfers, assignments, classifications and promotions" are "within the scope of the decree." R. 6946-2 at 12:15–24. The IDOC Staff Assistant scheme is indeed all the worse, as Judge Schenkier explained, because the scheme started with supposedly exempt hiring: "employees who were hired into staff assistant positions that were labeled as exempt [many of whom reportedly had political affiliations], and a later time transferred into non-exempt positions … leads to the possibility that their experience gained while nominally in an exempt position gave them a leg up on others who were unsuccessful in obtaining non-exempt positions." *Id.* at 13:1–11.

Lastly, hiring decisions are within the scope of the Consent Decree's reserved jurisdictional provisions. To the extent hiring decisions implicate concerns about whether the hire is for a legitimately exempt position, this is arguably covered by Paragraph ¶ (H)(1)(a) of the Consent Decree. Judge Schenkier reasonably found that it was. *See id.* at 15:16–18 ("[i]n these circumstances, I find that there is authority under the 1972 decree to address the plaintiffs' concerns about whether positions in IDOT labeled as exempt truly were and are exempt"). The Court also retained jurisdiction over the question of whether political sponsorship or political considerations

---

arguing that the Consent Decree did not confer the Special Master with authority to investigate Staff Assistant hiring, then that argument was correctly rejected by Judge Schenkier based on the Decree's jurisdictional provisions. R. 6946-2 at 15:15–18 (explaining that, "[i]n these circumstances, I find that there is authority under the 1972 decree to address the plaintiffs' concerns about whether positions in IDOT labeled as exempt truly were and are exempt."). Finally, if the State is arguing that the Consent Decree does not apply to the Staff Assistant decisions because those decisions supposedly only involved hiring, then that argument fails for the reasons explained in the text: the political hiring caused a ripple effect on current employees.

can affect hiring and how much. Consent Decree ¶ (H)(1)(b). Again, the text of the actual injunction as applied against the State is indeed limited to decisions that affect current government employees—but, in some circumstances, even those hiring decisions that do not directly involve a current-employee applicant can affect current employees. So, yes, the Court must apply the textual limit of protection for current employees, but event that limit allows for some level of monitoring of hiring decisions.

### b. Comprehensive Exempt List and Exempt Employment Plan

With those governing principles on the scope of the Consent Decree in mind, it is time to evaluate the factual changes proffered by the State in support of ending the Decree. First, in collaboration with the Special Master, Illinois has adopted a comprehensive statewide exempt list and employment plan for exempt positions. R. 6158; R. 6180. According to the State, this ought to satisfy the Plaintiffs' principal complaints leading to the Special Master's appointment. R. 6946 at 25. To be sure, these measures are steps in the right direction. But the devil is not just in the details, but in the implementation. The Special Master reasonably explains that drawing conclusions about the exempt employment plan's "overall impact" must await a later time. *See* R. 7083 at 14. (This is not to lay blame on any person or institution for delay, but is just a recognition of the complexity in implementing the plan.) What's more, the Consent Decree goes beyond just banning abuse of exempt positions to prejudice current employees; instead, no term or aspect of non-exempt employment can be riddled with political reasons.

20

Illinois also argues that the Consent Decree should sunset with the end of the Special Master's appointment. R. 6947 at 1. As support, the State points to a statement made by Judge Schenkier during an October 2014 hearing. During that hearing, the judge commented that the Special Master "performing those very targeted [assigned] functions *will not usurp the responsibilities of officials* to run the affairs of IDOT, but rather will *help* ensure that IDOT's employment practices comply with the requirements of the decree." R. 6946-2 at 17:7–11 (emphases added). Illinois also cites part of the November 2016 Opinion to equate the exempt-position problem with the end of the 1972 Decree. The opinion says that a "review of the exempt positions at the other agencies will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case." R. 4798 at 3. But these statements merely expressed the judge's belief that the Special Master could help IDOT and the State with a specific aspect of statewide employment practices so that the government would comply with the Decree. It is difficult to discerns any intent to strictly connect the Special Master's discharge with the Consent Decree's sunset. Yes, the timing could coincide, and indeed with other government entities, the timing has coincided. But the simultaneity of Special-Master-discharge and Decree-termination is a product of the natural progress that is made so satisfy the Decree's directives when experienced and hardworking Special Masters and the government cooperatively work together. It is not a product of an order connecting the two.

21

### c. The OEIG and HEM

Next, the State argues that the OEIG and one of its divisions, the Hiring and Employment Monitoring Division (HEM), are "dispositive aspects of the State's durable remedy." R. 6946 at 26. The OEIG was established as part of the Illinois State Officials and Employees Ethics Act. 5 ILCS 430/20-10(a). In 2009, the Illinois General Assembly expanded the OEIG's jurisdiction to include the power to "review hiring and employment files of each State agency within the Executive Inspector General's jurisdiction to ensure compliance with *Rutan*[ ] … and with all applicable employment laws." 5 ILCS 430/20-20(9). To carry out this responsibility, in 2015, the OEIG created HEM, which conducts compliance-based reviews of State hiring and employment procedures to ensure that they are lawful, merit-based, and justifiable.

In the past, the previously assigned judge did not consider the OEIG and, later, HEM to be sufficient ways to erect a durable remedy—at least at the time. With regard to the OEIG, in appointing the Special Master in 2014, Judge Schenkier found that "the Inspector General's work in my judgment does not eliminate the need for the Court to take action to ascertain the extent of any violation of its order, the 1972 decree, and what steps are necessary to ensure that the decree will be followed in the future." R. 6946-2 at 16:10–16. With regard to HEM, in 2017, Judge Schenkier expanded the Special Master's role in part because he was "not convinced that the newly-created HEM unit currently possesses the experience or expertise to take on the investigation and review of exempt positions … for the entire state of Illinois without the active involvement of the Special Master." R. 4798 at 5. But that was

several years ago, the State argues, and now "there is no doubt about HEM's experience or expertise, and there is no question concerning the integrity, competency, or rigor of their monitoring of the State's hiring and employment." R. 6946 at 27. Illinois points to the size of HEM's staff, which comprises 10 full-time employees. *Id.*

The Plaintiffs respond that the OEIG's and HEM's efforts have not yet translated into meaningful changes. R. 7104 at 17. The Plaintiffs contend that State agencies regularly disregard HEM advisories on important measures, including conflicts-of-interest review and the application of minimum qualification requirements. *Id.* at 19. And there is an apparent lack of sanctions for disregarding the recommendations. *Id.* Furthermore, as the Special Master explains in her response brief, the CEP grants OEIG the discretion (not the duty) to investigate allegations of political contact or political discrimination. R. 7083 at 55; CEP XI.A.4.a-b. The Special Master also finds that "the current compliance framework does not always allow for transparent reporting in HEM Advisories." R. 7083 at 57. She explains how, as a policy, the OEIG does not permit HEM to reveal issues that are referred to the OEIG for investigation. *Id.* at 58. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. In reply, the State explains that state law mandates that all investigatory files and reports of the OEIG remain confidential. R. 7140 at 43; 5 ILCS 430/20-95(d).

Although there are sound policy reasons supporting the confidentiality of that information, the interest in confidentiality does not eliminate doubts about the efficacy of these institutions in preventing violations of the First Amendment. Again, this is not to lay blame on any institution or person, but rather a sign of just how difficult it is to protect public employees from partisan decision-making in employment. On the front end, partisan decision-makers naturally will make every effort to conceal the political bases of an employment decision. On the back end, current employees naturally fear retaliation for challenging or reporting potential violations. This is not an easy problem to solve.

Aside from concerns with the OEIG's and HEM's efficacy, the mere existence of these oversight institutions does not actually help the State's case when there is evidence of ongoing noncompliance with the Consent Decree or with processes—like the Comprehensive Employment Plan—that are designed to serve as the durable remedy against partisan decision-making. The message is not getting across to employment decision-makers that the OEIG and HEM will root out the problems and that there is a price to pay. Indeed, the OEIG investigated the IDOT's misuse of the Staff Assistant position and its findings contributed to the Special Master appointment. R. 3944-2, OEIG Final Report Case No. 11-01567. According to the Special Master, as "of September 14, 2020, HEM has issued 80 Advisories regarding 53 term appointment renewal hiring sequences; 15 complaint referrals; and 12 non-term ap-

pointment hiring sequences." R. 7083 at 49. The Special Master also reasonably concludes that "HEM routinely identifies violations of the CEP or current CMS guidance." *Id.*

To be clear, the Court most certainly is *not* saying that Illinois put itself in a worst position (Decree-termination-wise) by expanding the OEIG's authority and by creating HEM. To the contrary, the OEIG's—and really HEM's—efforts are the best points in the State's favor when evaluating whether Illinois has fashioned a durable remedy. But the State's obligations under the Consent Decree do not end with merely *identifying* partisan decision-making. Rather, as much as is reasonably practicable, Illinois must implement a durable remedy that prevents political-patronage employment decisions that affect current employees. Consent Decree ¶ (E)(1). If the State's oversight mechanism is merely uncovering noncompliance with the Decree or noncompliance with the other processes that are in turn designed to prevent noncompliance with the Decree, then that mechanism cannot carry the day for Illinois in terminating the Decree.

### d. Continuing Violations

The remainder of the State's arguments, in essence, contend that Illinois is in compliance with the Decree and that judicial intervention is no longer necessary. R. 6946 at 28–34, 39–42. According to the State, neither the Special Master nor the Plaintiffs can produce evidence of illegal political discrimination in the past six years. *Id.* at 30–31. The first problem with this argument is that it misstates where the burden of proof lies. As the party seeking relief from a judgment, the State bears the

burden. *Horne*, 557 U.S. at 447 (2009). Second, although the Special Master has noted significant progress in fashioning preventive measures to protect employees, she also has highlighted areas of ongoing concern from which inferences of First Amendment violations can be drawn. Not all of the examples are particularly damning—but some are.

For example, in the Sixth Report Regarding Statewide Compliance, the Special Master highlighted the use of Personal Service Contracts (PSCs) to manipulate hiring sequences. *See* 6710 at 11–14; R. 7083 at 28. In late 2018, the Department of Human Services (DHS) posted an opening for an Employment First Coordinator, a non-exempt position. *Id.* at 11. The Special Master reviewed the hiring sequence in Fall 2019 after learning that the selected candidate was never hired. *Id.* Based on that review, the Special Master determined that DHS abruptly terminated the position before the presumptive hire was offered the position. *Id.* Instead, a different candidate, who had declined to interview for the position because of an unwillingness to relocate, was hired on a PSC without going through the non-exempt interview process. *Id.* According to the Special Master, DHS circumvented the competitive non-exempt hiring process to favor a pre-selected candidate. *Id.* at 14.

That was not the only instance of PSC misuse and failure to follow anti-political processes. In February 2020, the OEIG issued a report, OEIG Report 14-01678, on misuse of PSCs by the Department of Agriculture. In a supplement to the Sixth Report, R. 6919, the Special Master explained that, between 2007 and 2015, the Agriculture Department had entered into 633 PSCs with 269 separate employees, *id.* at

26

4. Many of them were rehires. *Id.* The Special Master explained that, in "the overwhelming majority of PSCs reviewed, Agriculture could not demonstrate that it adhered to the *Rutan* hiring guidance." *Id.* Although the OEIG did not find direct evidence that PSCs were awarded based on political considerations, it noted the "potential for improper political hiring to occur." *Id.* at 5. That is not surprising: one purpose of fashioning and applying employment-decision processes designed to prevent partisan decisions is to increase transparency, thus deterring First Amendment violations. Absent compliance with those processes, going back after the fact to uncover political hiring is difficult.

Nor is it likely that the PSC misuse will be solved by CEP itself. Although the Plan does set forth a provision that governs PSCs, the Special Master explains that the language is nearly identical to the previous policy on PSCs, fails to address manipulation of PSCs, allows exceptions for individuals previously hired through PSCs outside of the *Rutan* requirements, and does not include any meaningful enforcement mechanism. R. 7083 at 30. She also points out that prior PSC policies have often been ignored. *Id.* Moreover, despite the CEP's requirement that agencies submit quarterly reports to CMS on the use of PSCs, as of September 2020 no reports had been submitted. *Id.*

In response, the State argues that without direct evidence of political decision-making, the Special Master's concerns about PSCs do not provide probative evidence of noncompliance. R. 7140 at 32. It is true that direct evidence of political motivation is absent in those examples. But those facts do demonstrate how PSCs can provide a

27

workaround to the protocols that are supposedly in place to prevent political hiring, which naturally raises the question of whether non-exempt positions are being impermissibly filled based on political reasons.

Another area of concern identified by the Special Master is the use of seasonal, emergency, and temporary hires. R. 7083 at 24–28. In her Fifth Report, the Special Master explained that many of the IDOT Staff Assistants hired from 2010 to 2011 were designated as supposed "emergency employees." R. 5012 at 34–37. A number of these hires had connections to politicians and high-level government officials. *Id.* In her initial report, the Special Master discussed the IDOT's hiring of seasonal Highway Maintainers, known as Snowbirds. R. 4128. at 22–23. The report noted that "Clout Lists," from back in 2003, revealed that at least ten Snowbirds were hired based on recommendations from former Chicago Alderman Richard Mell. *Id.;* R. 4128-2 at 33. Although the Clout Lists are outdated, the Special Master points out that, as recently as 2015, Snowbird hiring is directly handled by district personnel offices with a lack of uniformity and very little oversight. R. 4128 at 22. The OEIG also discovered that, from 2013 to 2017, the DOA hired seasonal state fair workers without conducting *Rutan* interviews, and improperly designated them as exempt. OEIG Case 14-01678 Report at 18–19.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



The Special Master points to a number of other practices that pose a threat to the State's implementation of a durable remedy. Again, on review of those practices, the Court does not view some of them as posing a substantial risk of political decision-making (as distinct from best-human-resources practices). R. 7083 at 18–19 (reachability); *id.* at 35 (bypass process). But two of the identified problems do pose that risk:

- **Cancelled Sequences:** Agencies can terminate a job posting during a hiring sequence when they—supposedly—no longer want to fill the opening. R. 7083 at 40. In one example, an agency cancelled a hiring sequence for a position requiring a Master's of Social Work degree. *Id.* at 41. The agency later reposted the opening, now stating that an MSW

or related degree sufficed. *Id.* This favored a preferred incumbent candidate who had an M.A. in a related field but not an MSW. *Id.* (This is an instance of a decision-making involving a current employee.)

- **Vetting of Conflicts:** The Special Master identified problems with improper documentation and vetting of conflicts of interests in hiring sequences. R. 7083 at 42.

In light of the uncertain efficacy of the OEIG and HEM (again, without laying blame at their doorstep), the nascent implementation of the Comprehensive Employment Plan, the failure to prevent misuse of Personal Service Contracts, and the frequency and nature of the other practices discussed above that would allow political considerations to affect current State employees, now is not the right time to terminate the Consent Decree—a durable remedy is not yet in place. It bears repeating and emphasis that this is not to cast pejorative criticisms on any particular institution or person. It just is not easy to durably protect State employees from partisan decision-making in employment, because those in power will do much to keep unlawful employment decisions out of the light and employees who lose out naturally fear retribution if they speak up. Nor does the Court downplay the significant progress made by the State, especially in the past two years, toward implementing a durable remedy. Indeed, as the implementation of the CEP continues, and as HEM continues its efforts and—it is hoped—increases its impact on State agencies, then the Court would be receptive to consider another motion to terminate in the last quarter of this

30

year. If the Sheriff of Cook County, the Forest Preserve District, the City of Chicago, and Cook County can do it, so can the State.[13]

## B. Scope of the Special Master's Authority

Separately, the Plaintiffs have moved to clarify the scope of the Special Master's authority, or in the alternative expand her responsibilities "to include the power to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental relief orders and *Rutan*." R. 6789 at 22. In their reply brief, the Plaintiffs appear to scale back their requested expansion to "monitor[ing] implementation of the CEP … and related policies, and report to the Court and the parties." R. 7104 at 39. In contrast, the State argues that the Special Master has completed her responsibilities, so Illinois seeks a vacatur of the appointment. R. 6947 at 1, 26.

### 1. Orders Conferring Authority

The initial 2014 Order appointing the Special Master authorized her to perform five duties:

> (i) investigate the scope and reason for any violations of the 1972 Decree regarding the Illinois Department of Transportation ("IDOT"), (ii) recommend measures that may be necessary or appropriate to prevent any recurrence, (iii) assess the implementation of those efforts to ensure that they are effective; (iv) address whether positions in IDOT labeled as exempt were properly exempt under applicable legal principles, and (v) make recommendations for how to remedy any violations of the 1972 Decree.

---

[13]It is worth noting that all of those institutions exited from the case with the agreement of the Special Masters assigned to those institutions.

R. 4020 ¶ 3. The order also says that the Special Master "shall only have the duties, responsibilities and authority conferred by this Order and subsequent Court Orders regarding such duties." *Id.* Also, the Court denied other forms of requested relief similar to those contained in supplemental relief orders entered against other defendants. R. 3744 ¶ 23.

In appointing the Special Master, Judge Schenkier reasoned that, despite the OEIG's efforts, the Court nonetheless needed to undertake "action to ascertain the extent of any violation of its order, the 1972 decree, and what steps are necessary to ensure that decree will be followed in the future." R. 6946-2 at 16:10–16. The judge found "that function is best carried out by an officer who is appointed by the Court who is acting under the auspices of the Court." *Id.* at 16:16–18. The Court also concluded that "compliance with the decree is best served by having a transparent process in which an agent of the Court is involved in further investigating the scope and reason for what occurred, recommending the measures that may be necessary to prevent any recurrent and then in assessing the implementation of those efforts to ensure that they are effective." *Id.* at 16:25–17:6. Lastly, the judge expressed a preference for a court-appointed officer to assemble relevant evidence rather than engage in adversarial litigation to flush out the facts. *Id.* at 18:5–17.

In May 2017, Judge Schenkier expanded the Special Master's authority (1) to review all positions under the jurisdiction of the Governor that are identified as exempt to determine whether the Governor has adequately demonstrated that the positions meet the *Branti* standards; (2) to develop an approved and comprehensive list

of all *Rutan*-exempt positions across all agencies in the state (the Exempt List); (3) to develop procedures for correcting and revising the Exempt List; and (4) to analyze any *Rutan*-exempt positions that are also protected under either the State Personnel Code or are subject to a collective bargaining agreement and make recommendations about whether these positions may continue to be classified as exempt and still adhere to the *Branti* criteria. R. 4798 at 6–7. After that, Judge Schenkier entered an order instructing the Special Master to "work with the Parties to develop a list … of all positions under the jurisdiction of the Office of the Governor of Illinois … that are exempt from restrictions on hiring or affecting conditions of employment on the basis of political reasons or factors." R. 5004 ¶ A. That order also authorized the "continuing monitoring of the foregoing activities by the Special Master and Plaintiff's counsel." *Id.* ¶ C.

In the opinion expanding the scope of the Special Master's authority, Judge Schenkier reasoned that "involving the Special Master in the endeavor from the outset will better promote effectiveness of the review, and will cost the State less money in the long run." R. 4798 at 4. He also expressed his confidence in the Special Master's experience, noting that she helped shepherd the City of Chicago out from under their *Shakman* obligations. *Id.* Although not intending to criticize HEM, Judge Schenkier was "not convinced that the newly-created HEM unit currently possesses the experience or expertise to take on the investigation and review of exempt positions … for the entire state of Illinois without the active involvement of the Special Master." *Id.* at 5.

33

### 2. State's Motion to Vacate Appointment

With those appointment orders as the backdrop, the right place to start in considering the dueling motions is the lower bound of the issue, that is, the State's request to discharge the Special Master and vacate the orders supplying her authority.

The Governor contends that the Special Master has completed her court-ordered mandate. R. 6947 at 26. The Court disagrees. First, the 2014 Order assigned the Special Master the duty to "recommend measures that may be necessary or appropriate to prevent any recurrence" of *Shakman* Decree violations and "assess the implementation" of those efforts. R. 4020 at ¶ 3. According to the Special Master herself, as of September 2020, several of her recommendations have not been implemented by IDOT. *See* R. 7083 at 9–12. These include maintaining accurate position descriptions and objective minimum requirements, improving conflicts of interest policies, and completing an internal audit of all *Rutan*-covered position descriptions at IDOT. *Id.*

On top of that, the Special Master also identifies pending tasks under the 2017 Order. Although the Court has approved the statewide Exempt List and the Comprehensive Employment Plan for Exempt Positions, R. 6180, R. 6158, the Special Master has raised some concerns about their implementation, R. 7083 at 10 n.13 ("[a]lthough the selection process of converting previously exempt position[s] into covered positions is completed, many of those sequences raised concerns about improper applica-

34

tion and vetting of conflicts of interests, improper application of minimum qualifications and scoring anomalies"). It is true that significant progress has been made, but the Special Master has not exhausted her mandate.

Furthermore, although the State argues that the work of OEIG and HEM render judicial oversight unnecessary, *see* R. 6947 at 20–22, 29–30, as explained earlier HEM is still a relatively new institution. R. 4798 at 5. The Court shares Judge Schenkier's view that continued collaboration amongst the Special Master, the OEIG, and HEM remains "the most efficient and cost-effective" approach. R. 4798 at 8. Indeed, the Special Master has displayed awareness to monitor with a lighter touch as HEM becomes more and more established. In the Special Master's Sixth Report, she reported that "HEM reviews the appointment paperwork for each appointment [t]o Exempt List positions," so "[t]o avoid duplication of efforts, the Special Master's office has not played an active role in reviewing each appointment in recent months." R. 6710 at 28. Illinois argues that this evinces the Special Master's intent to yield exempt review to HEM. R. 7140 at 23. Far from "yielding" exempt review, the Special Master is simply following her instructions to work efficiently.

The State also asserts that Judge Schenkier instructed the Special Master to "facilitate the fastest and most efficient transfer of knowledge and experience from the Special Master to HEM unit employees so that they may carry more of the burden." R. 6947 at 16. Illinois cited that directive from the 2016 opinion, and the State argues that the Special Master is phasing herself out by relinquishing more autonomy to HEM's self-policing. R. 4798 at 6. That is all well and good, but it does not

evince an intent to terminate the Special Master's appointment when concerns of HEM's efficacy (as discussed earlier) still abound.

The State also tries to rely again on its arguments for vacating the Consent Decree. But those arguments have now been rejected. Nor do the cases cited by the State support its position. *See* R. 6947 at 18–19 (citing *Plotkin v. Ryan*, 239 F.3d 882 (7th. Cir. 2001); *Salazar by Salazar v. D.C.*, 896 F.3d 489 (D.C. Cir. 2018)). *Plotkin* is a case about standing. 239 F.3d at 884–85. It says nothing about discharging a Special Master. *Salazar* is inapposite because there the plaintiff was the one seeking relief, so the plaintiff bore the burden. *Salazar,* 896 F.3d at 498. Second, *Salazar* simply explains that the standard for modifying a consent decree is less demanding than the standard for obtaining a preliminary injunction in the first instance. *Id.* at 497–98. The opinion cautioned that, in the rare instance that a plaintiff, as the non-enjoined party, seeks to modify a consent decree, "courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree … [and] may not, under the guise of modification, impose entirely new injunctive relief." *Id.* at 498. It is not the Plaintiffs who seek a vacatur of the appointment order.

As a related argument, the State asserts that, after six years of work with IDOT, the Special Master's continued issuance of recommendations and assessment of their implementation would create new injunctive-relief requirements. R. 6947 at 24. But the Special Master has, in the words of the State, merely "recommended" and "assessed" for six years. R. 6947 at 27. The mere continuation of the Special Master's

36

work will not create new injunctive requirements when they were not injunctive to begin with. *See Bogard v. Wright*, 159 F.3d 1060, 1063 (7th Cir. 1998) ("the extension of the monitor ... did not continue the injunction because the appointment of the monitor was not itself an injunction"). For all of these reasons, the Court denies the State's motion to discharge the Special Master and to vacate the appointing orders.

### 3. Request to Expand Authority

Now for the outer bound of the Special Master's authority. At least initially, the Plaintiffs proposed expanding the Special Master's responsibilities "to include the power to investigate and report on the compliance of all agencies under the jurisdiction of the Governor with the Court's 1972 Decree and supplemental relief orders and *Rutan*." R. 6789 at 22. This would be too expansive for four reasons.[14] First, the Governor is not party to any supplemental relief orders, so of course that part of the proposal does not apply at all.

Second, although there is some overlap between the Consent Decree and *Rutan*, the State's obligations under them are not co-extensive. As discussed in connection with the State's motion to terminate the Consent Decree, the Decree bans conduct that is narrower in scope than *Rutan*. The Decree only prohibits political em-

---

[14]Although the Court agrees with the State that this broad interpretation of the Special Master's charge is "impermissible," it is not because of the Governor's reliance on *Cobell v. Norton,* 334 F. 3d 1128 (D.C. Cir. 2003); R. 6974 at 24. There, the court-appointed a monitor under a nebulous "inherent power" that it did not have. *Cobell*, 334 F.3d at 1141. The D.C. Circuit specifically distinguished this from the "practice of a federal district court appointing a special master pursuant to Rule 53 to supervise implementation of a court order." *Id.* at 1142.

ployment actions to the extent that they affect a *current* government employee. Although hiring of outside candidates can still affect current employees (as discussed earlier in the Opinion), the Consent Decree does not provide the Special Master with plenary authority to address hiring of outside candidates if no current government employee applied for the position. That is beyond the scope of the Consent Decree. (Again, this Opinion explained earlier how those hiring decisions *can* affect current employees, in which case the Special Master would have authority to address those decisions.)

Third, the record does not justify granting the Special Master authority to actively monitor *all* State agencies for compliance with every aspect of the Consent Decree. To date, the Special Master's authority drew upon incremental conferrals relying upon robust and highly probative evidence of noncompliance with the Consent Decree or noncompliance with processes put in place to prevent violations. In appointing the Special Master, Judge Schenkier relied on a detailed OEIG investigation, which concluded that IDOT "approved the hiring of persons into the nominally *Rutan*-exempt Staff Assistant positions to perform duties of *Rutan*-covered positions or duties that would *not* support *Rutan*-exempt status," and then "in some cases, transferred Staff Assistants into *Rutan*-covered positions, without following the *Rutan* hiring process." R. 3944-2 at iii-iv; R. 3944-4 at 182. In addition, the OEIG investigators "identified a number of persons who had been hired into *Rutan*-exempt Staff Assistant positions who had some sort of affiliation or association with an elected official" and found "evidence that a number of persons hired into Staff Assistant positions

stated they obtained their position as a result of some sort of political affiliation." R. 3944-4 at 197–98. These OEIG findings evinced Consent Decree violations because "some of those people who obtained staff positions already were employed at the Department of Transportation … others were hired into the positions from outside IDOT, and then later formally obtained non-exempt positions through transfers or an application process ... [a]nd according to the Inspector General report, some of the people who were hired into the staff assistant positions … had partisan political connections." R. 6946-2 at 8:10–18. Judge Schenkier also tied the Special Master's initial mandate to the jurisdiction-retention provisions of the Consent Decree, "under the decree, the Court also retained jurisdiction to address disputes about whether particular job positions are legitimately exempt." *Id.* at 14:16–18.

Expanding the Special Master's authority in 2017 to statewide review of exempt positions was a logical progression because, as Judge Schenkier noted, the "Special Master's work revealed that part of the problem at IDOT resulted from a lack of effective oversight policies at [CMS] which has authority to approve exempt job designations statewide." R. 4798 at 3. Again, Judge Schenkier tied expansion to the Decree's jurisdiction-retention provisions, and concluded that a "review of the exempt positions at the other agencies will allow the Court to ensure the requirements of the 1972 decree (and the constitution) are met by ensuring that only positions that truly qualify for exempt status receive that label, and that robust processes are in place to ensure that remains the case. *Id.*; *see* Consent Decree ¶ (H)(1)(a).

39

To now provide the Special Master with statewide authority to monitor all agencies for compliance with all aspects of the Consent Decree is neither substantiated by robust findings nor a logical extension of the Special Master's previously defined role. More robust findings, commensurate with OEIG's investigation of IDOT, would be needed to warrant an expansion of that magnitude. To be clear, by declining to confer plenary authority to the Special Master for all statewide employment practices, the Court is *not* concluding that the State has fashioned a statewide durable remedy; the Court found otherwise as explained earlier.

In their reply brief, the Plaintiffs appear to narrow the scope of their requested expansion to "monitor[ing] implementation of the CEP (whether in its current form or as modified by the Governor after discussions with the Special Master and Plaintiffs) and related policies, and report to the Court and parties." R. 7104 at 39. In contrast to the more expansive request, this request is justifiable for four reasons.

First, many of the Special Master's identified concerns may be addressed by monitoring implementation of the CEP. The CEP, as currently constituted, contains provisions addressing minimum qualifications (CEP ¶ IV.G); accurate position descriptions (*id.* ¶ IV.H); disclosure of conflicts (*id.* ¶ IV.L); sequence cancellation (*id.* ¶ V.L.); temporary and seasonal assignments (*id.* VIII); personal service contracts (*id.* ¶ IX); and the scoring and screening of applications (*id.* ¶¶ IV.M, IV.H, V.J).

Second, the proposal naturally and logically expands on work that the Special Master is already doing and does not stray far from her authority as currently defined. The 2014 Order instructed the Special Master to "make recommendations for

how to remedy any violations of the 1972 Decree," R. 4020 ¶ 3, which should include recommendations for implementing and amending a plan proposed by Illinois as a means of exiting the Consent Decree, *see* R. 7083 at 45 ("the State proposed, and the parties agreed that a Comprehensive Employment Plan was necessary"). And since early 2018, the Governor has collaborated with CMS, HEMS, and the Special Master to write concrete provisions of the CEP. R. 6710 at 19. Many of the Special Master's recommended provisions were ultimately included in the CEP filed with the Court (but not all). *Id.*

This leads to the third reason for a modest expansion. The proposal reasonably encompasses the Special Master's outstanding tasks and remaining concerns regarding the CEP. According to the Plaintiffs, they believe that the Special Master shares their several objections to the proposed CEP. R. 7104 at 24. The Special Master reported that, as of September 2020, major portions of the CEP have not been rolled out or implemented, R. 7083 at 45–47, and reports during subsequent status hearings confirm the ongoing and challenging rollout. This includes adoption of the new electronic hiring system. *Id.* at 46. Although the Special Master should not be scrutinizing every single posting and hiring sequence documented by the system, it is sensible for her to continue to monitor its implementation. The Special Master also expressed concerns about whether obligations under the CEP are being regularly followed. *Id.* at 47–48. According to dozens of HEM advisories, many State employees have not been trained on the CEP and many hiring managers are unaware of its requirements.

41

*Id.* at 48–53. These advisories have identified issues with vetting conflicts, inconsistent position descriptions, and insufficient documentation of hiring sequences. *Id.* at 49. Given the Special Master's collaborative history with the State on the CEP, and her remaining concerns on its implementation and enforcement, the Special Master's continued involvement will serve the goals of efficiency and cost-effectiveness. *See* R. 4798 at 8.

Fourth and finally, court-appointed monitors greatly helped other *Shakman* defendants by shepherding the implementation *and* subsequent revision of employment plans to exit the case. *See* R. 1984 ¶ 3 (Sheriff of Cook County); R. 3256 ¶ 2 (Forest Preserve District); R. 3861 ¶¶ 2,4 (City of Chicago); R. 6078 ¶¶ 2, 4 (Cook County). Although those Defendants were subject to supplemental relief orders that specifically included the implementation of hiring plans into the definition of "substantial compliance," *see e.g.* R. 3256 ¶ 4, the framework is nonetheless instructive. As the court-appointed monitor for the City of Chicago, the Special Master found that the City achieved substantial compliance after reviewing its adoption of city-wide hiring plans. R. 3256 ¶ 2. To be clear, the Court is not holding Illinois to the same standard contained in other supplemental relief orders. Rather, the point is that continuing to work collaboratively with the Special Master provides the clearest path to terminating the Decree.

### 4. Clarification of Authority

For the reasons discussed, going forward the Special Master is authorized to:

1.     Assess the implementation of the CEP (including the Electronic Hiring Plan) and make recommendations on the implementation of the CEP

(including proposing amendments to the CEP) that would assist in preventing violations of the 1972 Consent Decree.

2. Investigate particular hiring sequences if, in the course of assessing the CEP, the Special Master finds a reasonable basis to believe that the sequence involves a potential violation of the 1972 Consent Decree (bearing in mind that the Decree applies to current government employees but also bearing in mind that hiring can affect current employees in various ways, as discussed earlier in the Opinion).

3. Assess the implementation and enforcement of the Comprehensive Employee Plan for Exempt Positions, the statewide Exempt List, the John Doe Process, and finalize any outstanding proposals for modifications of the Plan, List, and the Process.

## IV. Conclusion

The State's motion to terminate the Consent Decree is denied and the cross-motion to vacate the appointment of the Special Master also is denied. The Plaintiffs' motion to enforce or to clarify is granted in part and denied in part.

ENTERED:

 s/Edmond E. Chang 
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2021

43