**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 69-2145 |
| DEMOCRATIC ORGANIZATION OF COOK | ) | |
| COUNTY, *et al.,* | ) | Judge Edmond E. Chang |
| | ) | |
| Defendants. | ) | |

**GOVERNOR'S REDACTED MEMORANDUM IN SUPPORT OF HIS MOTION
TO VACATE THE MAY 5, 1972 CONSENT DECREE**

JB Pritzker, in his official capacity as Governor of the State of Illinois, by his attorney,

Kwame Raoul, Attorney General of Illinois, moves this Court, pursuant to Federal Rule of Civil

Procedure 60(b), to vacate the consent decree entered on May 5, 1972.  In support of this motion,

the Governor states as follows:

**BACKGROUND AND INTRODUCTION**

In July 2020, the State moved to vacate the 1972 consent decree.  Dkt. 6946.[1]  This Court

denied that motion, while acknowledging "the significant progress made by the State, especially

in the past two years," and expressing that it "would be receptive to consider another motion to

terminate in the last quarter of this year."  Dkt. 7369 at 30-31.  The Court clarified the authority

of the Special Master's Office ("SMO") to assess the State's implementation of the hiring

processes set out in its Comprehensive Employment Plan ("CEP") and to investigate hiring

---

[1] The State hereby incorporates the arguments presented in the initial briefing, including that plaintiffs' lack of standing and the federalism concerns raised by this case present equitable reasons to end the decree.  *See Shakman v. Clerk of Cook County,* Case No. 20-1828, 994 F.3d 832 (7th Cir. 2021) ("*Shakman VI*").  Rather than repeat the arguments already considered by the Court, the State focuses on the areas the Court identified as remaining compliance tasks.

sequences that might demonstrate a violation of the decree. *Id.* at 42-43. Shortly after issuing its order, the Court provided additional guidance in a minute entry that followed the Seventh Circuit's decision in *Shakman VI*. Dkt. 7394. The Court directed the parties and the Special Master to attempt to "arrive at a reasonably concrete plan so that the State can achieve a durable remedy and the decree can be terminated." *Id.* It emphasized that "[f]ocused and sustained effort by the State over the next months, as well as collaboration with the [SMO], on the ongoing implementation of the CEP as discussed in the Opinion should be the cornerstone of a sunset plan." *Id.*

The parties agreed on eight benchmarks and the Court addressed those eight benchmarks and the other disputed areas in its October 14, 2021 Order. Dkt. 7616. The State focuses its arguments below on the parameters identified by the Court's Order. Based on the "changed circumstances" and "durable remedy" implemented since the SMO was appointed in 2014, as well as the State's continued progress in implementing the CEP as directed by the Court, vacatur of the decree is warranted under Rule 60(b), as further explained below. *See Horne v. Flores*, 557 U.S. 433, 447 (2009). Vacatur also is warranted because the State is in compliance with the decree and with federal law and will remain in compliance absent continued court supervision. *Id.* at 454.

## ARGUMENT

### I. The State Has Addressed Past Violations and Implemented a Durable Remedy.

Before the State filed its initial motion to terminate in July 2020, it had performed the tasks identified by the Plaintiffs, the SMO, and the Court as central to remediating the Staff Assistant misuse that led to the SMO's appointment, and it implemented numerous reforms

identified as priorities by the SMO.  These components of the State's "durable remedy" remain in place today.  Below, the State presents an update demonstrating that these features continue to prove to be effective.

**Exempt List and Exempt Employment Plan.**  The State developed a comprehensive Exempt List, and created and implemented a detailed process to modify that list as needed.  The Exempt list and process were approved in January 2019, Dkt. 6154; Dkt. 6180.  When the State filed its motion in July 2020, it had been following that process without any significant issues for eighteen months.  At this point, the State has complied with the Exempt process without any significant issues for nearly three years; all 900+ exempt positions that have been filled by Governor Pritzker have gone through this process.  As both the Plaintiffs and the SMO have argued, the remedy for the Staff Assistant misuse is drawing a bright line between Exempt and Non-Exempt positions, and not allowing for crossover between the two categories.[2]  That remedy is undoubtedly in place and effective.

**Office of the Executive Inspector General ("OEIG") and Its Hiring and Employment Monitoring Division ("HEM").**  Both the OEIG and its specific HEM division are meaningful guards against violations of *Rutan* and other political discrimination, and powerful agents of improving the State's policies and practices.  OEIG has broad jurisdiction "to investigate allegations of fraud, waste, abuse, mismanagement, misconduct, nonfeasance, misfeasance, malfeasance, or violations or this Act or violations of other related laws and rules."

---

[2] As the Plaintiffs put it, "[t]he lack of a single comprehensive list of Exempt Positions and of an established procedure for revising the list of Exempt Positions permitted the Quinn administration to appoint approximately 300 individuals as purportedly exempt IDOT 'technical assistants' despite the fact that they did not warrant exempt status."  Dkt. 4676 at 4.  According to the SMO, "[h]aving a finite list ensures that *improper* political hiring is less likely to occur, because no department can simply create and fill an unlimited number of new positions, as was the case with the Staff Assistant positions at IDOT."  Dkt. 6306 at 2.

5 ILCS 430/20-10(c). The Ethics Act specifically charges OEIG with "review[ing] hiring and employment files of each State agency … to ensure compliance with *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), and with all applicable employment laws." 5 ILCS 430/20-20(9). In keeping with this charge, the OEIG has consistently focused its expansive investigatory powers in an effort to uncover hiring and employment misconduct and mismanagement. The State has a statutory obligation to both cooperate with these investigations and to respond to the OEIG's findings. All state officers and employees are required to cooperate with the OEIG's investigations, and failure to do so is grounds for disciplinary action, including dismissal. 5 ILCS 430/20-70. The statute requires either the ultimate jurisdictional authority (here, the Governor's Office) or the agency head to respond to any investigatory reports that conclude that a violation has occurred. 5 ILCS 430/20-50(a). The OEIG has recourse to seek further action through the Executive Ethics Commission if it finds the State's response to the findings unsatisfactory. 5 ILCS 430/20-50(c). And the OEIG can conduct follow-up investigations to assess whether problems identified in investigatory reports have truly been addressed.

The OEIG was the critical force in bringing the Staff Assistant misuse to light and prompting change in the State's practices. Since the comprehensive Staff Assistant investigation, the OEIG has repeatedly identified hiring and employment problems that the Governor's Office otherwise may never have learned about and addressed. For instance:

- In March 2018, the OEIG issued a report detailing problems with how State Fair workers were hired. This Report led the Department of Agriculture to institute significantly improved procedures. (OEIG Rpt. 14-01678)[3]

- In December 2020, the OEIG issued a report detailing problems with how the Department of Human Services ("DHS") mismanaged a PSC, and lacked clear protocols around PSCs. This Report led to structural changes in how DHS

---

[3] Published OEIG founded reports are available online at
https://www2.illinois.gov/oeig/investigations/Pages/PublishedOEIGCases.aspx.

4

processes PSCs and substantive improvements in how it and other agencies assess whether a PSC is the appropriate hiring mechanism.  (OEIG Rpt. 19-02266)



The OEIG reported that during the third quarter of 2021 alone, it received 44 hiring-related complaints; it opened 6 hiring-related investigations; and it closed 8 hiring-related investigations.[5]  This robust investigative work is critical to uncovering hiring and employment-related problems.  And the OEIG's statutory authority to mandate that the State respond to its findings is vital to ensuring the State takes action to address those problems.  That is precisely the role of independent inspectors general, and why the OEIG is a critical component of the State's durable remedy.

Notably, however, although OEIG is statutorily responsible for investigating compliance with *Rutan*, it has not reported a *Rutan* violation in several years.  In the reports listed above – each the product of many months of intensive investigatory work – the OEIG specifically noted

---



[5] HEM Report, Third Quarter 2021, *available at* https://www2.illinois.gov/oeig/HEM/Documents/HEM%20Report%20-%20Third%20Quarter%202021.pdf.

that it uncovered no evidence of political manipulation. *See* OEIG Rpt. 14-01678 at 20 ("[T]he OEIG did not uncover evidence that the hires were made based on political connections …"); OEIG Rpt. 19-02266 at 27 ("[T]he evidence did not show that [Candidate B]'s hire was the result of any unlawful political discrimination …"); ███████████████████

████████████████████████████████████████████

███████████████████████████████████

OEIG's investigatory work is complemented by HEM's detailed focus on hiring and employment compliance efforts. The State's prior motion described how, in 2015, the OEIG created HEM, which conducts compliance-based reviews of State hiring and employment procedures and decisions to ensure that they are lawful, merit-based, and justifiable. Dkt. 6946 at 26. OEIG submitted a report describing its role as part of the earlier briefing. Dkt. 6936.

HEM has now developed and sharpened its expertise and efficacy for several years. HEM's recent Third Quarter report describes its work in detail, noting that during that timeframe it issued 10 Advisories; reviewed 71 exempt position description clarifications; received 10 exempt list modification requests; and reviewed 85 exempt appointment notifications. HEM recently published a series of Advisories that are "Progress Reviews" – detailed and comprehensive assessments of categories of HEM Advisories and analysis of whether agencies are improving their practices based on those Advisories. *See* Dkt. 7635, Dkt. 7642. Those "Progress Reviews" are described in more detail later in this memorandum.

Between the OEIG's investigatory work and HEM's compliance work, the State has an effective bulwark of an independent entity that monitors day-to-day employment actions to improve the State's hiring and employment practices, investigates allegations that may uncover more serious issues of mismanagement and misconduct, and ensures State action in response to

both findings and recommendations for change. The Court previously found OEIG's and HEM's efforts to be strong evidence in the State's favor, Dkt. 7369 at 25, and their work in the subsequent fifteen months confirms their efficacy as a significant component of the State's durable remedy.

**Completion of many other improvements.** In its initial motion in July 2020, the State described numerous other significant improvements in its hiring and employment procedures since 2014. Dkt. 6946 at 28-29. The State's improvement efforts have been ongoing and significant since then.

While the State's Rule 60(b) motion was pending, its work continued under this Court's and the SMO's oversight. Specifically, because both the Plaintiffs and the SMO had argued that, at that time, the State had not yet implemented its "Comprehensive Employment Plan" ("CEP"), the State (although it disputed the necessity of the CEP as a condition for exiting the decree)[6] devoted enormous effort to rolling out the CEP as briefing continued on the Rule 60(b) motion. The State had filed the CEP in November 2019, Dkt. 6612, with hopes of providing training to agency human resources and personnel staff early in 2020. Due to pandemic-related delays, that training ultimately took place beginning in September 2020, with eight sessions. The SMO

---

[6] The State is committed to the CEP and to electronic hiring, as detailed in this filing. However, its position firmly remains that the CEP and electronic hiring are not required by the decree or to exit the decree. *See Horne*, 557 U.S. at 450 ("[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation. If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers."). The State would be in compliance with federal law with or without a CEP and electronic hiring; and neither the CEP nor electronic hiring are aimed at eliminating conditions that violate federal law or flow from such a violation. *Compare supra* note 2: in contrast to the CEP and electronic hiring, which share no meaningful nexus with federal law, both the Plaintiffs and SMO asserted a direct link between the lack of an exempt list and a process for revising it and federal law, arguing that those specific defects led to the Staff Assistant misuse.

offered comments and suggestions for the trainings. Those trainings were:

- **Session 1:** Overview and the Exempt Employment Plan. (9/22/20, <u>Exhibit 1</u>)
- **Session 2:** Position Descriptions. (9/24/20, <u>Exhibit 2</u>)
- **Session 3:** Hiring Sequence Pre-Work (10/6/20, <u>Exhibit 3</u>)
- **Session 4:** After Posting Closes (10/8/20, <u>Exhibit 4</u>)
- **Session 5:** Interviews/Evaluations (10/20/20, <u>Exhibit 5</u>)
- **Session 6:** Work Performed on Less than Permanent Basis, Non-Code and Technical Positions (11/17/20, <u>Exhibit 6</u>)
- **Session 7:** Compliance and Reporting (11/19/20, <u>Exhibit 7</u>)
- **Session 8:** Summary/Questions/Discussion (2/23/21 – no slides utilized)

An average of more than 200 human resources personnel, representing all agencies under the Governor, attended these training sessions. In addition, those trainings have been completed 655 times by online participants.

The Court issued its Order denying the State's Rule 60(b) motion on March 31, 2021. That Order provided guidance that the State must continue to implement the CEP, and identified some areas that the Court viewed as requiring additional focus, as well as other areas that the Court found did not "pos[e] a substantial risk of political decision-making (as distinct from best-human-resources practices)." Dkt. 7369 at 29. The Court's subsequent minute entry reinforced that "[f]ocused and sustained effort by the State over the next months, as well as collaboration with the [SMO], on the ongoing implementation of the CEP as discussed in the Opinion should be the cornerstone of a sunset plan." *Id.*

The State tailored its proposed sunset plan benchmarks to respond to the Court's guidance. For instance, the Court had expressed concerns about four specific areas: personal services contracts; seasonal, emergency, and temporary hires; cancelled sequences; and vetting of conflicts. The State committed to supplemental CEP trainings on those four topics. (The State later added training sessions on the additional topics suggested by the Plaintiffs and SMO.) The Court also made clear that it expected the State to demonstrate that agencies internalized

recommendations and improved practices in response to HEM's monitoring and compliance work. The State thus committed to highlighting HEM Advisories during the monthly supplemental CEP trainings, so that each agency could learn from other agencies' Advisories. The State also made all HEM Advisories available to statewide HR staff on its centralized Personnel Workbench. The State likewise included a new requirement in the CEP that any time a HEM Advisory contains a recommendation, the agency must provide a written response detailing how it has implemented changes or plans to implement changes to address the recommendation. The agreed benchmarks (as well as disputed benchmarks) were submitted in a joint status report in June 2021. Dkt. 7481 at 6-7. As described below, the State has devoted significant effort and resources to achieving those benchmarks and has done so.

## II. The State Has Achieved the Benchmarks Identified in the Sunset Plan.

The State has achieved the benchmarks adopted by the Court, Dkt. 7616, and more broadly has demonstrated what the Court has explained would be important to achieving termination: ongoing and serious commitment to implementing the CEP and to continuing to improve its hiring and employment practices. Below, the State describes its efforts regarding each of the eight adopted benchmarks, as well as additional steps the State has taken to demonstrate its commitment to both compliance with federal law and ongoing improvement in its hiring and employment practices.

**Benchmark #1: Amended CEP**. The State worked with the plaintiffs, the SMO, and the OEIG to amend the CEP to address some of the concerns that had been raised about the CEP during the first round of briefing. This process brought the parties closer to alignment, albeit not complete agreement. *See* Dkt. 7616 at 2. Most of the provisions in the CEP remained substantively the same or with minor clarifications. The fundamental roles of OEIG, HEM, and

the Department of Central Management Services ("CMS") Compliance Office remained

unchanged. The State made amendments to: clarify and distinguish the paper hiring process

from the electronic hiring process; strengthen CMS Compliance's role by specifically noting that

it may halt sequences and recommend sanctions for non-compliance; adjust processes for

canceled sequences; clarify interview best practices and expectations regarding individual and

consensus scoring; and include additional reporting and auditing for Personal Services Contracts

("PSCs") and Temporary Assignments ("TAs"), as described further below.[7] The State provided

training on the amended CEP in the June 2021 supplemental session.[8] The amended CEP is

attached as Exhibit 8 to this motion. As described below, the CEP has been the subject of

extensive supplemental training.

      **Benchmark #2: Increased Monthly Training on the CEP**. The State committed to and

has conducted six monthly supplemental CEP trainings for human resources and personnel staff.

The State identified the topics of these trainings by focusing on the areas for improvement

identified in the Court's order denying the State's initial Rule 60(b) motion, plus including the

additional topics identified by Plaintiffs and the SMO. The trainings also each utilized recent

HEM Advisories to allow agencies that were not the subject of the Advisories to nonetheless

learn from them. Training slides were provided to the SMO and HEM in advance of the

trainings, in order to allow feedback and dialogue that would make the training as clear and

effective as possible. Each session has been recorded and posted for State employees so that

they (and future employees) can refer to the trainings as additional guidance or refreshers. The

---

[7] In addition to substantive revisions, the State reformatted the CEP in a way that made it more user-friendly by assigning each paragraph a number (rather than users having to identify sub-paragraphs and sub-sub paragraphs within the lengthy document).

[8] The slides for that session are attached as Exhibit 10; the slides explain the changes described in this paragraph.

supplemental trainings were as follows, and the training slides are attached as Exhibits to this motion.

- **May**: vetting of conflicts (5/26/21, <u>Exhibit 9</u>)
- **June**: CEP amendments (6/30/21, <u>Exhibit 10</u>)
- **July**: canceled sequences (8/4/21, <u>Exhibit 11</u>)
- **August** (conducted September 1): personal services contracts ("PSCs") (9/1/21, <u>Exhibit 12</u>)
- **September**: agency required submissions to CMS Compliance; bypass (9/29/21, <u>Exhibit 13</u>)
- **October**: SuccessFactors; temporary assignments; seasonal, emergency, and intern hiring (10/28/21, <u>Exhibit 14</u>)

The State expects to continue the monthly cadence of CEP training sessions indefinitely, and the focus of the training will continue to be based on issues that are identified in HEM Advisories or through CMS Compliance monitoring. Based on the SMO's recommendation, training scheduled for November 24 will focus on minimum qualifications and screening criteria. Training scheduled for December 22 will focus on best practices for performance evaluations, and will be accompanied by a CMS-issued memorandum regarding those best practices, as the State agreed in the benchmark discussions. *See* Dkt. 7616 at 14. The State has solicited and invited suggestions from the SMO regarding topics it would like to see addressed in future sessions.

**<u>Benchmark #3: Enhanced Agency Interaction with HEM Advisories.</u>** In the prior briefing, Plaintiffs and the SMO expressed concern that HEM Advisories might not be internalized or acted upon when agencies receive them. In the benchmark discussion, the State proposed a six-month period during which agencies would provide responses to all Advisories containing recommendations; Plaintiffs and the SMO urged that that requirement be added to the CEP without the six-month limitation. The State agreed, and the Amended CEP now requires agencies to provide a response to each HEM Advisory that contains recommendations,

11

explaining the agency's plan for remedying deficiencies and addressing recommendations.

Exhibit 8, Am. CEP ¶ 101. The State has provided the agency responses to the Special Master and to the Plaintiffs as they are issued by uploading them to the SharePoint site, and has filed a number of examples pursuant to the Court's prior request. Dkt. 7533. The HEM Advisories and Responses are also attached as Exhibits to this motion, as follows:

| Date/Number | Agency | Response | Exhibits (Advisory/ Response) |
|---|---|---|---|
| 5/27 – 20-0027/ 20-0094 | IDOT | Yes | 15/16 |
| 5/27 – 20-0099 | ILCC | Yes | 17/18 |
| 6/04 – 21-0004 | IEPA | Yes | 19/20 |
| 6/10 – 19-0080 | IDOT | No recommendation | 21 |
| 6/16 – 21-0019 | DCFS | Yes | 22/23 |
| 6/24 – 21-0018 | DHS | No recommendation | 24 |
| 6/24 – 21-0020 | AGR | Yes | 25/26 |
| 6/29 – 21-0027 | DVA | Yes | 27/28 |
| 7/15 – 21-0013 | CMS & DPH | Yes | 29/30 |
| 7/15 – 21-0015 | CMS & DPH | Yes | 31/32 |
| 8/10 – 19-0084 | CMS & DCFS | No recommendation | 33 |
| 8/19 – 20-0077 | DHS | No recommendation | 34 |
| 8/20 – 20-0066 | HFS | Yes | 35/36 |
| 8/30 – 21-0017 | IDVA | Yes | 37/38 |
| 9/16 – 21-0037 | IEPA | Yes | 39/40 |
| 9/23 – 20-0021/ 20-0026 | CMS | No recommendation | 41 |
| 9/23 – 21-0030 | AMPLM | Yes | 42/43 |
| 9/23 – 21-0026 | DHS | No recommendation | 44 |
| 10/13 – 21-0047 | Various | Progress review: Candidate Scoring | 45 |
| 10/14 – 21-0048 | Various | Progress review: Screening | 46 |
| 10/27 – 21-0049 | Various | Progress review: Conflict Relationship Disclosure | 47 |

In light of the prior concern that agencies may not be internalizing and improving based on HEM's Advisories, three recent HEM Advisories merit highlighting. It is not always easy to

tell from an individual Advisory whether a mistake has been repeated by the same people within an agency, whether it was made by separate groups of people in the agency, and whether the mistake occurred before or after receiving another Advisory that relates to the same issue (and thus whether the agency had an opportunity to take remedial or corrective action in the interim) or before or after training on an issue. Three recent Advisories are "Progress Reviews" that assess various aspects of State hiring and specifically analyze an agency's ongoing track record to determine (1) whether agencies are correcting mistakes that they have made, and (2) whether State agencies overall are responsive to HEM and demonstrating improvement. While the Progress Reviews highlight areas where the State can continue to make strides to eliminate mistakes, they also clearly show that the agencies take HEM's work and its recommendations seriously and are improving their processes.

The "Candidate Scoring" progress review explains that "only two Advisories identified scoring issues for all 2021 hiring sequences," Ex. 45 at 3, and that, for earlier issues "[w]here HEM has identified repeated non-compliance at an agency related to candidate scoring, HEM has worked successfully with the agency to eliminate the issue." *Id.* at 2. The report concludes that, based on HEM's analysis and assessment, "individual State agencies do not have widespread candidate scoring issues," and that "agencies are correcting errors based on HEM's Advisories." *Id.* at 20.

The "Screening" progress review likewise explains that "the numbers show improvement," Ex. 46 at 2, and that "[f]or the Advisories to date, individual agencies have demonstrated progress and improvement, and very few if any repeated recommendations." *Id.* at 21. It notes that "HEM's monitoring processes have resulted in corrected screening activity by those agencies." *Id.*

The "Conflict Relationship Disclosure" progress review concludes that "it is apparent that the vast majority of Conflict Form issues were based on initial agency confusion regarding the Conflict of Interest Form process that was first implemented statewide in 2019. After HEM Advisories highlighted these issues of confusion and difficulties with the Conflict Form itself, the State modified the form, provided clearer instructions for completing the form, and increased its training in this area." Ex. 47 at 2. Notably, the Advisory reports that "HEM has not identified any issues relating to any Conflict Form activity since the State's focused training on Conflict Forms in May 2021." *Id.* at 2, 27.

These Progress Reviews demonstrate that the State cannot be complacent: there are still improvements to be made, and there are other areas besides scoring, screening, and conflict relationship disclosure that require ongoing focus. But the Progress Reports also plainly demonstrate that HEM is a thorough, capable, and effective monitor in ensuring that State hiring practices continues to improve, and that the State agencies are not only receptive to HEM's recommendations, but actively working to make improvements.

**Benchmark #4: Robust Information Sharing.** The State has devoted significant effort and resources to providing the SMO with the information it requests. Both the CMS team and the agency staff responding to the SMO's requests have been directed to prioritize those requests, and the SMO has noted that "[t]he agencies are cooperating and providing dates and documents." 8/2/21 Hr'g Tr. at 6. The bi-weekly calls with the CMS team consistently include a review of any outstanding SMO information requests to ensure prompt responses. The State has facilitated robust information sharing through various mechanisms, including: SMO access to all hiring sequences posted through the SuccessFactors hiring platform; a SharePoint site with numerous documents sought by the SMO and Plaintiffs (such as all of the HEM advisories and

the agency responses); frequent email exchanges; facilitating monitoring of 50+ hiring sequences at the eight identified agencies; providing information that the SMO has requested through standing requests; and facilitating in-person visits to CMS and other agency staff in Springfield (most recently, on October 14). The State detailed in recent filings the information it has provided. *See* Dkt. 7615, Dkt. 7453-1, Dkt. 7511-1. This information shows that the State's dialogue with the SMO typically involves multiple emails each day, and when any issues arise with the SMO's requests, the Governor's Office and CMS work to ensure that requested information is provided expeditiously.

**Benchmark #5: Four additional Compliance Officers.** At the time of the Court's ruling on the State's initial Rule 60(b) motion, the CMS Chief Compliance Officer was working extensively with many others at CMS who are involved in State hiring on a day-to-day basis but did not have additional staff in the Compliance Office. At the urging of the SMO, the State committed to posting four additional compliance officer positions. The State posted the Compliance Officer positions in June, and onboarded those four additional staff on September 16. With those four additional compliance officers, the training coordinator, and the Chief Compliance Officer, the CMS Compliance Office has grown to a team of six. The six individuals in the CMS Compliance Office work in concert with numerous others at CMS and all other agencies to ensure that hiring actions follow appropriate processes. CMS expects to continue expanding the number of people working in its Bureau of Personnel. The work of the CMS Compliance Office recently was summarized in the Semi-Annual Report, which is available on the CMS website. That report is attached hereto as Exhibit 50.

**Benchmark #6: Training for Interviewers/Revised Interviewer Instructions.** On August 5, the State shared detailed interviewer training slides with the SMO. The SMO

provided comments and suggestions on August 11. The interviewer training went live on August 20. The 90 training slides are attached hereto as Exhibit 51. In concert with the training, the State incorporated into the "scoring tool" utilized by interviewers an instruction page of "important reminders" for interviewers. The State provided a draft of these instructions to the SMO on July 15, and the SMO provided suggestions on July 19. The content of the final instruction page is attached hereto as Exhibit 52. These instructions emphasize, among other things, submitting relationship disclosures on a timely basis; conducting interviews consistently; and appropriate steps to follow when scoring candidates (*i.e.* appropriate use of "independent" scoring as opposed to "consensus" scoring). All interviewers, including new interviewers who have joined the State workforce, are required to have completed this training before they can sit on an interview panel. More than 4,000 State employees have taken this training to date.

**Benchmarks #7 and #8: Additional CMS Oversight of PSCs and Temporary Assignments ("TAs"), and Documentation of PSCs and TAs.** The State has described how it has worked to bring additional focus on and oversight of PSCs and TAs, and that while it will take time for all aspects of the new PSC and TA processes to become fully engrained at the agencies, there has been significant work in these areas that will continue into the future.

For PSCs, in fall 2020, in light of upcoming training, the Court directed the State to ensure that the "tone and content of the training must promote close attention to adhering to the policy by supervisors." Dkt. 7084. That training was conducted in November 2020. Exhibit 6. The SMO was provided with the training slides in advance, and it complimented the CEP trainings during Court statuses. *See* 12/11/20 Hr'g Tr. at 42 ("we think that overall, the training was informative"). In addition to training for HR and personnel staff, training regarding additional focus on PSCs was given to senior leadership at the agencies. *See* Dkt. 7230

("Personal Service Contracts were part of the CEP training and also presented to agency chiefs of staff."). As PSCs remained a focus after the Court's Rule 60(b) order, the State provided supplemental CEP training on this topic on September 1, again with the SMO's review of and comment on the training slides. Exhibit 12. CMS plans to conduct an additional PSC training for HR and personnel staff in January 2022 in conjunction with next quarter's PSC reporting.

Pursuant to the Amended CEP, PSCs entered into or renewed by an agency now are routed through CMS and many – including any that are entered without a competitive hiring process – are reviewed by the CMS Compliance Office. Notice of "exempt" PSCs is now provided to the SMO and OEIG, using specific documentation. And agencies now submit to CMS quarterly reports providing information regarding the number of PSCs they are utilizing, describing the PSC terms and purpose, and the justification for the PSC. A modified version of the third quarter report recently compiled by CMS Compliance (streamlined to include fewer columns) is attached as Exhibit 53.[9] This report reflects that in the fourth quarter of 2020, there were 736 PSCs in all State agencies. Since agencies have been given more guidance on PSCs, that number has decreased to 651. (If the 99 PSCs from the Department of Public Health (many relating to the pandemic), the 51 PSCs from the Department of Employment Security (same),

---

[9] In its Order, the Court noted its expectation that the State's termination motion would be accompanied by an exhibit that provides the position, name, duration, and reason for any PSC that is 180 days or more, or has been extended beyond 180 days. Dkt. 7616 at 9. The reasons that are provided in the quarterly report reflect the operational reasons for the assignment as described by the agency. There are additional reasons that support the use of all PSCs, including that: the State does not pay for pension, insurance, or other benefits for individuals hired through contracts, and thus saves taxpayer money; a PSC may be the only available mechanism for paying workers who have a part-time, seasonal, or as-needed role or who work in another location; all PSCs are at will and thus can be utilized for projects that are temporary, time-limited, or flexible in terms of hours worked; and, relatedly, there are many instances (such as the pandemic, specific legislative actions, specific federal or other funding sources, or in the context of consent decrees) in which the State has a need for work to be performed, but that work does not support the hiring of a full time employee who will go on to obtain various union or personnel code job protections and thus a degree of permanency that may not be appropriate.

and the 130 PSCs at the Department of Military Affairs are subtracted, the total is just 371 PSCs across 50 agencies – far less than one percent of the State workforce and an average of less than 10 per agency.)  The Amended CEP also requires CMS to perform auditing of longer-lasting PSCs.  Am. CEP ¶ 70.  The CMS Compliance team just produced its first quarterly auditing review, which is attached as Exhibit 54.

Likewise, TAs have been a significant focus at IDOT, *see* Dkt. 7511 at 3-4, and more recently have become a significant focus at other agencies.  With respect to documentation, the State provided to the SMO on July 16 a revised TA template for agencies to use to track TAs and exchange information on TAs with the relevant union(s).  On July 22, the SMO provided comments on the template to the State.  The revised template that has been rolled out to all agencies through CMS Labor is attached to this motion as Exhibit 55.  The Amended CEP also requires CMS to perform quarterly reporting of TAs and auditing of longer-lasting TAs, Am. CEP ¶ 60, and the CMS Compliance team is in the process of finalizing both documents.  They will be shared with relevant agencies, as well as Plaintiffs and the SMO, upon completion.

**Electronic hiring**.  While the benchmarks described above are the eight identified by the parties and the Court, the Court also made clear that it wanted the transition to electronic hiring to remain a priority.  It is.  The State has invested $26 million in its Human Capital Management ("HCM") platform, and desires to leverage the enhanced functionality of that platform as quickly as possible.  The Court explained that this motion "must include a realistic, good-faith estimate of the timeline of obtaining any remaining union approval and of transitions to the SuccessFactors platform."  Dkt. 7616 at 7.[10]  That estimate, as well as a summary of the current

---

[10] The Court likewise asked for a summary of the training on the platform to-date.  *Id.*  The State's vendor, Deloitte, conducted technical training in December 2020 and January 2021.  An SMO staff

state of play, is as follows:

To date, all "merit compensation" (non-Exempt and non-union) positions under the jurisdiction of the Governor proceed through electronic hiring. The State reached agreement with four unions (Teamsters, the Illinois Nurses Association, the Illinois Federation of Teachers, and the Illinois Federation of Public Employees) to convert to electronic hiring, and that conversion was completed in August, such that all positions in those unions now go through the electronic process. The State previously had piloted a position with AFSCME through the electronic process. Yesterday, the State formalized an agreement to significantly expand that pilot to include twenty-one positions, many of which are frequently filled. The State expects the transition of those positions to the electronic platform will occur this month. At that point, the State's rough estimate is that at least a quarter of its roughly 50,000 positions will proceed through electronic hiring. However, that number likely underestimates the proportion of *vacancies* that will proceed through the process because several often-filled positions (those with high turnover, frequent vacancies, or a significant number of total employees) are among those proceeding through electronic hiring.

The State expects to reach agreement with some smaller labor groups (prevailing rate employees, conservation police officers, sergeants, and lieutenants, boiler safety specialists, and meat and poultry inspector supervisors) by the end of November, with the transition to electronic hiring to follow by the end of the year. Barring any issues with the AFSCME pilot, the State is

---

member attended that training and provided comments that were sent to Deloitte regarding the slides. Additional trainings have taken place, but those trainings have focused on technical implementation and do not overlap with the implementation of the CEP and are not necessary for HR and personnel staff and interviewers who are the end-users of the platform. However, relevant aspects of the electronic hiring platform have been covered during CEP trainings, and CMS provided supplemental CEP training on the SuccessFactors platform during its latest monthly training session. *See* Exhibit 14.

committed to work toward reaching agreement to expand electronic hiring to all AFSCME employees during the first quarter of 2022. The State expects to likewise reach agreement with any outstanding smaller bargaining units by the end of the first quarter of 2022. As directed by the Court, the State will make every effort to bargain for a transition schedule that occurs over weeks, not months, and the State does not anticipate obstacles to that timeframe. The State's best estimate is that all non-Exempt positions will proceed through electronic hiring no later than the end of the State's fiscal year (June 30, 2022), but it is optimistic that by focusing significant effort on this work, the transition realistically can occur by April.

**Benchmarks Summary**. As explained above, the State unequivocally has demonstrated the "[f]ocused and sustained effort by the State over the next months, as well as collaboration with the [SMO], on the ongoing implementation of the CEP" that the Court instructed. Dkt. 7394. It likewise plainly has accomplished the benchmarks identified by the Court in its recent Order, Dkt. 7616. As the State has committed above, progress will not stop when the decree is vacated. The CEP will remain in place; monthly supplemental CEP trainings will continue; the State and its agencies will continue to work with and be responsive to HEM; CMS Compliance will continue to perform robust compliance and monitoring work; and additional positions will convert to the electronic hiring process. The significant achievements during the past seven years can be celebrated knowing that there is not risk of backsliding; to the contrary, the State will continue to build on its progress.

### III.    The State Is and Will Remain in Compliance with the Decree and Federal Law.

The State argued in its first motion that ongoing enforcement of the decree was no longer supported by ongoing violations of federal law. *See Horne*, 557 U.S. at 454. Since filing that

motion in July 2020, another 15+ months have passed without any violation of federal law, much less the kind of "systemwide" violations needed to warrant continued supervision, *Lewis v. Casey*, 518 U.S. 343, 359 (1996). That period includes the past several months during which the SMO has investigated particular hiring sequences to determine if any evidence provides a basis to believe that a sequence involves a potential violation of the 1972 decree. *See* Dkt. 7369 at 43. Similarly, while the OEIG is tasked with investigating *Rutan* violations, it also has not identified any during this period, or in the past several years.

The State currently is in compliance with federal law and will "continue that compliance in the absence of continued judicial supervision." *See John B. v. Emkes,* 710 F.3d 394, 412 (6th Cir. 2013); *accord, e.g., Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020); *Jackson v. Los Lunas Community Program*, 880 F.3d 1176, 1202-03 (10th Cir. 2018). The State's compliance with the decree and with federal law requires vacatur. *See Horne*, 557 U.S. at 454 (extending federal consent decree must be justified by "an ongoing violation of federal law").

## CONCLUSION

The State's initial Rule 60(b) briefing described the extensive work that the State has undertaken since the SMO was appointed in 2014. That work continued after the State filed its motion in July 2020, and the State redoubled and focused its efforts on the eight benchmarks after the Court asked the parties to develop a sunset plan. As described above, the State has achieved the goals reflected in those eight benchmarks, and more broadly has demonstrated its commitment not only to compliance with federal law, but to improving its hiring and employment practices on a continuous basis. This Court has made clear that it desired to achieve termination of the decree soon, in keeping with the Seventh Circuit's instruction that "[i]t is time to get these cases off the federal docket," and in light of the "grave federalism concerns" that

"entrenched federal oversight" pose. *Shakman VI*, 994 F.3d at 843. The State's significant efforts over the past seven years, and specifically to achieve critical benchmarks over the last several months, justify restoring control of State hiring and employment processes to the State.

November 2, 2021

Respectfully Submitted,

KWAME RAOUL                              JB Pritzker, in his official capacity
Illinois Attorney General                as the Governor of the State of Illinois

By:     /s/ Christopher Ryan Fletcher
        Christopher Ryan Fletcher
        Office of the Illinois Attorney General
        100 W. Randolph Street, 12th Floor
        Chicago, Illinois 60601
        (312) 814-5131

**CERTIFICATE OF SERVICE**

The undersigned, an attorney of record, hereby certifies that, on November 2, 2021, he caused to be filed through the Court's CM/ECF system a copy of Governor's Memorandum in Support of His Motion to Vacate the May 5, 1972 Consent Decree. Parties of record may obtain a copy of this filing through the Court's CM/ECF system.

/s/ Christopher Ryan Fletcher

Christopher Ryan Fletcher