UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. SHAKMAN, *et al.*, | ) |
| | ) Case No. 69 C 2145 |
| Plaintiffs, | ) |
| | ) Hon. Edmond E. Chang |
| v. | ) District Judge |
| | ) |
| COOK COUNTY ASSESSOR, *et al.*, | ) Hon. Gabriel A. Fuentes |
| | ) Magistrate Judge |
| | ) |
| Defendants. | ) |

**SEVENTH INTERIM REPORT OF THE COMPLIANCE
ADMINISTRATOR FOR THE COOK COUNTY ASSESSOR**

Susan G. Feibus, Compliance Administrator for the Cook County Assessor ("ACA"), by her attorney, Matthew D. Pryor, pursuant to Section III(C) of the September 19, 2012 Agreed Order for the Cook County Assessor's Office ("AO"), Doc. No. 3007, submits the ACA's Seventh Interim Report:

**I.      INTRODUCTION**

The Court's July 6, 2022 order (at §7) set October 12, 2022 as the target date for filing a Motion to Dissolve the Assessor's Consent Decrees[1] and the September 19, 2012 Agreed Order ("Agreed Order"), in accordance with Section III(F) of the Agreed Order. Based on the October 12, 2022 target date, the AO's "preview date" for the motion is September 28, 2022. Also, in connection with the October 12, 2022 target date, the Court ordered the ACA to provide a Seventh Interim Report by September 1, 2022, and a final report by October 26, 2022.

---

[1] The "Assessor's Consent Decrees" refer to the Consent Decrees to which the Assessor entered: (1) in 1972, which, *inter alia*, prohibited the Assessor from taking any employment action against a current employee based on political reasons or factors; and (2) in 1995, which extended the prohibitions of the 1972 Consent Decree to include the Assessor's hiring practices, certain exclusions.

This is the Seventh Interim Report. It follows the ACA's June 6, 2021 First Interim Report; August 16, 2021 Second Interim Report; September 27, 2021 Third Interim Report; November 10, 2021 Fourth Interim Report; December 13, 2021 Supplement to Fourth Interim Report; February 15, 2022 Fifth Interim Report; May 4, 2022 Sixth Interim Report ("Sixth Interim Report"); and July 1, 2022 Status Report Regarding Potential Sunset Timeline.

The Agreed Order's conditions for sunset in Section III(F) include achieving Substantial Compliance,[2] as defined therein,[3] and Certifications of Substantial Compliance by the Assessor, the Deputy of Human Resources and the Director of Compliance. As the Court indicated at the May 10, 2022 status: "[S]ubstantial compliance requires a durable remedy. So that's the goal we are shooting for." 5/10/22 Tr. at 37.

The goal of a durable remedy has not changed since the Seventh Circuit's August 5, 2022 decision in *Shakman v. Governor of Illinois*, USCA No. 21-1739 (7th Cir. Aug. 5, 2022) ("*Shakman VII*"). *See* Op. at 9, 10. Although as the Court pointed out in its opinion in the Governor's case: "'[D]urable remedy'…is not necessarily a self-defining term," *Shakman v. Governor*, No. 69-CV-02145 (N.D. Ill. March 31, 2021) at 8, indicating that a court "may and should consider the totality of defendants' efforts to comply with federal law and defendants' commitment to remaining in compliance with federal law." *Id.* at n. 8 (citation omitted).

---

[2] All capitalized terms have the meaning ascribed to them in the Agreed Order, Employment Plan or Employee Handbook, unless otherwise indicated.

[3] Substantial Compliance under Section III(F)(8) of the Agreed Order requires: (1) The Assessor has implemented the New Employment Plan, including procedures to ensure compliance with the New Employment Plan and identify instances of non-compliance; (2) The Assessor has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence; (3) The Assessor does not have a policy, custom or practice of making employment decisions based on political reasons or factors except for Exempt Positions; (4) The absence of material noncompliance which frustrates the Assessor's Consent Decrees and this Agreed Order's essential purpose. However, technical violations or isolated incidents of noncompliance shall not be a basis for a finding that the Assessor is not in substantial compliance; and (5) The Assessor has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with employment with the Assessor.

This report, like those prior, will focus on areas that are a threat to the Assessor's implementation of a durable remedy because they pose a substantial risk of political decision-making (as opposed to best human resources practices). *See Shakman v. Office of the Governor of Ill.*, No. 1:69-CV-02145 (N.D. Ill. Mar. 31, 2021) at 29. Unlike prior reports, this analysis is in the light of *Shakman VII*.

First, the ACA is unaware of any finding of Unlawful Political Discrimination since Assessor Kaegi took office.

Second, the AO has made considerable progress since the Sixth Interim Report. This includes:

1. Revising the Employment Plan and implementing forms.

2. Completing annual Employment Plan-mandated Employment Plan training.

3. Revising (or nearly so) the Employee Handbook and implementing forms.

4. Completing (or nearly so) annual Employment Plan-mandated Employee Handbook training.

5. Making a good faith effort to comply with the Employment Plan's various hiring processes.

6. Making a good faith effort to administer and enforce Shakman-related policies.

This progress could not have been accomplished without the leadership of the Chief Legal Officer who has served as the Shakman Liaison for approximately the past 14 months. *See* Agreed Order at §I(E) ("The Assessor will designate an executive employee to act as a liaison with the ACA…to ensure they receive cooperation from all Assessor employees."). The Chief Legal Officer was not the first executive employee to serve as the Shakman Liaison in the nearly four years since Assessor Kaegi took office. But she has been by far the most effective. The Chief Legal

Officer's reasonableness, cooperation and collaboration, not to mention patience and good humor, were fundamental to the progress achieved. She has the ACA's appreciation and thanks.

## II. EMPLOYMENT PLAN AND IMPLEMENTING FORMS: REVISIONS COMPLETE

The revisions to the Employment Plan and implementing forms are complete. The Court entered an order approving the most recent amendments on August 26, 2022.

## III. STATUS OF EMPLOYMENT PLAN TRAINING (EMPLOYMENT PLAN-MANDATED)

### A. HR Annual Employment Plan Training: Completed

Section IV(D) of the Employment Plan requires annual comprehensive mandatory Employment Plan training programs for all HR personnel to ensure that they are able to "administer relevant portions of [the] Employment Plan… and are able to answer questions they may receive." The purpose of this training is to go beyond the Employment Plan training that employees and Supervisors must receive under Sections IV(E) and IV(F) and focus on what is required for HR to administer the Employment Plan competently.

As discussed in prior reports, the HR Employment Plan annual training was completed in November 2021.

### B. All-Employee Annual Employment Plan Training: Due

Section IV(F) of the Employment Plan requires annual comprehensive training on the Employment Plan for all employees.

The AO last presented annual Employment Plan training for all employees in or about June 2021, so the 2022 annual training was due in or about June 2022. The ACA monitored and provided feedback/compliance analysis of the June 2021 training.

4

The AO has not completed the 2022 all-Employee Employment Plan training but has indicated that it plans to do so in September 2022.

### C. Supervisor Annual Employment Plan Training: Completed

Section IV(E) of the Employment Plan requires annual comprehensive Employment Plan training for Supervisors. The purpose of this training is to go beyond the Employment Plan training required under Section IV(F) and focus on those sections of the Employment Plan, primarily related to the various hiring processes, that Supervisors must implement.

As indicated in prior reports, the annual Supervisor Employment Plan training was completed in March 2022.

### IV. EMPLOYEE HANDBOOK/SHAKMAN-RELATED POLICIES AND IMPLEMENTING FORMS: REVISIONS NEARLY COMPLETE

#### A. Shakman-related policies except for Time and Attendance

The Shakman-related policies – excluding Time and Attendance – went through multiple iterations since the Sixth Interim Report and were agreed between the parties and the ACA on or about June 27, 2022. As indicated in prior reports, the policy revisions were subject to union review. The AO indicated in July 2022 that the AO and union had come to agreement on these Shakman-related policies revisions.

#### B. Time and Attendance policy

As indicated in prior reports, revisions to the Time and Attendance policy have been on a slower track based on the AO's desire, indicated in January 2022, to revise the policy. The parties and ACA agreed to revisions that the AO provided to the union on August 25, 2022. The AO advised the ACA on August 31, 2022 that the AO and the union had reached agreement on the Time and Attendance policy revisions.

### C. Implementing Employee Handbook Forms – Completed

The parties and ACA came to agreement on the Employee Handbook implementing forms on or about July 28, 2022.

### V. STATUS OF EMPLOYEE HANDBOOK TRAINING (EMPLOYMENT PLAN-MANDATED): NEARLY COMPLETED

#### A. HR Annual Employee Handbook Training: Completed

Section IV(D) of the Employment Plan requires annual comprehensive mandatory Employee Handbook training programs for HR personnel to ensure they are able to "administer relevant portions of… the Employee Handbook, and are able to answer questions they may receive." The purpose of this training is to go beyond the Employee Handbook training that employees and Supervisors must receive under Sections IV(E) and IV(F) and focus on what is required for HR to administer the Employee Handbook competently.

The annual HR Employee Handbook training was completed in June 2022.

#### B. HR Validation and EAS Training: Completed

Section IV(D) of the Employment Plan requires mandatory comprehensive training of HR employees on proper validation and application review protocols, including the use of the AO's electronic application system, before they review application materials and conduct validations.

The Validation and EAS training, required only once for new HR personnel, last was conducted in June 2022.

#### C. All-Employee Annual Employee Handbook Training: Completed

Section IV(F) of the Employment Plan requires annual comprehensive training on the Employee Handbook for all employees. The AO last presented this annual training in or about June 2021 so this training was due in or about June 2022.

The annual Employee Handbook training for all employees was completed in July 2022.

6

### D. Supervisor Annual Employee Handbook Training: Completed

Section IV(E) of the Employment Plan requires annual comprehensive Employee Handbook training for supervisors. The purpose of this training is to go beyond the Employee Handbook training required under Section IV(F) and focus on those sections of the policies in the Employee Handbook that supervisors must implement. The AO last conducted this annual training in December 2020 so this training was due in December 2021. The parties and ACA agreed to continue the training until the Employee Handbook and implementing forms were revised.

The annual Supervisor Employee Handbook training was completed in August 2022.

### E. Time and Attendance Policy Training: Not Completed

As indicated in the July 6, 2022 order (at §5), training on the Time and Attendance policy was decoupled from the Employee Handbook training as a result of the delay in revising the Time and Attendance policy described above and in the Sixth Interim Report.

The AO provided proposed training decks for the Time and Attendance policy to the ACA for review on August 26, 2022. The ACA expects to provide comments by or before September 9, 2022.

Two AO training decks are directed to all employees and one training deck is directed to supervisors. There is no deck for HR as the HR personnel responsible for administering the Time and Attendance policy created the training decks and will present the training. HR personnel will be required to take the employee and supervisor trainings.

The ACA expects the AO will provide an anticipated timeframe for completing the Time and Attendance policy training at the September 6, 2022 court status.

## VI.  REPORT ON EXEMPT LIST/EXEMPT HIRING

### A.  Exempt List

Exhibit C to the August 26, 2022 Employment Plan is a revised Exempt List.  Currently, the AO has 37 Exempt positions with the following four positions added: (1) Chief Management Officer (Chief Management Officer); Director of Special Projects – Commercial (Valuations); Chief of Staff – Valuations (Valuations); and Director of Data Science (Data).

### B.  Exempt Hiring

The AO filled three positions through the Exempt hiring process since the Sixth Interim Report: (1) Director of Special Projects (Executive) – July 5, 2022 date of hire; (2) Director of Special Properties (Valuations) – August 29, 2022 date of hire; and (3) Director of Data Science (Data) – August 29, 2022 date of hire. The AO identified an internal candidate for a fourth position - the new Chief of Staff (Valuations) – who has been approved and is expected to assume that role on or about September 12, 2022.

The Exempt Positions were filled in accordance with the Employment Plan.

Five Exempt positions are vacant: (1) Executive Assistant (Assessor) - vacant since March 1, 2021; (2) Special Assistant/Projects Lead (Executive) - vacant since June 11, 2021; (3) Director of Operations and Budget (Administrative Operations) – vacant since July 5, 2022; (4) Deputy Assessor/Chief Administrative Officer (Administrative Operations) – vacant since July 8, 2022; and (5) Senior Data Scientist (Data) – vacant since August 29, 2022.

**VII.** **REPORT ON NON-EXEMPT HIRING**

**A. Hiring Under the General Hiring Process**

1. Completed hiring

The AO completed four hiring sequences under the General Hiring process since the Sixth Interim Report: (1) Manager of Legal Services (Legal); (2) Manager of FOIA (Legal); (3) TPI Specialist (TPI); and (4) Industrial Commercial ("IC") Junior Analyst (Valuations).

As indicated below, the time required to fill these positions ranged from three months to over five months (with no delay attributable to the ACA):

| POSITION/ DEPARTMENT | DATE OF RTH | CURRENT STATUS | DATE OF OFFER | DAYS FROM RTH TO COMPLETION |
|---|---|---|---|---|
| TPI Specialist/TPI | 2/10/22 | Complete | 7/19/22 | 160 days |
| Mgr. of Legal Services/Legal | 2/23/22 | Complete | 6/30/22 | 128 days |
| IC Jr. Analyst/ Valuations | 4/18/22 | Complete | 8/19/22 | 124 days |
| Manager of FOI/ Legal | 4/27/22 | Complete | 7/25/22 | 90 days |

2. Hiring in progress

The AO has initiated two General Hiring sequences since the Sixth Interim Report via a fully executed Request to Hire ("RTH"), *see* Section VII(D) of the Employment Plan: (1) Incentive Senior Analyst (Valuations); and (2) Junior Data Scientist (Data). As indicated below, the Incentive Senior Analyst hiring sequence has lasted over four months so far (with no delay attributable to the ACA). The Junior Data Scientist has not been posted:

9

| POSITION/ DEPARTMENT | DATE OF RTH | CURRENT STATUS | DATE OF OFFER | DAYS FROM RTH TO PRESENT |
|---|---|---|---|---|
| Incentive Senior Analyst/Legal | 4/26/22 | Ranking Meeting (7/28/22) | N/A | 129 days |
| Junior Data Scientist/Data | 8/18/22 | Not Posted | N/A | 13 days |

Also, one of the Senior HR Generalists resigned, as of July 15, 2022. The AO has indicated that it intends to post that position soon.

B. **Hiring Under the Actively Recruited Hiring Process**

The AO did not complete any hiring sequences under the Actively Recruited Hiring process since the Sixth Interim Report. The Manager of Commercial Valuations hiring sequence has been ongoing for over four months. The RTH was signed on April 14, 2022, and the Taleo posting expired on June 2, 2022. The Application Review Panel met on August 24, 2022 and interviews should be forthcoming.

********

In the main, the hiring sequences under the General Hiring and Actively Recruited hiring processes since the Sixth Interim Report materially complied with the Employment Plan. When (material and non-material) compliance issues arose and the ACA provided feedback, the AO did its best to redress the violations.

By way of example, there was a material Employment Plan violation related to the IC Junior Analyst hiring sequence. Under the terms of the Employment Plan, three internal candidates (current AO employees) found minimally qualified were entitled to be interviewed for this union position. When the interviewees were identified, following skills testing for a Preferred

10

Qualification, the three internal candidates were not included based on their (high) randomization numbers. The IC Junior Analyst position was offered to, and accepted by, a candidate who did not work for the AO.

When the ACA advised the AO of this violation on August 23, 2022, the AO addressed it by interviewing the three internal candidates and reassembling the Interview Panel to consider whether any of the three internal candidates should be ranked. The AO has indicated that any ranked internal candidate will be considered should additional vacancies arise.

These efforts indicate that the AO is making a good faith effort to follow the Employment Plan in the various hiring processes. As the Court has indicated, Substantial Compliance does not require perfection and this good faith effort presumably should be sufficient to support such a finding.

## VIII. REPORT ON ASSESSOR'S IMPLEMENATION OF SHAKMAN-RELATED POLICIES

### A. Performance Evaluations

#### 1. Annual performance evaluations

As indicated in the Sixth Interim Report, the AO conducted its second annual performance evaluation cycle of 170 non-Exempt employees between December 1, 2021 and February 4, 2022. The ACA monitored approximately half and gave the AO a detailed compliance analysis on June 2, 2022. As indicated in the Sixth Interim Report, the ACA identified recurring compliance deficiencies. By the same token, this 2021 annual cycle was improved from the 2020 (first annual) cycle.

The AO developed an automated tool for the 2021 annual performance evaluations. The ACA's June 2, 2022 compliance analysis identified compliance issues with the automated tool. The AO, ACA and Compliance Analyst "de-briefed" on July 13, 2022 regarding changes to the

automated tool for the Performance Evaluation policy compliance. Discussions about and adjustments to the automated tool have been ongoing between the AO, ACA and DOC as the AO readies for the 2022 performance evaluation cycle.

As part of the preparation for the 2022 performance evaluation cycle, the AO has indicated that it will provide supervisors a "cheat sheet" regarding supervisory Performance Evaluation policy requirements. Also, the Manager of Application Development has prepared an instructional video for supervisors regarding use of the automated tool.

2. <u>90-day and 180-day performance evaluations</u>

The ACA monitored 20 90-day and 180-day performance evaluations between December 1, 2021 and July 31, 2022. The ACA gave the AO three detailed compliance analyses of these 90-day and 180-day performance evaluations since the Sixth Interim Report:

- <u>June 2, 2022</u> - AO/HR compliance deficiencies from December 1, 2021 to February 4, 2022

- <u>June 14, 2022</u> - AO/HR compliance deficiencies from February 5, 2022 to June 1, 2022

- <u>August 4, 2022</u> - AO/HR compliance deficiencies from June 2, 2022 and July 31, 2022

The most significant compliance deficiency was the AO's failure to conduct ten 90-day or 180-day performance evaluations on a timely basis during the ACA's review period. This compliance deficiency was identified in prior reports.

**B. Discipline**

- <u>Disciplinary actions pending</u> - As of July 31, 2022, five AO/HR disciplinary actions were pending.

- <u>Disciplinary actions concluded</u> - Between April 22, 2022 and July 31, 2022, seven AO/HR disciplinary actions were concluded.

The ACA provided the AO with two detailed analyses of Discipline policy compliance deficiencies since the Sixth Interim Report:

- <u>June 22, 2022</u> - AO/HR compliance deficiencies from April 23, 2022 to June 1, 2022.

- <u>August 10, 2022</u> - AO/HR compliance deficiencies from June 2, 2022 to July 31, 2022.

While the ACA's feedback/analyses were extensive, this report is limited to significant, recurring Discipline policy violations with the potential to affect the transparency and consistent enforcement (all of which have been raised in prior ACA analyses):

1. <u>HR failed to issue Discipline in a timely fashion (§1)</u>

    - The seven disciplinary actions that were concluded between April 23, 2022 and July 31, 2022 took at least six months to complete. Two took seven months to complete and one took nine months to complete.

    - Of the five disciplinary actions pending as of July 31, 2022, one was pending for three months; one was pending over six months; one was pending for seven months; and one was pending for ten months.

2. <u>Request for Disciplinary Action Form ("RDAF") failed to identify the rule or policy allegedly violated (§4(A)(2)) (five RDAFs)</u>

3. <u>HR's written summary erroneously concluded discipline should be imposed ((§4C)) (one employee)</u>

4. <u>HR investigated after determining that an investigation was unnecessary and imposed discipline without basis (§4(A)(3)) (one employee)</u>

**C. Time and Attendance**

The AO/HR's failure to enforce its Time and Attendance policy has been discussed in prior reports. This failure has continued since the Sixth Interim Report.

In July 2022, HR took a retrospective look at Time and Attendance policy compliance from April 2022 to June 2022. The ACA did a similar review for May 2022 to July 2022. The ACA's

13

analysis, provided to the AO/HR on August 25, 2022, indicated that HR failed to identify many of the Time and Attendance policy violations that the ACA identified.

While the ACA's August 25, 2022 analysis was more detailed, the Time and Attendance policy violations that HR failed to identify included seven instances where the employee arrived late - without any employee or supervisory explanations in the timekeeping system – in violation of Section 2.6 of the Discipline policy. Two of these late arrivals were over one hour and one was over two hours.

On the plus side, the AO has indicated that HR professionals will take a more active role in Time and Attendance policy administration and enforcement and no longer leave it solely to the Payroll Manager, as has been described in prior reports.

### D. Telecommuting

Telecommuting has become an integral part of how the AO conducts its business. Most AO employees work in the office part of the week and work remotely part of the week. The Shakman concern has been to ensure that employees in the same position be treated the same, absent a stated explanation (such as a medical issue), to guard against better or worse employee telecommuting schedules based on politics.

Consistent with that Shakman concern, the ACA reviewed the AO's various telecommuting schedules by department, since the Sixth Interim Report (and prior, beginning most recently in February 2022) and provided multiple Telecommuting policy compliance analyses (the latest on August 26, 2022). The thrust of the ACA's analyses has been (and continues to be): (1) lack of clarity regarding what constitutes a "hybrid" schedule (part-time in the office and part-time remote) by department (as the schedules indicate they are not the same); and (2) failure to

document/explain instances where employees in the same position do not have the same telecommuting schedule.

### E. Other Shakman-related Policies

- Temporary Assignment policy – The ACA has no basis to comment as the AO did not engage in Temporary Assignments since the Sixth Interim Report.

- Layoff/Recall policy - The ACA has no basis to comment as the AO did not engage in Layoffs or Recalls since the Sixth Interim Report.

- PIP policy - The AO decided to eliminate the PIP policy since the Sixth Interim Report so the ACA will not comment on PIP policy enforcement.

- Overtime policy - Overtime since the Sixth Interim Report was materially policy compliant.

- Interim Assignment policy - Interim Assignments since the Sixth Interim Report were materially policy compliant.

- Reclassification policy – Reclassifications since the Sixth Interim Report were materially policy compliant.

- Training policy - Compliance has improved with the addition of the Director of Learning and Development and Training has been materially policy compliant.

********

The AO/HR's administration and enforcement of Shakman-related policies have improved over time. This improvement indicates that the AO is making a good faith effort to do so. As the Court has indicated, Substantial Compliance does not require perfection and this good faith effort presumably should be sufficient to support such a finding.

## IX. REPORT ON HUMAN RESOURCES

The requisite procedures required to achieve Substantial Compliance cannot be implemented without a "HR staff of experienced and knowledgeable professionals" who are "responsible for fulfilling the Assessor's Office obligations under [the] Employment Plan and

Employee Handbook." Employment Plan at Section III(I). As the Court has made clear, an effective HR function is key to a durable remedy. *See, e.g.*, 8/18/21 Tr. at 19.

1. Human Resources Staffing

Current HR personnel are the Deputy Assessor of HR; Director of HR; three Senior HR Generalists; Payroll Manager; and, since a recent AO reorganization, the Director of Learning and Development. As indicated above, one Senior HR Generalist position is vacant (as of July 15, 2022) that apparently will be posted soon.

2. Human Resources – Assessment

The ACA has had little contact with the Deputy Assessor of HR since the Sixth Interim Report since, as indicated above, the ACA has been working with the Chief Legal Officer/Shakman Liaison to move this matter forward. The Director of HR has shown excellent employee relations skills and demonstrated that she is an effective trainer. The three Senior Human Resources Generalists seem to have become more facile with the Employment Plan and Employee Handbook and their administration and enforcement has become more effective.

The Director of Learning and Development appears to be a welcome addition to the AO. Although on the job only five months (as of March 28, 2022), the Director of Learning and Development has demonstrated that she is an effective trainer and, as indicated above, brought the AO into material compliance with the Training policy.

## X. REPORT ON DIRECTOR OF COMPLIANCE

Substantial Compliance cannot be implemented without an effective DOC who "functions as the Employment Plan compliance officer for the Assessor's Office by assuming responsibilities relating to monitoring, investigating, and auditing Employment Actions to ensure compliance with

16

the Employment Plan and [Shakman-related] policies in the Employee Handbook." Employment Plan at Section V(A).

The DOC began her employment on August 23, 2021 and has been on the job for one year. She appears to be identifying more issues in real time, although the ACA continues to identify material compliance issues that the DOC does not.

As indicated in prior reports, while the DOC provides weekly reports regarding her activities and those of the Compliance Analyst, these reports rarely describe compliance issues that have been identified, actions recommended to the AO/HR to correct them and whether those actions were taken. At the May 10, 2022 status, the DOC indicted that she gave feedback in real time that is not reflected in her weekly reports. *See* 5/10/22 Tr. at 36. The DOC's semi-annual report that is due on September 15, 2022, per Section V(B) of the Employment Plan, may provide additional insight into her recommendations for corrective measures and their acceptance (or not) by the AO.

## VIII. REPORT ON SUNSET TIMELINE

The Court's July 6, 2022 order (at §7) set forth these target dates to sunset:

- September 28, 2022 - AO's "preview date" of Motion to Dissolve to Plaintiffs and ACA
- October 12, 2022 - Motion to Dissolve
- October 26, 2022 – ACA's final report to the Court

Based on the AO's progress since the Sixth Interim Report, the ACA would expect this schedule to hold, followed by a hearing on the Motion to Dissolve at the Court's convenience.

Dated: September 1, 2022

17

Respectfully submitted,

Susan G. Feibus
Assessor Compliance Administrator
411 West Ontario St. #308
Chicago, IL 60654
(312) 343-0221
susan@feibuslaw.com

By her attorney:

/s/ Matthew D. Pryor
Matthew D. Pryor
69 West Washington St., Suite 830
Chicago, IL 60602
(312) 603-8911
mpryor@shakmancompliance.com

## CERTIFICATE OF ELECTRONIC FILING

I, Matthew D. Pryor, the undersigned, do hereby certify that on September 1, 2022, I electronically filed a true and correct copy of the foregoing **Seventh Interim Report of the Assessor Compliance Administrator for the Cook County Assessor** using the CM/ECF system, which sends notification of such filing to all registered users.

/s/ Matthew D. Pryor
Counsel to the ACA